## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF IOWA
## CEDAR RAPIDS DIVISION

| | |
|---|---|
| CATHY SELLARS, CLAUDIA LOPEZ, and LESLIE FORTUNE, On behalf of themselves and all others similarly situated, )<br><br>Plaintiffs, )<br><br>v. )<br><br>CRST EXPEDITED, INC., )<br><br>Defendant. ) | **COMPLAINT**<br><br>Case No. \_\_\_15cv117-LRR\_\_\_<br><br>**Jury Trial Demanded** |

Plaintiffs Cathy Sellars, Claudia Lopez, and Leslie Fortune, on behalf of themselves and all others similarly situated, allege, upon personal knowledge as to themselves and upon information and belief as to other matters, violations of Title VII of the Civil Rights Act and the California Fair Employment and Housing Act as follows:

## I. JURISDICTION AND VENUE

1.      This Court has subject matter jurisdiction over Plaintiffs' claims pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. Sec. 2000e-5(f), pursuant to 28 U.S.C. Sec. 1331 and 1343(a)(4), and pursuant to the California Fair Employment and Housing Act, Government Code Sec. 12940, *et seq*.

2.      Venue is proper pursuant to 42 U.S.C. Sec. 2000e-5(f)(3) because the unlawful practices alleged herein were committed in part within this judicial district, and because

1

Plaintiffs would have worked in this judicial district but for the alleged unlawful employment practices.

## II.  NATURE OF THIS ACTION

3.     Plaintiffs Cathy Sellars, Claudia Lopez, and Leslie Fortune (hereinafter, "Class Representatives") file this Complaint as a class action against CRST Expedited, Inc. ("CRST"), a long-haul transportation company and wholly owned subsidiary of CRST International.  Female truck drivers at CRST are subjected to discrimination on the basis of their sex, including a hostile work environment on the basis of sex, and retaliation as a result of protected activity, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e et seq., and the California Fair Employment and Housing Act, Government Code Sec. 12940, *et seq*.

4.     The Class Representatives seek to represent a class comprised of presently and formerly employed female over-the-road truck drivers for CRST who have been subjected to one or more aspects of the systemic gender discrimination described in this Complaint, including but not limited to:

  a) Hostile work environment harassment based on sex; and

  b) Retaliation for complaining about harassment in the workplace.

The systemic gender discrimination described in this Complaint has been, and is, continuing in nature.

5.     The Class Representatives seek to represent a sub-class comprised of presently

and formerly employed female over-the-road truck drivers for CRST who worked in California and have been subjected to one or more aspects of the systemic gender discrimination described in this Complaint, including but not limited to:

a)      Hostile work environment harassment based on sex; and

b)      Retaliation for complaining about harassment in the workplace.

6.      The Class Representatives are seeking, on behalf of themselves and the class they seek to represent, declaratory and injunctive relief; back pay; front pay; compensatory and punitive damages; and attorneys' fees, costs and expenses to redress CRST's pervasive, discriminatory employment policies, practices and/or procedures.

### III.  PARTIES

**A.      Plaintiffs**

7.      Cathy Sellars is a woman and a resident of Fort Walton Beach, Florida.  She was employed by CRST from December 2013 to  January 2015 as a truck driver.  She attended training classes in Riverside, California

8.      Claudia Lopez is a woman and a resident of Lakeland, Florida.  She was employed by CRST from May 2014 to January 2015 as a truck driver.  She attended training classes in Waterloo, Iowa.

9.      Leslie Fortune is a woman and a resident of St. Louis, Missouri.  She was employed by CRST from October 2013 to January 2015 as a truck driver.  She attended training classes in Cedar Rapids, Iowa.

**B.** **Defendant**

10.     CRST Expedited, Inc. is a long-haul trucking company headquartered in Cedar Rapids, Iowa, with driver terminals in Riverside, California; Oklahoma City, Oklahoma; and Carlisle, Pennsylvania.  It is a subsidiary of CRST International.

11.     Defendant is an employer for the purposes of Title VII and the California Fair Employment and Housing Act.

## IV.    PROCEDURAL HISTORY

12.     Class representative Cathy Sellars filed a Charge of Discrimination against CRST with the Equal Employment Opportunity Commission ("EEOC") on August 8, 2014, and filed an Amended Charge on November 28, 2014, both on behalf of herself and a class of similarly situated persons.  The charges were dual-filed with the California Department of Fair Employment and Housing ("DFEH").  Class Representative Claudia Lopez timely filed a Charge of Discrimination with the EEOC and DFEH on behalf of herself and a class of similarly situated persons.  Class Representative Leslie Fortune timely filed a Charge of Discrimination with the EEOC and DFEH on behalf of herself and a class of similarly situated persons.

13.     Class Representatives Sellars, Fortune and Lopez received Notices of Right to Sue from the EEOC.  They timely filed this lawsuit.

14.     Class Representatives Sellars, Fortune and Lopez received Notices of Right to Sue from the DFEH.  They timely filed this lawsuit.

# V.  CLASS CLAIMS

## A.  CRST's Organizational Structure and Driver Training Program

15.     CRST Expedited, Inc. ("CRST") is a long-haul transportation company that employs over-the-road truck drivers, who transport and deliver loads around the country in teams of two.

16.     CRST is headquartered in Cedar Rapids, Iowa, and its President is Cameron Holzer.

17.     One Human Resources office, located in Cedar Rapids, serves all CRST drivers. Its head is Karen Carlson, Human Resources manager.

18.     All CRST drivers are subject to the same set of Human Resources policies.

19.     All CRST truck drivers receive their instructions from dispatchers, also known as fleet managers, all located in a single office in Cedar Rapids.

20.     CRST terminals are located in Riverside, California; Oklahoma City, Oklahoma; Carlisle, Pennsylvania; and Cedar Rapids, Iowa.  Each terminal has a manager. The Carlisle and Oklahoma City terminals are more like garages or warehouses. Unlike Riverside and Cedar Rapids, they do not have offices and living accommodations for trainers, drivers and trainees.

21.     Drivers begin and end their trips (or "runs") at the four terminals, and spend time at the terminals while they are waiting to be paired with new co-drivers.  All drivers may stop at any and all of the four terminals depending on what route they have been

5

assigned to drive at that particular time.

22.    Drivers may live at the terminals for limited periods from time to time.  For example, the terminal in Riverside, California has dorms, a cafeteria, and facilities for driver training classes.

23.    New truck drivers enter CRST's training program.  Drivers first attend approximately two weeks of classes, held either at one of the driver terminals, or at an affiliated community college site.

24.    After completing the classes, trainees are paired with a truck driver trainer, also referred to as a "lead driver," and go out on the road, where CRST published rules require 28 days of driving instruction.

25.    Eligibility requirements to work as a trainer, published in CRST's Employee Handbook, do not include the requirement that the trainer has not engaged in harassment in the past.

26.    During training, the trainer's dispatcher also serves as the dispatcher for the trainer's trainee.

27.    The trainer provides instruction, and documents the trainee's driving skills in such tasks as shifting, backing, parallel parking, and other maneuvers.  The trainer produces this documentation to CRST at the conclusion of the over-the-road training period.  The trainer's recommendation and documentation are the basis of CRST's decision whether the trainee passes the training.

28.     Trainees earn significantly less pay than drivers who have completed their training.

29.     Trainees are required to enter into an eight month contract to drive upon completion of training.  The cost of training, several thousand dollars, is forgiven by CRST only if the trainee fulfills her eight month contract.  When she is sexually assaulted during training, or during her time as a co-driver prior to the completion of the eight months, her choice is to remain at CRST and endure the sexual abuse; report it, continue to endure it due to CRST's indifference to complaints, and suffer retaliation; or quit, owe CRST thousands of dollars, and potentially be sued for payment.  When women sue CRST due to sexual harassment, CRST is known to counterclaim to recover the cost of training.

30.     Truck drivers make all runs in pairs.  Each driver has a 12 hour shift "on" followed by 12 hours "off," while their partner drives, so that the vehicle is stopped for significantly less time than it would be with only a single driver.

31.     During their "off" time in transit, drivers sleep in the truck.  Each truck has a sleeper berth containing bunk beds.  For safety reasons, drivers are only permitted to sleep on the bottom bunk while the truck is in motion.  When the truck is stopped for a more extended period, such as while waiting for the truck's next load to be ready for shipment, the drivers may sleep simultaneously and use both bunks.

32.     Drivers work for three weeks, and then are off for a fourth week.

33. Drivers are paid per mile driven. During times they are not driving, drivers are not paid.

34. CRST maintains a list of available co-drivers, with names and contact information, at all times. When a driver does not currently have a partner, he or she can access this list and contact potential co-drivers. The two then generally meet at a terminal before agreeing to drive together. Drivers therefore generally work with multiple partners, and can re-encounter each other within the single pool of available co-drivers.

35. A driver may choose to wait at the terminal for a particular co-driver to become available, however during the waiting time he or she will earn nothing.

36. Each driver is assigned to a particular dispatcher.

37. All trucks are equipped with the Qualcomm communication system. Qualcomm is a small computerized device, similar in appearance to a laptop, which drivers use to communicate with dispatchers. Drivers sign in and out on the Qualcomm system when they make stops, similar to a timeclock. They can type messages, analogous to a text message or email, and transmit them to dispatch.

38. The Qualcomm system has a nightly outage, known to all drivers, from approximately 9-11pm. If drivers send messages via Qualcomm during the down time, dispatch will not receive them until the system is back up.

**B.** **CRST Has Maintained a Pattern or Practice of Discrimination**

**41.** CRST's standard operating procedure is sex discrimination. Sexual assaults and harassment have continued, and become more physical, because despite its knowledge of the harassment, CRST has done nothing that could be reasonably expected to stop it. As a consequence, it has gotten worse through the Named Plaintiffs' employment and up to the present.

