**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CEDAR RAPIDS DIVISION**

CATHY SELLARS, on behalf of herself
and all others similarly situated, et al.,

Plaintiffs,

vs.

CRST EXPEDITED, INC.,

Defendant.

No. C15-117-LTS

**MEMORANDUM OPINION
AND ORDER**

_____

*TABLE OF CONTENTS*

**I.    INTRODUCTION**..................................................................*2*

**II.   BACKGROUND**.................................................................*3*

    **A.   CRST's Business**.....................................................*3*

    **B.   CRST's Handling of Sexual Harassment and Related
    Complaints**............................................................*5*

    **C.   Plaintiffs' Allegations**............................................*7*

        **1.   Corroboration of Complaints**.............................*8*

        **2.   Failure to Impose Discipline Where Harassment is
        Corroborated**............................................*10*

        **3.   Tolerating DMs' Failure to Act Promptly on
        Harassment Complaints**.................................*12*

        **4.   "Unpaid Suspension"**...................................*15*

        **5.   Transit and Lodging Costs**..............................*16*

        **6.   Extension of Student Driver Training**..................*17*

**III.  DISCUSSION**..................................................................*18*

    **A.   Evidentiary Issues**...............................................*18*

    **B.   Class Certification**..............................................*22*

1

1. *Applicable Law* ............................................................ 22
2. *Rule 23(a) Requirements* ............................................. 23
    a. *Numerosity* ................................................... 23
    b. *Commonality* ................................................ 27
        i. *Corroboration of Complaints* .......................... 31
        ii. *Failure to Impose Discipline* ......................... 32
        iii. *Failure to Discipline DMs* ............................ 34
        iv. *Unpaid Suspension* ................................... 36
        v. *Transit and Lodging Costs* ........................... 37
        vi. *Extension of Student Training* ........................ 38
    c. *Typicality* ..................................................... 39
    d. *Adequacy of Representation* ................................. 41
3. *Rule 23(b) Requirements* ............................................. 42
    a. *Rule 23(b)(3)* ................................................ 43
        i. *Predominance* ........................................ 43
        ii. *Superiority* .......................................... 48
    b. *Rule 23(b)(2)* ................................................ 49
4. *Rule 23(c)(4)* .......................................................... 50
5. *Rules Enabling Act* ................................................... 52
6. *Article III Standing* .................................................. 53
IV. **CONCLUSION** ........................................................... 54

## I. INTRODUCTION

This case is before me on plaintiffs' motion (Doc. No. 35) for class certification. Defendant has filed a resistance (Doc. No. 55) and plaintiffs have filed a reply (Doc. No. 65). Neither side has requested a hearing and, in any event, I find that a hearing is not necessary. *See* N.D. Ia. L.R. 7(c).

## II.    BACKGROUND

Plaintiffs are female truck drivers and assert claims of hostile work environment and retaliation in violation of Title VII of the Civil Rights Act of 1964 and the California Fair Employment and Housing Act (FEHA) against their employer, CRST Expedited, Inc. (CRST).  In 2014, Cathy Sellars (Sellars), Claudia Lopez (Lopez) and Leslie Fortune (Fortune) each filed a charge of discrimination against CRST with the Equal Employment Opportunity Commission (EEOC) and California Department of Fair Employment and Housing.  They were provided notices of right to sue from each organization and timely filed this lawsuit on behalf of themselves and others similarly situated.  They allege CRST has maintained patterns or practices of discrimination amounting to a hostile work environment and retaliation toward female drivers who report sexual harassment.

### A.    CRST's Business

CRST employs approximately 7,000 truck drivers.  Doc. No. 35-3 at 10.  It has more than 3,500 drivers on the road at any one time.  Doc. No. 55-1 at 4.  It is the nation's largest team carrier, servicing 48 states and Mexico.  Doc. No. 35-2.  Women make up approximately 12 to 13 percent of CRST's workforce.  Doc. No. 35-4 at 2; Doc. No. 55-1 at 15.  CRST assigns two drivers per truck so that one driver may sleep while the other is driving.  Doc. No. 35-5 at 1; Doc. No. 55-1 at 4.  This allows the truck to continue moving beyond the 14-hour limit per driver.  *Id.*  Each truck contains a small sleeper berth with a bunk bed.  Doc. No. 35-6 at 1-2; Doc. No. 55-1 at 4.

CRST has four terminals located in Riverside, California; Oklahoma City, Oklahoma; Carlisle, Pennsylvania; and Cedar Rapids, Iowa.  *Id.* at 2.  Drivers begin and end their trips at these terminals.  *Id.*  Both the Cedar Rapids and Riverside terminals contain living facilities, including sleeping areas, where drivers may stay until their next assignment.  Doc. No. 35-3 at 21.

All driving teams are supervised by a driver manager (DM).  Doc. No. 55-1 at 6.

All DMs are based in Cedar Rapids and communicate with drivers via phone, email and Qualcomm messaging.[1]  *Id.*  DMs are responsible for ensuring that loads are delivered on time and are evaluated on various metrics such as time percentage, overall mileage and truck utilization.  Doc. No. 35-3 at 31; Doc. No. 35-12 at 2.  They are also responsible for driver retention and addressing conflicts amongst team drivers.  Doc. No. 35-3 at 31.  Their performance on these metrics determines their eligibility for a bonus and can also lead to the termination of their employment.  Doc. No. 35-12 at 2.  DMs are trained annually on Title VII issues and are instructed to separate drivers upon a complaint of sexual harassment.  Doc. No. 35-3 at 54-55.  DMs must then report the complaint to human resources (HR).  *Id.* at 57,

CRST provides a training program for new truck drivers consisting of classroom instruction, road testing and a 28-day over-the-road training period with a lead driver.  Doc. No. 35-3 at 40-42.  Student drivers are required to sign a contract providing they will continue working for CRST for a specified period of time after their training to "pay back" CRST for the value of their training.  *Id.* at 41.  Lead drivers accompany student drivers on the 28-day over-the-road testing and are responsible for evaluating the student on approximately 20 different skills and completing paperwork that assesses the student's performance.  *Id.* at 47.  The lead driver then makes a recommendation as to whether the student should pass his or her training.  *Id.*  The DM makes the ultimate decision on whether or not to pass the student based on this information.  *Id.* at 47-48.

There are approximately 25 female lead drivers out of about 500 at any given time.  Doc. No. 35-19 at 1-2; Doc. No. 55-1 at 15 (identifying 23 female lead drivers as of August 31, 2016).  In August 2016, CRST had 54 females out of 617 total student drivers.  Doc. No. 55-1 at 15.  The only eligibility requirements to become a lead driver are six

---

[1] Qualcomm messaging is a computer system that allows driver managers and their drivers to send text messages back and forth.  DMs have Qualcomm set up on their computers while drivers access it through a small computer in the truck.  Doc. No. 35-17 at 2-3.

months recent over-the-road experience, acceptable winter driving experience and ten other specific requirements relating to driving and logging performance. Doc. No. 35-18. Lead drivers must also complete a certification class, which includes specific training on CRST's policy prohibiting sexual harassment in the workplace. Doc. No. 55-1 at 10. Lead drivers are paid a higher split mileage rate. Doc. No. 35-15.

Once a student passes training, he or she becomes a regular CRST driver. The next task is to find a co-driver. A driver may request a list of potential co-drivers, whom the driver may contact to see if they would like to drive with that individual. Doc. No. 35-3 at 25-26. CRST maintains a gender-neutral policy with respect to its driver teams. Doc. No. 55-1 at 5. However, a driver may request to be paired with only a male or female driver. Doc. No. 25-3 at 26. CRST may also designate certain drivers for male or female co-drivers depending on any past issues. *Id.* at 28. Drivers are not paid during the period in which they are waiting to find a co-driver. Once a DM approves a pairing, the pair can begin driving and earning pay. *Id.* at 26-27.

Drivers are paid per mile. Doc. No. 35-3 at 11. Most drivers have their payroll deposited directly onto ComData cards (similar to debit cards) issued by CRST rather than receiving a check. Doc. No. 35-17 at 7-8. DMs may also advance money onto the card, which will automatically be recouped by deducting the amount from the driver's next paycheck. *Id.* at 35-36.

## B. *CRST's Handling of Sexual Harassment and Related Complaints*

Karen Carlson (Carlson) is CRST's Manager of Employee Relations. As such, she is in charge of investigating complaints of harassment or discrimination. Doc. No. 35-3 at 3. From June 2013 to April 2014, Carlson was solely responsible for investigating employee complaints. By the end of 2015, CRST had hired two employee relations representatives, Cassie Burrill and Megan Knott, to assist Carlson in investigating employee complaints. *Id.* at 5-7.

When a driver raises a complaint that falls within the ambit of Title VII, that driver is directed to get off the truck. *Id.* at 12. As of May or June 2015, he or she is then given HR layover pay while Carlson or one of her team members investigates the complaint. *Id.* at 12-13. According to Carlson, prior to this policy the complaining driver was removed from the truck but did not receive any HR layover pay or other pay.[2] *Id.* at 13-14. Aside from the HR layover pay that is now in place, complainants may also receive funds to cover hotel expenses and cab fare. *Id.* at 17. All harassment complaints, regardless of location, are subject to the same HR policies. *Id.* at 24.

CRST's driver employee handbook specifically provides, "The Company prohibits sexual harassment and the harassment of any individual . . . ." Doc. No. 55-1 at 19. The handbook contains a section on the definition of harassment and a section on sexual harassment, which provides specific examples of prohibited conduct. *Id.* at 19-20. CRST addresses its policy on sexual harassment during driver orientation. Doc. No. 55-1 at 8-9. Drivers watch video presentations and receive business cards with reporting phone numbers. *Id.* at 9, 62. CRST also displays its sexual harassment policies at all company locations. These postings include the 24-hour ReportLine telephone number. *Id.* at 12, 71. It also uses newsletters and memoranda to reiterate and reinforce its sexual harassment policies. *Id.* at 13. Since 2012, CRST has sent all drivers a copy of its sexual harassment policy on a quarterly basis via Qualcomm. *Id.* In 2015, CRST began sending Qualcomm messages outlining CRST's expectations concerning sexual harassment along with all contact information for reporting sexual harassment. *Id.* at 49.

According to Carlson, if a Title VII complaint has been made against a lead driver, HR does not have the authority to stop the lead driver from continuing to drive. *Id.* at

---

[2] CRST has submitted a declaration from Angela Stastny, Director of HR, stating that the HR layover pay policy was initiated in July 2015 and that prior to that time, drivers would have had any lodging and transportation costs as a result of getting off the truck pre-paid or reimbursed. Doc. No. 55-1 at 15.

45. That decision may be made only by the DM, the operations manager, the lead coordinator, the supervisor of safety, the director of company drivers or the director of lease-purchase drivers. *Id.*

When a driver has a complaint, he or she may call the HR Service Center line, which is a general HR line, or a hotline number that is available 24 hours a day, seven days a week. The hotline, which is operated by a third-party vendor, permits the complainant to speak to a person who will take notes about the situation and forward those notes electronically to Carlson or one of her team members. *Id.*

## C.  *Plaintiffs' Allegations*

Plaintiffs allege CRST has maintained various policies, patterns or practices that create or contribute to a hostile work environment for its female drivers. Plaintiffs allege that these policies are "centrally devised and have been commonly applied for years to all drivers." Doc. No. 35-1 at 14. These policies allegedly include:

- Refusing to find harassment can be corroborated despite evidence beyond "he said/she said" accounts
- Failing to impose discipline even when harassment is corroborated
- Tolerating DMs' failure to act promptly on harassment complaints

They also allege CRST maintains policies, patterns or practices of discriminating and retaliating against women who complain of sexual harassment. These policies include:

- Subjecting women who complain of sexual harassment to "unpaid suspension"
- Imposing transit and lodging costs incurred as a result of their complaint
- Extending their student driver training

I will discuss the evidence plaintiffs have put forth in support of each of the identified policies in their attempt to show they have met the class certification requirements of Federal Rule of Civil Procedure 23(a).

## 1.    *Corroboration of Complaints*

Plaintiffs allege that CRST maintains a pattern or practice of failing to find a harassment complaint is corroborated in the absence of an admission by the accused individual or an eyewitness account.  This is based on Carlson's deposition testimony as well as anecdotal evidence.  Carlson testified as follows:

> Q:    If the allegations of harassment concerned behavior that occurred on the truck while the drivers are there together, would it ever be possible for you to find that harassment was corroborated based on evidence other than a third person eyewitness who was on the truck seeing harassment?