**42.** For example, during driver Cinda Cianelli's employment with CRST from June 2013 to April 2014, she was subjected to sexual harassment by supervisors and co-drivers. By way of example and not limitation, a co-driver repeatedly tried to convince her to have sex with him, and when she refused, he spread rumors throughout Riverside Terminal that she was filing a sexual harassment lawsuit against him.

**43.** Ms. Cianelli was forced to carry knives to protect herself during her employment at CRST.

**44.** Driver Veronica Saur, who began working at CRST in January 2014, was subjected to repeated sexually offensive statements by her coworker, who also physically touched her with his feet.

**45.** When Ms. Saur complained to Riverside Terminal Manager Alvin Hoggard, Hoggard told her there was no evidence her co-driver had done anything; in essence, discounting her own complaint as evidence of what had occurred. He refused to listen to recordings she had made of her co-driver.

**46.** Ms. Saur was also forced to carry a knife in order to protect herself while working

at CRST.

**C.     Continuation of the Pattern or Practice of Sexual Assaults on Women**

72.     CRST's policy of creating a hostile work environment begins in its training facilities.  Male CRST drivers make offensive sexual comments and/or engage in sexually offensive behavior towards class members in the Terminals on a daily basis.

73.     In the Terminals, male drivers regularly proposition female drivers for sex, comment on their bodies, and discuss the appearance of women in the Terminal and what they did sexually with women.

74.     Trainers and Dispatchers regularly witness the Terminal Managers engaging in offensive sexual conduct—which violates CRST Rules—towards women drivers.

75.     By way of example, and not limitation, current Riverside, California Terminal Manager Alvin Hoggard (formerly Terminal Manager when the same terminal was instead located in Fontana, California) sexually harassed trainee Kathy VonHatten. Hoggard repeatedly sent her sexual text messages; told her he would "go back on the road" for her; and sexually assaulted her when she walked into his darkened office, running his hands over her and forcibly kissing her.

76.     As another example, Hoggard subjected driver Cinda Cianelli to sexually offensive behavior including, but not limited to, the following: repeatedly requesting that she have sex with him; making sexually offensive statements, such as telling her in reference to Cianelli's male friend: "my penis is as big as his;" and showing her an

10

image of his genitals. Safety officer Brian Hairston made senior management aware of the fact that Hoggard had shown Cianelli this image. Following these events, Hoggard remained in his role as Terminal Manager.

77.    When CRST supervisors who work in the Terminals, including Terminal Managers, engage in sexual harassment, it gives license to subordinate supervisors, on down to Trainers, to do the same.

78.    When  Terminal Managers, Dispatchers, the Head of Human Resources— essentially everyone at CRST with the responsibility and ability to stop sexual assault and sexual harassment—have actual knowledge of the illegal conduct, because they are present and able to hear the comments, which are openly made in common areas, or because it is repeated, reliably reported, over a period of decades, it is a reasonable inference that CRST intentionally chooses not to address the illegality, and therefore intentionally seeks the result of its indifference.

79.    While on the road, class members have to fend off or worry about rape by their trainer, while enduring express threats of being failed, while being objectified and told to perform sex acts.

80.    Driver Service Manager Ben Lafayette was aware of multiple male trainers who tried to be paired with female students, to get the opportunity to try to have sex with the students.  By way of example but not limitation, Lafayette spoke with the Terminal Manager of Cedar Rapids Terminal about a trainer who was trying to have sex with a

female trainee. The Terminal Manager told Lafayette it was not the first time the trainer had done so. Lafayette told the Terminal Manager that he should stop the trainer from doing it. The Terminal Manager replied "we talked to him, but it's not serious."

81.    Male CRST drivers and trainers regularly physically touch class members on intimate body parts, intentionally expose themselves, repeatedly attempt to get into their sleeping bunk with them, masturbate in front of them or in the same cab, show them pornography, engage in other sexually offensive conduct, including making other sexually offensive statements.

82.    When female drivers refuse to have sex with them, male drivers retaliate, including but not limited to by kidnapping them, kicking them off shared trucks, making false reports of  misconduct, threatening them with weapons, beating them or threatening beatings, spreading rumors they are prostitutes, preventing them from contacting CRST for assistance, and refusing to assist them with work-related tasks.

83.    Plaintiffs and other class members have frequently complained to their fleet managers, Human Resources, Safety, and upper management about this sexually offensive conduct and speech, both verbally and in writing.

84.    Safety officer Brian Hairston gave a safety class for trainees. He received complaints from Plaintiff Leslie Fortune on three occasions.  On each occasion he directed her to write a statement, and personally gave it to Alvin Hoggard, Riverside Terminal Manager. In addition, the written complaints were scanned and sent to Human

Resources. In response to these complaints, Hoggard told Hairston not to speak to Ms. Fortune anymore, and told him that she was "crazy" and "does not have what it takes." Hairston responded that "She has done good in class, so she seems reasonable." Hoggard responded that "you need that log, you may have to give a deposition on her."

85.    Hairston received written complaints of sexual harassment from other drivers and always scanned them, sent them to Human Resources, and made sure that the originals went to "Document Control."

86.    By way of further example, Ben Lafayette, Driver Service Manager, received complaints from female drivers who had been harassed, and received reports by male drivers that they had witnessed women being harassed by drivers or trainers.

87.    Lafayette observed that managers tried to avoid addressing complaints of sexual harassment, and he had to work to try to convince managers that such complaints were serious and needed to be addressed.  Driver managers would often state that the complaining female driver was the problem.

88.    By way of example but not limitation, a scared female driver called Lafayette from a truck that she wanted to get off of immediately.  Her male co-driver had touched her without her consent while she was sleeping.  He was sitting beside her during the call so that she could not talk freely.  Management asked the female driver to stay on the truck longer, even though Lafayette recommended against it.  When he followed up with the female driver, she was still on the truck.

89.    By way of example but not limitation, Hairston received calls from Cinda Cianelli, Veronica Saur, Lindsey Raphael and McKinsey [LNU], complaining of sexual assault and/or sexual harassment. Hairston had been the safety trainer. McKinsey and Saur knew him from interaction at the Riverside terminal.

90.    McKinsey called Hairston surreptitiously during a period when she was being assaulted. Hairston told her to call the police. He personally tried to contact the CRST 800 number but it was not answered. He had been given no other resource by CRST. He called everyone he thought could help from a staff list, but many people no longer worked there due to high turnover. He finally reached Bill Sin on his personal home phone, and told him that McKinsey was being accosted at Cedar Rapids. Human Resources did not terminate the attacker.

91.    Veronica Saur called Hairston from northern California and reported that she had been assaulted. He told her to call the police. Dispatch would not authorize a car rental or hotel, initially, to move her from where she got off the truck, to safety.

92.    Plaintiffs and other class members have been forced to carry, sleep with and use weapons such as tasers, knives, and screwdrivers for personal protection from their male co-drivers, due to CRST's intentional failure to protect them from sexual assault.

**D.    CRST's "No Females" Policy and Ineffective Anti-Discrimination Efforts**

93.    CRST has a pattern or practice of ignoring and/or failing to act promptly to investigate harassment complaints, conducting inadequate investigations, which are

biased against finding any violation, failing to make any finding as to whether harassment has occurred and removing complaining female drivers or trainees from its trucks, but allowing male drivers against whom harassment complaints have been made to continue driving, earning money, and working with additional co-drivers, unaffected by the complaint, while any alleged investigation takes place

94.    CRST has a pattern or practice of returning men who have engaged in harassment to the trucks, with the foreseeable consequence that they sexually assault and/or harass additional women.

95.    When there is a finding of discrimination following a harassment complaint, CRST fails to implement any effective disciplinary or other deterrent or corrective measures.

96.    When there is a finding of discrimination following a harassment complaint, CRST has a policy of designating a male driver as "no females" for a period of six months. This means the driver cannot drive with female co-drivers for six months, after which he can again work with any co-driver in the pool. The "no females" designation can be appealed. Female drivers are not told which male co-drivers have been designated "no females."

97.    CRST's "no females" policy is not disciplinary. It does not affect male drivers' pay, their prospects for promotion, or continued employment.

98.    It is common knowledge among CRST trainers, drivers, and the trucking industry,

that CRST is often said to stand for "Constantly Raping Student Truckers."

99.     CRST's "no females" policy encourages male drivers' widely held belief that having a female co-driver or trainee entitles them to ask for sexual favors from her, because there are no disciplinary consequences for sexual assault or harassment. It effect, all CRST does is take away the perk, when a trainer is reported, and then only temporarily. That decision can be immediately appealed, and is itself sometimes not enforced. Six months of "no females" is considered a modest price to pay by male trainers, for an opportunity to coerce sex on the job.

100.    CRST has a policy of allowing trainers' recommendations to determine whether trainees pass their training, resulting in trainers demanding sexual favors as a condition of passing the training.  CRST management is aware, and in fact it is common knowledge, that male trainers frequently demand and receive sexual favors in return for passing trainees, and that male trainers sexually assault and sexually harass female trainees.

101.    CRST has a pattern or practice of requiring female trainees to train over-the-road for more than 28 days because of interruptions to their training from harassment, which results in lower pay than they would have received had they been able to timely complete their training.