> A:    Not unless there was an admission by the accused individual.

Doc. No. 35-3 at 67-68.  Plaintiffs allege that under this policy, it is nearly impossible for any woman to prove she was sexually harassed by her co-driver on a truck.  Further, plaintiffs allege CRST has had knowledge that its policy is discriminatory based on an email from Carlson dated August 3, 3014.  Doc. No. 35-20.  In this email, Carlson recommended that cameras be installed on the trucks.  *Id.*  She wrote, "So many of my investigations including those such as physical altercations, inappropriate verbal comments, throwing the qualcomm, sexual misconduct, etc. are hearsay and there are no witnesses.  I feel that a camera on each truck would mitigate the possibility of misconduct."  *Id.*

Plaintiffs provide declarations to demonstrate how this policy has been applied.  Veronica Saur's declaration states that a male co-driver made offensive sexual comments to her, including requesting sex and asking to stay together in a hotel.  Doc. No. 35-10 at 2.  Saur used her phone to record some of the offensive comments.  *Id.*  She then called CRST dispatch and reported her co-driver's behavior.  *Id.*  Saur also reported her co-driver's behavior to Carlson and offered the recordings as evidence.  *Id.* at 3.  Carlson stated she could not consider the recordings because there was no way to verify whether

it was her co-driver's voice or someone else's. *Id.*[3] Saur then complained to the terminal manager of the Riverside Terminal. He also refused to listen to the recordings. *Id.* Carlson later informed Saur of her finding that "nothing had happened with [Saur's co-driver]" and he was not fired.[4] *Id.*

The other example plaintiffs provide is from plaintiff Sellars. Sellars states she reported to Carlson that her new co-driver had shown her and a female co-worker a video of stuffed animals "with a knife . . . the reindeer and bear holding him hostage" and that later, while on the truck, her co-driver told her "the reindeer are going to tie you up and do something to you." Doc. No. 35-22 at 1. Sellars reportedly called her daughter and told her what her co-driver said. She also sent Qualcomm messages. A DM called her co-driver and he denied anything inappropriate. *Id.* Sellars stated her co-driver pulled out a knife, put it on the dash and told her she was not going to get off the truck until he was ready to let her out. *Id.* A DM called her back and Sellars told him about the knife. *Id.* at 2. When her co-driver stopped, she got out of the truck and was able to stay at a hotel at that location. *Id.* Carlson interviewed the co-driver about this incident. Doc. No. 35-23 at 1. He admitted he had a utility knife on the truck, but stated that he kept it

---

[3] CRST disputes much of the anecdotal evidence plaintiffs rely on. These disputes "may be resolved only insofar as resolution is necessary to determine the nature of the evidence that would be sufficient, if the plaintiff's general allegations were true, to make out a prima facie case for the class." *Blades v. Monsanto Co.*, 400 F.3d 562, 567 (8th Cir. 2005). In most instances, the disputes between the parties involve competing admissible evidence. Therefore, I will acknowledge CRST's evidence, but find that no further resolution of the disputed evidence is necessary because plaintiffs' evidence, if presented in the form of testimony, would be sufficient to make out a prima facie case for the class. On that note, CRST disputes the allegation that Carlson refused to listen to the recordings. *See* Doc. No. 55-2 at 11 ("I did not refuse to listen to Saur's recording of Reeve.").

[4] CRST disputes this statement. *See* Doc. No. 55-2 at 11 ("I did not advise Saur that she [sic] found nothing had happened with Reeve, but sent a follow up letter regarding the investigation to Saur on March 4, 2014."). *See* Doc. No. 55-2 at 235 (in which the follow up letter states in relevant part, "I want to assure you that I have conducted an investigation and we have taken appropriate action regarding this matter.").

in the door of the truck. *Id.* at 3. He also admitted showing the video, but stated that Sellars made a comment that *she* could tie herself up. *Id.* He claimed Sellars did not have a problem until she realized their truck was headed for New Mexico rather than Oklahoma City. *Id.* at 3-4. Carlson also interviewed the female co-worker, who stated that she was aware the co-driver had a knife and corroborated the allegation that he had shown them a video depicting him tied up and acting like stuffed animals were holding a knife that was shown in the video. Doc. No. 35-24. Carlson made the following conclusions:

- The co-driver admitted he had a utility knife on the truck but size could not be corroborated.

- The co-driver admitted to a video he posted on Facebook that showed him tied up as if a hostage by stuffed animals.

- This appears to be a he-said/she-said situation. Corroboration of wrongdoing could not be made.

- Drivers instructed not to contact one another via phone, text, email, in person or by other means.

- The co-driver was instructed to be mindful of the material on his phone and not to share inappropriate photos or videos to co-workers.

*Id.* Plaintiffs argue this should not have been deemed a "he-said/she-said" situation, given the "overwhelming corroborating evidence." Doc. No. 35-1 at 17. Therefore, they argue CRST's policy of failing to find that complaints of sexual harassment can be corroborated absent an admission or eyewitness is discriminatory and creates a hostile work environment.


### 2. *Failure to Impose Discipline Where Harassment is Corroborated*

With regard to its disciplinary practices, plaintiffs allege CRST fails to discipline harassing drivers even when their harassing behavior has been corroborated. They note CRST's standard response to complaints of sexual harassment is to designate the accused driver as "male only" or "no females," meaning the accused male driver may drive only

with other males.  Doc. No. 35-3 at 79.  Plaintiffs allege this designation is not disciplinary as it does not reduce a driver's pay, is not considered to be a disciplinary warning, and is used in instances even when the harassment could not be corroborated. *Id.* at 80-81.  Indeed, a driver could request from the beginning to be paired only with male or female drivers.  *Id.* at 79.

When harassment is corroborated, HR makes a recommendation as to what should be done and the driver's DM has authority to decide what discipline, if any, should be imposed, subject to approval by the supervising Operations Manager.  *Id.* at 74-75. Carlson testified that "any corroborated harassment . . . of a Title VII nature" "will result in termination."  *Id.* at 73.  Carlson is responsible for evaluating the situation and determining whether the harassment constitutes a Title VII violation justifying termination.  *Id.* at 77.

 Plaintiffs provide anecdotal evidence of CRST's failure to impose discipline.  On one occasion, a lead driver was alleged to have made inappropriate jokes of a sexual nature to a male friend on the phone and made vulgar and harassing remarks to a student who was on the lead driver's truck.  Doc. No. 35-29.  This was corroborated by one of CRST's employee relations representatives.  The lead driver coordinator recommended pulling the driver's lead certification and HR recommended designating him male only. *Id.*  The offending driver was not discharged and was permitted to finish training another (male) student who was on his truck during the investigation.  *Id.*

In another instance, HR "[c]orroborated that [a] Lead . . . did talk about sex with his girlfriend and friends" while his student was on the truck and his lead certification also was not revoked.  Doc. No 35-32.  His team preference was changed to male only and he was put through Positive Work Environment (PWE) training again.  *Id.*  Plaintiffs also give an example in which a lead admitted to having "pornographic books and magazines laying around the truck" and listening to "uncensored radio . . . which talked about penis, breasts, sex . . ." while training a student.  Doc. No. 35-33.  Carlson

11

interviewed the driver, who admitted he had uncensored radio and pornographic magazines but stated his magazines did not have pictures. *Id.* He stated the student he was currently with was his last and then he had a co-driver lined up. *Id.* He was put through PWE training again and his preference was changed to male only. *Id.*

Plaintiffs allege these disciplinary issues apply to regular drivers as well, not just leads. In one case, a driver sent Carlson a text message she had received from another driver saying, "lets chill, I'm gonna be honest, I want to eat that. If you know what I'm talking about. Just between me and you." Doc. No. 35-30. The driver who sent the offensive message then attempted to give a fake identity, but later admitted to doing that because he "felt [she'd] like to tell someone." *Id.* When Carlson interviewed the driver who sent the message, he admitted to sending it but stated that the female driver had come on to him and had given him her number. Doc. No. 35-31. His team preference was changed to male only and he was advised that another similar allegation could be grounds for termination. *Id.* Based on this evidence, plaintiffs argue that CRST's policy of failing to discipline drivers for corroborated allegations of sexual harassment is discriminatory and creates a hostile work environment.

### 3. *Tolerating DMs' Failure to Act Promptly on Harassment Complaints*

Finally, plaintiffs allege that CRST maintains a pattern or practice of tolerating DMs' failures to act promptly on harassment complaints, which is discriminatory and creates a hostile work environment. Due to the nature of CRST's business, complaints do not always arise during normal business hours. Drivers are instructed to call the HR Service Center line with complaints. Doc. No. 35-3 at 50. During normal business hours, the complaint will reach an employee relations representative. Outside of normal business hours, it will go to voicemail. *Id.* at 50-51. The direct number for HR also is not staffed overnight and a call will be sent to voicemail. *Id.* at 51-52. CRST does maintain a 24-hour hotline number, operated by a third party vendor *Id.* at 50. A staff

member will take notes on a driver's complaint and email them to Carlson. *Id.* at 50-51. In other words, if a complaint is made during off hours, CRST's HR department is not set up to respond to the complaint until the following business day. A driver in need of immediate assistance, however, may communicate with the DM. DMs are instructed to split the drivers when they receive a sexual harassment complaint. *Id.* at 53.

Plaintiffs allege CRST has a pattern or practice of tolerating DMs' failure to promptly separate the drivers upon receiving a sexual harassment complaint. They allege DMs frequently encourage drivers to continue driving with the person they are claiming has sexually harassed them. For instance, plaintiff Fortune states in her declaration that after complaining that her co-driver had been propositioning her for sex, her fleet manager laughed at her and told her to get back on the truck saying "you guys can work this out." Doc. No. 35-8 at 3-4. On another occasion, Fortune complained about her co-driver making inappropriate comments to her and her DM told her to stay on the truck and to let them know if something happened. *Id.* at 6. On yet another occasion, Fortune complained about her co-driver standing over her bed while she was asleep and asking to get into bed with her. *Id.* at 7. She said she wanted to get off the truck right away, but her DM stated she would reroute the truck to Riverside where Fortune could then get off the truck. *Id.*

Driver Kathy Von Hatten states that when she complained about her co-driver groping and assaulting her, her DM told her to have her co-driver drop her off at the terminal. Doc. No. 35-11 at 2. Von Hatten states that due to her co-driver's constant harassment, she felt she had no choice and had sex with him. *Id.* He dropped her off at one of CRST's terminals a few hours later. *Id.* Driver Evangelina Martinez provided a declaration stating she complained to her DM about her co-driver rubbing his penis against her and harassing her. Doc. No. 35-7 at 2. She told him she did not want to drive with him anymore. *Id.* He told her to stay on the truck and be patient and that he would talk to her co-driver to see what was going on. After her co-driver's behavior

continued, she called CRST's safety office and was again told to stay on the truck. *Id.* Driver Sandra Encinas provided a declaration stating that her co-driver grabbed her buttocks while she was sleeping. He also made offensive remarks to her. Doc. No. 35-9 at 2. After reporting this conduct to her DM, he asked if she could just stay on the truck until she got home since that was where they were headed. *Id.* She stated she needed to get off the truck right away, but he pressured her to keep driving back to the terminal in Riverside to finish "one last load." *Id.* at 2-3. Finally, Saur states that after complaining to her DM that her co-driver was touching her with his feet and making sexual comments, her DM told her to stay on the truck with him. Doc. No. 35-10 at 2.

Plaintiffs also provide evidence that they reported this behavior to CRST and that CRST had knowledge of it. *See* Doc. No. 35-34 (email stating "I had notified [DM] about my sexual harassment claims prior to my final load delivery. I also spoke to the Operation Manager above [him], when I refused to relay my final load. My final load destination was to Downey, California, but [the DM] tried to initiate a relay in Missouri for a load to Washington State which I refused because I did not want to continue driving with [my co-driver]. The Operation Manager accused me of making a sexual harassment claim without evidence, and he disconnected the phone call with me."); Doc. No. 35-35 (message forwarded to HR between DM and female driver in which DM advised complainant to stay on truck until they delivered the load and could get the truck to the Riverside terminal). Plaintiffs also reference Carlson's recommendation that cameras be installed on trucks. She made this recommendation in late 2013 or early 2014, but received a "neutral response." Doc. No. 35-3 at 83-85. In addition to recommending cameras, Carlson also recommended that DMs spend some time on a truck and that CRST implement an "undercover boss" type program to monitor the performance of lead drivers, as they were the source of most complaints. Doc. No. 35-20.