**E.      Retaliation Against Female Drivers on the Basis of their Complaints**

102.    CRST maintains a pattern or practice of retaliating against the Named Plaintiffs

and members of the proposed class for opposing sexual harassment by taking action against workers who complain about sex discrimination, including but not limited to: requiring a female driver who has complained of harassment to leave the truck and allowing her male co-driver to continue onward, even if the woman had been using the truck first before the accused harasser joined her as co-driver; requiring women who have been removed from trucks following a harassment complaint to pay out of pocket to remain in a hotel, without advancing payment for the accommodations; requiring women who have been removed from trucks following a harassment complaint to wait in place to be picked up by a company truck, sometimes for as long as a week, during which time they can earn nothing; failing to take any action to pair women removed from trucks following harassment complaints with a new co-driver, forcing them to wait and earn nothing while seeking a new co-driver; where a female trainee has complained of harassment by her male trainer, prolonging her training beyond 28 days, resulting in much less pay than she would have earned during that period had she completed her training free from harassment; continuing to provide the names and contact information of women who have made harassment complaints to the entire pool of potential co-drivers, including men about whom they complained.

103.   For example, Driver Service Manager Ben Lafayette was aware that the "remedy" for female drivers' harassment complaints was to remove her from the truck, often far from any landmarks, causing her to stop earning money.  This served as a deterrent

against female drivers complaining about harassment.

104.   CRST has a pattern or practice of condoning known retaliatory actions taken against female drivers who complain about harassment, such as male employees kidnapping them, physically assaulting them, brandishing weapons, threatening them with physical harm, photographing and making video recordings of them, and/or spreading rumors they are prostitutes.

105.   CRST's retaliatory actions deterred members of the proposed class from complaining about sexual harassment.

## VI.  CLASS ACTION ALLEGATIONS

**A.          Class Definition**

106.   Plaintiffs bring this action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of themselves and on behalf of a class of all women who are or were employed as truck drivers at any time during the class period.  Each of the Class Representatives is a member of the class.

107.   The class consists of all women who are, or have been, employed by CRST as truck drivers and have experienced gender discrimination at any time during the applicable liability period.  Upon information and belief, there are more than 100 members of the proposed class.

108.   Plaintiffs additionally bring this action on behalf of themselves and a subclass of all women who are or were employed as truck drivers and experienced gender

discrimination in California during the class period. Each of the Class Representatives is a member of the California Subclass.

109. The California Subclass consists of all women who are, or have been, employed by CRST as truck drivers and have experienced gender discrimination in California at any time during the applicable liability period. Upon information and belief, there are more than 100 members of the proposed subclass.

**B.    Numerosity and Impracticability of Joinder**

110. The members of the classes are sufficiently numerous that joinder of all members is impracticable. Plaintiffs are informed and believe that the proposed classes consisted of more than 100 women during the liability period.

**C.    Common Questions of Law and Fact**

111. The prosecution of the claims of the Class Representatives will require the adjudication of numerous questions of law and fact common to both their individual claims and those of the proposed classes they seek to represent. The overarching common question for each class member is: why was I treated differently by CRST than male drivers. Plaintiffs expect that the evidence will demonstrate that the common answer in each case is: bias against women.

112. The common questions of law include, *inter alia:* (a) whether CRST has engaged in unlawful, systemic sexual harassment of its female drivers; (b) whether CRST has unlawfully retaliated against female employees for complaining about gender

discrimination; (c) whether CRST is liable for a continuing systemic violation of Title VII; and (d) a determination of the proper standards for proving a pattern and/or practice of discrimination by CRST against its female drivers.

113. The common questions of fact would include, *inter alia*: whether, through its policies, practices and/or procedures: (a) CRST has maintained a hostile work environment based on gender among its female drivers; (b) CRST has subjected female drivers to sexual harassment and/or a sexually hostile work environment; (c) CRST has a policy or practice of retaliating against women for complaining about the gender discrimination described in (a) and (b) above; (d) senior CRST managers and Human Resources personnel were aware of the sexual harassment and gender discrimination; (e) CRST has engaged in a pattern or practice of failing to take prompt and effective action to remedy the pervasive sexual harassment of female drivers; and (f) whether injunctive relief and punitive damages are warranted.

114. The employment policies, practices and/or procedures to which the Class Representatives and the class members are subject, are set or approved at CRST Expedited, Inc. corporate level and apply universally to all class members. These employment policies, practices and/or procedures are not unique or limited to particular CRST terminals or specific fleet managers; rather, the policies and practices that give rise to and perpetuate the hostile work environment based on sex apply to all female drivers and trainees. The discriminatory policies, practices, and/or procedures therefore

affect the Class Representatives and proposed class members no matter which routes they drive.

115. Discrimination in the form of a hostile work environment occurs as a pattern or practice in all CRST Terminals and along all drivers' routes and affects the Class Representatives and the members of the classes in the same way. Male drivers and trainers engaged or engage in in various forms of the following conduct: propositioning class members for sex, requesting sex as a condition of passing driver training, sexually assaulting class members, threatening them with rape and/or assault, physically touching them on intimate body parts, intentionally exposing themselves, repeatedly attempting to get into bed with class members, commenting sexually on their bodies, masturbating in front of them, showing them pornography, and making other sexually offensive statements; and have otherwise created a working environment hostile to female employees.

**D.     Typicality of Claims and Relief Sought**

116. The claims of the Class Representatives are typical of the claims of the proposed classes. The Class Representatives assert claims in each of the categories of claims they assert on behalf of the proposed classes. The relief sought by the Class Representatives for gender discrimination complained of herein is also typical of the relief sought on behalf of the proposed classes.

117. The Class Representatives are, like the members of the proposed classes, all

female truck drivers who have worked for CRST during the liability period.

118.   Several of the Class Representatives and members of the classes have complained about sexual harassment, including by informal and formal complaints to supervisors and managers up to and including Cameron Holzer, President of CRST, and to the current head of Human Resources, Karen Carlson.  CRST's investigations into these complaints have been inadequate, and Class Representatives and class members have been affected in the same ways by CRST's failure to take adequate remedial measures to correct this pattern or practice of gender discrimination.

119.  CRST has failed to create adequate incentives for its managers to comply with equal employment opportunity laws and has failed to adequately discipline its managers and other employees when they violate the anti-discrimination laws, which has affected the Class Representatives and the class members in similar ways.

120.   Consequently, the claims alleged by the Class Representatives are typical of the claims of the classes.  Each plaintiff has worked as a truck driver for CRST during the class period and has been subjected to the discriminatory policies or practices alleged herein.  The relief sought by the Class Representatives for gender discrimination is also typical of the relief which is sought on behalf of the proposed classes.

**E.     Adequacy of Representation**

121.   The Class Representatives' interests are co-extensive with those of the members of the proposed classes they seek to represent, and the Class Representatives will fairly

and adequately represent and protect the interests of the classes. The Class Representatives seek to remedy CRST's discriminatory employment policies, practices and/or procedures so that women at CRST will not be subjected to a hostile environment, and will not be retaliated against for complaining about discrimination. The Class Representatives are willing and able to represent the proposed classes fairly and vigorously as they pursue their individual claims.

**F.     Efficiency of Class Prosecution of Common Claims**

122.   Certification of a class and subclass of female employees similarly situated to the Class Representatives is the most efficient and economical means of resolving the questions of law and fact which are common to the claims of the Class Representatives and the proposed classes.  The individual claims of the Class Representatives require resolution of the common question of whether CRST has engaged in a systemic pattern and/or practice of gender discrimination against female employees.  The Class Representatives seek remedies to eliminate the adverse effects of such discrimination in their own lives, careers and working conditions and in the lives, careers and working conditions of the proposed class members, and to prevent continued gender discrimination in the future.  The Class Representatives have standing to seek such relief because of the adverse effect that such discrimination has had on them individually and on female employees of CRST generally.  To gain such relief for themselves, as well as for the proposed class members, the Class Representatives will first establish the

existence of systemic gender discrimination as the premise for the relief they seek. Without class certification, the same evidence and issues would be subject to re-litigation in a multitude of individual lawsuits with an attendant risk of inconsistent adjudications and conflicting obligations. Certification of the proposed classes of females who have been affected by these common questions of law and fact is the most efficient and judicious means of presenting the evidence and arguments necessary to resolve such questions for the Class Representatives, the proposed classes and CRST.

## G. Requirements of Rule 23(b)(2)

123. Claims for injunctive relief are properly maintainable under Federal Rule of Civil Procedure Rule 23(b)(2) because defendant has acted on grounds generally applicable to the Class Representatives and the proposed classes by adopting and following systemic policies, practices and/or procedures, which are discriminatory on the basis of gender, thereby making appropriate final injunctive relief or corresponding declarative relief with respect to the classes as a whole. Gender discrimination is standard operating procedure at CRST, rather than a sporadic occurrence. CRST has refused to act on grounds generally applicable to the classes by, *inter alia:* (a) refusing to provide a working environment which is free of gender hostility and sexual harassment; and (b) refusing to take effective measures to correct and remedy sexual harassment. CRST's systemic discrimination against female employees and its refusal to act on grounds that are not discriminatory have made appropriate the requested final injunctive and

declaratory relief with respect to the classes as a whole.

124.   Injunctive and declaratory relief are the predominant relief sought in this case because they are the culmination of the proof of CRST's individual and class-wide liability at the end of Stage I of a bifurcated trial and the essential predicate for the Class Representatives' and class members' entitlement to monetary and non-monetary remedies at Stage II of such trial.  Declaratory and injunctive relief flow directly and automatically from proof of the common questions of law and fact regarding the existence of systemic gender discrimination against female CRST drivers.  Declaratory and injunctive relief are the factual and legal predicates for the Class Representatives' and the class members' entitlement to monetary and non-monetary remedies for individual losses caused by, and for exemplary purposes necessitated by, such systemic discrimination.

## H.   Requirements of Rule 23(b)(3) and Rule 23(c)(4)

125.   Claims for monetary relief are properly certified under Rule 23(b)(3) because questions of law and fact common to the classes predominate over any questions affecting only individual members, and a class action is superior to other available methods for the fair and efficient adjudication of this case.

126.   Additionally, the cost of proving CRST's pattern or practice of discrimination against female drivers makes it impracticable for the Class Representatives and members of the proposed classes to pursue their claims individually.