Plaintiffs contend that CRST has admitted no DM has ever been disciplined for encouraging a woman complaining of sexual harassment to stay on the truck. *See* Doc.

No. 35-3 at 59-60 ("Q: Has any dispatcher ever been disciplined in any form for encouraging a complainant to stay on the truck rather than separating the drivers right away when they received a complaint? A: Not to my knowledge."). Plaintiffs allege that the DMs' performance metrics and bonus structure incentivize DMs to keep trucks moving and have loads delivered despite HR's instructions to split drivers immediately when a sexual harassment complaint arises. Plaintiffs allege this pattern and practice of allowing DMs to respond to sexual harassment complaints in this way contributes to a hostile work environment.

### 4.    *"Unpaid Suspension"*

Plaintiffs further allege that CRST has a pattern or practice of removing female complainants while allowing the male drivers to continue driving, earning money and working with other co-drivers, which amounts to discriminatory retaliation. They allege CRST's policy requires the accuser, not the accused, to be removed from the truck when there is a complaint of sexual harassment.[5] Plaintiffs claim this policy is retaliatory because drivers may earn pay under the split mileage rate system only when the truck is moving. They claim "[i]t is a punishment for complaining, and a deterrent for female drivers, who know they will be pulled off their truck and stranded with no pay if they make a complaint." Doc. No. 35-1 at 19. They allege CRST could use non-mileage-based compensation to avoid a retaliatory effect, as CRST does in other instances such as providing layover pay when trucks lie empty or when there is a truck breakdown or

---

[5] The only exceptions to this policy are when a lead driver has a complaint against a student, as students are not authorized to remain on the truck alone, and when the complainant is an owner-operator. Doc. No. 35-3 at 55; Doc. No. 55-1 at 14. In all other instances, plaintiffs allege CRST's policy requires the accuser to leave the truck.

impassable road.[6]  *Id.*  Plaintiffs contend that a month after they filed their case in California, CRST instituted a policy of paying "HR layover pay" to women complaining of sexual harassment "so that they don't suffer financially for having to get off the truck so that we can investigate the allegation brought forward."  *Id.*  Plaintiffs allege this change in policy is evidence that CRST knew its previous policy was retaliatory.  As such, plaintiffs claim all female drivers were subject to CRST's retaliatory "unpaid suspension" policy up to May or June 2015.[7]  Even as of July 2016, plaintiffs state that the new HR layover pay policy was not in the employee handbook and had not been produced in any written format.  *Id.* at 19-20.

### 5.  *Transit and Lodging Costs*

Plaintiffs allege CRST has a policy or practice of discriminating and retaliating against women complaining of sexual harassment by imposing transit and lodging costs incurred as a result of their complaint.  Plaintiffs state that upon making a sexual harassment complaint, CRST would remove the accuser from the truck and advance lodging and transit costs.  CRST would then recoup these costs by deducting them from the driver's next paycheck.  Several of the declarations submitted by plaintiffs state that any lodging or transportation costs they had following their harassment complaints were advanced and then deducted from their paycheck.  *See* Doc. Nos. 35-6 at 7; 35-7 at 3; 35-9 at 3; 35-10 at 2-3.[8]

---

[6] CRST's director of HR states in a declaration that "[p]rior to July 2015, where there was a delay in the pairing and continuation of driving which exceeded 48 hours, a driver complaining of harassment would receive layover pay of $40/day – assuming the complaining driver was located at a remote site and not at their home."  Doc. No. 55-1 at 15.

[7] CRST clarifies this policy went into effect July 2015.  *See* Doc. No. 55-1 at 15.

[8] CRST denies these costs were deducted from the drivers' paychecks and provides supporting documentation.  *See* Doc. No. 55-2 at 6, 9-10.

Plaintiffs allege that CRST has acknowledged its policy was retaliatory because it has now changed that policy. As of July 2015, drivers who complain of sexual harassment are "not to be required to pay back hotel and cab fares related to [their] being pulled off the truck . . ." Doc. No. 35-27. Plaintiffs point out that Carlson still testified in July 2016 that she did not know whether CRST had a policy of covering hotel expenses associated with a driver being pulled off a truck due to a Title VII-related complaint. *See* Doc. No. 35-3 at 16-17 (in which Carlson testified that her understanding is that the hotel and cab fares are paid, but stated she does not have the policy and was "unaware of the policy that [the DMs] rely on concerning those payments."). Plaintiffs state Carlson's testimony raises the question of whether the new policy is being applied or whether compliance with the policy is being monitored. Nonetheless, they contend the policy prior to July 2015 amounted to discriminatory retaliation.

### 6.    *Extension of Student Driver Training*

Plaintiffs allege CRST has a pattern or practice of discriminating and retaliating against women complaining of sexual harassment by extending their student driver training. Specifically, plaintiffs allege that a student driver's over-the-road training is extended far beyond 28 days if the student is removed from a lead driver's truck due to her sexual harassment complaint. *Id.* at 21. They contend this deprives the student of being able to earn regular pay as a co-driver. In other words, if a student driver makes a sexual harassment complaint, her training time will be extended and she will continue being paid at the lower student rate. *Id.* (citing Doc. No. 35-3 at 70-72).[9] Sellars' declaration states that her training went on for over two months due to repeated

---

[9] CRST has submitted declarations stating that a student driver's pay is not affected due to the extension of training unless the extension exceeds three months. *See* Doc. No. 55-1 at 6 (noting that a student driver's pay rate does not increase until the completion of three months of service); *Id.* at 10 ("[u]nless a driver's training period is extended beyond 90 days there is no economic detriment to a 'student driver' designation versus a 'co-driver' designation.").

harassment by her trainers. *See* Doc. No. 35-6 at 8. Plaintiffs also point to an email from the student driver coordinator advising that she was looking for a female lead driver for a student to complete her 28-day training again. Doc. No. 35-28 at 1. The student driver said she refused to do another 28 days because she had done nothing wrong and CRST was punishing her for "those men making advances on her." *Id.* The student coordinator indicated she told the student that because her training had been broken up so much, CRST would like her to perform a full 28-day training again for "her safety and others." *Id.* Plaintiffs argue this policy of extending a student driver's over-the-road training beyond 28 days due to her reports of sexual harassment is discriminatory retaliation.

## III. DISCUSSION

### A. Evidentiary Issues

Prior to considering whether plaintiffs have established the requirements for class certification, I must first address evidentiary issues raised by plaintiffs in their reply (Doc. No. 65). Plaintiffs take issue with CRST's submission of the declarations of Angela Stastny (Director of HR and Carlson's direct supervisor), Chad Brueck (Vice President of Operations from mid-2011 through May 2016) and Laura Wolfe (Director of Safety).

Stastny's declaration addresses timing and payment of lodging and transit costs when a driver complaining of harassment is removed from a truck. During her deposition, Carlson was unable to answer many questions as to (1) whether funds for these expenses were advanced and then recouped by CRST and (2) when CRST instituted its HR layover pay policy. Indeed, while plaintiffs' motion for class certification was pending, the parties litigated whether Carlson was a sufficient Rule 30(b)(6) witness. Doc. Nos. 26, 43, 48. Then-Chief United States Magistrate Jon S. Scoles determined that Carlson was able to answer questions related to all of the subjects identified by plaintiffs in their Rule 30(b)(6) notice, with one exception: she lacked knowledge

regarding driver pay. Doc. No. 61 at 3. Paragraph C(1) of plaintiffs' Rule 30(b)(6) notice requested a corporate witness who would be generally able to testify as to CRST's "practices" regarding compensation and pay rates for drivers. *Id.* Judge Scoles instructed: "If the parties cannot agree on some other form of discovery, then CRST must produce a witness who is able to testify regarding 'CRST's policies, practices, procedures, criteria, and standards regarding, and the identity and physical location of the persons responsible for, setting or determining compensation and pay rates for drivers.'" *Id.* Plaintiffs apparently did not agree to Stastny's declaration in satisfaction of Judge Scoles' order. Plaintiffs now claim they are disadvantaged because CRST relies on Stastny's declaration in resistance to the class-certification motion and plaintiffs contend that these issues are a key component of their case.

Stastny's declaration addresses three topics raised by plaintiffs:

(1) an exception to the purported policy that the complainant must always get off the truck unless she is a lead driver and the accused a student driver

(2) whether prior to July 2015 complainants ever received any pay after getting off a truck due to their complaint and whether transit and lodging costs deducted from pay were reimbursable

(3) whether DMs were ever suspended or had their employment terminated for failing to comply with HR policies

As to the first topic, Stastny stated: "If a student driver lodges a complaint against a lead driver who is an owner/operator, then the student or co-driver would be removed from the truck because it is the owner/operator who owns the truck. This would also apply to a company/co-driver who lodges a complaint against an owner/operator." Doc. No. 55-1. This is consistent with plaintiffs' contention that CRST's policy is to always remove the complainant from the truck. However, it appears Stastny's point was that an owner-operator must always stay with his or her truck. This provides a non-discriminatory reason as well as an exception to the policy alleged by plaintiffs that the complainant is always directed to get off the truck rather than the alleged harasser.

As to the second topic, Stastny's declaration provides that prior to July 2015, a complainant was paid $40 per day if a delay in pairing the driver exceeded 48 hours and she was at a remote location and not her home. *Id.* at 15. Lodging and transportation costs were also pre-paid or reimbursed under these circumstances. *Id.* If a DM needed to advance money to cover costs, the driver would need to submit receipts for CRST to reimburse costs. *Id.* (noting that if an advance of a fixed sum was made, it was subsequently deducted from the driver's pay and could then be reimbursed upon submission of receipts). CRST explains that Stastny's declaration demonstrates that under the former policy, it may not have been obvious that CRST covered costs related to harassment complaints. Doc. No. 55 at 50. This is because a complaint of harassment might not surface until after CRST had deducted money it advanced. *Id.* Under this scenario, CRST could not have known that it would need to cover those costs and would only do so once it became aware of the reason for transit and lodging expenses.

As to the third topic, Stastny's declaration states that DMs have been suspended or have had their employment terminated in the past for failure to comply with HR reporting requirements. Doc. No. 55-1 at 13-14. Stastny refers to a DM and a terminal manager who were discharged for failure to follow HR policies related to timely forwarding complaints of sexual harassment to HR. *Id.*

Plaintiffs also take issue with Brueck's declaration. Carlson testified she assumed students were paid at a lower rate than a normal CRST co-driver. Doc. No. 35-3 at 43. CRST submitted Brueck's declaration, which states:

> For new drivers, one of three pay schedules applies depending on whether the driver has a license and prior experience; a license and no prior experience; or a license obtained through CRST-funded training and no experience. *Irrespective of which class the driver fits in, pay increases are triggered based on the length of service with CRST measured according to calendar dates. Under the pay schedules effective on and after October 15, 2013, a student driver's pay rate increases one cent per mile following completion of three months of service.* To qualify, the student driver must be released to the status of co-driver. Nonetheless, the training program

> only lasts up to 28 days, so there is a negligible chance of a driver remaining active at CRST and failing to have his or her skills evaluated by the time three months have lapsed.

Doc. No. 55-1 at 5-6 (emphasis added).  CRST also submitted Wolfe's declaration, which states that "[u]nless a driver's training program is extended beyond 90 days there is no economic detriment to a 'student driver' designation versus a 'co-driver' designation." *Id.* at 10.

Plaintiffs complain that these declarations are contradictory to Carlson's testimony.  I disagree.  These declarations provide additional information that Carlson was unable to provide due to her lack of knowledge.  However, I acknowledge plaintiffs' complaint that they did not have the opportunity to cross-examine these declarants on the information they have now provided.  I also note that these declarations *are* contradictory to the declarations submitted by plaintiffs.  *See* Doc. No. 35-5 at 6 ("I had to remain in Miami for several days, with no ability to drive or earn pay, until I was permitted to go to Virginia to join another truck.  I was paid nothing during that time."); 35-6 at 7 (in which plaintiff Sellars states that CRST recouped costs of her hotel stay and bus transportation from her pay and that during the time she had to travel from Riverside, California to Oklahoma City, Oklahoma, to retrieve her belongings left by the driver who had harassed her, she received no pay).  Only plaintiff Sellars states that the extension of her training beyond the 28 days affected her pay.  However, her training was only extended to two months.  *See* Doc. No. 35-6 (in which Sellars states that her training was extended to two months instead of 28 days and that she was still receiving the student-driver pay rate at two months).