25

127. Alternatively, class-wide liability on the Title VII claims and punitive damages liability under the theories advanced in this action are properly certified under Rule 23(c)(4) because such claims present only common issues, the resolution of which would advance the interests of the parties in an efficient manner.

## I. Nature of Notice to the Proposed Classes Required

128. In accordance with Fed.R.Civ.P. 23(b)(3), class and subclass members must be furnished with the best notice practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort. Plaintiffs are informed and believe that CRST computer records contain a last known address for class and subclass members. Plaintiffs contemplate that individual notice be given to class and subclass members at such last known address by first class mail, informing them of the following:

A. The pendency of the class action, and the issues common to the class;

B. The nature of the action;

C. Their right to "opt out" of the action within a given time, in which event they will not be bound by a decision rendered in the class action;

D. Their right, if they do not "opt out," to be represented by their own counsel and enter an appearance in the case; otherwise, they will be represented by the named plaintiffs and their counsel; and

E. Their right, if they do not "opt out," to share in any recovery in favor of the

class, and conversely to be bound by any judgment on the common issues, adverse to the class.

## VII. ALLEGATIONS OF NAMED PLAINTIFFS

### A. Cathy Sellars

129.   Cathy Sellars was hired by CRST in or about November 2013 as a truck driver.

130.   Ms. Sellars fulfilled her obligation to complete two weeks of training classes at the Riverside, California terminal in or about December 2013.

131.   The vast majority of Ms. Sellars' trips over the course of her employment with CRST started or terminated at Riverside.

132.   When she was at the Riverside terminal, Ms. Sellars daily heard men make offensive sexual remarks about women, including but not limited to comments about the way women's bodies were built, how they were dressed, and the attractiveness of women who were in the terminal.  For example, men would tell Ms. Sellars "you have a nice ass, lady" or "I'd like to tap that ass."

133.   Ms. Sellars observed Alvin Hoggard, Riverside Terminal Manager, walking around the terminal and sitting in the cafeteria while such comments were openly being made at such volume that he would have heard them.

134.   On her first day at the terminal, while Ms. Sellars was sitting in the cafeteria, Lydell Wilkerson approached her.   Wilkerson, a trainer, was waiting at the terminal to be assigned a trainee. He could have been assigned to train Ms. Sellars.  He began

telling Ms. Sellars what he wanted to do to her and with her sexually, including but not limited to saying he wanted to "go down on her" and "eat her." Ms. Sellars quickly left the room.

135. The following day, Ms. Sellars returned from class and was talking with Jay, another driver. Wilkerson stared at them as they spoke. Jay noticed Wilkerson staring. She asked Wilkerson what he wanted, at which point he approached to stand behind Ms. Sellars, and then left, when she explained that she was showing Jay pictures of her family.

136. On or about December 3, 2013, around 8PM, Ms. Sellars walked out to the far back lot of the Riverside Terminal, where she had arranged to meet Anthony, who was the co-driver of Ms. Sellars's brother-in-law, Adolfo Armenta. While she was walking and speaking to Armenta on the phone, Wilkerson suddenly grabbed Ms. Sellars's shoulder, spun her around to face him, and made several requests to the effect of, "why didn't you come lie down with me? Why didn't you come to my truck and have sex with me?" Surprised and afraid, Ms. Sellars told Wilkerson he was "crazy" and to get away from her.

137. At Armenta's request, Anthony walked Ms. Sellars back to the terminal after their meeting, for her safety. When they reached the front doors, Wilkerson was inside, and he stared intimidatingly at Ms. Sellars.

138. The following day, Ms. Sellars approached the front desk at the terminal.

Coworkers Dawn Mann and Victor Thomas, two injured drivers, were working the front desk. Ms. Sellars reported the sexual harassment to both of them. Dawn Mann has stated under oath:

[C]o-worker Victor Thomas and I were working behind the front desk at the terminal. Ms. Sellars approached very upset, to report a fellow driver who was sexually harassing her, even when she asked him to stop. The next day the same driver continued to follow Ms. Sellars, making her extremely uncomfortable. I saw co-worker Victor Thomas escort Ms. Sellars to the terminal manager, Alvin Hoggard, to report the incident.

*See* Declaration of Dawn Mann, dated June 6, 2014, ¶4, attached as Exhibit A.

139. Victor Thomas has stated under oath:

I first met Cathy Sellars at CRST in December 2013. I met Ms. Sellars at the CRST terminal in Riverside, CA during her first week on the job. . . .

Ms. Sellars first experienced sexual harassment at CRST her first week. She told me that Lydell, one of the other driver's (sic), solicited her, telling her he wanted her to come to his truck to have sex with him. She told him no. . . .

A day or two later, Lydell began following Ms. Sellars around outside. She told me this combined with the comments about having sex in his truck made her very

uncomfortable. . . .

....I went with Ms. Sellars to see Alvin [Hoggard], the terminal manager, so that

she could file a complaint about what had happened. I was there as Ms. Sellars

told Alvin exactly what she had told me, as described above.

*See* Declaration of Victor Thomas, dated September 30, 2014, ¶2-5, attached as Exhibit

B.

140. Ms. Sellars complained to Terminal Manager Hoggard about Wilkerson's conduct.

Hoggard gave Ms. Sellars the phone number for Karen Carlson, CRST Human

Resources Manager, but did not offer to document the complaint, or otherwise insure

that it was properly reported. Ms. Sellars called Carlson that same day and complained

about Wilkerson's sexually harassing statements and conduct. Carlson told Ms. Sellars

she would investigate the situation and would report back to Ms. Sellars.

141. Carlson never called Ms. Sellars back. When Ms. Sellars contacted Carlson to ask

about the status of her complaint, Carlson told her not to worry about it and said it was

none of her business.

142. Ms. Sellars subsequently learned that Wilkerson was still employed at CRST and

had gone to another state to pick up another female trainee. CRST's lack of response

made it clear to Ms. Sellars and others, that complaining about harassment was

ineffective.

143.   In or about January 2014, Ms. Sellars was assigned to be trained by Jesse Radford. In their first conversation, Radford made offensive sexual remarks to Ms. Sellars, including but not limited to telling her she had a "nice ass" and that he could "see where Lydell was coming from."  Ms. Sellars warned Radford that she would not get on his truck if he believed anything sexual would happen between them.  Radford agreed he would stop making sexual comments.

144.   On her first night on Radford's truck, after they had shut down for the evening, Ms. Sellars and Radford watched a movie.  During the movie, Radford reached under his covers and began masturbating.  He quickly asked Ms. Sellars if she "wanted to join him."  She told him no. He then said, "are you sure?"  Ms. Sellars replied "yes, I'm sure."  Radford then reached toward Ms. Sellars and tried to touch her back.  She quickly moved away and went up to the top bunk.

145.   The following day, Radford was visibly angry with Ms. Sellars.  After she was finished driving for the day, Ms. Sellars retired to the sleeper berth.  Radford finished driving and shut down at about 9:30PM. He then came into the sleeper berth and approached Ms. Sellars.

146.   Rudford began to pull Ms. Sellars's shirt off.  She immediately began struggling, telling him to stop, but he was able to remove her shirt to the point where it was up to her head before she was able to pull her shirt back on and push him away.  Ms. Sellars then fled again to the top bunk.

147. The following day, Ms. Sellars called dispatch and was connected with Alex Hinnenan, Radford's Fleet Manager. She complained to Hinnenan about Radford's assault and sexual harassment. Radford told Ms. Sellars that he had "known Jesse a while, and didn't think Jesse would do anything like that, but he'd take her off the truck anyway."

148. When she hung up with Hinnenan, Ms. Sellars called Carlson, Human Resources head. Carlson said she would "look into it," and that it was "her word against his," (even though Carlson had not yet spoken with Radford), and "they'd have to go from there."

149. Hinnenan arranged for Armenta to pick Ms. Sellars up in Elizabethtown, Kentucky, to transport her to the terminal in Oklahoma City. Ms. Sellars's training was interrupted, and she earned no pay during this time since she was not driving. Radford remained on the truck and continued on his route, making money.

150. On or about February 10, 2014, Ms. Sellars met Dwain Monroe, who had been assigned as her trainer. While at Riverside Terminal Ms. Sellars, Monroe and Mann talked about their children and families. Ms. Sellars showed Monroe a picture of her daughter. Monroe then showed Ms. Sellars pictures on his cell phone, but after displaying a picture of his own daughter, he displayed pornographic photos of a couple. Ms. Sellars told him she "did not want to see that stuff," and Monroe told her it had been an accident.

151.   Monroe then showed Ms. Sellars and Mann a video on his cell phone that he said he had made.  In the video, Monroe was being tied up and held for ransom with a knife by a stuffed reindeer and bear. Monroe then told Ms. Sellars he was "going to do that to her."  He laughed and acted like he was kidding, so Ms. Sellars tried to brush it off as a joke.

152.   Ms. Sellars began her training on Monroe's truck.  On her second day of training, on the route between Hesperia and Barstow, CA, Monroe again told Ms. Sellars that he and his "friends" wanted to tie her up and "do things to her."  She refused and told Monroe it was not going to happen.

153.   Monroe became angry at Ms. Sellars.  He told her she was annoying him and that she had better stop it, because she was "grinding his gears" and making him mad.  He began taking photos and video of her while she was driving, making her extremely nervous.

154.   On a subsequent route heading east out of California, Ms. Sellars and Monroe stopped at highway exit 185 on Interstate 40 in Arizona.  There Ms. Sellars texted Thomas and Mann, and called her daughter, to tell them what Monroe had said, because she was concerned for her safety.