I do not find it necessary to resolve any fact issues on plaintiffs' claims as long as plaintiffs have put forth some evidence in support of their claims that would be admissible at trial.  *See Blades*, 400 F.3d at 567 (noting that factual disputes "may be resolved only insofar as resolution is necessary to determine the nature of the evidence that would be sufficient, if the plaintiffs' general allegations were true, to make out a prima facie case

for the class."). Plaintiffs have done so here. Any further resolution of factual issues is not appropriate at this time.

## B.     *Class Certification*

### 1.     *Applicable Law*

Federal Rule of Civil Procedure 23 governs class certification. Under Rule 23(a), the party seeking certification must demonstrate:

(1)     the class is so numerous that joinder of all members is impracticable

(2)     there are questions of law or fact common to the class

(3)     the claims or defenses of the representative parties are typical of the claims or defenses of the class, and

(4)     the representative parties will fairly and adequately protect the interests of the class.

The proposed class must also satisfy at least one of the three requirements under Rule 23(b). Here, plaintiffs seek certification under Rule 23(b)(3), which requires that "the questions of law or fact common to class members predominate over any question affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). They alternatively seek certification under a hybrid of Rule 23(b)(2) and Rule 23(b)(3), or issue certification under Rule 23(c)(4). These options will be discussed in further detail below. The court retains "broad discretion in determining whether to certify a class, recognizing the essentially factual basis of the certification inquiry and . . . the district court's inherent power to manage and control pending litigation." *In re Zurn Pex Plumbing Prods. Liab. Litig.*, 644 F.3d 604, 616 (8th Cir. 2011) (internal quotations and citations omitted).

Courts are instructed to "conduct a 'rigorous analysis' to determine whether the

prerequisites for a class action under Rule 23(a) are satisfied." *Rattray v. Woodbury Cnty., Iowa*, 614 F.3d 831, 835 (8th Cir. 2010) (quoting *Gen Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 161 (1982)). The "rigorous analysis" may "entail some overlap with the merits" in evaluating whether plaintiffs have met the Rule 23(a) requirements. *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 351 (2011). However, in determining whether to certify a class action, "the question is not whether the plaintiff or plaintiffs have stated a cause of action or will prevail on the merits, but rather whether the requirements of Rule 23 are met." *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 178 (1974). "Rule 23 does not set forth a mere pleading standard." *Wal-Mart Stores, Inc.*, 564 U.S. at 350. "A party seeking class certification must affirmatively demonstrate his compliance with the Rule – that is, he must be prepared to prove that there are *in fact* sufficiently numerous parties, common questions of law or fact, etc." *Id.* "The Court may also certify a class as to one or more claims without certifying the entire complaint." *Jenson v. Eveleth Taconite Co.*, 139 F.R.D. 657, 659 (D. Minn. 1991) (hereinafter *Jenson I*) (citing Fed. R. Civ. P. 23(c)(4)).

### 2. *Rule 23(a) Requirements*

#### a. *Numerosity*

Rule 23(a)(1) requires that the class be "so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). Relevant factors include: the number of persons in the proposed class; the size of the individual claims; the inconvenience of trying individual suits; and any other factor relevant to the practicability of joining all of the putative class members. *Paxton v. Union Nat'l Bank*, 688 F.2d 552, 669-60 (8th Cir. 1982). Plaintiffs seek to certify the following Hostile Work Environment Class:

> All women who were or are employed as team truck drivers by CRST Expedited, Inc. at any time from October 12, 2013 to the present, who were subjected to a hostile work environment based on sex, or, in the alternative, such separate class or subclasses of such persons as may be appropriate under the Federal Rules of Civil Procedure.

Doc. No. 25-1 at 29-30. Plaintiffs also seek certification of the following Retaliation Class:

> All women who were or are employed as team truck drivers by CRST Expedited, Inc. at any time from October 12, 2013 to the present, who were subjected to retaliation in response to their complaints concerning sexual harassment, or, in the alternative, such separate classes or subclasses of such persons as may be appropriate under the Federal Rules of Civil Procedure.

*Id.* at 30. Plaintiffs further seek certification of California hostile work environment and retaliation subclasses of such women who experienced the hostile work environment and retaliation within California. *Id.* at 29-30.

Plaintiffs allege their proposed Hostile Work Environment Class is sufficiently numerous because CRST's PWE charts indicate CRST has documented sexual harassment complaints from 106 women between October 12, 2013 and February 24, 2016. *See* Doc. No. 35-14. They further allege that "[a]ssuming a constant rate until the date of this filing, Human Resources has received over 1425 such complaints." Plaintiffs allege this number does not account for complaints that were not passed on to HR or women who did not complain due to economic repercussions. Plaintiffs claim this class exceeds 125 individuals, "because many more of the 1893 women who worked as team drivers between October 12, 2013 and March 2016 will have individual claims for relief at Phase II, given the impediments CRST creates to a complaint actually reaching Employee Relations, and given the policy of retaliation that punishes women who experienced a hostile work environment." Doc. No. 35-1 at 32.

Plaintiffs allege the proposed Retaliation Class also satisfies the numerosity requirement because of the overlap between the two classes. In other words, when a woman complained about harassment while she was on a truck, she was also exposed to the alleged retaliatory policy by being removed from the truck, incurring lodging and transit costs and, if she was a student, delaying her training and compensation as a fully-trained driver. Without offering any explanation, plaintiffs estimate this proposed class

consists of approximately 140 women. *Id.* at 33. [10]

Plaintiffs argue the proposed California subclasses also satisfy the numerosity requirement because a "large part of CRST's business comes in through Riverside, and nearly all team drivers are likely to pass through the Riverside terminal at some point." *Id.* Plaintiffs do not offer an estimate of the number of women in these proposed subclasses, stating they "are likely to be somewhat smaller than 140 person each, but based upon the experiences of the Plaintiffs and other putative class members, many women will have experienced harassment in California." *Id.* at 34.

CRST spends much of its resistance arguing that plaintiffs do not have a legitimate pattern or practice claim. It repeatedly cites to this court's decision in *E.E.O.C. v. CRST Van Expedited, Inc.*, 611 F. Supp. 2d 918 (N.D. Iowa 2009), to suggest plaintiffs cannot prevail on the merits of their claims. However, the merits of plaintiffs' claims are not currently at issue and are different than the claims involved in the 2009 case. [11] At this stage, I must decide only whether plaintiffs have satisfied the Rule 23 requirements to certify a class.

As to numerosity, CRST argues the particular allegations of the named plaintiffs limits the putative class because each harassment complaint presents unique

---

[10] It is unclear how plaintiffs have calculated their estimates of class members. While they have submitted PWE charts (Doc. No. 35-14), they have not offered any evidence explaining these charts or how they reached estimates of more than 125 women for the Hostile Work Environment Class and more than 140 women for the Retaliation Class. Indeed, I am unable to follow their logic that because CRST documented sexual harassment complaints from 106 women between October 12, 2013 and February 24, 2016, it follows that HR has received over 1,425 complaints of harassment. It also is not clear how the Hostile Work Environment Class will exceed 125 individuals because "many more of the 1893 women who worked as team drivers between October 12, 2013 and March 2016 will have individual claims for relief." Nonetheless plaintiffs' exhibit (Doc. No. 35-14) does show multiple documented claims of sexual harassment between October 12, 2013, and February 24, 2016, from approximately 100 women.

[11] The EEOC claimed that CRST had a pattern or practice of tolerating sexual harassment of its female drivers.

circumstances. Plaintiffs argue that their proposed classes are based on exposure to CRST's patterns and practices that amounted to a hostile work environment and retaliation and not whether each plaintiff can ultimately prove sexual harassment.

I find that plaintiffs have shown the proposed Hostile Work Environment and Retaliation Classes to be "so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). Plaintiffs have presented PWE charts (Doc. No. 35-14) demonstrating that approximately 100 women made sexual harassment complaints since October 12, 2013. Doc. No. 35-14 at 41-58. The "Comments/Corrective Action" section of these charts provides some indication of how complaints came in, whether the complaints were corroborated or not and how the co-driver was disciplined, if at all. *Id.* at 59-76. Separation of drivers is frequently mentioned throughout the charts. *Id.* at 59-76. Therefore, I find there is a sufficient number of putative members to satisfy each proposed class.

As for the subclasses, plaintiffs allege the class members experienced "multiple asserted incidents of tortious conduct" in California. *See* Doc. No. 65 at 44-45. Plaintiffs attempt to demonstrate there are enough members for a subclass by citing multiple exhibits in which class representatives and putative class members state how often they were in California and describe the type of sexual harassment they experienced at the Riverside terminal. *See* Doc. No. 35-1 at 33-34. This is somewhat confusing because plaintiffs do not seek class certification based on sexual harassment from co-workers, but rather six policies, patterns or practices that CRST allegedly uses in responding to complaints of sexual harassment that purportedly amount to a hostile work environment or retaliation throughout the United States. Individual instances of harassment in California are applicable only to the extent they demonstrate that the alleged patterns or practices was carried out in California. Plaintiffs have failed to make this connection. Specific accounts of harassment occurring in California do not demonstrate how many individuals were subject to the claimed patterns and practices that amounted to a hostile

work environment and retaliation in California. For this reason, I find plaintiffs have not proved numerosity as to the proposed California subclasses. The remainder of the analysis will address only the Hostile Work Environment and Retaliation Classes.

### b.    Commonality

"Commonality requires a showing that class members 'have suffered the same injury.'" *Powers v. Credit Mgmt. Servs.*, 776 F.3d 567, 571 (8th Cir. 2015) (quoting *Falcon*, 457 U.S. at 157). This requirement is satisfied when the legal question "linking the class members is substantially related to the resolution of the litigation." *DeBoer v. Mellon Mortg. Co.*, 64 F.3d 1171, 1174 (8th Cir. 1995) (quoting *Paxton*, 688 F.2d at 561). "Their claims must depend upon a common contention – for example, the assertion of discriminatory bias on the part of the same supervisor." *Wal-Mart Stores, Inc.*, 564 U.S. at 350. "That common contention, moreover, must be of such a nature that it is capable of classwide resolution – which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Id*. The commonality requirement cannot be satisfied by demonstrating that class members have all suffered a violation of the same provision of law." *Bennett v. Nucor Corp.*, 656 F.3d 802, 814 (8th Cir. 2011). "Plaintiffs cannot 'simply leap from the premise that they were the victims of discrimination to the position that others must also have been.'" *Gonzalez v. Brady*, 136 F.R.D. 329, 331 (D.D.C. 1991) (quoting *Morrison v. Booth*, 763 F.2d 1366, 1371 (11th Cir. 1985)).

A class action discrimination case requires plaintiffs to prove by a preponderance of the evidence that the defendant engaged in a "pattern or practice of unlawful discrimination in various company policies." *Jenson v. Eveleth Taconite Co.*, 824 F. Supp. 847, 860 (D. Minn. 1993) (hereinafter *Jenson II*) (citing *Craik v. Minnesota State Univ. Bd.*, 731 F.2d 465, 470 (8th Cir. 1984)). To establish a pattern or practice the discriminatory acts must not be "isolated, insignificant or sporadic" but must be

"repeated, routine, or of a generalized nature." *Jenson II*, 824 F. Supp. at 860 (citing *Catlett v. Missouri Highway and Transp. Comm'n*, 828 F.2d 1260, 1265 (8th Cir. 1987)). The discrimination should be "the company's standard operating procedure – the regular rather than the unusual practice." *Jenson II*, 824 F. Supp. at 860 (citing *Int'l B'hood of Teamsters v. United States*, 431 U.S. 324, 360-62 (1977)). For instance, the pattern or practice theory could be that the employer "created and maintained a sexually hostile and abusive work environment . . . because it tolerated . . . individual acts of harassment by its employees by refusing to take notice of, investigate, and/or discipline the workers who sexually harassed employees." *E.E.O.C. v. Mitsubishi Motor Mfg. of America, Inc.*, 990 F. Supp. 1059, 1069 (C.D. Ill. 1998).