155.   Ms. Sellars returned to the truck and requested that Monroe drive for the final couple of hours, because she was fatigued and was afraid her driving would be impaired. Monroe refused to drive. He climbed out of the truck and began speaking to someone on

the phone.

156.   Ms. Sellars used the Qualcomm system to send a message to dispatch, advising them that she was too fatigued to drive safely.  Rick [last name unknown], the third shift dispatcher, told her to talk to Monroe and find out what was going on.  Monroe was talking to Rick simultaneously, and Rick had told him what Ms. Sellars was saying.

157.   Ms. Sellars was standing between the two front seats inside the truck cab, by the shift, when Monroe reentered the truck.  Enraged and yelling at Ms. Sellars that she was "going to regret telling on him," he shoved her into the passenger seat, smashing her left shoulder and head into the passenger side door and window.

158.   Ms. Sellars grabbed her purse and told Monroe she was getting off the truck.  He replied "not until I tell you you're getting off," and began driving.  She repeatedly asked to be let off the truck, and asked where she was going, which he refused to answer.

159.   When Monroe began driving he pulled a knife out of his pocket and rested it on his right leg.  He told Ms. Sellars to "shut up and sit down."  As he drove, he alternately set the knife on the dash within reach, or held it and toyed with it in his lap.

160.   Ms. Sellars sent multiple Qualcomm messages to dispatch to report the emergency.

161.   Ms. Sellars frantically texted her daughter, Thomas, and Mann to tell them what was happening.  Mann stated under oath:

In February, 2014, Ms. Sellars texted me repeatedly she was being held at knife

point by a trainer/driver who, more than once, pressured Ms. Sellars to have sex with him while on the road. When she refused he became angry, continuing to physically and verbally threaten her. Ms. Sellars texted me she tried unsuccessfully to inform dispatch, their computer system was down every night between 9-11PM.

Earlier that day, I had eaten dinner with Ms. Sellars and the trainer, we used his fold-up knife to cut our meat.

*See* Ex. A ¶6-7.

162.    Thomas stated under oath: "The worst incident was in February 2014 when Ms. Sellars was texting me from the truck because the driver had a knife in his lap and he was not going to let her go.  I told her to call the police and get off that truck."  *See* Ex. B ¶7.

163.    Monroe finally pulled into a truck stop in or near Gallup, New Mexico.  As the truck slowed to a stop Ms. Sellars grabbed her purse, opened the passenger door and stepped out onto the step.  Just as she did so Rick, a dispatcher, called her cell phone, saying he had received her Qualcomm messages, and asking "what's with the knife?"  Ms. Sellars said that she could not answer.  Rick then asked if she had been held against her will, and she said yes.  He told her to get her valuables and get off the truck.  Ms. Sellars jumped down from the step.  She ran inside and called the police.  Monroe drove away.

164.   Officers responded to the scene and took Ms. Sellars's statement.  CRST required her to stay in a hotel room at the gas station overnight.

165.   The next morning Ms. Sellars called Carlson and told her of the kidnapping, and her report to the police. Carlson said she would look into it.

166.   Ms. Sellars was transported to Riverside Terminal.  There she sought medical attention for neck and back injuries from Monroe's assault, and reported the injury to CRST.

167.   CRST required Ms. Sellars to go to Oklahoma City to retrieve her belongings, because that was where Monroe had unloaded them.

168.   Within several days Ms. Sellars learned that Monroe was still on the road driving for CRST.  She called Carlson and told her Monroe was still driving.  Carlson replied, "yeah?"  Ms. Sellars asked whether Monroe was being disciplined for the sexual assault and kidnapping.  Carlson replied it was "none of her business."

169.   On or about March 10, 2014, Ms. Sellars called and complained to Mike Gannon, Group President for Strategic Growth for CRST International, and Jenny Bower, who reports to Gannon, about the sexual assaults and harassment committed by her trainers. Gannon stated he would need to speak with Carlson and find out what was going on. Ms. Sellars told Gannon she would need to talk with an attorney if nothing was done about the harassment.

170.   Ms. Sellars asked Gannon, "what are you going to do when they [harassing male

drivers] kill one of these women?"  Gannon replied, "well we'll deal with that when it happens."

171.   Shortly thereafter, CRST Expedited President Holzer ordered Ms. Sellars' current trainer to bring her directly to Iowa.  There she met with Holzer and Carlson.  Holzer attempted to pressure Ms. Sellars not to speak with an attorney about the harassment. They did not tell Ms. Sellars the outcome of their investigation of her complaints.

172.   CRST put Ms. Sellars on worker's compensation due to the spinal injuries resulting from Monroe's assault.  Holzer directed that Ms. Sellars be confined to a hotel in Iowa with no contact with any other CRST employee for the duration of her physical therapy.  She was not permitted to ride the company shuttle, speak to any company employees at her physical therapy sessions, or have any guests in her room.  After two weeks in isolation, Ms. Sellars convinced her worker's compensation representative to allow her to return home to complete her physical therapy.

173.   On or about January 1, 2015 Ms. Sellars's new worker's compensation representative informed her that CRST was stopping her worker's compensation payments on the pretext that she had failed to provide certain medical forms which, in reality, should have been provided directly to CRST by physicians.  Ms. Sellars was left without any wages or any worker's compensation payments from CRST.

174.   Despite Ms. Sellars's complaints, all of the drivers who harassed her continued to be employed by CRST.  Mann has stated under oath:

I continue to see all of the drivers/trainers Ms. Sellars complained about at the terminal, still employed and driving. I do not know the total number of driver/trainers who harassed her, there were four about whom she reported ongoing harassment and/or assaults.

*See* Ex. A ¶5.

175. Thomas has stated under oath:

[] Ms. Sellars told me about four different drivers who harassed her at CRST between December 2013 and February 2014. When she called me after an incident of harassment, she would tell me that she had complained yet again to management and/or Human Resources about what had happened.

[] As far as I know, CRST has not done anything about the sexual harassment. I still see the drivers Ms. Sellars complained about coming into the terminal.

[] I hear about incidents of both male and female CRST employees being sexually harassed, three to five times a week. It is part of the culture.

[] From August 2013 to March 2014, I worked at the front desk at the Riverside Terminal. Sometimes I was the only person available at the Terminal to answer the phone. I received calls from female trainees on the road who were being sexually harassed. I would inform the terminal manager about the call and tell the woman who was being harassed to tell the dispatcher and call Corporate about what had occurred.

[] One woman driver told me that the driver who had been assigned to train her told her she had to sleep with him if she wanted to pass the training. She filed a detailed report, but he is still a trainer.

[] CRST says they have a zero tolerance policy for harassment, but it is someone else's definition of zero. Harassment is swept under the rug.

*See* Ex. B ¶¶8-13.

176.    Ms. Sellars spent time at Riverside Terminal at the start and/or end of the majority of her runs for CRST.

177.    Ms. Sellars would have continued to work in California but for the harassment and retaliation she experienced.

178.    As a result of CRST's conduct, Ms. Sellars experienced severe emotional distress and lost wages.

179.    Ms. Sellars's injuries were proximately caused by CRST.

B.    **Claudia Lopez**

180.    Claudia Lopez is a woman and a resident of Passaic, New Jersey. She was hired by CRST in May 2014 as a truck driver.

181.    Ms. Lopez completed her training classes at Hawkeye Community College in Waterloo, Iowa. For the duration of the classes CRST trainees were housed at an area Red Roof Inn.

182.    On the first day of Ms. Lopez's training, at the Red Roof Inn, she was sitting at a

computer with Gloria [last name unknown], her roommate and a fellow trainee. They were approached by Junior [last name unknown], another trainee. Junior began asking them personal questions, including whether they were each married. Ms. Lopez replied that she was. Junior stated that she was a "liar" because she didn't have a ring.

183.   Junior told Ms. Lopez and Gloria that he wanted to give them some paperwork that would help them in their training classes, and requested that they meet him late that night. Ms. Lopez and Gloria, concerned by his actions, decided to return to their room. As they walked to the elevator, Junior told Gloria her "shirt was too long," indicating his desire to look at her rear end. The women did not come back down that night.

184.   The following day, Junior approached Ms. Lopez while she was working on a general knowledge practice test on the computer. He offered to help, and she told him no, because she needed to learn the information herself. He then sat down in a chair close to Ms. Lopez.

185.   Ms. Lopez received a call from her mother. When she sat up to answer the call, Junior reached over and began scratching her back. Ms. Lopez pushed his hand away, telling him "don't you dare touch me." He began laughing. As Ms. Lopez spoke on the phone, he started to scratch her back again. Ms. Lopez told him, "you better stop," and quickly left.

186.   The following day, Cynthia Russo and Nancy [last name unknown], two trainees, noticed that Ms. Lopez appeared nervous when Junior was nearby. Lopez told them

what Junior had done. Nancy told Junior to "bug off." Junior responded by asking Ms. Lopez, "has your mom called you again?" She replied "no, and please leave me alone." Junior again just laughed.

187.   Several days into her training, Ms. Lopez was in the CRST employee shuttle which ran between the hotel and the training classes. Junior approached and told her she was "very pretty." Ms. Lopez was fearful and started shaking. Junior asked what was wrong, and she told him "I don't like you, you're a bad person that doesn't understand when I say 'stop,' and that's not nice."

188.   At the training center, Junior sat down next to Ms. Lopez. Russo and Nancy were present. In Ms. Lopez's presence, Junior told Russo he was leaving for his 28 day road training, and that he was "coming back for Claudia to rape her and marry her and take her with me." Ms. Lopez felt panicked.

189.   A few hours later, when Junior was about to leave, he approached Ms. Lopez and tried to force her to hug him. She pushed him away, telling him to stop.

190.   Fearing for Ms. Lopez's safety, Russo and Nancy reported Junior's conduct to Bob [last name unknown], a CRST manager. They subsequently accompanied Ms. Lopez to speak with Bob. She complained to him about Junior's conduct. Bob told Ms. Lopez he would relay her complaint to HR, and that she did the right thing.