Plaintiffs advocate for a *Teamsters* approach to their putative class action, which would bifurcate the case into two phases: liability and damages. *See Teamsters*, 431 U.S. at 360-62; *Jenson II*, 824 F. Supp. at 875-76 (applying modified *Teamsters* framework to pattern or practice hostile work environment claim). Phase I would determine whether (1) CRST created or tolerated a hostile work environment and (2) whether CRST retaliated against women based on sex for each class. If liability was established, each case would then proceed to Phase II to determine damages.

A hostile work environment is established if the conduct is "sufficiently severe or pervasive to alter the conditions of the victim's employment." *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 73 (1986). To prove a claim of hostile work environment, plaintiffs must prove (1) that they are members of a protected group, (2) that they were subjected to unwelcome sexual harassment, (3) that the harassment was based on sex and (4) that the harassment affected a term, condition or privilege of her employment. *Henthorn v. Capitol Comm'cns, Inc.*, 359 F.3d 1021, 1026 (8th Cir. 2004). "The fourth element involves both objective and selective components." *Id.* Some courts applying the *Teamsters* approach in this setting find that only the objective component need be established during Phase I. *See Mitsubishi Motor Mfg.*, 990 F. Supp. at 1078 ("All that

the EEOC will have established in Phase I by a finding of pattern or practice is that an objectively reasonable person would find that, as a whole, the environment within the company is hostile and that the company was on notice of and was negligent regarding the systemic problem.").[12]   In Phase II, the individual plaintiffs must then prove the subjective component to demonstrate they are part of the affected class.  *See Bremiller v. Cleveland Psychiatric Inst.*, 195 F.R.D. 1, 25, 26 (2000) (describing the two-phase approach for class action claims alleging pattern or practice of hostile work environment as a result of sexual harassment).[13]  Phase II would also involve individual determinations of damages.  *See Bremiller*, 195 F.R.D. at 36 ("Whether individual class members are entitled to damages that resulted from the alleged policy of harassment is relevant only during the recovery phase of the proceedings and will be determined therein should a jury first find Defendants liable for tolerating a policy of sexual harassment.").

To prove a claim of retaliation, plaintiffs must demonstrate (1) that they engaged in a statutorily-protected activity, (2) that they subsequently suffered an adverse employment action and (3) a causal connection between the adverse employment action

---

[12] Pattern or practice claims may be brought by the Equal Employment Opportunity Commission (EEOC) or by a class pursuant to Rule 23(a).  The same liability standards apply.  *See E.E.O.C. v. Dial Corp.*, 156 F. Supp.2d 926 (N.D. Ill. 2001) (referencing both EEOC and class actions in discussing liability).

[13] Courts disagree on whether plaintiffs are entitled to a presumption that the conduct at issue was subjectively unwelcome and whether subjective perceptions are relevant for damages or liability.  *Compare Jenson II*, 824 F. Supp. at 875-76 (refusing to recognize a presumption of discrimination from an objectively hostile environment because the employee's subjective perception is an essential element of a claim of hostile work environment, which each individual class member seeking relief must demonstrate to be entitled to damages in Phase II) *with Mitsubishi Motor Mfg.*, 990 F. Supp. at 1097 (recognizing a rebuttable presumption in which employer would bear the burden of production to "come forward with evidence to show that the individual members of the potential class, either in whole or in part, did not subjectively perceive the environment as hostile" in Phase II).  *See also Markham v. White*, 171 F.R.D. 217, 222 (N.D. Ill. 1997) ("Inquiry into each class member's subjective perception and response will of course be relevant to damages.").

and the protected activity. *Schoffstall v. Henderson*, 223 F.3d 818, 826 (8th Cir. 2000). If plaintiffs are able to establish these elements, the burden would shift to the defendant to articulate a legitimate non-discriminatory reason for its adverse employment action. Plaintiffs would then have the opportunity to show that the non-retaliatory reason provided was pretext and that the true reason for the adverse action was discrimination. *See Musolf v. J.C. Penney Co., Inc.*, 773 F.3d 916, 918-19 (8th Cir. 2014) (describing the burden-shifting analysis of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973)).

Here, plaintiffs allege that CRST has a pattern or practice of creating and tolerating a hostile work environment based on the following discriminatory policies:

- Refusing to find complaints of harassment could be corroborated despite the existence of evidence beyond "he said/she said" accounts

- Failing to impose discipline even when harassment by a driver has been corroborated

- Tolerating DMs' failure to act promptly on harassment complaints.

Doc. No. 35-1 at 37. They also allege that CRST has a pattern or practice of retaliating against women based on the following policies:

- Subjecting women who complained of sexual harassment to "unpaid suspension"

- Imposing transit and lodging costs incurred as a result of women's harassment complaints upon the women themselves

- Extending the student driver training of women who complain of sexual harassment

*Id.* Carlson has admitted that CRST's policies regarding Title VII complaints apply to all CRST employees. *See* Doc. No. 35-3 at 24. Plaintiffs provide declarations from each named plaintiff and five proposed class members to demonstrate that these policies constitute a pattern or practice, rather than individualized responses, to claims of sexual

harassment. CRST argues that the class representatives' individual proof of alleged discrimination does not justify an inference that CRST maintains a policy of sex discrimination amounting to a hostile work environment or retaliation.

### i. *Corroboration of Complaints*

With regard to the allegation that CRST refuses to find corroboration of harassment complaints absent an eyewitness or admission, CRST states that each instance of alleged harassment is unique and that it does not maintain a common "policy" in responding to complaints, whether corroborated or not. CRST maintains that it takes action even when it finds complaints cannot be corroborated by separating the drivers, re-educating and reinforcing its policies and designating accused individuals as "male only." In their reply, plaintiffs assert that CRST has admitted it refuses to find harassment is corroborated absent an admission or eyewitness. Doc. No. 65 at 39. Carlson's testimony on this point was as follows:

> Q: If the allegations of harassment concerned behavior that occurred on the truck while the drivers are there together, would it ever be possible for you to find that harassment was corroborated based on evidence other than a third person eyewitness who was on the truck seeing the harassment?
>
> A: Not unless there was an admission by the accused individual.

Doc. No. 35-3 at 67-68. Essentially, the parties disagree as to whether this policy is discriminatory and creates a hostile work environment. That is not the issue here. Carlson's testimony provides some evidence that CRST maintains a policy or practice with regard to "he said/she said" complaints by requiring either an eyewitness statement or an admission to find that the complaint was legitimate. Whether this amounts to discrimination that creates a hostile work environment or has a legitimate non-discriminatory purpose is an issue still in play. For purposes of commonality under Rule 23(a)(2), plaintiffs have produced sufficient evidence. Not only have they presented

Carlson's testimony, but they have also submitted declarations stating CRST refused to consider other potentially corroborating evidence, such as recordings. *See* Doc. Nos. 35-10 at 3; 35-22; 35-24. While Carlson disputes plaintiffs' statements that she refused to listen to recordings, this is an issue for trial. Plaintiffs' allegations of a pattern or practice of creating or tolerating a hostile work environment based on this policy satisfy the commonality requirement.

### ii. *Failure to Impose Discipline*

Plaintiffs allege CRST also maintains a pattern or practice of failing to impose discipline even where harassment is corroborated. Plaintiffs state that CRST's standard response to complaints of sexual harassment is to designate the accused driver as "male only" or "no females." Plaintiffs allege this designation, which is also used in instances when the harassment cannot be corroborated, is not disciplinary and demonstrates tolerance of a hostile work environment. Carlson testified that "any corroborated harassment . . . .of a Title VII nature" would result in termination. Doc. No. 35-3 at 72-73. However, plaintiffs point to a couple of seemingly-contradictory instances. On one occasion, Burrill corroborated inappropriate joking of a sexual nature by a lead driver. Doc. No. 35 -29 at 3. The lead was not discharged but, instead, was permitted to finish training another student who was on his truck during the investigation. *Id.* at 1. The other example is a male student who admitted he sent a female driver a text message stating, "Let's chill, I'm gonna be honest, I want to eat that. If you know what I'm talking about. Just between me and you." Doc. No. 35-30. The student also gave the driver a false identity, but later admitted he had done so because he thought she might tell someone. *Id.* The student's employment was not terminated. Doc. No. 35-31.[14]

---

[14] Plaintiffs fail to mention that according to the investigation form, the student reported that the

Plaintiffs also complain that lead drivers are not sufficiently disciplined when harassment is corroborated. In the above example involving inappropriate joking by a lead driver, the safety supervisor stated that the lead driver would be allowed to finish his current student's training, but his lead certification would be pulled for 90 days. Doc. No. 35-29 at 1. However, Brian Brejcha, a CRST Operations Manager, ultimately decided that the only action required would be for the lead driver to "ha[ve] a face to face conversation with Laura/Michael/Jenny regarding what it means and the expectations of being a lead driver [ ] at CRST." *Id.* Brejcha stated, "[b]ased on their findings in the conversation they will give the final determination if he understands what it takes to be a trainer for CRST and meets the expectations needed." *Id.* In another instance, HR corroborated that a lead driver talked about sex with his girlfriends and friends in front of a female student. Doc. No. 35-32. His team preference was changed to "male only," he was required to complete PWE training again and he was given a verbal warning not to discuss sexual topics in the presence of a student. *Id.* Plaintiffs point to a third instance where a lead driver admitted to having "pornographic books and magazines laying around the truck" and listening to "uncensored radio in which [it] talked about penis, breasts, sex. . ." Doc. No. 35-33. This driver was routed to Cedar Rapids for counseling by the safety team and was recommended for PWE training again. *Id.* His team preference was also changed to male only. *Id.*

CRST argues that discipline imposed is commensurate with culpability. It states that plaintiffs merely describe individual examples of alleged harassment, assert that those allegations were corroborated and argue that CRST should have imposed greater discipline. CRST argues this does not demonstrate a policy of CRST, but plaintiffs' own

---

driver made advances to him by giving him her phone number and saying she was looking for a guy friend. Doc. No. 35-31 at 2. He was directed to have no further contact with the driver, his team preference was changed to male only and he was advised that if another allegation of this nature was brought forward, it could be grounds for discharge. *Id.* at 3.

assessment of a unique fact pattern of alleged harassment. CRST asserts that plaintiffs assume all allegations of harassment are legitimate or that CRST's investigations "always produce sufficient information upon which to base a decision as important as deciding whether an employee should be fired for misconduct." Doc. No. 55 (citing *CRST Van Expedited, Inc.*, 611 F. Supp. 2d at 955). They argue this issue cannot be resolved on a class basis because it depends on individual circumstances and no common contention or common answer exists.

Essentially, the parties disagree as to whether the alleged pattern or practice exists. However, it is not necessary to resolve at this time the question of whether CRST does or does not maintain a pattern or practice of failing to discipline drivers when harassment is corroborated. While both parties intend to rely on anecdotal evidence to demonstrate that such a pattern or practice does or does not exist, I find that the overall claim and its associated issues satisfies the commonality requirement. *See Radmanovich v. Combined Ins. Co. of America*, 216 F.R.D. 424, 432 (N.D. Ill. 2003) (finding common issues existed such as whether a pattern or practice of sexual discrimination exists, whether plaintiff's statistical evidence established such a pattern or practice, defendant's knowledge of such a pattern or practice of discrimination and defendant's preventative or remedial actions with regard to such discrimination).

### iii. Failure to Discipline DMs

Plaintiffs argue that CRST creates or maintains a hostile work environment based on its pattern or practice of failing to adequately discipline DMs for failing to act promptly in responding to complaints of sexual harassment. CRST notes that plaintiffs again rely on specific anecdotes to establish this pattern or practice. They also note that "promptly" is a subjective term that must be assessed based on actual circumstances and in relation to the severity of the specific instance of alleged harassment. CRST explains that upon receipt of a complaint of sexual harassment, it first ensures the driver is safe and makes

a fact-dependent assessment of when and how the drivers should be separated. Upon receiving the report, HR then begins an investigation. CRST contends that DMs' actions in responding to complaints depend on when and how the complaints are submitted and the substance of the complaint. It argues that its response to complaints is too tailored to individual circumstances to satisfy the commonality requirement. In their reply, plaintiffs assert that their submission of CRST records shows that DMs pressured women to stay on trucks and failed to take action in response to complaints. They allege DMs have not been punished for these actions.