191.   Approximately a week later, Carlson from Human Resources contacted Ms. Lopez. Ms. Lopez again complained about Junior's harassment. Carlson told Ms.

41

Lopez to send her a written account of what Junior had done via email.

192. Ms. Lopez sent Carlson the requested email. Carlson never followed up to get additional details, or test contradictions between her version and her harasser's (if in fact Carlson spoke to her harasser, or any witness).

193. Ms. Lopez passed her training and became a driver for CRST.

194. When she spent time at Riverside Terminal and Cedar Rapids Terminal, male drivers frequently came on to her sexually, making comments to the effect of "is it true what they say about Puerto Rican women, that they're hot?"

195. On or about July 3, 2014, Ms. Lopez met Charles Smith, a potential co-driver, at Riverside Terminal. Smith was the only available co-driver at the time.

196. Ms. Lopez told Smith she wanted his respect, and that she was married. Smith told her he was married too and everything would be fine. She agreed to drive with him.

197. When they started driving together, departing from Riverside Terminal, Smith began buying things for Ms. Lopez during stops. Ms. Lopez told him to stop doing so.

198. Smith made offensive sexual remarks to Ms. Lopez, including but not limited to telling her that he "liked big women."

199. Smith pulled into a filling station on an occasion when it was Ms. Lopez's turn to drive. He went into the berth where she was sleeping, and began touching her hair. She woke up and immediately told him to stop. Smith said, "it's hard to wake you up." Ms. Lopez told him not to touch her.

200.   On another day late in the week, Ms. Lopez was asleep in the sleeper berth when she began to wake up, feeling that there was someone near her.  It was Smith.  He asked her if he could stay there with her, and she told him no.  He began to touch her hair and hold her hand, and lay down next to her.  Frightened and angry, Ms. Lopez pushed him away and told him to stop.  Smith told her "that's the way he likes women to be, angry, because he'll put them straight."  Ms. Lopez insisted, "I told you to respect me."

201.   Because of Smith's prior behavior, Ms. Lopez had already arranged to drive with a new partner beginning on the following Monday.  She informed Smith that she would be taking him back to the terminal on Monday because she could not work with him anymore.

202.   On the weekend they stopped at a Pilot Truck Stop in Florida to shower.  A cashier escorted Ms. Lopez and Smith to the showers.  As they walked, Smith suggested to Lopez that she should join the shower with him.  The cashier, unaware of Smith's harassment, asked Ms. Lopez "do you want to join your husband in the shower?"  Humiliated, Ms. Lopez said that he was not her husband, he was her co-driver, and she did not.

203.   On or about July 7, 2014, Ms. Lopez and Smith were nearing their delivery location in or near Miami, Florida.  Ms. Lopez was driving, but could not find the building.  She stopped the truck in a safe location and disembarked to ask for directions.

204.   While she was seeking assistance, Smith started driving the truck, called Austin

[last name unknown], Fleet Manager, and told him that Ms. Lopez had abandoned the truck.

205.   Dispatcher Matt Pachota called Ms. Lopez on her cell phone, with Austin also on the line, and asked if she had abandoned the truck.  She told him she was only 100 feet away from the truck and that she was seeking directions.  She then complained to Pachota and Austin about Smith's harassment.

206.   Ms. Lopez returned to the truck, put her cell phone onto speakerphone mode, and forced Smith to admit that he had touched her and sexually harassed her.  Pachota and Austin instructed Ms. Lopez to get off the truck, and she removed her belongings and did so.

207.   She then called Pachota back and begged him to remove Smith from the truck and allow her to go onward instead, because it had been her truck before he joined her.  Both Smith and Ms. Lopez were company drivers.  Pachota told Ms. Lopez to remain where she was and get a hotel room.  Even though Smith had no more entitlement to remain on the truck than Ms. Lopez did, they told her he could not be removed.

208.   Ms. Lopez had to remain in Miami for several days, with no ability to drive and earn pay, until she was permitted to go to Virginia to join another truck.

209.   Several days after she had been removed from the truck, Human Resources manager Carlson called Ms. Lopez.  Ms. Lopez complained about all of Smith's harassment.  As was the case with her complaint about Junior, Carlson's conduct had

none of the hallmarks of a bona fide investigation. She did not request additional details, she did not ask Ms. Lopez to rebut Smith's claims and she did not ask Ms. Lopez whom she could interview to corroborate any of the details of her ordeal, such as the cashier at the Pilot Truck Stop. After her single contact with Carlson there was literally no further contact about Smith.

210.   Later in 2014, Ms. Lopez met potential co-driver Craig Jones in Iowa.

211.   Venell Brown, who had been Ms. Lopez's trainer, was present.  He had suggested that he present himself to Jones as Ms. Lopez's husband to deter him from later coming on to her sexually.  Brown introduced himself as Ms. Lopez's husband, and Ms. Lopez told Jones he had to respect her.  They agreed to drive together.

212.   After beginning to drive with Jones, Ms. Lopez parked the truck when it was time for a shift change and entered the back to tell Jones it was his turn to drive.  Although company policy requires that employees always remain fully clothed while on the truck, she encountered Jones only in his underwear.  She hurriedly told Jones it was his turn to drive and ran out.

213.   Afterward, she told Jones she did not like seeing him unclothed.

214.   On the way to California, Jones later stopped the truck near West Memphis, Arkansas.  Ms. Lopez was asleep in the sleeper berth.  She began to awaken and felt someone massaging and touching her.  She was lying on her stomach and felt something hard on her rear end.  She sat up and turned around to find Jones naked and on top of

her, with his penis erect. His clothes were on the floor. Ms. Lopez grabbed the screwdriver she kept under her pillow, and left the truck.

215. Ms. Lopez called Al [last name unknown], a CRST shuttle driver, and asked whether she was currently closer to the terminal in Oklahoma City or in Iowa. She cried and told him what Jones had done. Al told Ms. Lopez she should report Jones to CRST, but she said she feared doing so because she knew they would again remove her from the truck and leave her alone in a totally unknown part of Arkansas.

216. Al notified Dan [last name unknown], a management-level CRST employee, who then called Ms. Lopez. She requested that he tell her where to drop off the load, and then get her to a safe location, and then she would talk about what had happened. Dan told Ms. Lopez to drop the load about 45 minutes away in West Memphis. She drove the remainder of the way there displaying the screwdriver, for her own protection.

217. During this drive, Ms. Lopez recorded Jones admitting he had touched her:

Lopez: I'm scared of you.

Jones: Scared of me?

Lopez: Yeah.

Jones: Why?

Lopez: Because. I never know you was going to touch me [inaudible].

Jones: Oh my god.

Lopez: I want you to be honest. Why did you touch me? Or made me touch

46

[inaudible].  Do what you did?

...I want to know.  What happened?

Jones:  I don't know, I guess playing around too much.

Lopez:  Huh?

Jones:  Playing around too much.

Lopez:  I don't play around like that.  I can't work with you like that [inaudible].

218.   After she dropped off the trailer CRST directed Ms. Lopez to remove her belongings from the truck, and sent her to a hotel.  She had to advance her own funds for the hotel and seek reimbursement later, and earned nothing while she waited.  Jones continued onward in the truck, driving and earning pay.

219.   Ms. Lopez complained to Fleet Manager Theresa Strong about Jones's conduct.

220.   Ms. Lopez was required to rent a car to drive from West Memphis to the terminal in Oklahoma, during which time she earned nothing.  Carlson called her while she was in route.  Ms. Lopez complained about everything Jones had done.  Carlson said she would investigate.  Ms. Lopez later followed up by sending Carlson the recording she had made of Jones admitting he touched her.  Carlson never responded to this complaint, or the evidence Ms. Lopez had provided.

221.   In Oklahoma Ms. Lopez had to wait a week to pick up with another truck, during which time she had no opportunity to earn anything.

222.   In or about November, Ms. Lopez began to drive in the Refrigeration unit.  When

CRST sent her the list of available co-drivers, she saw Craig Jones on the list.

223.  Ms. Lopez approached the Safety representative at Riverside Terminal, and said she was afraid that Jones would find her.  He directed her to speak with a driver coordinator at the terminal.  When she told the driver coordinator her concerns, the coordinator told Ms. Lopez it was a "big world" and she wouldn't see Jones.  Ms. Lopez protested that there were only a few CRST terminals and she could easily see him at any of them, and that it was even more likely since they were both driving in the Refrigeration unit, and those trips were between a more limited set of locations.

224.  In or about December 2014, Ms. Lopez began driving with Mark [last name unknown].

225.  Mark told Ms. Lopez he was becoming irritated with her.  Ms. Lopez saw text messages he was exchanging about her with Butch [last name unknown]:

Butch:         Lol...slap her with da dick

Mark:          LMAO! [Laughing My Ass Off]

Butch:         Tell her to shower first...lol

*See* Text Message Exchange with Butch, attached as Exhibit C.

226.  Ms. Lopez asked Mark why he kept saying she was "grinding his gears."  Mark replied, "you know, one of these days I could come kill you and leave you in the mountains, and just bury you, and nobody's gonna find you."  He then laughed.  Ms. Lopez was terrified and said she wanted to get off the truck, but Mark refused, saying he

48

was just kidding.

227.  Ms. Lopez was too afraid to continue driving due to the threats, assaults and sexual harassment she continued to experience, with no consequences for the harassers despite her repeated complaints. She was constructively discharged on or about January 10, 2015.

228.  Over the course of her work at CRST Ms. Lopez spent time at Riverside Terminal on more than ten occasions, spending on average several days at the terminal each time.