Again, the parties disagree on whether plaintiffs can establish the existence of this alleged pattern or practice, whether it is discriminatory and whether it contributes to a hostile work environment. Plaintiffs' reliance on anecdotal evidence to establish a pattern or practice does not defeat commonality. *See Catlett*, 828 F.2d at 1265 (noting that either statistical or anecdotal evidence may be used to establish a pattern or practice and noting "a class claim may succeed despite employer rebuttal of alleged instances of discrimination involving class representatives and testifying class members."); *see also* Fed. R. Civ. P. 23(a)(2) (noting commonality requires plaintiffs to show "there are questions of law or fact common to the class"). Here, the class will attempt to prove, through a series of examples, that CRST had a pattern or practice in responding to DMs who failed to act promptly in responding to complaints of sexual harassment and that this pattern or practice, combined with the others plaintiffs have described, created an objectively hostile work environment. If a particular pattern or practice cannot be established, as CRST alleges, then that pattern or practice will not be considered in assessing whether CRST contributed to a hostile work environment.

In sum, I find that plaintiffs have established commonality with regard to their claim that CRST creates or tolerates a hostile work environment through the alleged patterns and practices.

### iv.    *Unpaid Suspension*

Plaintiffs allege that CRST retaliates against women complaining of sexual harassment by subjecting them to "unpaid suspension" in requiring them to get off the truck upon making a complaint.   CRST argues that in responding to a harassment complaint, safety is its top priority and that individual circumstances determine who gets off the truck and who stays.  It notes that owner-operators cannot be separated from their own trucks and students cannot drive a truck alone.  CRST contends that plaintiffs have not offered sufficient proof that the assessment of who to remove from the truck is unrelated to non-discriminatory factors such as licensing and truck ownership.  Plaintiffs argue they do not have to prove why female drivers were removed from the truck at this stage.  I agree.  CRST's argument goes to the merits of plaintiffs' claim.  Plaintiffs have provided at least some evidence to support their claim that this is a pattern or practice of CRST.  Carlson testified as follows:

> During the training that I have conducted a couple of times a year, it is communicated that the accuser is the individual that gets off the truck because we want to make sure that they are in a safe location, a safe environment.  If the accuser – Let's see – If the accuser is the lead driver, then the accuser has to stay on the truck because the student can't remain on the truck and drive the truck because they are not qualified yet.  So in that particular case the student would have to get off the truck.  But in the majority of cases, it would be the accuser that gets off the truck.  So we engage in a dialogue with the driver managers when these situations arise and if they have questions, they call us on the telephone, whether it be me or any of our employee relations representatives.  And we reaffirm that the accuser needs to get off the truck, we need to get them a hotel and cab, then we need to do so immediately so that we can begin the investigation.

Doc. No. 35-3 at 55-56.  Plaintiffs have also submitted declarations describing instances in which female drivers were instructed to get off the truck after complaining of sexual harassment, even when they specifically asked to stay on the truck and for the alleged male harasser to be removed.  *See* Doc. Nos. 35-5, 35-6, 35-7, 35-8.  I find that this evidence is sufficient to demonstrate commonality.   Whether this amounts to

discriminatory retaliation is a question for another day.

### v.    *Transit and Lodging Costs*

With regard to whether female drivers were required to pay lodging and transit costs upon getting off the truck, CRST notes that its policy regarding these costs has changed during the putative period.  However, it contends these costs were always reimbursable, as noted in Stastny's declaration.  Moreover, CRST contends that plaintiffs have not shown whether a significant number of putative class members were separated from their truck and subject to these costs.  Plaintiffs argue that they do not have to demonstrate that all putative class members had these costs imposed on them at this stage of the case.

The parties present conflicting evidence as to whether the lodging and transit expenses were reimbursable, if so, and under what circumstances.  CRST's evidence suggests that prior to the new policy in 2015, there was a process by which lodging and transit expenses were paid by CRST (either through vouchers or advances to the driver) and then recouped by CRST by deducting that advance from the driver's paycheck.  Those paycheck deductions could then be reimbursed upon notice that the advance was made in relation to a sexual harassment complaint and upon submission of receipts.  Plaintiffs' declarations state lodging and transit costs were deducted from their paychecks, but never reimbursed.

Again, the parties' arguments go to the merits of whether a pattern or practice exists.  However, I find that even if there was a pattern or practice, it would not be sufficiently common to all putative class members.  First, both parties acknowledge that more than one type of policy applies to the proposed class (pre-July 2015 or post-July 2015).  Second, application of any type of policy appears to be very dependent on individual circumstances, such as where the driver got off the truck.  Third, these costs flow from the previously-alleged retaliatory policy, making this an issue more appropriate

for damages rather than liability. Due to the factual disparities, I find that plaintiffs have not demonstrated a policy, pattern or practice to which the class members would have been commonly subjected regarding lodging and transit costs. However, this issue may be relevant in individual calculations of damages in Phase II as a result of another established pattern or practice of discriminatory retaliation.

### *vi.* *Extension of Student Training*

Plaintiffs argue that CRST maintains a policy or practice of retaliation against female student drivers reporting sexual harassment because requiring a student to exit the truck extends her training beyond the regular 28 days. They argue this deprives them of pay at the higher co-driver rate and also prevents them from being able to apply for jobs outside CRST for a longer period of time. CRST argues that a student's ability to start earning at a higher pay rate depends on the passage of a certain amount of time, not the date training is completed. It relies on Brueck's declaration, which provides that the first pay increase is triggered by the passage of three months of employment, not the completion of driver training. Doc. No. 55-1 at 5-6. The only change that occurs at the completion of training is the designation of "student" to "co-driver." Wolfe's declaration clarifies that "[u]nless a driver's training period is extended beyond 90 days there is no economic detriment to a 'student driver' designation versus a 'co-driver' designation." *Id.* at 10.

Plaintiffs contend defendant's arguments are directed at the merits of the claim, not commonality. I agree. However, similar to the lodging and transit costs, I find that this issue does not meet the commonality requirement because it is far too dependent on individual circumstances. First, it would only apply to student drivers. Second, application of any policy would vary depending on how long the training was extended and the extent of economic detriment (if any). In other words, any retaliatory effect of the policy would not be common among the class. Again, this issue would be more

appropriate in calculating individual damages as a result of another established pattern or practice of retaliation.

To conclude, I find that plaintiffs have established commonality with regard to their claim that CRST retaliates against female drivers making sexual harassment complaints through its alleged pattern or practice of requiring them to exit the truck, unless the complainant was an owner-operator or lead driver. All other "patterns or practices" plaintiffs have alleged are too dependent on the individual circumstances involved and, in any event, would be consequential to the other alleged policy.

My commonality findings have no bearing on the issues of whether these policies, patterns or practices exist or are discriminatory and amount to a hostile work environment or retaliation. I find only that there are common contentions among the class members that would allow for class resolution.

### c.    *Typicality*

Typicality requires that the claims of the representative parties be typical of the claims of the class. Fed. R. Civ. P. 23(a)(3). As such, "a class representative must be part of the class and possess the same interest and suffer the same injury as the class members." *Falcon*, 457 U.S. at 156. In *Falcon*, the Supreme Court provided the following guidance on the typicality requirement:

> Conceptually, there is a wide gap between (a) an individual's claim that he has been denied a promotion on discriminatory grounds, and his otherwise unsupported allegation that the company has a policy of discrimination, and (b) the existence of a class of persons who have suffered the same injury as that individual, such that the individual's claim and the class claims will share common questions of law or fact and that the individual's claim will be typical of the class claims. For [plaintiff] to bridge that gap, he must prove much more than the validity of his own claim.

*Falcon*, 457 U.S. at 157.

CRST compares plaintiffs' claims to the claims in *Elkins*. In *Elkins*, the plaintiffs

alleged they were subjected to suggestive or lewd comments and gestures and/or physical grabbing and groping as well as unwanted sexual advances. *Elkins v. American Showa, Inc.*, 219 F.R.D. 414, 425 (S.D. Ohio 2002). The court stated "this is not a case where a named plaintiff who proved her own claim would prove anyone else's." *Id.* It reasoned that plaintiffs' claims did not arise "from the same event or practice or course of conduct that gives rise to the claims of other class members." *Elkins*, 219 F.R.D. at 425. CRST argues plaintiffs have no basis to assert that each female employee who reported sexual harassment was subject to the same alleged experiences of the class representatives.

I agree with defendants to the extent that claims involving payment of lodging and transit costs and extension of student training are not typical to the entire class for the same reasons they are not common among the class, as described above. However, I do find that the following of plaintiffs' claims are typical to the class:

    A.    CRST created or tolerated a hostile work environment by

        (1)    failing to find their complaints were corroborated without an eyewitness or admission,

        (2)    failing to discipline drivers after complaints were corroborated and

        (3)    failure to discipline DMs for failing to promptly respond to sexual harassment complaints and

    B.    CRST retaliated against women making sexual harassment complaints by requiring them to exit the truck

Such pattern or practice claims would apply to each of the respective classes if proved.[15] As such, I find that these claims satisfy the typicality requirement.

---

[15] While plaintiffs' hostile work environment claim requires proof that each plaintiff subjectively perceived the work environment to be hostile, that issue can be left for individual determination in Phase II. *See Jenson II*, 824 F. Supp. at 875-76 (refusing to recognize a presumption of discrimination from an objectively hostile work environment because the employee's subjective perception is an essential element of a claim of hostile work environment, which each individual class member seeking relief must demonstrate to be entitled to damages in Phase II).

### d. Adequacy of Representation

Under Rule 23(a)(4), the class representatives and class counsel must fairly and adequately protect the interests of the class. "In deciding this question, the Court considers (a) whether the class representatives and their counsel will competently and vigorously pursue the action, and (b) whether differences exist between the interest of the class representatives and the putative class." *Morgan v. United Parcel Serv.*, 169 F.R.D. 349, 354 (E.D. Mo. 1996). With regard to the first inquiry, plaintiffs satisfy this element where they "share the same interests as those of the putative class[, which] shared interest insures the vigorous prosecution of the action by the named plaintiffs." *Jenson I*, 139 F.R.D. at 665 (citing *Bishop v. Committee on Professional Ethics, Inc.*, 686 F.2d 1278, 1289 (8th Cir. 1982)). Plaintiffs have submitted PWE charts demonstrating that CRST found their complaints were not corroborated. *See* Doc. No. 35-14 at 64-65, 67. They have also submitted CRST documents addressing how drivers and DMs were disciplined (or not disciplined) regarding corroborated complaints and failures to promptly address sexual harassment complaints. Doc. Nos. 35-29 through 35-35. Finally, they presented declarations demonstrating they were required to get off the truck following their reports of sexual harassment. Doc. Nos. 35-5, 35-6 and 35-8. I find that plaintiffs share the interests of both putative classes and will adequately represent the class members.

With regard to whether counsel will also competently and vigorously pursue the action, I note that under Rule 23(g)(1)(A), I must consider the following in appointing class counsel:

> (i)     the work counsel has done in identifying or investigating potential claims in the action;
>
> (ii)    counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action;
>
> (iii)   counsel's knowledge of the applicable law; and
>
> (iv)   the resources that counsel will commit to representing the

class.

Fed. R. Civ. P. 23(g)(1)(A). Plaintiffs' counsel, Friedman & Houlding LLP, represents that it has been involved in multiple class action lawsuits, including class actions involving allegations of sexual harassment and hostile work environment. Doc. No. 35-1 at 48. It also represents that local counsel, Thomas Newkirk, is highly experienced in this field, having represented plaintiffs in employment matters for more than two decades. I have no reason to believe that plaintiffs' counsel would not adequately represent the putative classes.

The second inquiry under Rule 23(a)(4) "serves to uncover conflicts of interest between named parties and the class they seek to represent." *Amchem Prods, Inc. v. Windsor*, 521 U.S. 591, 625 (1997). Plaintiffs have proposed two classes: a Hostile Work Environment Class and a Retaliation Class. I find no conflict within each of these classes or between them. Because plaintiffs propose a *Teamsters* approach, in which liability would be determined at Stage I and damages at Stage II, I do not find that the class members will have antagonistic goals in resolving their claims.