229.  Ms. Lopez would have continued working in California but for the harassment and discrimination she experienced.

230.  Ms. Lopez would be interested in re-employment with CRST if she could be guaranteed that she would not experience any further harassment, discrimination or retaliation.

231.  As a result of CRST's conduct, Ms. Lopez experienced severe emotional distress and lost wages.

232.  Ms. Lopez's injuries were proximately caused by CRST.

C.    **Leslie Fortune**

233.  Leslie Fortune is a woman and a resident of St. Louis, Missouri.  She was hired by CRST in October 2013 as a truck driver.

234.  Ms. Fortune completed her training classes at the CRST Terminal in Cedar Rapids, Iowa.

235.  During her training at the Cedar Rapids Terminal, Ms. Fortune heard daily offensive sexual remarks from male trainers and co-drivers, including but not limited to men coming onto Ms. Fortune or propositioning her for sex (including while she was in the middle of studying), men making comments about women's bodies such as "man she's got ass on her" or "I'll hit that," and men talking about which women they had slept with.

236.  In or about early November 2013, Ms. Fortune was paired with trainer Stephen Woods to do her over-the-road time.

237.  Woods was in the process of becoming an owner-operator, so Ms. Fortune was required to drive with him in a rental car from Cedar Rapids to Riverside, CA to pick up the truck he would be using.

238.  On their first day on the road, Woods asked Ms. Fortune what she liked sexually, and commented that she was pretty.  He then said he had "never been with a colored woman before."  She rejected his advances.

239.  When they arrived at their first hotel, Woods told Ms. Fortune to stay in the car while he went in.  When he reemerged he claimed the motel only had one room left, with one bed.  He said, "that's ok, we can share."  Ms. Fortune refused.

240.  Ms. Fortune and Woods went to the room.  It contained two beds.  Woods told Ms. Fortune they should share only one of the beds.  She again told him no.  He asked Ms. Fortune if he could take his clothes off, and told her to "dress down."  She continued to

reject his advances.

241.    Ms. Fortune left to do laundry.  When she returned, he was in only his boxer shorts.

242.    Woods told Ms. Fortune, "I haven't had pussy in six months, if you want to pass you might want to take that into consideration."  She told him no.

243.    She locked herself into the bathroom to shower, emerged fully dressed, and got into her own bed to sleep in her clothes.  Woods told her his shoulders hurt and asked for a massage.  Ms. Fortune refused.  He then suggested that he give her a massage.  He again told him no, and went to sleep.

244.    The following morning, Woods told Ms. Fortune she was a "hard sleeper."  He said he had tried to wake her up, and that "you sleep so hard, anything can happen to you while you're asleep."

245.    Woods stayed close to Ms. Fortune, listening to any calls she made on her phone, and standing right by the bathroom door while she was inside to see if she was calling anyone.  She had no phone numbers to contact anyone at CRST.  Woods, her trainer, had the numbers but would not give them to her.

246.    Woods called their fleet manager, told him that Ms. Fortune was fine, and would not allow her to speak to him.

247.    When she arrived at Riverside Terminal, Ms. Fortune complained about Woods to the Safety representative.  He directed her to write a report about Woods's conduct,

which she did.

248.  Ms. Fortune completed her training with a different trainer.  The trainer suggested that she work with James Parker as her first co-driver, and she agreed.

249.  In or about December 2013, Ms. Fortune departed Riverside Terminal with Parker. He propositioned Ms. Fortune for sex, and she refused.

250.  Parker told Ms. Fortune he had been in jail immediately before he began driving at CRST.  He drank alcohol and smoked marijuana while on the job.

251.  Parker asked Ms. Fortune to sleep with him a second time while they were stopped at a weigh station waiting for two other CRST drivers, one of whom was Kairee [last name unknown], to come assist them in resolving a problem with the truck's weight.  He then began acting angry at her, which the other two drivers observed.

252.  En route to Salt Lake City after their stop, Parker became angry with Ms. Fortune because she would not sleep with him, and kicked her off the truck.  She called her fleet manager Ben, who laughed and told her to get back on the truck, even after she told him Parker had been drinking, smoking marijuana, and propositioning her for sex.  He said "you guys can work this out."

253.  Ms. Fortune refused to get back on the truck, and had to be picked up by the two other CRST drivers, who returned her to Riverside Terminal.

254.  Once Parker returned to the terminal, he spread rumors that Ms. Fortune was a "lot lizard," trucker slang for a prostitute, and had been doing "extra jobs," i.e. sleeping

with male truckers for pay.

255.  Ms. Fortune filed a written complaint with Alvin Hoggard about Parker's conduct. A week or two later, Human Resources representative Karen Carlson called her.  Ms. Fortune complained to Carlson about everything Parker had done.  Carlson did not tell Ms. Fortune what action would be taken, if any.  She never afterward told Ms. Fortune what was the outcome of her complaint, if any.

256.  When Parker learned Ms. Fortune had filed a written complaint, he accosted her in the lobby at Riverside Terminal, yelled at her, and put up his fists to intimidate her.

257.  In or about early 2014, Ms. Fortune worked with a co-driver named Jamal.  He requested that she record herself urinating, because he "liked hearing women pee."  Ms. Fortune got off his truck at Riverside Terminal.

258.  Also in or about early 2014, Ms. Fortune met a different potential co-driver also named Jamal. The two met at Riverside Terminal and agreed to drive together.

259.  After they began driving Jamal repeatedly commented on how "pretty" Ms. Fortune is, and came on to her.  She told him she was not interested.

260.  On a route heading east from Riverside Terminal, Jamal insisted on buying Ms. Fortune a meal at Denny's for her birthday.  While they were eating, he told Ms. Fortune "it's not working."  She asked what he meant, and he replied "nothing."

261.  When they got back into the truck, Jamal told Ms. Fortune "you're going to give me some ass, either I'm going to take it or you're going to give it to me."  He started

laughing.

262.   Ms. Fortune was afraid.  At night, she contacted a fleet manager and complained about Jamal's threat to rape her.  The fleet manager asked if she could see any hotels nearby, but Ms. Fortune explained that the truck was in an empty part of Kansas and there was nowhere to go if she got off the truck.  She agreed to stay on the truck until they reached Missouri.

263.   Once they reached St. Louis, Ms. Fortune waited until Jamal had entered a service station, then took her possessions and left the truck.  She lost the pay she would have earned had she been able to continue driving free of harassment.

264.   Ms. Fortune complained to an employee in Human Resources about Jamal's conduct.  She was not told what would happen following her complaint.

265.   Later, when she stopped in to visit her CRST classroom instructors in Cedar Rapids, Ms. Fortune encountered Jamal.  He had been promoted to become a CRST classroom trainer.

266.   Ms. Fortune began carrying knives and a Taser for personal protection because of the harassment and threats she was experiencing from her codrivers.

267.   In or about spring 2014, Ms. Fortune was waiting at Riverside Terminal to find a new co-driver, and was not earning any pay while she waited.  She met a potential co-driver from Florida, Hans Davis, and they began to work together.

268.   Ms. Fortune was having difficulty improving her skills at backing trucks, and

Davis agreed to help teach her how.

269.   Not long after they left Riverside Terminal to begin driving together, Davis repeatedly commented on Ms. Fortune's appearance, telling her that she was "gorgeous" and "fine." He told her he had previously driven with a Puerto Rican woman and that they had sex "all the time" in the truck, in an effort to convince Ms. Fortune to sleep with him and that he would not tell anyone. Ms. Fortune rejected his advances.

270.   Davis later told Ms. Fortune that he was "going to need [her] to take an AIDS test." Ms. Fortune was shocked, said they were not sleeping together, and asked why she would take such a test. He replied "well I need to know if you're clean."

271.   Davis asked to lie in bed with Ms. Fortune, and propositioned her for sex. She told him no.

272.   Because she would not sleep with him, Davis became hostile, and stopped teaching Ms. Fortune how to back the truck, telling her "well just figure it out."

273.   Davis decided to take a different job without informing CRST that he was quitting. He began threatening Ms. Fortune that she would not want to see what happened if she told CRST about it.

274.   When they arrived at Oklahoma City Terminal, Ms. Fortune called a hotline that she saw posted on the wall in the terminal, which was intended for reporting threats. She complained about Davis's conduct.

275.   In or about summer 2014, Ms. Fortune was at Cedar Rapids Terminal in need of a

co-driver. Her fleet manager suggested she work with potential co-driver Charles Pickens, and she agreed.

276. Ms. Fortune had to drive in a rental car with Pickens and two other drivers to pick up a truck at the terminal in Carlisle, Pennsylvania.

277. During the drive, Pickens started touching Ms. Fortune inappropriately, including but not limited to grabbing her behind and waist. She told him to stop and that she did not like it.

278. After they began driving the truck together, Pickens stopped the truck at night while Ms. Fortune was asleep. She awoke to find him standing over her. He asked to get into bed with her, and she said no. He would not leave until Ms. Fortune referred to the knives she kept under her pillow.

279. Ms. Fortune complained about Pickens's conduct to her fleet manager Whitney Bell, and got off the truck at Riverside Terminal.

280. Ms. Fortune was constructively discharged in January 2015.

281. Ms. Fortune was present at Riverside Terminal approximately three times per month over the course of her employment with CRST. She would have continued working in California but for the harassment and discrimination she experienced.

282. As a result of CRST's conduct, Ms. Fortune experienced severe emotional distress and lost wages.

283. Ms. Fortune's injuries were proximately caused by CRST.

# VIII. CLAIMS FOR RELIEF

## First Claim for Relief

## Discrimination in Violation of Title VII

## On Behalf of the Named Plaintiffs and the Title VII Class

283. Plaintiffs incorporate Paragraphs 1 through 282.

284. The foregoing conduct violates Title VII of the Civil Rights Act of 1964.

285. Defendant CRST has engaged in illegal, intentional discrimination on the basis of sex, by creating a hostile work environment based on sex with respect to all women employed as truck drivers.