In sum, I find that plaintiffs have satisfied each Rule 23(a) requirement for the Hostile Work Environment and Retaliation Classes. I must now determine whether the classes meet at least one of the Rule 23(b) requirements.

### 3.    *Rule 23(b) Requirements*

Plaintiffs seek to certify their proposed classes under Rule 23(b)(3), or in the alternative, as a hybrid action under both Rule 23(b)(2) and 23(b)(3). Rule 23(b)(3) requires a finding "that the questions of law or fact common to class members predominate over any questions affecting only individual members and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." *Powers*, 776 F.3d at 569. Rule 23(b)(2) is appropriate when "the party opposing the class has acted or refused to act on grounds that apply generally to the class,

so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole."

### a.     Rule 23(b)(3)

Rule 23(b)(3) is composed of two requirements: predominance and superiority. Common questions must "predominate over any questions affecting only individual members" and class resolution must be "superior to other available methods for the fair and efficient adjudication of the controversy." *Amchem Prods., Inc.*, 521 U.S. at 615. The rule lists the following factors are pertinent to these findings:

(A)     the class members' interests in individually controlling the prosecution or defense of separate actions;

(B)     the extent and nature of any litigation concerning the controversy already begun by or against class members;

(C)     the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and

(D)     the likely difficulties in managing a class action.

Fed. R. Civ. P. 23(b)(3).

### i.     Predominance

"The predominance inquiry 'tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation.'" *Elkins*, 219 F.R.D. at 419 (quoting *Bacon v. Honda of America Mfg., Inc.*, 205 F.R.D. 466, 486 (S.D. Ohio 2001)).  It is not satisfied if "individual questions . . . overwhelm the questions common to the class." *Ebert v. General Mills, Inc.*, 823 F.3d 472, 478-79 (8th Cir. 2016) (quoting *Amgen Inc. v. Conn. Ret. Plans & Trust Funds*, 133 S. Ct. 1184, 1196 (2013)).  "An individual question is one where 'members of a proposed class will need to present evidence that varies from member to member,' while a common question is one where 'the same

evidence will suffice for each member to make a prima facie showing [or] the issue is susceptible to generalized, class-wide proof." *Ebert*, 823 F.3d at 479 (quoting *Tyson Foods, Inc. v. Bouaphakeo*, 136 S. Ct. 1036, 1045 (2016)). With regard to predominance, the Eighth Circuit has stated:

> When determining whether common questions predominate, a court must conduct a limited preliminary inquiry, looking behind the pleadings, but that inquiry should be limited to determining whether, if the plaintiffs' general allegations are true, common evidence could suffice to make out a prima facie case for the class. While limited in scope, this analysis should also be rigorous.

*In re Zurn Pex Plumbing Prod. Liab. Litig.*, 644 F.3d at 618 (internal citations and quotation marks omitted). "In conducting this preliminary inquiry, however, the court must look only so far as to determine whether, given the factual setting of the case, if the plaintiffs['] general allegations are true, common evidence could suffice to make out a prima facie case for the class." *Blades*, 400 F.3d at 566. The predominance requirement is "far more demanding" that Rule 23(a)'s commonality requirement. *Amchem*, 521 U.S. at 623-24. "In contrast to Rule 23(a)(2), the issue of predominance under Rule 23(b)(3) is qualitative rather than quantitative." *Ebert*, 823 F.3d at 478.

CRST argues that individualized issues predominate over any common issues. They contend that whether certain modifications to CRST policies are necessary must be measured against particular allegations. For instance, it notes that there may be a putative class member who filed a complaint about language used by her co-driver, but had no desire for either driver to get off the truck. CRST states that even if plaintiffs are "permitted to split off a portion of their liability showing, the volume of plaintiff-specific hostile work environment and retaliation determinations remaining would undo any purported efficiency gained." Doc. No. 55 at 66.

I have found plaintiffs have met the commonality requirement under Rule 23(a) with regard to the following issues:

        A.     CRST created or tolerated a hostile work environment by

          (1)      failing to find their complaints were corroborated without an eyewitness or admission,

          (2)      failing to discipline drivers after complaints were corroborated and

          (3)      failure to discipline DMs for failing to promptly respond to sexual harassment complaints and

     B.      Retaliated against women making sexual harassment complaints by requiring them to exit the truck

The evidence plaintiffs intend to rely on for these two claims includes testimony from Carlson and anecdotal evidence in the form of testimony from individual plaintiffs subject to the alleged policies, patterns or practices. Plaintiffs advocate for the *Teamsters* approach such that liability for each claim would be established in Phase I, and individual damages established at Phase II.[16] The potential need for individual damage calculations at a later stage is typically not decisive of the predominance factor. *See* William B. Rubenstein, *Newberg on Class Actions*, § 4:54 (5th ed. Dec. 2016 Update) ("[C]ourts in every circuit have uniformly held that the 23(b)(3) predominance requirement is satisfied despite the need to make individualized damage determinations and a recent dissenting decision of four Supreme Court Justices characterized the point as 'well nigh universal'").

Some courts have found that class action hostile work environment claims do not meet the predominance requirement. *See Elkins*, 219 F.R.D. at 425-26 (noting that even

---

[16] *See also E.E.O.C. v. CRST Van Expedited, Inc.*, 611 F. Supp. 2d 918, 936-37 (N.D. Iowa 2009) (describing the modified burden-shifting approach of *Jenson II*, which was approved by the Eighth Circuit). The modified burden-shifting approach requires the plaintiffs to bear the burden of proving their prima facie case of a hostile work environment claim during the liability phase of the litigation. *See Jenson v. Eveleth Taconite Co.*, 130 F.3d 1287, 1299 (8th Cir. 1997). Then, "[i]n the damages phase, the plaintiffs still were required to show they were as affected by that hostile environment as a reasonable woman would be affected." *Id.* at 1300. Once that showing is made, "the burden of proof shift[s] to [the defendant] to show that it was more likely than not that their decision not to return to work was not the product of the hostile work environment." *Id.* As applied here, the modified burden-shifting analysis would require plaintiffs to prove at Phase II that they were subjectively affected by the hostile work environment. The burden would then shift to CRST to prove that they were not affected by the hostile environment.

if plaintiffs were able to establish that the plant-wide environment was objectively hostile, "issues as to whether a given individual perceived the environment to be hostile would remain."); *Adler v. Wallace Computer Servs., Inc.*, 202 F.R.D. 666, 672-73 (N.D. Ga. 2001) (noting that individual issues predominated in pattern-or-practice case alleging discrimination and hostile work environment because each plaintiff would need to show she suffered adverse consequences, defendant would have opportunity to show non-discriminatory reason for adverse consequences, each employee would have to show she perceived the environment to be abusive, and compensatory and punitive damages would require individualized proof). These cases primarily rely on the individualized findings that would be required at Phase II – (1) that plaintiffs subjectively perceived the environment to be abusive and (2) damages. These factors are not dispositive to class certification in the Eighth Circuit, as both of those requirements were present in *Jenson*, which was maintained as a class action. *See Jenson*, 824 F. Supp. at 885 ("only one-half of the required showing need be made in the liability phase of a class action lawsuit: would the 'reasonable woman' consider the conduct sufficiently severe or pervasive to alter the conditions of employment and create an abusive work environment.").

Bifurcating each class action into two phases avoids the possibility that individualized questions will predominate common questions. This approach has been used by numerous courts. *See In re Visa Check/MasterMoney Antitrust Litig.*, 280 F.3d 124, 141 (2d Cir. 2001) ("There are a number of management tools available to a district court to address any individualized damages issues that might arise in a class action, including: (1) bifurcating liability and damage trials with the same or different juries; (2) appointing a magistrate judge or special master to preside over individual damages proceedings; (3) decertifying the class after the liability trial and providing notice to class members concerning how they may proceed to prove damages; (4) creating subclasses; or (5) altering or amending the class."), *overruled on other grounds by In re Initial Pub. Offerings Sec. Litig.*, 471 F.3d 24, 40 (2d Cir. 2006); *In re Whirlpool Corp. Front-*

*Loading Washer Products Liability Litig.*, 722 F.3d 838, 860 (6th Cir. 2013) (finding the predominance requirement satisfied when the district court certified only a liability class and reserved all damages issues for individual determination); *Butler v. Sears, Roebuck and Co.*, 727 F.3d 796, 801 (7th Cir. 2013) ("If the issues of liability are genuinely common issues, and the damages of individual class members can be readily determined in individual hearings, in settlement negotiations, or by creation of subclasses, the fact that damages are not identical across all class members should not preclude class certification."); *Allapattah Servs. v. Exxon Corp.*, 333 F.3d 1248, 1261 (11th Cir. 2003) ("numerous courts have recognized that the presence of individualized damages issues does not prevent a finding that the common issues in the case predominate"); *Ellis v. Costco Wholesale Corp.*, 285 F.R.D. 492, 539 (N.D. Cal. 2012) (concluding that individualized hearings required for damages are narrow in scope and significance when compared to the classwide issues subject to generalized proof.).[17]

For each of the two classes proposed by plaintiffs, I find that the common issues as to liability will predominate over individualized issues. On the subjective element of

---

[17] This issue has been subject to much debate following the Supreme Court's decision in *Comcast Corp. v. Behrend*, 133 S. Ct. 1426 (2013). That case involved current and former cable subscribers who sought damages for alleged violations of federal antitrust laws. *Id.* at 1431. The district court certified the class under Rule 23(b)(3) on all issues, including damages calculations. The Supreme Court reversed, finding that the district court erred in certifying the class because questions of individual damage calculations would overwhelm questions common to the class. *Id.* at 1433. Since *Comcast*, courts have taken varying approaches to motions for class certification when individualized damages questions are present. Courts that have certified classes have distinguished *Comcast* on the premise that the plaintiffs in *Comcast* did not seek to bifurcate the case into liability and damages stages and note that the Court's ruling is silent as to that approach. *See Houser v. Pritzker*, 28 F. Supp. 3d 222, 253-54 (S.D.N.Y. 2014) (discussing *Comcast* and finding that class could be certified under Rule 23(b)(2) for purposes of determining liability and affording injunctive relief, but could not be certified for purposes of resolving damages.); *In re Whirlpool Corp. Front-Loading Washer Products Liability Litig.*, 722 F.3d at 860 ("Where determinations on liability and damages have been bifurcated, *see* Fed. R. Civ. P. 23(c)(4), the decision in *Comcast* – to reject certification of a liability and damages class because plaintiffs failed to establish that damages could be measured on a classwide basis – has limited application).

the hostile work environment claim and damages as to both claims, however, individualized questions will predominate. Therefore, the classes will be certified only as to the liability question in Phase I. *See* Fed. R. Civ. P. 23(c)(4) ("When appropriate, an action may be brought or maintained as a class action with respect to particular issues.").

### ii. Superiority

Superiority tests whether class resolution would be "superior to other available methods for the fair and efficient adjudication of the controversy." *Amchem*, 521 U.S. at 615. "In deciding whether class certification will achieve substantial efficiencies, the proper comparison is not between class litigation and no litigation at all, but between class litigation and actions conducted separately by individual class members." *United States v. City of New York*, 276 F.R.D. 22, 49 (E.D.N.Y. 2011).

Under plaintiffs' proposed approach of bifurcating the trial, liability would be determined in one phase and damages in the other. There would be a Hostile Work Environment Class limited to the issue of whether CRST created or maintained an objectively hostile work environment based on the three alleged patterns or practices. There would also be a Retaliation Class limited to the issue of whether CRST retaliated against female drivers based on a pattern or practice of requiring the harasser to exit the truck. Class resolution of these issues will promote efficiency because the evidence offered in support of liability as to each class will need to be presented only once. At the same time, class members who wish to opt out of the class may do so under Rule 23(c)(2)(B) and pursue their own actions.

For these reasons, I find that the Hostile Work Environment Class and the Retaliation Class may both be certified under Rule 23(b)(3).