286. Plaintiffs have regularly complained to CRST regarding discrimination and harassment.

287. CRST has allowed the discrimination and harassment to continue.

288. As a consequence of Defendant's conduct, the Named Plaintiffs have suffered emotional distress.

289. Defendant's actions proximately caused the Named Plaintiffs' and Class's injuries.

290. Plaintiffs request relief as provided in the Prayer for Relief below.

## Second Claim for Relief

## Harassment in Violation of

## the California Fair Employment and Housing Act

## On Behalf of the California Subclass

291. Plaintiffs incorporate Paragraphs 1 through 290.

292. The foregoing conduct violates the California Fair Employment and Housing Act, Government Code Sec. 12940, *et seq*.

293. Defendant CRST has engaged in illegal, intentional discrimination on the basis of sex, by creating a hostile work environment based on sex with respect to all women employed as truck drivers.

294. Plaintiffs have regularly complained to CRST regarding discrimination and harassment.

295. CRST has allowed the discrimination and harassment to continue.

296. As a consequence of Defendant's conduct, the Named Plaintiffs have suffered emotional distress.

297. Defendant's actions proximately caused the Named Plaintiffs' and Class's injuries.

298. Plaintiffs request relief as provided in the Prayer for Relief below.

### Third Claim for Relief

### Retaliation in Violation of Title VII

### On Behalf of the Named Plaintiffs and the Title VII Class

299. Plaintiffs incorporate Paragraphs 1 through 298.

300. CRST retaliated against the Class Representatives and the members of the proposed class because they insisted upon a work environment free of sex discrimination and also because they complained about sex discrimination.

301. CRST retaliated against the Class Representatives and the members of the proposed class by subjecting them to adverse employment actions, including but not limited to, subjecting them to sexual harassment, a hostile work environment and/or other forms of discrimination in violation of Title VII; requiring a female driver who has complained of harassment to leave the truck and allowing her male co-driver to continue onward; requiring women who have been removed from trucks following a harassment complaint to pay out of pocket for accommodations; requiring women who have been removed from trucks following a harassment complaint to wait in place to be picked up by a company truck while earning nothing; failing to take any action to pair women removed from trucks following harassment complaints with a new co-driver, forcing them to wait and earn nothing while seeking a new co-driver; where a female trainee has complained of harassment by her male trainer, prolonging her training beyond 28 days, resulting in much less pay than she would have earned during that period had she completed her training free from harassment; continuing to provide the names and contact information of women who have made harassment complaints to the entire pool of potential co-drivers, including men about whom they complained; in the case of the Named Plaintiffs, being constructively discharged; and otherwise penalizing women for complaining.

302. As a consequence of Defendant's conduct, the Named Plaintiffs lost past and future wages and other job benefits, and suffered severe emotional distress.

303.  CRST's actions proximately caused the injuries of the Class Representatives and the members of the proposed class.

304.  The Class Representatives and the proposed class request relief as provided in the Prayer for Relief below.

**Fourth Claim for Relief**

**Retaliation in Violation of the California Fair Employment and Housing Act**

**On Behalf of the Named Plaintiffs and the California Subclass**

305.  Plaintiffs incorporate Paragraphs 1 through 304.

306.  CRST retaliated against the Class Representatives and the members of the proposed class because they insisted upon a work environment free of sex discrimination and also because they complained about sex discrimination.

307.  CRST retaliated against the Class Representatives and the members of the proposed class by subjecting them to adverse employment actions, including but not limited to, subjecting them to sexual harassment, a hostile work environment and/or other forms of discrimination in violation of the Fair Employment and Housing Act; requiring a female driver who has complained of harassment to leave the truck and allowing her male co-driver to continue onward; requiring women who have been removed from trucks following a harassment complaint to pay out of pocket for accommodations; requiring women who have been removed from trucks following a harassment complaint to wait in place to be picked up by a company truck while earning

nothing; failing to take any action to pair women removed from trucks following harassment complaints with a new co-driver, forcing them to wait and earn nothing while seeking a new co-driver; where a female trainee has complained of harassment by her male trainer, prolonging her training beyond 28 days, resulting in much less pay than she would have earned during that period had she completed her training free from harassment; continuing to provide the names and contact information of women who have made harassment complaints to the entire pool of potential co-drivers, including men about whom they complained; and otherwise penalizing women for complaining.

308. As a consequence of Defendant's conduct, the Named Plaintiffs lost past and future wages and other job benefits, and suffered severe emotional distress.

309. CRST's actions proximately caused the injuries of the Class Representatives and the members of the proposed class.

310. The Class Representatives and the proposed class request relief as provided in the Prayer for Relief below.

<u>**Fifth Claim for Relief**</u>

<u>**Constructive Discharge in Violation of Title VII**</u>

<u>**On Behalf of the Named Plaintiffs and the Title VII Class**</u>

311. Plaintiffs incorporate Paragraphs 1 through 310.

312. As a consequence of Defendant's conduct, the Class Representatives and members of the proposed class were subjected to discriminatory working conditions that

were so intolerable that any reasonable person would resign.

313.   As a consequence of Defendant's conduct, the Class Representatives suffered severe emotional distress.

314.   CRS's actions proximately caused the injuries of the Class Representatives and the members of the proposed class.

315.   The Class Representatives and the proposed class request relief as provided in the Prayer for Relief below.

## Sixth Claim for Relief

## Constructive Discharge in Violation of the

## California Fair Employment and Housing Act

## On Behalf of the Named Plaintiffs and the California Subclass

316.   Plaintiffs incorporate Paragraphs 1 through 315.

317.   As a consequence of Defendant's conduct, the Class Representatives and members of the proposed class were subjected to discriminatory working conditions that were so intolerable that any reasonable person would resign.

318.   As a consequence of Defendant's conduct, the Class Representatives suffered severe emotional distress.

319.   CRST's actions proximately caused the injuries of the Class Representatives and the members of the proposed class.

320.   The Class Representatives and the proposed class request relief as provided in the

Prayer for Relief below.

## IX.  RELIEF ALLEGATIONS

321.   Plaintiffs and the Classes they represent have no plain, adequate or complete remedy at law to redress the wrongs alleged herein, and the injunctive relief sought in this action is the only means of securing complete and adequate relief. Plaintiffs and the Classes they represent are now suffering and will continue to suffer irreparable injury from Defendant's discriminatory acts and omissions.

322.   The actions on the part of Defendant have caused and continue to cause Plaintiffs and all Class and Subclass members substantial losses in earnings, promotional opportunities another employment benefits, in an amount to be determined according to proof.

323.   Defendant acted or failed to act as herein alleged with malice or reckless indifference to the protected rights of Plaintiffs and Class and Subclass members. Plaintiffs and class members are thus entitled to recover punitive damages in an amount to be determined according to proof.

## DEMAND FOR JURY TRIAL

324.   Plaintiffs hereby demand trial of their claims by jury to the extent authorized by law.

## X.  PRAYER FOR RELIEF

WHEREFORE, Plaintiffs and the proposed Classes pray for relief as follows:

1) Certification of the Class and California Subclass as a class action under Rule 23 (b) (2) and (3), and designation of the Named Plaintiffs Cathy Sellars, Claudia Lopez and Leslie Fortune as representatives of the Classes and their counsel of record as Class Counsel;

2) All damages which the Named Plaintiffs and the Classes have sustained as a result of Defendant's conduct, including back pay, front pay, general and special damages for lost compensation and job benefits that they would have received but for the discriminatory practices of Defendant;

3) For Plaintiffs' individual, non-class claims, all damages they have sustained as a result of defendant's conduct, including back pay, front pay, general and specific damages for lost compensation and job benefits they would have received but for the discriminatory practices of defendant, damages for emotional distress, and punitive damages, according to proof;

4) For Plaintiffs and the Classes exemplary and punitive damages in an amount commensurate with Defendant's ability to pay and to deter future conduct;

5) A preliminary and permanent injunction against Defendant and its directors, officers, owners, agents, successors, employees and representatives, and any and all persons acting in concert with them, from maintaining a hostile work environment on the basis of sex. Such relief at minimum should include implementation of effective policies to prevent and correct sexual harassment, including effective avenues for reporting

harassment that do not force women to incur penalties (financial or otherwise), and measures to prevent retaliation; implementation of mandatory training regarding harassment for all of Defendant's managerial and non-managerial employees; elimination of the "no females" policy and implementation of effective discipline for harassment.

6) A declaratory judgment that the practices complained of in this First Amended Complaint are unlawful and violate 42 U.S.C. § 2000(e), et. seq., Title VII of the Civil Rights Act of 1964;

7) For Plaintiff Claudia Lopez, reinstatement to her position at CRST free from harassment, discrimination and/or retaliation;

8) Costs incurred, including reasonable attorneys' fees, to the extent allowable by law;

9) Pre-Judgment and Post-Judgment interest, as provided by law; and

10) Such other and further legal and equitable relief as this Court deems necessary, just and proper.

Dated: October 29, 2015

**NEWKIRK ZWAGERMAN**

By    /s/ Tom Newkirk
Tom Newkirk
515 E. Locust St., Suite 300
Des Moines, IA 50309
Telephone: (515) 883-2000
tnewkirk@newkirklaw.com

Local Counsel for Plaintiffs

**LAW OFFICES OF JOSHUA FRIEDMAN, P.C.**

By \_\_/s/ Giselle Schuetz_____
   Giselle Schuetz
   1050 Seven Oaks Ln.
   Mamaroneck, NY 10543
   Telephone: (888) 369-1119 x8
   Fax:   (866) 731-5553
   giselle@joshuafriedmanesq.com

   To Be Admitted *Pro Hac Vice*