### b.    Rule 23(b)(2)

Plaintiffs alternatively request that a hybrid class be certified under Rule 23(b)(2) and Rule 23(b)(3).  They assert that a hybrid class consists of two stages: (1) resolving the liability issue under the procedures of Rule 23(b)(2) and (2) resolving the issue of damages using the "opt out" procedures established for Rule 23(b)(3) actions.  "Class certification under Rule 23(b)(2) is proper only when the primary relief sought is declaratory or injunctive."  *In re St. Jude Med., Inc.*, 425 F.3d 1116, 1121 (8th Cir. 2005).  In other words, it applies when "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole."  *Ebert*, 823 F.3d at 480.    Plaintiffs argue "[a]n injunction in the instant case requiring investigation and disciplinary policies and procedures designed to respond adequately to complaints of sexual harassment – incorporating the suggestions of the head of Employee Relations, ignored by other CRST management, for example – and eliminating CRST's policies of retaliation, would be an appropriate use of Rule 23(b)(2)."  Doc. No. 35-1 at 57.  Plaintiffs further argue that this would "free the Court to address the question of damages, for those women who were injured as a result of the prior policies."  *Id.*

The Eighth Circuit has acknowledged that the use of hybrid certification is an available approach that is gaining ground in class action suits.  *See Ebert*, 823 F.3d 480 (citing *Newberg on Class Actions* § 4:38).  This is similar to the approach plaintiffs advocate in referencing *Teamsters*.  *See Newberg on Class Actions* § 4:38 (stating one of the primary approaches to hybrid certification is to "bifurcate the litigation into liability and damage phases" beginning with a determination of defendant's liability by certifying a (b)(2) class for the liability phase or using issue certification under Rule 23(c)(4) and then deciding whether to certify a (b)(3) class for money damages or an additional (b)(2) class for final injunctive relief).  However, as the Eighth Circuit pointed out in *Ebert*, this type of certification is insufficient if the class does not meet the Rule 23(b)(2)

requirements due to a lack of cohesiveness or "when each class member would be entitled to an individualized award of monetary damages." *Ebert*, 823 F.3d at 480.

I find that a hybrid action under Rule 23(b)(2) and Rule 23(b)(3) is not appropriate here. Plaintiffs seek both injunctive relief and monetary damages. Moreover, plaintiffs' description of the injunctive relief they seek is not entirely clear. Bifurcating the cases into liability and damages phases does not require hybrid certification under both Rules 23(b)(2) and (b)(3). Rather, the classes may be appropriately certified under Rule 23(b)(3) for the liability phases and remain decertified for the damages phases. *See Brand v. Comcast Corp., Inc.*, 302 F.R.D. 201, 223 (N.D. Ill. 2014) (declining to certify a hostile work environment class under Rule 23(b)(2) because plaintiffs sought monetary damages along with injunctive relief, but approving certification under Rule 23(b)(3)); *Butler v. Sears Roebuck & Co.*, 727 F.3d 796, 801 (7th Cir. 2013) ("[A] class action limited to determining liability on a class-wide basis, with separate hearings to determine – if liability is established – the damages of individual class members, or homogenous groups of class members, is permitted by Rule 23(c)(4)."). For these reasons, the classes will not be certified as a hybrid class under Rule 23(b)(2) and (b)(3).

### 4.    *Rule 23(c)(4)*

Plaintiffs alternatively seek certification pursuant to Rule 23(c)(4), which provides "[w]hen appropriate, an action may be brought or maintained as a class action with respect to particular issues." I have found that out of the six "policies, patterns or practices" plaintiffs claim contributed to a hostile work environment or were retaliatory, four were sufficiently common to allow for class-wide resolution. On plaintiffs' hostile work environment claim, I found that their allegation that each of the alleged policies, pattern or practices was sufficiently common. On plaintiffs' retaliation claim, I found that their allegation that CRST's policy, pattern or practice of requiring the female complainant of sexual harassment to exit the truck, except where the she was a lead driver

or an owner-operator, was also sufficiently common. If plaintiffs insisted on trying the remaining two issues (involving transit and lodging costs and extension of student training) as part of the class, the predominance requirement would not be met. However, plaintiffs have alternatively requested issue certification pursuant to Rule 23(c)(4). I find that this rule provides the requisite authority to certify the classes with respect to the identified common issues.

The Second Circuit considered this issue in *In re Nassau Cnty. Strip Search Cases*, 461 F.3d 219, 221 (2d Cir. 2006), holding that "a court may employ Rule 23(c)(4)(A) to certify a class as to an issue regardless of whether the claim as a whole satisfies the predominance test." The court found the following issues presented common questions: "(1) whether defendants maintained a blanket strip search policy; (2) whether that policy was unconstitutional; and (3) whether some or all defendants may be held liable." *Id.* at 222-23. The issues that it determined were individualized and predominated were: "(1) whether subordinate Jane and John Doe defendants might escape liability in some cases, because, notwithstanding the blanket policy, they had reasonable suspicion to search certain detainees; (2) the existence of proximate causation for each alleged injury; and (3) compensatory and punitive damages calculations." *Id.* at 223.

As acknowledged in *Nassau County*, the Ninth and Fourth Circuits approve of this approach. *See Valentino v. Carter-Wallace, Inc.*, 97 F.3d 1227, 1234 (9th Cir. 1996) ("[e]ven if the common questions do not predominate over the individual questions so that class certification of the entire action is warranted, rule 23 authorizes the district court in appropriate cases to isolate the common issues under Rule 23(c)(4)(A) and proceed with class treatment of these particular issues."); *Gunnells v. Healthplan Servs., Inc.*, 348 F.3d 417, 439 (4th Cir. 2003) ("subsection 23(c)(4) should be used to separate 'one or more' claims that are appropriate for class treatment, provided that within that claim or claims (rather than within the entire lawsuit as a whole), the predominance and all other necessary requirements of subsections (a) and (b) of Rule 23 are met."). The

Fifth Circuit does not. *See Castano v. Am. Tobacco Co.*, 84 F.3d 734, 745 n. 21 (5th Cir. 1996) ("[t]he proper interpretation of the interaction between subdivisions (b)(3) and (c)(4) is that a cause of action, as a whole, must satisfy the predominance requirement of (b)(3) and that (c)(4) is a housekeeping rule that allows court to sever the common issues for a class trial."). The Eighth Circuit has acknowledged the circuit split on this issue without ruling on it. *See In re St. Jude Medical, Inc.*, 522 F.3d 836, 841 (8th Cir. 2008) (noting that the district court did not limit its class certification to specific issues that may be amenable to class-wide resolution, but suggesting that even if it had, it would not have been appropriate because it would not increase the efficiency of the litigation and individual issues would continue to predominate).

As explained above, I find that plaintiffs have presented two common issues (through four alleged patterns or practices) that are appropriate for class resolution. As such, I will certify the designated classes with respect to only those issues pursuant to Rule 23(c)(4)(A).

### 5. *Rules Enabling Act*

CRST argues the classes may not be certified due to limitations of the Rules Enabling Act. The Rules Enabling Act requires that rules of procedure "shall not abridge, enlarge or modify any substantive right." 28 U.S.C. § 2072(b). CRST contends that if the classes are certified, it will be deprived of the opportunity to "mount a defense that its policy appropriately addressed fact-specific determinations as to alleged harassment of each and every class member." Doc. No. 55 at 71. It contends that for each putative class member who filed an internal complaint, CRST is "entitled to present evidence and prove that its policy effectively addressed the concerns raised." *Id.* CRST alleges that bifurcation does not alleviate these concerns because the liability would be based on CRST's remedial efforts following particular instances of alleged harassment that caused the policies to operate in different ways. It points out that this court previously

dismissed a contention that CRST maintained a "'standard operating procedure' to tolerate sexual harassment." *CRST Van Expedited, Inc.*, 611 F. Supp. 2d at 952.

CRST's argument misconstrues the nature of plaintiffs' claims. Individual instances of harassment are not at issue here, as they were in the prior case. Plaintiffs' Hostile Work Environment Class seeks to prove that CRST maintains an objectively hostile work environment by way of the three identified policies. Plaintiffs intend to prove the existence of the three policies through anecdotal evidence. CRST will be able to cross-examine plaintiffs and any class members on this evidence. If liability is established, then during Phase II individual members will have to prove their work environments was subjectively hostile based on any of the policies that were determined to contribute to an objectively hostile environment and damages.

With regard to the Retaliation Class, plaintiffs seek to prove that CRST's policy of requiring female drivers to get off the truck upon reporting a sexual harassment complaint amounted to discriminatory retaliation. Plaintiffs also intend to rely on anecdotal evidence, which CRST will be again able to address. Moreover, the burden will shift to CRST to prove a non-discriminatory reason for that policy (if it is determined to exist), which it can do through anecdotal evidence. Of course, the case will proceed to Phase II, addressing individual damages, only if the class proves that CRST did maintain a pattern or practice of discriminatory retaliation against female drivers who complained of sexual harassment. Other federal courts have permitted retaliation claims to proceed as class actions. *See Employees Committed for Justice v. Eastman Kodak Co.*, 407 F. Supp. 2d 423, 432-33 (W.D.N.Y. 2005) (describing other pattern or practice claims of retaliation). For these reasons, I find the Rules Enabling Act does not prohibit class certification for the two proposed classes here.

### 6. *Article III Standing*

Finally, CRST argues that class certification would violate Article III's standing

requirements because the class would include members who have suffered no injury in fact and, therefore, have no standing under Article III, Section 2 of the United States Constitution. *See Avritt v. Reliastar Life Ins. Co.*, 615 F.3d 1023, 1034 (8th Cir. 2010) ("Although federal courts 'do not require that each member of a class submit evidence of personal standing,' a class cannot be certified if it contains members who lack standing."). Plaintiffs argue they are not required to prove at the certification stage that all women in the proposed classes have suffered an injury. *See Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802, 823 (7th Cir. 2012) ("[S]ome class members' claims will fail on the merits if and when damages are decided, a fact generally irrelevant to the district court's decision on class certification."). I agree. In any event, the proposed classes are defined in such a way that anyone within them would have standing as they had to have "been subjected to" a hostile work environment or retaliation. *See Hassan v. City of New York*, 804 F.3d 277, 291 (3d Cir. 2015) (quoting *Ad Hoc Comm. of Concerned Teachers v. Greenburgh # 11 Union Free Sch. Dist.*, 873 F.2d 25, 29 (2d Cir. 1989) for the proposition that where a plaintiff "is asserting [his or her] own [equality] right, a claim of discrimination, even where it affects a broad class, is not an abstract concern or generalized grievance.") (internal quotations omitted). Moreover, because these cases will be bifurcated such that liability will be established on a class basis, any individual who is a part of the class will be required to prove that she suffered injury in order to recover damages in Phase II. For these reasons, Article III standing is not a barrier to class certification.

## IV.    CONCLUSION

Based on the foregoing, plaintiffs' motion (Doc. No. 35) for class certification is **granted in part** and **denied in part** as follows:

1.      The following classes are certified and defined:

a.      The Hostile Work Environment Class:  All women who were or

are employed as team truck drivers by CRST Expedited, Inc. at any time from October 12, 2013 to the present, who have been subjected to a hostile work environment based on sex as a result of any of the following alleged CRST policies:

(1)  failing to find their complaints were corroborated without an eyewitness or admission,

(2)  failing to discipline drivers after complaints were corroborated; and

(3)  failure to discipline DMs for failing to promptly respond to sexual harassment complaints.

b.  The Retaliation Class:  All women who were or are employed as team truck drivers by CRST Expedited, Inc. at any time from October 12, 2013 to the present, who have been subjected to retaliation based on sex as a result of CRST requiring them to exit the truck in response to their complaints of sexual harassment.

2.  There shall be no certified subclasses at this time.

3.  The following issues shall be certified pursuant to Rule 23(c)(4)(A) with respect to each class:

a.  As to the Hostile Work Environment Class, whether CRST has any of the following policies,  patterns or practices that create or contribute to a hostile work environment:

(1)  failing to find their complaints were corroborated without an eyewitness or admission,

(2)  failing to discipline drivers after complaints were corroborated and

(3)  failure to discipline DMs for failing to promptly respond to sexual harassment complaints and

b.  As to the Retaliation Class:

(1)  Whether CRST has a policy, pattern or practice of retaliating against women complaining of sexual harassment by requiring them to exit the truck except when they are a lead driver or owner-operator

4.      Plaintiffs' counsel of Friedman & Houlding, LLP, and local counsel Thomas Newkirk, are hereby appointed as class counsel for both certified classes.

5.      This Order may be altered or amended as appropriate before final judgment pursuant to Rule 23(c)(1)(C).


**IT IS SO ORDERED.**

**DATED** this 30th day of March, 2017.


_____
LEONARD T. STRAND
CHIEF UNITED STATES DISTRICT JUDGE