**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CEDAR RAPIDS DIVISION**

CATHY SELLARS, on behalf of herself
and all others similarly situated, et al.,

        Plaintiffs,

vs.

CRST EXPEDITED, INC.,

        Defendant.

No. C15-117-LTS

**MEMORANDUM OPINION
AND ORDER**

———————————

*TABLE OF CONTENTS*

*I.*     **INTRODUCTION**...............................................................................2

*II.*    **BACKGROUND**................................................................................3

*III.*   **ANALYSIS** ........................................................................................4

    *A.*    *Motion for Partial Summary Judgment on Retaliation
          Claim*...............................................................................................4

        *1.*    *Parties' Arguments*.........................................................4

        *2.*    *Applicable Law* ...............................................................5

        *3.*    *Undisputed Facts* ............................................................7

            *a.*    *Defendant's Statement of Facts* ................................7

                *i.*    *CRST Operations* ..........................................7

                *ii.*    *CRST Written Policies*....................................8

                *iii.*   *CRST Practices in Responding to
                       Complaints of Sexual Harassment* ...................10

            *b.*    *Plaintiffs' Statement of Additional Facts*....................14

        *4.*    *Analysis* .......................................................................21

            *a.*    *Adverse Employment Action* ....................................22

|  |  | i. | *Admissibility of Plaintiffs' Evidence* ................. 26 |

i.    *Admissibility of Plaintiffs' Evidence* ................. 26

ii.    *Is There a Policy, Pattern or Practice?* ............. 29

iii.    *Does the Alleged Policy, Pattern or Practice Involve an Adverse Employment Action?* ................................... 33

b.    *Retaliatory Motive* ................................................ 35

B.    *Motion for Decertification of Hostile Work Environment Class* ................................................................................. 42

1.    *Parties' Arguments* ...................................................... 42

2.    *Factual Background* .................................................... 44

a.    *Failure to Corroborate Complaints Without an Eyewitness or Admission* .................................. 47

b.    *Failure to Discipline When Complaints are Corroborated* .................................................... 49

c.    *Failing to Discipline DMs Who Do Not Promptly Respond Appropriately to Complaints* ...................................................... 50

3.    *Applicable Law* ......................................................... 53

4.    *Analysis* .................................................................... 57

IV.    *CONCLUSION* ........................................................................... 68

## I.    INTRODUCTION

This case is before me on defendant's motion (Doc. No. 171) for partial summary judgment on plaintiffs' retaliation claim and motion (Doc. No. 172) for decertification of the hostile work environment class. Plaintiffs have filed resistances (Doc. Nos. 187, 188)[1] and defendant has filed replies (Doc. Nos. 197, 198). I also allowed plaintiffs to file a sur-reply (Doc. No. 201) as to both motions. I find that oral argument is not necessary. *See* Local Rule 7(c).

---

[1] Pursuant to the court's order at Doc. No. 183, plaintiffs filed sealed resistances at Doc. Nos. 187 and 188 and redacted versions at Doc. Nos. 191 and 192. I will refer to the redacted versions throughout this order whenever possible.

## II.    BACKGROUND

Plaintiffs are female truck drivers who assert claims of hostile work environment and retaliation in violation of Title VII of the Civil Rights Act of 1964 (Title VII) against their employer, CRST Expedited, Inc. (CRST). On March 30, 2017, I entered an order certifying the following classes:

> a.    The Hostile Work Environment Class: All women who were or are employed as team truck drivers by CRST Expedited, Inc. at any time from October 12, 2013 to the present, who have been subjected to a hostile work environment based on sex as a result of any of the following alleged CRST policies:
>
> > (1)    failing to find their complaints were corroborated without an eyewitness or admission,
> >
> > (2)    failing to discipline drivers after complaints were corroborated; and
> >
> > (3)    failure to discipline DMs for failing to promptly respond to sexual harassment complaints.
>
> b.    The Retaliation Class: All women who were or are employed as team truck drivers by CRST Expedited, Inc. at any time from October 12, 2013 to the present, who have been subjected to retaliation based on sex as a result of CRST requiring them to exit the truck in response to their complaints of sexual harassment.

*See* Doc. No. 85 at 54-55. I also certified the following issues pursuant to Rule 23(c)(4)(a):

a.    As to the Hostile Work Environment Class, whether CRST has any of the following policies, patterns or practices that create or contribute to a hostile work environment:

> (1)    failing to find their complaints were corroborated without an eyewitness or admission,
>
> (2)    failing to discipline drivers after complaints were

3

corroborated and

  (3)  failure to discipline DMs for failing to promptly respond to sexual harassment complaints and

 b.  As to the Retaliation Class:

Whether CRST has a policy, pattern or practice of retaliating against women complaining of sexual harassment by requiring them to exit the truck except when they are a lead driver or owner-operator

*Id.* at 55. I noted the order could be altered or amended as appropriate before final judgment pursuant to Rule 23(c)(1)(C). *Id.* at 56. CRST now seeks summary judgment on the retaliation claim and decertification of the hostile work environment class.

## III. ANALYSIS

### A. *Motion for Partial Summary Judgment on Retaliation Claim*

#### 1. *Parties' Arguments*

CRST argues that plaintiffs' retaliation claim fails for four reasons:

1.  Plaintiffs cannot show that they suffered any materially adverse employment action.

2.  Plaintiffs cannot show that their removal from their trucks was motivated by retaliatory animus against them for complaining of sexual harassment.

3.  CRST has legitimate, non-retaliatory reasons for its remedial actions.

4.  The record lacks any evidence of pretext.

*See* Doc. No. 171.

Plaintiffs argue an unpaid suspension or pay cut in response to sexual harassment complaints constitutes a materially adverse employment action. They contend they have direct evidence of retaliatory intent based on CRST's admission that its policy is to

4

remove women who complain about harassment from their trucks and, depending on whether the removal occurred before or after July 2015, to pay them nothing or reduced pay. Plaintiffs also rely on a Human Resources (HR) PowerPoint presentation in which CRST considered whether female drivers were "punished for raising concerns" by having to get off the trucks and lose money while the accused drivers were allowed to stay on and continue earning money. *See* Doc. No. 191-1 at 22. Alternatively, plaintiffs argue that under the *McDonnell-Douglas* burden shifting analysis, one could infer a retaliatory motive, for which CRST has no legitimate, non-retaliatory reason for removing women who complain of harassment from the trucks, resulting in a loss of pay. Even if CRST's reasons of safety and prompt investigation could be viewed as legitimate, they argue the evidence demonstrates these reasons are pretextual. They argue CRST's reasons for removing women from the trucks have shifted and that the temporal proximity between plaintiffs' complaints and CRST's actions indicates pretext.

In reply, CRST argues plaintiffs have not demonstrated a genuine issue of material fact as to a standard operating procedure of retaliation. *See* Doc. No. 198 at 7-11. Specifically, it argues plaintiffs cannot rely on their summary exhibit because it is inadmissible and unreliable. *Id.* at 11-14. With regard to retaliatory intent, they argue plaintiffs have not demonstrated a genuine issue of material fact based on either direct or indirect evidence. *Id.* at 14-23.

### 2. *Applicable Law*

Any party may move for summary judgment regarding all or any part of the claims asserted in a case. Fed. R. Civ. P. 56(a). Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

A material fact is one that "'might affect the outcome of the suit under the governing law.'" *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Thus, "the substantive law will identify which facts are material." *Id.* Facts that are "critical" under the substantive law are material, while facts that are "irrelevant or unnecessary" are not. *Id.*

An issue of material fact is genuine if it has a real basis in the record, *Hartnagel v. Norman*, 953 F.2d 394, 395 (8th Cir. 1992) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)), or when "'a reasonable jury could return a verdict for the nonmoving party' on the question." *Woods v. DaimlerChrysler Corp.*, 409 F.3d 984, 990 (8th Cir. 2005) (quoting *Anderson*, 477 U.S. at 248). Evidence that only provides "some metaphysical doubt as to the material facts," *Matsushita*, 475 U.S. at 586, or evidence that is "merely colorable" or "not significantly probative," *Anderson*, 477 U.S. at 249-50, does not make an issue of material fact genuine.

As such, a genuine issue of material fact requires "sufficient evidence supporting the claimed factual dispute" so as to "require a jury or judge to resolve the parties' differing versions of the truth at trial." *Anderson*, 477 U.S. at 248-49. The party moving for entry of summary judgment bears "the initial responsibility of informing the court of the basis for its motion and identifying those portions of the record which show a lack of a genuine issue." *Hartnagel*, 953 F.2d at 395 (citing *Celotex*, 477 U.S. at 323). Once the moving party has met this burden, the nonmoving party must go beyond the pleadings and by depositions, affidavits, or otherwise, designate specific facts showing that there is a genuine issue for trial. *Mosley v. City of Northwoods*, 415 F.3d 908, 910 (8th Cir. 2005). The nonmovant must show an alleged issue of fact is genuine and material as it relates to the substantive law. If a party fails to make a sufficient showing of an essential element of a claim or defense with respect to which that party has the burden of proof, then the opposing party is entitled to judgment as a matter of law. *Celotex*, 477 U.S. at 322.

In determining if a genuine issue of material fact is present, I must view the evidence in the light most favorable to the nonmoving party. *Matsushita*, 475 U.S. at 587-88. Further, I must give the nonmoving party the benefit of all reasonable inferences that can be drawn from the facts. *Id.* However, "because we view the facts in the light most favorable to the nonmoving party, we do not weigh the evidence or attempt to determine the credibility of the witnesses." *Kammueller v. Loomis, Fargo & Co.*, 383 F.3d 779, 784 (8th Cir. 2004). Instead, "the court's function is to determine whether a dispute about a material fact is genuine." *Quick v. Donaldson Co., Inc.*, 90 F.3d 1372, 1376-77 (8th Cir. 1996).

### 3. Undisputed Facts

The following facts are undisputed for purposes of CRST's motion, unless noted otherwise:

#### a. Defendant's Statement of Facts

#### i. CRST Operations

CRST operates its transportation company by teaming together two drivers per truck so one driver may sleep while the other is driving. *See* Doc. Nos. 171-2 and 191-2. This allows the truck to continue moving beyond the daily limits imposed by the Department of Transportation for hours of service for each individual driver. CRST's drivers include individuals who own, or are leasing to own, the vehicles they operate (owner-operators) and other individuals. CRST's training regimen requires student drivers to work alongside experienced drivers (lead drivers) for a designated period of time. Once the student drivers complete their training, they may team up with a co-driver of their choosing.[2]

---

[2] Plaintiffs note this choice is limited to currently available drivers and, depending on the driver's preferences, can take some time during which the individual is unpaid. For instance, a female driver wanting to drive with another female may have to wait for a female driver to become available, during which time the new driver is not paid. *See* Doc. No. 191-2 at ¶ 10.

All driving teams are supervised by a driver manager (DM). Drivers communicate with DMs over phone, email and CRST's messaging system, known as Qualcomm. DMs are evaluated based on metrics such as time percentage, overall mileage and truck utilization. Plaintiffs point out that expenses (amount spent per mile) and trucks in service are also metrics. Doc. No. 191-2 at ¶ 13. They note that factors such as the number of trucks working, and a bus ticket to relocate a driver from one location to another, count against these metrics. *Id.* DMs are also responsible for retaining drivers and addressing conflicts between team drivers. When that conflict is a complaint of harassment or discrimination, plaintiffs point out that CRST's human resources (HR) department is also responsible for investigating that complaint. *Id.* at ¶ 14.

Drivers are paid per mile using a "split mileage system." Each driver is paid at his or her personal rate for half of the total miles driven by the truck regardless of the number of miles each driver personally drives. The personal rate depends on the driver's length of experience. A driver may also receive layover pay for the time between when a truck is empty (not under a load) to the dispatched pickup time. This may occur when drivers are away from the terminal or home due to a breakdown or impassable highway conditions. Plaintiffs add that the time period required to receive layover pay is "no less than 48 hours." *Id.* at ¶ 19. After 48 hours, each driver of the truck may receive $40 for each subsequent 24-hour period. *Id.* Layover and breakdown compensation is based on standard daily rates unrelated to a driver's length of experience.

### ii.    *CRST Written Policies*

CRST has a written policy prohibiting sexual harassment in its workplace. The policy also prohibits unlawful employment discrimination and retaliation. The policy is contained within the handbooks that are distributed to CRST drivers and home office employees, including DMs. CRST emphasizes the policy during a dedicated session at driver orientation, where qualified trainers present the policy and provide drivers with a

stand-alone copy. The policy states that CRST "prohibits sexual harassment" and that those who report it "will NOT be subject to ANY form of retaliation." *See* Doc. No. 171-2 at ¶ 25. It also sets forth the complaint procedure and outlines reporting responsibilities for personnel. CRST's Code of Business Ethics prohibits harassment based on sex and mandates immediate reporting "to the appropriate Supervisor or the Human Resources Department." *Id.* at ¶ 26. The handbook instructs that "[i]f an employee believes he or she is being subjected to verbal or physical harassment, the employee should immediately contact his or her [DM] or [HR] to inform them of the situation and to request a new lead driver." *Id.* at ¶ 27. The handbook states: "[a]n employee has the right to request a new driver without fear of retaliation. Any employee who reports any act of harassment and/or discrimination will NOT be subject to ANY form of retaliation." *Id.* at ¶ 28.[3]

All drivers sign an acknowledgement that they have received and reviewed the handbook and statement of policy, including the policy on sexual harassment and retaliation. Drivers are also required to certify their understanding that employees who complain about harassment will be removed from the harassing situation. The acknowledgment states:

> I also understand and agree that if I believe I am being subjected to harassment or discrimination, no matter how severe or pervasive, I will immediately report it to my fleet manager or [HR] directly so that I may be removed from the harassing situation and so that CRST may conduct a prompt investigation.

*Id.* at ¶ 30.

---

[3] With regard to each of the written policies mentioned, plaintiffs deny that CRST enforces the policies or that employees who raise complaints are not subject to retaliation. *See* Doc. No. 191-2 at ¶¶ 21-28.

### iii. *CRST Practices in Responding to Complaints of Sexual Harassment*

CRST states that its first priority in responding to a complaint of sexual harassment is the safety of the complaining driver. Plaintiffs deny this. When a dispatcher receives a communication from a driver alleging sexual harassment, the dispatcher is required to take immediate steps to ensure the safety of the complainant and advance the investigation. Plaintiffs admit this is CRST's written policy, but deny that CRST's pattern or practice is to take immediate steps to ensure the safety of the complainant or advance the investigation. *See* Doc. No. 191-2 at ¶ 32. Dispatchers may respond to complaints of sexual harassment by separating the drivers and arranging for necessary accommodations for the complainant (including a hotel stay and transportation) and to pay or reimburse for those accommodations. Plaintiffs state that while dispatchers may have this authority, they do not in fact arrange for accommodations or travel or pay or reimburse these expenses. *Id.* at ¶ 33.

CRST states it takes steps to separate drivers quickly and safely. Plaintiffs deny this, stating there are frequent delays in separating drivers, which creates unsafe conditions for women subjected to sexual harassment. *Id.* at ¶ 34. When one driver makes a complaint against another driver – regardless of the nature of the complaint – DMs are instructed to remove the complainant from the situation unless the complainant is the lead driver or an owner-operator. Plaintiffs admit this to the extent it applies to sexual harassment complaints. *Id.* at ¶ 35. All employees receive notice of CRST's policy of removing the complaining employee when they join the company. Plaintiffs clarify that this policy concerns only harassment or discrimination complaints. They also add that the policy states only they will be "removed from the harassing situation" and does not state whether they will be removed from their truck. Plaintiffs allege that CRST's policy is to remove women who complain about sexual harassment from their

trucks. *Id.* at ¶ 36.[4]

CRST sets forth several purported rationales for the separation policy, many of which plaintiffs dispute. First, CRST states that removing the complainant allows her to seek necessary resources, such as law enforcement assistance, medical attention or mental health care. Plaintiffs take issue with the evidence cited in support of this statement and contend this shows that female drivers are forced to rely on police intervention to protect themselves from harassing co-drivers. *Id.* at ¶ 38. They add that complainants would be equally able to obtain these resources if the harasser was removed from the truck. *Id.*

Second, CRST claims the policy gives the complainant the opportunity and resources to gather and transmit necessary information to HR as part of the investigation. Plaintiffs disagree and state that HR gathers whatever information it seeks from the complainant in a single telephone conversation, which could easily take place while the complainant remains on the truck. Plaintiffs also deny that the policy provides the complainant with resources to gather and transmit information to HR because the policy leaves the complainant on unpaid suspension while off the truck, or receiving less compensation than she would have received had she stayed on the truck. Plaintiffs also note that the complainant is often responsible for the transportation and lodging costs once removed from the truck. *Id.* at ¶ 40.

Third, CRST states that removing a complainant from the truck better facilitates the investigation by allowing her to have a confidential conversation with HR and giving her the opportunity to gather and submit corroborating evidence. Plaintiffs deny this, stating that a confidential conversation could just as easily take place by removing the accused from the truck. To the extent CRST claims that allowing the complainant to stay

---

[4] CRST's reason for removing the complainant from the truck is at the crux of this claim. CRST claims it is for the safety of the complainant. Plaintiffs claim it is to retaliate against women for complaining and to deter further complaints. *Id.* at ¶ 37.

on the truck while communicating with HR poses a safety concern, plaintiffs state that a complainant can speak with HR while the truck is not moving. They also point out that HR has conducted investigations and communicated with accused drivers while they remain on the truck. *Id.* at ¶ 41.

Fourth, CRST states its policy complies with various licensing and ownership rules. For instance, when the complainant is a student driver, she cannot operate the truck alone and when the accused is an owner-operator, CRST has no authority to remove him from his own truck. Plaintiffs admit that removing a student driver or a driver who has been harassed by an owner-operator complies with licensing and truck ownership rules. They deny that other aspects of the removal policy comply with those rules, such as cutting the pay of the removed driver or allowing the lead driver or owner-operator accused of harassment to continue working and earning pay. *Id.* at ¶ 42.

CRST states that it works with the removed driver to investigate the complaint and to locate a new co-driver for the employee's next job. Plaintiffs admit that CRST does this in some, but not all instances, and adds that this does nothing to alleviate the consequences of spending the intervening time off the truck, wholly unpaid or with a pay cut, until a new co-driver can be located. *Id.* at ¶ 43.

On July 1, 2015,[5] CRST authored a new Layover Pay Policy, which states:

> CRST provides team drivers with multiple venues to report concerns related to harassment and discrimination. Upon a report of harassment or discrimination, CRST staff actively engages with each driver to ensure their safety. Normally, the driver making the complaint (Complainant/Accuser) is removed from the truck expeditiously and routed to a safe haven. The objective here is safety first. If the situation warrants, police will be called to ensure that no incidents transpire while the driver is packing up and exiting the truck. CRST exemplifies a culture that is fair and consistent with regard to pay and lodging to employees who report Title VII concerns.

---

[5] Plaintiffs argue that while this policy may have been authored on July 1, 2015, it was not implemented until later. Doc. No. 191-2 at ¶ 44.

> A team driver will not be penalized, financially, for reporting a bonafide concern. In addition, CRST enforces zero tolerance for retaliation.

*See* Doc. No. 171-2 at ¶ 45. The Policy further provides that when a complaint of harassment or discrimination is made, the dispatcher will "make arrangements to remove the Accuser from the truck" unless the removal of the accuser means that there will not be a qualified driver for the truck. *Id.* at ¶ 46.

CRST claims that when a driver is removed from a truck, it ensures she has sufficient funds for lodging and transportation costs (which she does not have to pay back) and CRST immediately investigates. Plaintiffs argue the lodging, transportation costs and timing of CRST's investigation are not relevant. They deny that CRST provides sufficient funds for lodging and transportation, stating that removed drivers often bear these costs on their own and CRST will often recoup any advance it has made from a driver's paycheck later. Doc. No. 191-2 at ¶ 47. They also deny that it was CRST's practice prior to July 2015 to cover any lodging or transportation costs. *Id.*

CRST states that it pays HR layover pay to a complainant removed from a truck starting on the date of removal and ending the date the employee is paired with a new co-driver. Plaintiffs deny this with respect to all times prior to July 1, 2015. *Id.* at ¶ 48. After July 1, 2015, plaintiffs deny that HR layover pay was always paid to women removed from their truck due to a sexual harassment complaint. They claim that in 31 out of the 84 occasions on which a woman was removed from a truck due to sexual harassment from July 1, 2015, to the end of the class period, CRST paid no HR layover pay at all. *Id.* They add that CRST's policy states that the HR layover pay ends on the date the employee is offered a new pairing, which does not always coincide with the date she is actually paired with a new co-driver and is able to begin driving. *Id.*

The amount of HR layover pay is based on the highest minimum wage in the country, which CRST multiplies by ten hours per day. Doc. No. 171-2 at ¶ 49. CRST paid $100 per day when it implemented HR layover pay. It then paid $110 per day based

on California's increase to its minimum wage. *Id.*

CRST states that prior to July 2015, a delay in pairing and continuation of driving exceeding 48 hours qualified the driver for layover pay of $40 per day. Plaintiffs deny this, stating that CRST's policy provided "[t]he truck must be available from empty time to dispatched pickup time no less than 48 hours to qualify for 1 layover." Doc. No. 191-2 at ¶ 50. They argue this excludes situations where a driver is off the truck. Plaintiffs also deny that CRST had a policy or practice of paying standard layover pay prior to July 1, 2015, stating that at least 49 out of 51 female drivers who had to leave their trucks due to sexual harassment during that time frame did not receive any layover pay. *Id.*

### b. *Plaintiffs' Statement of Additional Facts*

Karen Carlson, CRST's Manager of Employee Relations, has authority over the investigation of harassment or discrimination complaints made by all drivers in the CRST fleet. *See* Doc. No. 198-1. Carlson reports to Angela Stastny, CRST's Director of HR. Stastny in turn, reports to Brooke Willey, CRST's Vice President of HR.

As of August 2016, women comprised approximately 13 percent of all drivers and five percent of lead drivers for CRST. CRST contends that it is approximately three to four times more successful than the industry average in attracting and retaining women as drivers. *Id.* at ¶¶ 54, 55. With regard to its policy of removing drivers who complain of sexual harassment (aside from the two exceptions concerning lead drivers and owners/operators), CRST states its policy is not limited to female drivers who complain of sexual harassment, but applies regardless of the gender of the complaining driver or accused driver and regardless of the nature of the complaint. *Id.* at ¶ 56.

Plaintiffs have compiled an exhibit identified as "Figure 1," which they contend is a chart summarizing information provided by CRST consisting of complaint files documenting occasions in which a female driver had to get off her truck due to sexual harassment, "trip archive" records for these female drivers documenting each trip they

14

made and payroll records documenting how much they were paid. *Id.* at ¶ 57. CRST admits that it produced the information identified by plaintiffs but denies that "Figure 1" is an accurate compilation of such information. It disputes Figure 1 is evidence that would be admissible at trial for several reasons that I will discuss below. *Id.* I will consider CRST's objections to Figure 1 to apply to all of the assertions described below.

According to Figure 1, there were 135 occasions in which a female driver had to get off her truck due to sexual harassment between October 12, 2013, and December 5, 2017. CRST denies the legal conclusion that these women were all subjected to "sexual harassment." CRST states that in several of the cases plaintiffs rely on, the complaining driver exited the truck for reasons unrelated to alleged harassment. These reasons included things such as: update of commercial driver's license, truck maintenance and other disrespectful behavior. CRST also states that in many instances, the complaining driver requested to exit the truck. *Id.* at ¶ 58. Out of the 135 occasions plaintiffs cite, they contend 50 women were co-drivers and 85 women were students. CRST clarifies that Figure 1 does not list 135 different women, but admits that out of the 135 instances cited by plaintiffs in Figure 1, CRST's records show that 50 allegations were made by co-drivers and 85 allegations by student drivers. *Id.* at ¶ 59. None of the women in the 135 instances continued on their truck after complaining of sexual harassment. CRST states that the evidence shows that in some cases, the complainant did not make a complaint until she was already off the truck. *Id.* at ¶ 60. It cites one instance in which the female driver reported allegations three days after exiting the truck and another instance in which the female driver reported her allegations the day after she got onto a different truck. It also states again that some complainants exited the truck for reasons unrelated to the alleged harassment. *Id.*

According to plaintiffs, in nine of the 135 cases the female driver was physically kicked off the truck by the harasser and HR followed its policy of allowing the accused to continue driving. CRST denies that its files show that any female driver was

"physically kicked off the truck by the harasser" and states that its files show that none of the named individuals stated that the alleged harasser "physically" removed her from the truck. *Id.* at ¶ 61. CRST also states that none of the named individuals complained until after her co-driver or lead driver reported her for unsafe driving. *Id.*

In 20 of the 135 cases, plaintiffs contend the female driver physically jumped off the truck due to harassment and the alleged harasser was permitted to keep driving pursuant to CRST's policy. CRST denies that its files show that the named individuals "physically jumped" off the truck. *Id.* at ¶ 62. In one instance, it states the files show that the complainant and alleged harasser both exited the truck because it required maintenance. In another instance, CRST states the file shows the complainant was quitting employment and had already put in her notice when she got of the truck. *Id.* With regard to whether it permitted the alleged harassers to keep driving, it notes that its files show that in one instance, the alleged harasser quit and did not continue on the truck. In many of the instances, CRST states the files show that the driver did not complain until several days after getting off the truck. It cites examples in which complainants waited four days, two days and a week after getting off the truck. *Id.*

In the remaining 106 cases, the driver complained to HR while on the truck and CRST followed its policy of removing the complainant from the truck and allowing the alleged harasser to continue driving. *Id.* at ¶ 63. CRST denies that its files show that each of these women complained to HR while on board the truck. *Id.* It states that in many instances, the women complained to individuals outside of HR and exited the truck prior to HR commencing its investigation. It provides three examples in support. *Id.* CRST also denies that the alleged harassers continued driving the truck in all instances. It cites two examples in which the alleged harassers resigned before or during the investigation. *Id.*

Plaintiffs contend that male drivers accused of harassment are routinely allowed to continuing working and earning money while HR investigates complaints. *Id.* at ¶ 64.

In support of this assertion, plaintiffs have submitted responses from male drivers subject to investigation indicating that, at the time of their interview with HR, they were either working solo or with a new co-driver or student. *Id.* CRST argues that this assertion relies on inadmissible hearsay. *Id.* It also denies that the driver statements do not indicate whether the accused individual was actually operating the truck at the precise time of the interview by HR. It explains that HR does not interview the accused individual until it has an opportunity to interview the complainant. *Id.* It contends it attempts to interview the driver when he is not operating the truck. *Id.*

A complainant pulled off a truck must find a new co-driver before driving again. *Id.* at ¶ 65. CRST contends it works with the employee to locate a new co-driver. The complainant may have to travel, by bus or rental car, to meet her next potential co-driver or to pick up her next truck. *Id.* ¶ 66. CRST admits that drivers sometimes have to travel between loads but denies that this situation is unique to female drivers who complain of sexual harassment. *Id.* It also notes that CRST covers these travel expenses. *Id.*

Plaintiffs state that out of the 135 cases in which a female driver had to get off her truck due to sexual harassment, 51 of those complaints occurred between October 12, 2013, and July 1, 2015. *Id.* at ¶ 67. Prior to July 1, 2015, women who complained of sexual harassment and were removed from their trucks did not receive any pay during the time they had to spend off the truck in accordance with CRST's policy, pattern or practice. *Id.* at ¶ 68. CRST denies that Figure 1 shows it maintained the alleged policy, pattern or practice. *Id.* It states that prior to July 2015, when a delay in pairing or continuation of driving exceeded 48 hours, the driver was eligible to receive standard layover pay of $40 per day. *Id.* Plaintiffs assert that layover pay was provided on only one occasion out of the 51 instances during October 12, 2013, through July 1, 2015. *Id.* at ¶ 69. CRST cites evidence that two additional women received layover pay prior to

July 2015.[6]  *Id.*  Plaintiffs note that weeks could elapse before women who complained of harassment and removed from the truck could start working again.  *Id.* at ¶ 70.  CRST admits that various lengths of time elapsed, but denies the assertion to the extent it implies a cause for the length of time.  It notes that some complainants failed to return calls or respond to DMs or other CRST representatives.  *Id.*  It cites examples in which some drivers failed to get on a bus, kept the rental vehicle longer than authorized or refused lead drivers who were offered.  *Id.*  In other instances, the driver was terminated, quit, or requested vacation.  *Id.*

CRST produced two PowerPoint presentations from January and February 2014 that state the following:

> When drivers raise allegations of sexual or other issues of harassment, and we remove them from the truck . . . why is it that the accused can stay on earning money and the accuser gets stranded at a motel and loses money every day and has to wait for a new codriver  . . . Punished for raising concerns.

> When a driver raises a concern of harassment or safety . . . why not remove the accused from the truck when possible?  It seems as though, if you raise a concern, it is the person who raises the concern who stands to loose [sic] money and time on the road.

*Id.* at ¶ 71 (citing Doc. No. 187-2 at 103, 109).  CRST states that these documents reflect its ongoing efforts to strengthen its gender-neutral remedial policy.  *Id.*  CRST instituted its new HR Layover Pay policy on or after July 1, 2015.  *Id.* at ¶ 73.  The policy, providing for payment of $100 per day, was based on the highest state law minimum wage at the time, which was $10 per hour in California.  *Id.* at ¶ 74.  The HR layover pay policy is not announced to all drivers, but drivers are informed of it once they are involved with an allegation.  *Id.* at ¶ 75.  CRST states this is done so that it is used for

---

[6] One of these instances is prior to October 12, 2013.  *See* Doc. No. 198-2 at 46.  The other instance is for a different driver than plaintiffs cited.  Doc. No. 198-3 at 258.

the right reasons. *Id.* HR layover pay stops when a driver is offered a re-pairing rather than when she actually begins driving again. *Id.* at ¶ 76. CRST does not necessarily deny this, but states HR layover pay continues until the drivers "obtain[] a new team driver or until they arrive to their home should they voluntarily wish to go home." *Id.*

Out of the 135 cases when a female driver had to get off her truck due to alleged sexual harassment, 84 of those complaints were lodged between July 1, 2015, and December 5, 2017. *Id.* at ¶ 77. CRST denies that plaintiffs' Figure 1 supports that there were 135 instances in which a woman had to get off her truck due to sexual harassment or that 84 complaints were brought within the identified time frame. *Id.* According to CRST's President, Cameron Holzer, drivers with about one year of experience earn an average of $150 to $200 per day while driving. *Id.* at ¶ 78. Based on this estimate, plaintiffs contend every female driver with over a year's experience who received HR layover pay would lose $50 to $100 per day while waiting for her next assignment. *Id.* at ¶ 79. CRST denies this contention, stating that it assumes a driver would have earned this pay if she had remained on the truck and it does not take into account the driver's actual per-mile pay rate or length or duration of the discontinued trip. *Id.* Plaintiffs state that drivers are paid even lower than Holzer estimated, but that the HR layover pay still results in a pay cut for drivers the majority of the time. *Id.* at ¶ 80. CRST denies that plaintiffs' evidence supports that assertion and notes that drivers are paid on a per-mile basis for the length of the trip. It contends there is no baseline on which plaintiffs can measure a "pay cut" regarding HR layover pay in comparison to normal pay. *Id.*

Plaintiffs also reference column G of their Figure 1, which they contend records the number of days of work each woman lost as a result of harassment. *Id.* at ¶ 81. They state it reflects the number of days the driver was off her truck until she started driving her next truck. *Id.* Plaintiffs then calculated how much a driver would be paid per day based on HR layover pay or other layover pay and how much she would be paid per day while on her truck (based on the same time period and two prior paystubs). *See id.* at ¶¶

82, 83. Based on these calculations, plaintiffs arrived at what they contend is a percentage of each woman's average daily pay lost during her wait time. They explain:

> Plaintiffs subtracted the woman's average daily pay during her wait time from her average daily pay in the comparison period, in order to see how much pay she was missing out on each day while waiting. This absolute daily average loss is represented in Fig. 1 column M (P-App 1-7). Plaintiffs then divided this "missed" amount by her average daily pay in the comparison period, in order to see what percentage of her average daily pay had been lost. This percentage is represented in Fig. 1 column N (P-App 107). Where the woman experienced no loss, an 'x' is indicated.

*Id.* at ¶ 84. Plaintiffs conclude these calculations show that two-thirds of the female drivers (56 out of 84) who had to get off their trucks following their sexual harassment complaints from July 1, 2015, through the end of the class period experienced a significant pay cut during their wait time. *Id.* at ¶ 85. They further contend that 30 of these 56 women received no pay during their wait time. *Id.* at ¶ 86.[7] Plaintiffs claim it is unknown whether two of the 84 women experienced a pay cut during their wait time because the records did not reveal what happened in those cases.[8] Plaintiffs acknowledge that 25 of the 84 women avoided a pay cut. *Id.* at ¶ 87. In sum, plaintiffs claim that a female driver who was required to get off of her truck as a result of a sexual harassment complaint was totally unpaid or had her pay cut in at least 105 of the 135 total occasions.

CRST denies the cited evidence supports any of these assertions and adds that plaintiffs' calculations do not account for circumstances in which complainants failed to return calls or respond to DMs or other CRST representatives regarding a return to work, or circumstances where complainants quit, were terminated for reasons unrelated to their

---

[7] CRST denies its records show this. *See* Doc. No. 198-1 at ¶ 86 (citing Doc. No. 187-6 at 356).

[8] CRST denies that the evidence is insufficient for the two drivers identified by plaintiffs. *See* Doc. No. 198-1 at ¶ 87. They note that the records show one driver was off her truck one day and received HR layover pay during that time and the other driver's last day of work was the same day she alleged harassment by her co-driver. *Id.*

complaints or took vacation. *Id.* at ¶¶81-88. CRST denies that plaintiffs' calculations provide an accurate representation of per diem pay for a CRST driver. *Id.* It notes that they also do not account for natural fluctuations in pay for reasons such as load availability, truck availability, weather, planned home time and more. *Id.* CRST cites Cathy Sellars as an example. *Id.* at ¶ 83. She was paired with a co-driver from January 14 through January 19, 2014. They logged only one mile from January 14 through 17. CRST states that Sellars chose to exit the truck for reasons unrelated to any harassment complaint and returned to Riverside Terminal. She then stayed with her sister and declined to work for over two weeks. *Id.* However, plaintiffs' Figure 1 indicates she experienced a 100 percent pay cut. Overall, CRST maintains that plaintiffs have not offered admissible evidence in support of their assertions and that plaintiffs' calculations suffer from multiple flaws.

### 4. Analysis

CRST seeks summary judgment on plaintiffs' retaliation claim. Title VII prohibits employer actions that "discriminate against" an employee for engaging in protected conduct by opposing a practice that Title VII forbids. *See* 42 U.S.C. § 2000e-3. Plaintiffs allege that CRST retaliated against them for reporting sexual harassment by removing them from the truck in which they allegedly experienced the harassment and not paying them, or significantly reducing their pay, while the alleged harasser continued driving and earning money.

To survive a motion for summary judgment on their retaliation claim, plaintiffs must either offer direct evidence of retaliation or create an inference of retaliation under the *McDonnell Douglas*[9] burden-shifting framework. *Lors v. Dean*, 746 F.3d 857, 865 (8th Cir. 2014) (citing *Young–Losee v. Graphic Packaging Int'l, Inc.*, 631 F.3d 909, 912

---

[9] *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

(8th Cir. 2011)). Direct evidence must show "a specific link between the alleged discriminatory animus and the challenged decision, sufficient to support a finding by a reasonable fact finder that an illegitimate criterion actually motivated the adverse employment action." *Russell v. City of Kansas City*, 414 F.3d 863, 866 (8th Cir. 2005).

If there is no direct evidence, the burden-shifting analysis applies. *See Ellis v. Houston*, 742 F.3d 307, 319 (8th Cir. 2014) (retaliation claims "analyzed under the same *McDonnell Douglas* burden shifting framework as Title VII claims"). Under this framework, an inference of retaliation arises if plaintiffs establish a prima facie case by showing (1) that they engaged in statutorily protected conduct, (2) that they suffered an adverse employment action and (3) that a causal connection exists between the two. *Fiero v. CSG Sys., Inc.*, 759 F.3d 874, 880 (8th Cir. 2014). If retaliation is inferred, the burden shifts to CRST to articulate a legitimate, non-discriminatory reason for the adverse employment action. *McDonnell Douglas*, 411 U.S. at 802. If CRST meets that burden, then plaintiffs must show that the non-retaliatory reason provided is pretext and that the true reason for the adverse action was retaliation. *Id.*

CRST argues it is entitled to summary judgment on plaintiffs' retaliation claim for two reasons:

1.  Plaintiffs cannot demonstrate an adverse employment action

2.  Plaintiffs cannot show that their removal from the truck was the result of retaliation

*See* Doc. No. 171-1. With regard to the second reason, CRST argues that it has legitimate, non-retaliatory reasons for its actions and that the record lacks any evidence of pretext. I will consider each argument in turn.

### a.     Adverse Employment Action

CRST argues plaintiffs cannot establish an adverse employment action. They characterize the alleged adverse action as removal from a harassing environment.

Plaintiffs allege that the adverse employment action in this case is CRST's policy of removing complainants from the truck <u>and</u> subjecting them to no pay or less pay. CRST suggests that plaintiffs have not alleged this as the adverse action since the beginning of this lawsuit. I disagree. Their complaint alleges:

> CRST maintains a pattern or practice of retaliating against the Named Plaintiffs and members of the proposed class for opposing sexual harassment by taking action against workers who complain about sex discrimination, including but not limited to: requiring a female driver who has complained of harassment to leave the truck and allowing her male co-driver to continue onward . . . . forcing them to wait and earn nothing while seeking a new co-driver . . . .

Doc. No. 2 at ¶ 102. While discovery has revealed greater details concerning CRST's practices, plaintiffs have maintained the basic concept that it is not the removal itself that is problematic, but the lack of pay or decrease in pay that comes with the removal.[10]

As the Eighth Circuit has acknowledged, the Supreme Court clarified the term "adverse employment action" in *Burlington Northern & Santa Fe Railway Co. v. White*, 548 U.S. 53 (2006). *See AuBuchon v. Geithner*, 743 F.3d 638, 641 (8th Cir. 2014). Prior to *Burlington*, the Eighth Circuit required a "tangible change in duties or working conditions" to demonstrate an adverse employment action. *Id.* (citing *Manning v. Metro. Life Ins. Co., Inc.*, 127 F.3d 686 692 (8th Cir. 1997)). These included things such as "hiring, granting leave, discharging, promoting and compensating." *See Burlington Northern*, 548 U.S. at 60. Under the objective standard articulated in *Burlington Northern*, an employee can demonstrate an adverse employment action by showing "that

---

[10] I realize that in my order certifying the classes, I focused primarily on the removal aspect of the alleged policy, pattern or practice rather than the unpaid aspect in considering whether plaintiffs' claims met the Rule 23(a) elements, particularly with regard to commonality. *See* Doc. No. 85 at 36-37. However, plaintiffs did argue they were subjected to "unpaid" suspension and because this is the first time I am considering the merits of plaintiffs' argument and plaintiffs are the opposing party on summary judgment, I will consider the alleged adverse action here to involve removal and no pay or reduced pay.

a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Id.* at 67. In the context of a class action pattern or practice claim, plaintiffs must show there is a genuine issue of material fact that CRST "regularly and purposefully" retaliates against women who complain of sexual harassment by subjecting them to an adverse employment action. *See E.E.O.C. v. McDonnell Douglas Corp.*, 191 F.3d 948, 951 (8th Cir. 1999).

CRST argues that its policy of removing sexual harassment complainants from the truck was a not an adverse employment action because it essentially amounted to paid administrative leave. The parties agree that prior to July 2015, the employee could receive layover pay at a rate of $40 per day for any delay longer than 48 hours in locating a new co-driver.[11] They also agree that since July 2015, the employee could receive HR layover pay (previously $100 per day and now $110 per day). Drivers are otherwise paid on a per-mile basis and not during breaks between load assignments. For this reason, CRST contends the layover pay amounts to paid administrative leave, which the Eighth Circuit has concluded is not an adverse employment action as a matter of law. *See Singletary v. Mo. Dep't of Corr.*, 423 F.3d 886, 892 (8th Cir. 2005) ("We find the reasoning of Fourth, Fifth, and Sixth circuits persuasive and hold that [plaintiff] did not suffer an adverse employment action by being placed on administrative leave."). Alternatively, CRST argues that time without pay is part of the regular course of business for CRST drivers because they routinely move from truck to truck with periods of time in between. *See* Doc. No. 198 at 9. It notes that "short suspensions that leave no lasting effect on either the employee's present or future position or her pocketbook" cannot constitute an adverse employment action. *Id.* (quoting *Dickerson v. SecTek, Inc.*, 238 F. Supp. 2d 66, 80 (D.D.C. 2002)).

---

[11] Plaintiffs dispute whether the layover pay was actually paid in all instances that qualified and, if it was, whether CRST later recouped that pay from the driver's paycheck.

Plaintiffs state that in at least 49 out of the 51 instances from the beginning of the class period to July 1, 2015, in which a female driver had to get off her truck after complaining of sexual harassment, she was completely unpaid during the time she was off a truck. After July 1, 2015, plaintiffs state that in 30 instances the complainant was unpaid as well. They rely on their summary exhibit, Figure 1, in support. CRST argues plaintiffs' evidence is inadmissible and disputes plaintiffs' generalizations, arguing that there are other legitimate reasons why drivers were not paid, including that they quit or they took vacation time.

It is important to keep in mind the pattern-or-practice nature of this claim modeled on *Int'l Brotherhood of Teamsters v. United States*, 431 U.S. 324 (1977). The Tenth Circuit offers this helpful summary:

> Pattern-or-practice cases differ significantly from the far more common cases involving one or more claims of individualized discrimination. In a case involving individual claims of discrimination, the focus is on the reason(s) for the particular employment decisions at issue. *Cooper v. Fed. Reserve Bank of Richmond,* 467 U.S. 867, 876, 104 S.Ct. 2794, 81 L.Ed.2d 718 (1984). In contrast, the initial focus in a pattern-or-practice case is not on individual employment decisions, "but on a pattern of discriminatory decisionmaking." *Id.* Thus, the order and allocation of proof, as well as the overall nature of the trial proceedings, in a pattern-or-practice case differ dramatically from a case involving only individual claims of discrimination. *Teamsters,* 431 U.S. at 357–62, 97 S.Ct. 1843.

> Pattern-or-practice cases are typically tried in two or more stages. During the first stage of trial, the plaintiffs' "burden is to demonstrate that unlawful discrimination has been a regular procedure or policy followed by an employer or group of employers." *Id.* at 360, 97 S.Ct. 1843. Thus, "[a]t the initial, 'liability' stage of a pattern-or-practice suit the [plaintiffs are] not required to offer evidence that each person for whom [they] will ultimately seek relief was a victim of the employer's discriminatory policy." *Id.* Instead, plaintiffs' "burden is to establish that such a policy existed." *Id.* "The burden then shifts to the employer to defeat the prima facie showing of a pattern or practice by demonstrating that the [plaintiffs'] proof is either inaccurate or insignificant." *Id.* "If an employer fails to rebut the inference that arises from the [plaintiffs'] prima facie case," the

> finder of fact can conclude "that a violation has occurred" and the trial
> court can award prospective equitable relief. *Id.* at 361, 97 S.Ct. 1843. If
> the plaintiffs also seek "individual relief for the victims of the
> discriminatory practice," the case moves into the second or subsequent
> stages. *Id.* In these additional proceedings, it must be determined whether
> each individual plaintiff was a victim of the discriminatory practice.

*Thiessen v. Gen. Elec. Capital Corp.*, 267 F.3d 1095, 1106 (10th Cir. 2001) (footnotes omitted). Therefore, there are two issues at play. One is whether there is a genuine issue of material fact as to whether CRST has a policy, pattern or practice or "standard operating procedure" of not paying women who complain of sexual harassment, or of paying them significantly less than they otherwise would have earned following their removal from the truck. *See Morgan v. United Parcel Serv. of Am., Inc.*, 380 F.3d 459, 463 (8th Cir. 2004). The other is whether there is a genuine issue of material fact regarding whether that standard operating procedure involves an adverse employment action.[12] Underlying the first issue is whether plaintiffs' evidence is admissible. I will address that issue first.

### i.    *Admissibility of Plaintiffs' Evidence*

Federal Rule of Civil Procedure 56(c)(2) provides: "A party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence." A party cannot rely on inadmissible evidence to defeat summary judgment. *See Brooks v. Tri-Systems, Inc.*, 425 F.3d 1109, 1111 (8th Cir. 2005). "[A]

---

[12] This model is slightly modified from *Teamsters*, as I find it is inappropriate for a jury to decide in one bite whether CRST has a policy, pattern or practice of retaliation. I think the better approach is to have the jury decide whether a policy, pattern or practice exists, whether it involves a materially adverse employment action and whether there is a causal connection between the protected activity (complaining of sexual harassment) and the adverse employment action. *See Karp v. CIGNA Healthcare, Inc.*, 882 F. Supp. 2d 199, 213 (D. Mass. 2012) ("Under the pattern-or-practice method of proof, once the plaintiff has established that the pattern or practice existed and that she suffered an adverse employment action, the burden shifts to the defendant to disprove that the action was the product of the discriminatory practice.").

successful summary judgment defense requires more than argument or re-allegation; [the party] must demonstrate that at trial it may be able to put on admissible evidence proving its allegations." *JRT, Inc. v. TCBY Sys., Inc.*, 52 F.3d 734, 737 (8th Cir. 1995). The court "may consider only the portion of the submitted materials that is admissible or usable at trial." *Walker v. Wayne County, Iowa*, 850 F.2d 433, 434 (8th Cir. 1988).

Here, plaintiffs rely on Figure 1, a summary exhibit based on CRST records. CRST argues this exhibit is inadmissible under Federal Rule of Evidence 1006 because it was not prepared by a witness available for cross-examination, but instead by plaintiffs' counsel. Moreover, it states that it does not summarize evidence, but manipulates it through plaintiffs' self-serving calculations. Finally, CRST argues that the documents behind Figure 1 are inadmissible because they are hearsay or contain hearsay.

Plaintiffs argue that the information in Figure 1 is capable of being presented in admissible form at trial, which is all that they must show at the summary judgment stage. They state the source materials for Figure 1 are CRST's own business records, which are included in the appendix, and are admissible under Federal Rule of Evidence 803(6) as business records. Finally, they argue that Rule 1006 specifically provides that the exhibit may contain a "calculation" and note that it may be used as a demonstrative aid, even if it is not admissible at trial.

Rule 1006 allows for "summaries to prove content" stating:

The proponent may use a summary, chart, or calculation to prove the content of voluminous writings, recordings, or photographs that cannot be conveniently examined in court. The proponent must make the originals and duplicates available for examination or copying, or both, by other parties at a reasonable time and place. And the court may order the proponent to produce them in court.

Fed. R. Evid. 1006. The Eighth Circuit has stated such evidence is properly admitted when:

(1) the charts fairly summarize voluminous trial evidence; (2) they assist the jury in understanding the testimony already introduced; and (3) the

27

> witness who prepared the charts is subject to cross-examination with all
> documents used to prepare the summary.

*United States v. Boesen*, 541 F.3d 838, 848 (8th Cir. 2008) (quoting *United States v. Green*, 428 F.3d 1131, 1134 (8th Cir. 2005)). A summary may include assumptions and conclusions as long as those assumptions and conclusions are based on evidence in the record. *Green*, 428 F.3d at 1134.

Plaintiffs argue that I should focus not on Figure 1, but on the records underlying it. They argue these records are admissible under Rule 803(6) and that, if they choose to do so, they may "present the admissible data currently summarized in Figure 1 in a format compiled by a witness who is available for cross-examination, and [ ] omit the voluminous records summarized by that chart." Doc. No. 201 at 4. In other words, they argue that they *could* produce admissible evidence under Rule 1006 similar to Figure 1 at trial, based on CRST's admissible business records, which they rely on in response to CRST's motion for partial summary judgment.

Rule 803(6) excludes "records of a regularly conducted activity" from the rule against hearsay if:

> (A) the record was made at or near the time by – or from information
> transmitted by – someone with knowledge; (B) the record was kept in the
> course of a regularly conducted activity of a business, organization,
> occupation, or calling, whether or not for profit; (C) making the record was
> a regular practice of that activity; (D) all these conditions are shown by the
> testimony of the custodian or another qualified witness, or by a certification
> that complies with Rule 902(11) or (12) or with a statute permitting
> certification; and (E) the opponent does not show that the source of
> information or the method or circumstances of preparation indicate a lack
> of trustworthiness.

Fed. R. Evid. 803(6). The underlying records consist of 136 CRST Employee Relations Investigation Forms regarding different individuals, although there are multiple forms for some individuals. *See* Doc. No. 191-3 at 2-11. They also consist of emails, notes of complaints, written statements, payroll statements, trip archive records, termination

forms and disciplinary action forms. *Id.* Having reviewed these records, it does appear that they may fall within the scope of Rule 803(6) such that they would be admissible at trial (with proper foundational support to establish the rule's requirements). If the records themselves are admissible, then it will be possible for plaintiffs to present a summary exhibit, similar to Figure 1, based on these records that would comply with Eighth Circuit requirements for admission of that exhibit. At this stage, however, in considering whether plaintiffs have put forth admissible evidence in defense of CRST's motion for partial summary judgment, I will primarily consider the underlying CRST records as opposed to plaintiffs' Figure 1.

### ii.     Is There a Policy, Pattern or Practice?

The next question is whether plaintiffs have demonstrated there is a genuine issue of material fact regarding whether CRST maintained a policy, pattern or practice of requiring female drivers who complained of sexual harassment to get off the truck without pay or with a significant reduction in pay. Plaintiffs' evidence must allow a reasonable jury to conclude that such an action was not isolated or accidental, but CRST's standard operating procedure.

In my order certifying the class, I found that the deposition testimony of Karen Carlson, CRST's Manager of Employee Relations, along with declarations from some of the plaintiffs, were sufficient to satisfy the commonality requirement with regard to CRST's alleged policy, pattern or practice of requiring women complaining of sexual harassment to get off the truck upon making a complaint, thus resulting in a loss of compensation. Carlson testified:

> During the training that I have conducted a couple of times a year, it is communicated that the accuser is the individual that gets off the truck because we want to make sure that they are in a safe location, a safe environment. If the accuser – Let's see – If the accuser is the lead driver, then the accuser has to stay on the truck because the student can't remain

on the truck and drive the truck because they are not qualified yet. So in that particular case the student would have to get off the truck. But in the majority of cases, it would be the accuser that gets off the truck. So we engaged in a dialogue with the driver managers when these situations arise and if they have questions, they call us on the telephone, whether it be me or any of our employee relations representatives. And we reaffirm that the accuser needs to get off the truck, we need to get them a hotel and cab, then we need to do so immediately so that we can begin the investigation.

Doc. No. 85 at 36. Plaintiffs now submit "a complete set of all examples of [CRST]'s policy in action." *See* Doc. No. 191-1 at 3, n.1. As noted above, plaintiffs contend there were 135 occasions in which women who complained of sexual harassment were not permitted to continue working on their trucks after complaining. Doc. No. 191-1 at 3. They state that in nine cases the woman was kicked off the truck by the harasser, in 20 cases the woman voluntarily got off the truck due to the harassment and in the remaining 106 cases, the woman complained to HR while on board the truck and CRST told her to get off the truck. Having reviewed the records plaintiffs cite in support of these figures, I find that this evidence would allow a reasonable jury to conclude that CRST maintained a standard operating procedure of requiring female drivers complaining of sexual harassment to exit the truck. That is only one half of the relevant question, however.

The other half is whether, in requiring the female complainants to exit the truck, CRST subjected these drivers to an unpaid suspension or a significant pay cut. Prior to July 1, 2015, plaintiffs allege it was CRST's policy, pattern or practice to pay the drivers nothing for the time they spent off a truck. They state that on 49 out of the 51 occasions from October 12, 2013, to July 1, 2015, in which a woman had to get off her truck due to sexual harassment, CRST paid the driver nothing. CRST argues that drivers during this time were eligible to receive the standard layover pay of $40 per day. Plaintiffs state that this occurred in only one instance on October 23, 2014, for class member Claudia

Lopez.[13]  *See* Doc. No. 187-6 at 9.  Based on the record before me,  I find plaintiffs have demonstrated a genuine issue of material fact as to whether CRST maintained a policy, pattern or practice from October 12, 2013, through July 1, 2015, of failing to pay drivers complaining of sexual harassment after removing them from the truck.

The situation is far different for the period after July 1, 2015, plaintiffs state there are 84 cases where a woman had to get off her truck due to sexual harassment.  These complaints occurred between July 1, 2015 and December 5, 2017.  *See* Doc. No. 191-1 at 8.  Out of these 84 cases, plaintiffs claim 56 experienced a pay cut, with 30 receiving no HR layover pay or other layover pay.  *Id.*  They state that there was insufficient information for two of the women and that in only 25 cases, the complaining driver was able to avoid a pay cut following removal from the truck.  *Id.*  In sum, and upon combining both time periods, plaintiffs represent that in 105 out of 135 occasions in which female drivers complained of sexual harassment, the driver was totally unpaid or experienced a pay cut following her claim and removal from the truck.  *Id.*

CRST focuses on the removal aspect of the alleged policy, pattern or practice, arguing that it only removes complaining employees from the allegedly harassing environment and does not suspend them.  *See* Doc. No. 198 at 8.  Moreover, it argues that its removal policy does not have the intent or effect of suspending employees without pay, or with a significant pay cut, because its working environment routinely requires employees to move from truck to truck with periods of time in between.  *Id.* at 9.  It states that "removing a complaining employee from the specific truck where that employee claims to be experiencing harassment is not equivalent to suspending the employee and withholding pay."  *Id.*  These arguments go directly towards the jury question of whether plaintiffs' alleged policy, pattern or practice (removal with unpaid suspension and a significant pay cut) exists.

---

[13] CRST cites one other instance on January 14, 2014.  *See* Doc. No. 198-3 at 258.

I do find significant problems with regard to the alleged policy, pattern or practice after July 1, 2015. First, plaintiffs allege that CRST either failed to pay complainants who were removed from their truck or paid them significantly less than they would have made had they stayed on the truck. However, their evidence does not reflect this. Rather, their evidence reflects whether they experienced a "pay cut" based on their previous two weeks of pay, not the miles remaining to the truck's destination and their rate of pay. Plaintiffs' calculations of a percentage pay cut for complaints after July 1, 2015, cannot fairly be said to be a reflection of a standard policy of CRST, but a comparison to the complainant's prior two weeks of work. Given that the payment records demonstrate that mileage could differ drastically from week to week, this is not a fair comparison. In other words, the percentage pay cut identified in Column N of plaintiffs' Figure 1 does not depend on CRST's alleged policy, pattern or practice, but on how much the complainant drove in the previous two weeks. Indeed, for nearly all the women who purportedly experienced a 100 percent pay cut after July 1, 2015, plaintiffs did not even have a "comparison period."

I find that plaintiffs have not demonstrated a genuine issue of material fact as to whether CRST maintained a policy, pattern or practice after July 1, 2015, of not paying female drivers who were removed from their truck following a complaint of sexual harassment or paying them substantially less than they would have made had they stayed on the truck. The records indicate that CRST maintained a policy, pattern or practice of removing sexual harassment complainants from the truck and paying HR layover pay (based on some sort of formulation regarding a variety of circumstances), but the records do not demonstrate that this pay was consistently less than a driver would have made had she stayed on the truck. Plaintiffs have demonstrated only that for some women, the HR layover pay per day was less than they made per day driving the truck during the previous

weeks.[14]  The differences in pay are more attributable to circumstances that vary from individual to individual and the HR employee's discretion rather than to the application of a standard operating procedure by CRST.  For these reasons, I find CRST is entitled to summary judgment for all complaints after July 1, 2015, as plaintiffs have failed to demonstrate a genuine issue of material fact from which a jury could conclude that CRST maintained a policy, pattern or practice of failing to pay female drivers complaining of sexual harassment or paying them significantly less than they would have made had they stayed on the truck.

Because I have found a genuine issue of material fact as to whether CRST maintained a policy, pattern or practice from October 12, 2013, through July 1, 2015, of failing to pay drivers complaining of sexual harassment after removing them from the truck, I will now focus on that alleged policy, pattern or practice.

### iii.     Does the Alleged Policy, Pattern or Practice Involve an Adverse Employment Action?

CRST argues that the alleged policy, pattern or practice does not, as a matter of law, involve an adverse employment action.[15]  CRST notes that in its working environment, employees routinely move from truck to truck with periods of time in between when they are not paid.  *See* Doc. No. 198 at 9.  It emphasizes that removal

---

[14] I agree with CRST that plaintiffs' calculations suffer from multiple flaws that do not present an accurate picture of the harm a complainant would suffer if removed from the truck.  The figures are overinclusive in a number of ways, such as including non-PWE complaints or complaints that did not involve sexual harassment, including voluntary home time in the wait time, and using a complainant's formal separation date as the cut-off for wait time rather than the date the employee actually quit.

[15] While CRST argues the policy, pattern or practice at issue is removal only, plaintiffs allege it is removal without pay.  I will consider whether, as a matter of law, plaintiffs' alleged version of the policy, pattern or practice (removal without pay) cannot constitute a materially adverse employment action as a matter of law.

from the truck does not constitute disciplinary suspension without pay, but removal from the harassing environment. Plaintiffs argue that a policy, pattern or practice of removing women from their trucks without pay following complaints of sexual harassment is materially adverse. Because driving a truck is the means by which CRST pays its employees, this situation is akin to an employer who temporarily suspends or reduces the hours of an hourly employee. In this case, CRST temporarily suspended the mileage.

I find this question should go to a jury. Under *Burlington Northern*, an adverse employment action is one that "a reasonable employee would have found . . . materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington Northern*, 548 U.S. at 67. Based on the evidence plaintiffs have presented, reasonable jurors could conclude that a reasonable employee in plaintiffs' position would be dissuaded from making a sexual harassment complaint based on the alleged retaliatory action. A suspension of pay may be considered materially adverse under this standard. *See id.* at 73 ("A reasonable employee facing the choice between retaining her job (and paycheck) and filing a discrimination complaint might well choose the former. That is to say, an indefinite suspension without pay could well act as a deterrent, even if the suspended employee eventually received backpay.").

CRST's representation that its employees often experience unpaid wait time cuts both ways. Given that periods of time without pay seem to be the norm, a female driver who had received an assignment and was actually driving – thus earning money – might very well have been dissuaded from reporting that sexual harassment, knowing that she would be required to get off the truck and go back to a non-pay status for an indefinite period of time. The Court in *Burlington Northern* noted that "[c]ontext matters" and "phrase[d] the standard in general terms because the significance of any given act of retaliation will often depend upon the particular circumstances." *Id.* at 69.

I find that a reasonable jury could conclude that the alleged policy, pattern or

practice of requiring female drivers who complain of sexual harassment to exit the truck, and to receive no pay until they could be re-paired with another driver, constitutes a materially adverse employment action as a reasonable employee in the same circumstances would be dissuaded from reporting sexual harassment based on that policy, pattern or practice. CRST is not entitled to summary judgment based on this issue.

### b. Retaliatory Motive

CRST argues that plaintiffs cannot show that a retaliatory motive was the but-for cause of the alleged adverse employment action and, even if they could, CRST has legitimate, non-retaliatory reasons for the action that plaintiffs cannot demonstrate are pretextual. *See Donathan v. Oakley Grain, Inc.*, 861 F.3d 735, 739 (8th Cir. 2017) ("The plaintiff's ultimate burden in a Title VII retaliation case is to prove an impermissible retaliatory motive was the 'but-for cause' of the adverse employment action."). Plaintiffs argue the record contains direct evidence of CRST's retaliatory intent, meaning there is no need to conduct the *McDonnell Douglas* burden-shifting analysis. Plaintiffs note that CRST admits its policy prior to July 2015 was to remove women from their truck when they complained of sexual harassment and that they did not receive their regular pay while off the truck. Plaintiffs rely on PowerPoint presentations dated January and February 2014 from HR's Weekly Employee Relations Meetings, which state:

> When drivers raise allegations of sexual or other issues of harassment, and we remove them from the truck . . . why is it that the accused can stay on earning money and the accuser gets stranded at a motel and loses money every day and has to wait for a new co-driver . . . Punished for raising concerns.

> When a driver raises a concern of harassment or safety . . . why not remove the accused from the truck? It seems as though, if you raise a concern, it is the person who raises the concern who stands to loose [sic] money and time on the road.

Doc. No. 191-3 at 103, 109.

Alternatively, under the *McDonnell Douglas* framework, plaintiffs assert that they engaged in protected activity by complaining about alleged sexual harassment and that CRST has not identified legitimate, non-retaliatory reasons for its policy of removing complainants from the trucks with no pay. CRST disagrees, stating that its legitimate non-retaliatory reasons are: to protect employee safety and well-being, to comply with licensing and truck ownership rules and to facilitate a prompt and efficient investigation into the complaint. Doc. No. 171-1 at 23. CRST contends plaintiffs have no evidence to suggest these reasons are pretext.

For purposes of its summary judgment motion, CRST assumes that each individual plaintiff could demonstrate a reasonable and good faith belief that the behavior about which she was complaining violated Title VII. *See* Doc. No. 171-1 at 15, n.2. However, CRST contends the record is undisputed that female complainants were removed from trucks for the legitimate and non-retaliatory reasons in the preceding paragraph. *Id*. at 23. It contends that the removals were remedial rather than retaliatory and that the record lacks any evidence of pretext.

As noted above, plaintiffs contend CRST's HR PowerPoint presentations from January and February 2014 are direct evidence of retaliation. "Direct evidence of retaliation is evidence that demonstrates a specific link between a materially adverse action and the protected conduct, sufficient to support a finding by a reasonable fact finder that the harmful adverse-action was in retaliation for the protected conduct." *Lors v. Dean*, 746 F.3d 857, 865 (8th Cir. 2014). It does not include "stray remarks in the workplace" and "statements by nondecisionmakers." *Moody v. Vozel*, 771 F.3d 1093, 1096 (8th Cir. 2014) (citation omitted). It also does not include "statements by decisionmakers that are facially and contextually neutral." *Torgerson v. City of Rochester*, 643 F.3d 1031, 1045 (8th Cir. 2011) (citation omitted). Direct evidence does

include "evidence of conduct or statements by persons involved in the [decision-making] process that may be viewed as directly reflecting the alleged discriminatory attitude, where it is sufficient to support an inference that discriminatory attitude more likely than not was a motivating factor." *Shaffer v. Potter*, 499 F.3d 900, 904 (8th Cir. 2007) (quotation omitted). It "most often comprises remarks by decisionmakers that reflect, without inference, a discriminatory bias." *McCollough v. Univ. of Ark. for Med. Scis.*, 559 F.3d 855, 861 (8th Cir. 2009).

Under these standards, I do not find a genuine issue of material fact based on direct evidence of retaliation. The PowerPoint presentations do not demonstrate retaliatory intent on the part of CRST in response to sexual harassment complaints. These presentations were part of Employee Relations weekly meetings, during which HR employees considered alternatives to the policy in place at the time. I agree with CRST that, if anything, they demonstrate the opposite – that CRST was seeking to avoid any negative consequences for employees who brought sexual harassment complaints. The PowerPoint slides show an acknowledgment of potential negative effects stemming from CRST's policy, pattern or practice, but do not suggest any improper motivations by CRST. I also do not find that evidence of CRST's layover pay or HR layover pay constitutes direct evidence of retaliatory intent. Again, that evidence shows an intent to avoid negative consequences as a result of the removal, rather than an intent to impose them. Because I do not find a genuine issue of material fact based on direct evidence, I will consider whether plaintiffs are able to demonstrate a fact issue under the *McDonnell Douglas* burden shifting analysis.

Assuming plaintiffs can establish a prima facie case, CRST argues that it has legitimate, non-retaliatory reasons for removing sexual harassment complainants from the trucks in which they experienced the harassment and that plaintiffs have no evidence to suggest those reasons are pretextual. When "an employer has articulated a legitimate reason for its actions, it is permissible for courts to presume the existence of a prima

facie case and move directly to the issue of pretext." *Stewart v. Indep. Sch. Dist. No. 196*, 481 F.3d 1034, 1043 (8th Cir. 2007). To demonstrate a fact issue as to pretext, plaintiffs "must both discredit defendant[']s asserted reasons for [the adverse action] and show that the circumstances permit drawing a reasonable inference that the real reason for [the adverse action] was retaliation." *Hutton*, 812 F.3d at 684 (citing *Gilbert v. Des Moines Area Cmty. Coll.*, 495 F.3d 906, 918 (8th Cir. 2007)). "A plaintiff may show that the employer's explanation is 'unworthy of credence . . . because it has no basis in fact,' or 'by persuading the court that a prohibited reason more likely motivated the employer.'" *Id.*

CRST's proffered reasons for removing sexual harassment complainants from the truck without pay focus on the removal aspect, rather than the lack of pay aspect. To the extent the payment issue can be framed as removing the accuser from the truck rather than the accused, CRST argues that unworkable alternatives to a company's existing business practices are not evidence of pretext. *See* Doc. No. 171-1 at 26. They also argue that there is no evidence that CRST treated other employees more favorably, such as those who complained for a reason other than sexual harassment or who did not complain, but were removed from the truck for other reasons. *Id.*

Plaintiffs' response is two-fold:

*First*, they argue there is a genuine issue of material fact as to whether CRST has identified any legitimate non-retaliatory reasons for removing female complainants from the truck without pay. They argue that each of CRST's proffered reasons could be maintained while continuing to pay the removed driver at her regular rate of pay. They contend that CRST's purported safety concern of interviewing complainants while they continue driving is not credible because CRST routinely interviews the male alleged harasser as he continues driving the truck. *See* Doc. No. 191-1 at 28. They further contend that if CRST believed communicating with HR while driving a truck posed a safety concern, it would remove the male harasser from the truck as well. *Id.*

As for CRST's purported concern of assuring the safety of others on the road by preventing women from "operat[ing] trucks while simultaneously experiencing distress from the alleged harassment," *see* Doc. No. 171-1 at 24, plaintiffs argue this is "a patronizing and highly questionable generalization . . . that female truck drivers who have experienced any form of sexual harassment are emotionally incapable of driving a truck safely." Doc. No. 191-1 at 29. CRST responds that its removal policy is applied regardless of the gender of the complainant or the nature of the complaint. *See* Doc. No. 198 at 22. Plaintiffs also note that CRST's concern of conducting interviews outside of the other's presence could equally be achieved by removing the male harasser from the truck.

*Second*, plaintiffs argue that even if CRST reasons could be considered legitimate and non-retaliatory, there is a genuine issue of material fact regarding whether those reasons are pretextual. They argue that CRST's asserted reasons for removing women from the trucks without pay have shifted and that temporal proximity indicates pretext.

"Substantial changes over time in the employer's proffered reason for its employment decision support a finding of pretext." *Wierman v. Casey's Gen. Stores*, 638 F.3d 984, 995 (8th Cir. 2011) (quoting *Smith v. Allen Health Sys.*, 302 F.3d 827, 835 (8th Cir. 2002)). Plaintiffs rely on CRST's arguments in opposing class certification to argue that it has changed its reasons for the alleged adverse action. They contend that in opposing class certification, CRST stated that the decision to remove a complainant depended upon practical circumstances that could not be reduced to a single policy and now it argues that it is its practice to remove a complaining employee unless prohibited by licensing requirements (if the complainant is an owner-operator or a lead driver with a student). *See* Doc. No. 191-1 at 32. Given that the class certification issue involved a completely different standard, against which CRST was attempting to show lack of commonality, among other things, I find no "shifting" of a suspicious nature. Moreover, the difference in CRST's reasons goes toward the issue of whether a policy, pattern or

practice exists, not whether it is retaliatory.

With regard to temporal proximity, the alleged adverse action is very close in time to the protected conduct, but because CRST's reasons (safety of the complaining employee) support that immediacy, I do not find this to be a situation in which the temporal element alone could create an inference of pretext. *See Wierman*, 638 F.3d at 1001 (noting that an argument "built on temporal proximity, is undermined where the allegedly retaliatory motive coincides temporally with the non-retaliatory motive."); *Sprenger v. Fed. Home Loan Bank of Des Moines*, 253 F.3d 1106, 1114 (8th Cir. 2001) ("[W]e have been hesitant to find pretext or discrimination on temporal proximity alone, and look for proximity in conjunction with other evidence.").

While CRST has not stated a reason for failing to pay complainants removed from the truck, this is somewhat explained by the fact that the removal meant the complainant was no longer driving which, prior to July 1, 2015, was the only means by which CRST paid its drivers (excluding layover pay for periods over 48 hours). This situation is unique because the working environment that caused the employee to engage in the protected conduct (reporting sexual harassment) is the only environment immediately available through which that employee could earn money, at least prior to July 1, 2015. While CRST then instituted an additional payment source for sexual harassment complainants, through its HR layover pay, I do not find that to be relevant as to whether CRST's reasons for removing female drivers from their trucks without pay prior to July 1, 2015, is evidence of pretext. Indeed, evidence that CRST changed its policy may be inadmissible as a subsequent remedial measure under Federal Rule of Evidence 407.[16]

---

[16] Which states:

> When measures are taken that would have made an earlier injury or harm less likely to occur, evidence of the subsequent measures is not admissible to prove:

Ultimately, I find that plaintiffs have failed to point to anything in the record that would allow a jury to conclude that CRST's stated reasons for removing sexual harassment complainants from the truck without pay during the time they waited to get assigned to another truck was pretext for retaliation. Plaintiffs have not put forth sufficient evidence for a jury to infer that (a) CRST's articulated reasons were false and (b) the real reason was retaliation. *See Lors*, 595 F.3d at 834. Plaintiffs' best argument is that CRST's reasons for removing the complainant could just have easily been fulfilled by removing the alleged harasser. However, even if CRST could have accomplished its objectives in a better way, it does not follow that CRST's stated reasons of: (1) ensuring the safety of the complainant, (2) complying with licensing and truck ownership rules and (3) facilitating a prompt and efficient investigation into the complaint are not true, or that the jury could infer a retaliatory motive based on CRST's chosen course of action.

Plaintiffs' attempt to demonstrate a fact issue as to pretext by showing that they made complaints of sexual harassment and CRST took adverse employment action shortly thereafter is insufficient. They offer no evidence from which a reasonable jury could infer that CRST's stated reasons for removing the complainant from the truck (resulting in no pay until the complainant could be re-paired) were pretextual. As such, CRST is entitled to summary judgment on plaintiffs' retaliation claim.

---

- negligence;
- culpable conduct;
- a defect in a product or its design; or
- a need for a warning or instruction.

But the court may admit this evidence for another purpose, such as impeachment or — if disputed — proving ownership, control, or the feasibility of precautionary measures.

Fed. R. Evid. 407.

**B.     *Motion for Decertification of Hostile Work Environment Class***

**1. *Parties' Arguments***

CRST argues that the hostile work environment class must be decertified for the following reasons:

a.      Plaintiffs cannot meet the commonality and predominance requirements

b.      The lack of classwide proof renders certification unmanageable

c.      Issue certification under Rule 23(c)(4)(A) is improper

d.      The hostile work environment class as certified is not ascertainable

*See* Doc. No. 172-1.   CRST contends the class must be decertified pursuant to the commonality and predominance requirements because liability for this claim requires too much of an individualized analysis.   *See* Doc. No. 172-1 at 7.   It further argues that plaintiffs' approach to proving the claim based on a compilation of recorded complaints by divining a pattern or practice out of the underlying circumstances, without the aid of an expert, is not "common evidence" that is typically necessary for classwide proof.   *Id.* at 8.   It emphasizes that plaintiffs must provide "significant proof" of a "general policy" to proceed as a class and plaintiffs cannot meet that burden with anecdotal evidence from only two percent of class members.   *Id.*   CRST further contends that plaintiffs' approach makes certification unmanageable because the first phase of trial to resolve liability will result in hundreds of mini-trials, eliminating any efficiency of the certification.   *Id.* Finally, it argues that the current class definition creates an improper, "win-win" situation for the plaintiffs, as they will either prevail as to liability at the first phase or, by virtue of losing, would not be considered members of the class such that this litigation would have no preclusive effect on them.   *Id.* at 9.

Plaintiffs argue that CRST has not made any new arguments with regard to certification and that for the reasons stated in my original order (Doc. No. 85), certification of the hostile work environment class remains appropriate.   *See* Doc. No. 192-1 at 44-45.   They argue they intend to rely on the evidence that supported their

original motion for class certification as well as new evidence consisting of Rule 30(b)(6) testimony, testimonial evidence from CRST managers and documentary evidence (such as sexual harassment complaint investigation files) produced by CRST. *Id.* at 49-50. Plaintiffs argue they are allowed to prove their case using anecdotal evidence from CRST's own personnel files to prove the existence of a policy, pattern or practice rather than statistical evidence. *Id.* at 57-60. Plaintiffs argue the class is manageable, relying on the arguments in their initial motion for class certification and the reasons stated in my order granting certification. *Id.* at 65-66. Finally, they argue the class is ascertainable, but suggest that the class definition could be revised to those who "have made a documented complaint" to satisfy any of CRST's concerns. *Id.* at 67-68.

In reply, CRST argues that plaintiffs' proposed approach of proving their case with inadmissible and unreliable "summary exhibits" prepared by their trial counsel, rather than relying on testimony from female drivers, does not establish the requirements of commonality and predominance. *See* Doc. No. 197 at 5. It contends that at trial, it would be entitled to present evidence concerning the full story with respect to each and every recorded entry in the summary exhibits, which demonstrates why plaintiffs' proposed approach is unworkable. *Id.* at 5-6. It argues that proof through anecdotal evidence alone (without statistical analysis or the aid of an expert) is appropriate only in a limited number of circumstances (such as when the number of employees is small) and that the use of such evidence in this case is particularly problematic given the unique nature of CRST's workplace. *Id.* at 7. CRST summarizes its argument as follows:

> Plaintiffs have no evidence, and certainly not the *common* evidence required by *Dukes*, to prove their class-wide liability theory that highly confidential [HR] decisions about investigating and resolving individual complaints could somehow incite severe, pervasive, sex-based harassment by male drivers, each working on a different truck. They lack support for their assumption that any particular disciplinary failure overrode CRST's explicit anti-harassment policy, became known outside the strict confidentiality of [HR], was part of a routine everyday company policy of tolerating sexual harassment, and engendered a hostile work environment so severe as to

43

alter the terms of employment of any other female driver – let alone of hundreds of other female drivers. They simply presume that every single allegation of sexual harassment was true, rose to a level cognizable under Title VII, and justified termination of the accused driver.

*Id.* at 7-8 (emphasis in original).

### 2.    *Factual Background*

I previously certified the following Hostile Work Environment Class: All women who were or are employed as team truck drivers by CRST Expedited, Inc. at any time from October 12, 2013 to the present, who have been subjected to a hostile work environment based on sex as a result of any of the following alleged CRST policies:

(1)    failing to find their complaints were corroborated without an eyewitness or admission,

(2)    failing to discipline drivers after complaints were corroborated; and

(3)    failure to discipline DMs for failing to promptly respond to sexual harassment complaints.

Doc. No. 85-54-55. I also certified the issue of whether CRST has any of the following policies, patterns or practices that create or contribute to a hostile work environment:

(1)    failing to find their complaints were corroborated without an eyewitness or admission

(2)    failing to discipline drivers after complaints were corroborated and

(3)    failure to discipline DMs for failing to promptly respond to sexual harassment complaints.

*Id.* Each party has submitted a factual background, some of which overlaps with the factual background discussed in the certification order. *See* Doc. No. 85 at 3-18. As such, I will incorporate that background to the extent it is relevant to the hostile work environment class and will discuss the parties' additional representations based on

discovery below.

CRST states that upon receiving a complaint of sexual harassment from one of its drivers, its first priority is the safety of the complaining driver. Doc. No. 172-1 at 13. Upon receiving the complaint, an HR employee logs it into its "Positive Work Environment Employee Relations" spreadsheet and immediately commences an investigation, which includes gathering pertinent records, developing a line of questioning and speaking with the accused. *Id.* It states that each investigation depends on the circumstances of the complaint and the available sources of proof. After speaking with the accused regarding the nature and circumstances of her complaint, the HR employee then looks at whether there are any prior complaints against the accused driver and considers any relevant documents or communications, interviews any available witness and interviews the accused. *Id.* The HR employee then determines whether the complaint can be corroborated. CRST states that corroboration can come from a variety of sources and that the test if whether HR is "able to identify that the action was confirmed and that it took place." *Id.* at 13-14. It further states it does not have a policy or practice of requiring an eyewitness statement or admission to corroborate a complaint.

Even if the HR employee cannot corroborate the complaint, CRST states it nonetheless takes remedial measures. It changes the accused male driver's status to "male only" and assures the driver will never again be assigned to drive with the complainant. *Id.* at 14. These designations last indefinitely and can be removed only by HR. The accused driver also receives a copy of CRST's written policy prohibiting harassment via certified mail. *Id.* If the complaint is corroborated, the accused driver faces disciplinary action up to and including termination. HR itself does not impose the discipline but recommends a course of action to the driver's DM. Discipline depends on individual circumstances, including the nature and severity of the corroborated harassment. It could include verbal warnings, written warnings, counseling sessions with HR, Operations, Safety, or other personnel, removal of lead driver certification or termination. *Id.* at 15.

Plaintiffs suggest that authority over drivers is highly centralized. *See* Doc. No. 192-1 at 5. The drivers' work is directed by DMs. There are 60 DMs in total and they all work in the same work area. Approximately 10 operations managers supervise the DMs. The operations managers report to two directors who report to CRST President, Cameron Holzer. *Id.* at 6.

Carlson has authority over the investigation of all harassment or discrimination complaints. *Id.* From June 2013 to approximately April 2014, she was solely responsible for investigating each of those complaints. *Id.* By late 2015, Carlson supervised two other employee relations representatives who assisted in investigating employee complaints. *Id.* at 6-7.

Plaintiffs reference their motion for class certification regarding the sexual harassment female drivers experience. That summary is as follows:

Women who worked as team truck drivers for CRST were subjected to verbal sexual harassment; offensive sexual conduct; and unwanted physical contact including attempted sexual assault. This conduct frequently occurred on the team trucks while the drivers were in route. Examples of the verbal harassment female drivers experienced include requests or demands for sex (Ex. 5 ¶16, 18, 27, 36; Ex. 8 ¶11; Ex. 9 ¶7, 9; Ex. 7 ¶9, 16, 24, 26, 36, 53); comments about their bodies, come-ons, and other forms of verbal harassment (Ex. 4 ¶9-10, 13-15, 22, 27, 32, 56; Ex. 8 ¶38; Ex. 9 ¶7; Ex. 7 ¶9, 12, 17, 32, 34, 44, 50, 52; Ex. 5 ¶14, 26, 34-35). Examples of offensive conduct they experienced include requests or attempts to get into bed with them (Ex. 4 ¶29; Ex. 6 ¶12; Ex. 7 ¶13-14, 53, 60), being stared at while they slept (Ex. 6 ¶11; Ex. 7 ¶60), and men intentionally being unclothed or exposing themselves (Ex. 4 ¶42, 44; Ex. 7 ¶15). Examples of the unwanted physical contact include attempted sexual assault (Ex. 4 ¶44; Ex. 5 ¶28-29), and physical touching, including kissing or touching with genitals (Ex. 4 ¶12, 28, 29; Ex. 6 ¶8; Ex. 8 ¶8, 29-30; Ex. 9 ¶13; Ex. 7 ¶59). When women resisted the harassment or rejected sexual advances, the men harassing them retaliated against them. Examples of such retaliation included men kicking them off the truck and abandoning them (Ex. 6 ¶17; Ex. 7 ¶27), claiming they left the truck with no authorization (Ex. 4 ¶34), taking measures to stop them from communicating with dispatch (Ex. 8 ¶13; Ex. 7 ¶19-21), spreading rumors

about them (Ex. 7 ¶29), threatening to harm them (Ex. 5 ¶42-43; Ex. 8 ¶12; Ex. 7 ¶18, 31, 55), making false reports about the woman to dispatch (Ex. 6 ¶18; Ex. 8 ¶35; Ex. 7 ¶45), calling the police on them (Ex. 8 ¶31), destroying their belongings (Ex. 6 ¶19), holding them captive (Ex. 5 ¶41-46), and/or physically assaulting them (Ex. 6 ¶21; Ex. 8 ¶19).

Doc. No. 35-1 at 13-14. Plaintiffs contend that although HR considers whether there are prior complaints against the accused driver as part of its investigation into a sexual harassment complaint, Carlson stated in her capacity as a Rule 30(b)(6) witness that the existence of prior complaints will not impact CRST's determination as to whether the instant complaint is deemed corroborated. Doc. No. 192-1 at 14. The relevant facts for each of the three alleged policies will be discussed below.

### a. Failure to Corroborate Complaints Without an Eyewitness or Admission

Plaintiffs rely on the following testimony from Carlson regarding the existence of CRST's alleged failure to corroborate a complaint in the absence of an eyewitness or admission:

> Q: If the allegations of harassment concerned behavior that occurred on the truck while the drivers are there together, would it ever be possible for you to find that harassment was corroborated based on evidence other than a third person eyewitness who was on the truck seeing harassment?

> A: Not unless there was an admission by the accused individual.

*Id.* at 15. Plaintiffs contend that CRST's business records confirm this policy, which plaintiffs have compiled in summary fashion pursuant to Federal Rule of Evidence 1006. *See* Plaintiffs' Figure 1 and 2. They state that the records reveal that either an eyewitness or an admission was the basis of 54 out of the 56 total corroborated cases. Doc. No. 188 at 16. Plaintiffs rely on the anecdotal examples from their motion for class certification demonstrating that CRST disregarded evidence that could have corroborated sexual

47

harassment. *Id.*

Now that they have compiled a list of all documented complaints of sexual harassment made by female drivers against male drivers during the class period that CRST deemed not to have been corroborated, plaintiffs contend the basis for their pattern or practice claim is even stronger. They state that CRST found 209 sexual harassment complaints made by female drivers not to be corroborated during the class period. *Id.* They note that in 60 percent of those cases (124 out of 209), CRST's investigation records show that it disregarded evidence that could have potentially corroborated the victim's complaint, but did not consider that evidence to be eyewitness testimony or an admission of sexually harassing conduct. *Id.* at 17. In 36 cases, a witness was identified who could have provided evidence supporting that victim's complaint (such as witnesses who heard harassment over the phone or saw the harasser's conduct before or after the time the drivers were on the truck). *Id.* In 19 cases, evidence existed that could have supported the victim's complaint (including text messages, pictures, a police report, or some other document that CRST either did not obtain or refused to credit). *Id.* In 52 cases, the alleged harasser made admissions that could have supported the victim's complaint, but that CRST did not deem an admission of sexual misconduct. *Id.* Finally, in 17 cases more than one of these additional forms of evidence was available. *Id.* Plaintiffs conclude that in nearly 60 percent of "uncorroborated" cases, CRST either refused to obtain or credit evidence that could have distinguished the case from a true "he said/she said" situation. *Id.*

Plaintiffs assert that when confronted with examples of CRST refusing to find a complaint had been corroborated in light of this evidence, Carlson said she could not answer. *Id.* at 18. For instance, when Leslie Fortune complained about her lead driver, Carlson confirmed that this lead driver lied to HR when he stated he had not required Fortune to share a hotel room with only one bed. *Id.* Carlson deemed Fortune's complaint uncorroborated. When asked why the lead driver was terminated only for

texting while driving when she was able to confirm that he had required a student to stay in a hotel room with only one bed in it and lied to HR about it, Carlson replied, "I can't answer that." *Id.*

Fortune also complained that a co-driver called her a "lot lizard" (truck driver slang for prostitute) to another driver. *Id.* The investigation form shows that Carlson left a message for the driver to whom the statement was made but never followed up, even though she conceded that drivers are required to cooperate with HR investigations. *Id.* She also did not make any further efforts to reach out to three other witnesses Fortune had identified beyond leaving them a single telephone message. *Id.*

Plaintiffs identify one other specific example involving Fortune and an additional example involving Claudia Lopez. *Id.* at 19-20. In both instances, Carlson deemed the complaint uncorroborated, even though there was evidence that could have suggested it was true, such as statements by the accused or witnesses who were never contacted. *Id.* Plaintiffs discuss two additional examples of uncorroborated complaints with supporting evidence that were handled by the two employee relations representatives. *Id.* at 21. Plaintiffs state that these examples and others in the investigation forms demonstrate the alleged policy, pattern or practice of failing to find a complaint is corroborated in the absence of eyewitness testimony or an admission by the accused. *Id.* at 22.

### b. *Failure to Discipline When Complaints are Corroborated*

Plaintiffs argue CRST has a policy, pattern or practice of failing to discipline drivers when complaints are corroborated. While CRST states that HR merely makes a recommendation to DMs and operations managers regarding any discipline following a harassment complaint, plaintiffs provide deposition testimony from a DM and operations manager stating that he had no personal involvement in disciplining drivers outside of what HR instructed him to do. *Id.* Another DM during the class period also stated that "I just, in the end, was either told 'male only,' 'female-only,' 'terminated.'" *Id.*

Plaintiffs state that these designations of "male only" are not disciplinary, as they do not reduce a driver's pay and are not considered a disciplinary warning. Plaintiffs state that these same designations were used in many cases even when CRST found a sexual harassment complaint to be uncorroborated. *Id.* at 22-23. They also note that even CRST does not claim that its practice of sending the accused driver a copy of CRST's sexual harassment policy is a disciplinary action. *Id.* at 23.

In addition to the anecdotal examples provided in their motion for class certification, plaintiffs argue that based on CRST's own records, CRST imposed no discipline in over 60 percent of cases (34 out of 56) where CRST deemed some sexually harassing conduct to have been corroborated. *Id.* at 23. Plaintiffs summarize 12 instances where HR corroborated some sexually harassing conduct, but none of the harassing drivers were disciplined in any way, warned, or directed to sit through a PWE training. *Id.* at 23-27.

### c. *Failing to Discipline DMs Who Do Not Promptly Respond Appropriately to Complaints*

Plaintiffs note that Stastny stated in her deposition that DMs who receive sexual harassment complaints and do not immediately convey those complaints to HR should be disciplined if they permit the truck to continue driving after learning of the sexual harassment complaint.

Q:    If a driver manager doesn't immediately convey a sexual harassment complaint that they have learned of to HR, they should receive some form of discipline, right?

A:    Correct.

Q:    And same with a situation where the driver manager has permitted the truck to continue onward past the point where they learned about a sexual harassment complaint situation on the truck, right?

A:    Correct.

Doc. No. 192-1 at 27. An operations manager also admitted that DMs are required to notify HR of a sexual harassment complaint "[a]s soon as they conclude the conversation" in which they become aware of the complaint. *Id.* at 28. Carlson also testified as CRST's Rule 30(b)(6) witness that a DM who receives a sexual harassment complaint is required to split the drivers. *Id.* Plaintiffs note that HR does not regularly review how DMs respond to sexual harassment. *Id.* Stastny could not recall a single instance in which a DM was terminated for failing to comply with CRST's policy of reporting sexual harassment complaints to HR or disciplined for failing to appropriately handle a sexual harassment complaint. *Id.*

HR decides whether to discipline a DM for mishandling a sexual harassment complaint. When discipline is imposed upon a DM who has failed to appropriately handle a sexual harassment complaint, a disciplinary action form is filled out and stored in the employee's file and within the HR employee relations files. *Id.* at 29. In discovery, plaintiffs requested all disciplinary action forms relating to any DM's failure to timely or properly respond to a complaint of sexual discrimination or sexual harassment. *Id.* Only three forms were produced for the class period. *Id.* None of those disciplinary actions related to the anecdotes plaintiffs referenced in their motion for class certification. *Id.*

Plaintiffs then summarize 29 examples in which a complaint was allegedly mishandled and the DM did not receive any discipline, beyond a written warning in one instance and a three-day suspension in another. *Id.* at 29-31. Plaintiffs note that those examples are not an exclusive list of all failures by a DM to appropriately handle a sexual harassment complaint. Because there are only three documented occasions of a DM being disciplined, plaintiffs contend the extent of this failure can only grow as they uncover more examples. *Id.* at 32.

Plaintiffs further argue that failing to discipline DMs exacerbates the problem because the DMs can continue mishandling complaints without consequence. *Id.* They

cite an example of a DM who failed to immediately separate the drivers upon receiving a complaint but was not disciplined – even though HR had knowledge of how the DM handled the incident. *Id.* at 32-33. They cite another instance of the same DM taking no action regarding a complaint. *Id.* at 33. HR spoke with the DM and the DM admitted telling the complainant to "put her big girl panties on." *Id.* HR told the DM the comment was unprofessional and should not be used going forward. The DM was not disciplined for the comment, or failing to separate the drivers and escalate the complaint to HR. *Id.*

The same DM then handled a complaint from a student driver against a lead driver. *Id.* The DM forwarded an email chain between the two drivers to HR, which revealed that the DM failed to promptly separate the drivers and ultimately had them deliver the load before separating them. The DM also made the following comment to the complainant:

> That is strange because I have never had any one ever complain about that about him . . and he trains most women because we don't' [sic] have very many that will train women, . [sic] Unfortunately I will need to address this immediately in the morning with HR . .and it is too bad because he is a good trainer w/ good knowledge. I will figure out where to get you to . . are you okay for the night?

*Id.* at 34. The DM was not disciplined for how this complaint was handled. *Id.* at 35.

On a fourth occasion, this same DM handled another complaint by telling the complainant to deliver the load and then the drivers could separate at a CRST terminal. *Id.* When interviewed by HR, the complaining driver explained the DM's response. When HR spoke to the DM, the DM made admissions revealing the complaint had been mishandled and HR told the DM that when a driver mentions harassment, the DM should remove her right away. The DM, again, was not disciplined. *Id.* at 36.

Plaintiffs cite examples with another DM in which a driver complained that her lead driver slept in the truck nude and refused to stop when she told him it bothered her. *Id.* at 37. She told HR that her DM asked if she could deal with it one more day. This

DM was not disciplined for failing to immediately separate the drivers. On another occasion, a driver similarly reported to HR that upon complaining of her co-driver's inappropriate behavior, the DM tried to require her to keep driving to move the load. The DM was not disciplined and was subsequently promoted to operations manager, a position supervising other DMs. *Id.*

Plaintiffs allege that under this operations manager's supervision, other DMs engaged in similar behavior. They cite an example of a female driver who reportedly got off the truck after her co-driver approached her in his boxers, sat on her bed while she was lying down, watched videos of half-naked women in the cab of the truck and slapped her on the back several times while she was driving. *Id.* The driver reported that her DM hung up on her and did nothing to assist her with getting a hotel or transportation. The DM admitted that he probably should have sent an email to HR conveying the sexual harassment complaint, but neither the DM nor the operations manager were disciplined. *Id.* at 38.

In sum, plaintiffs contend that CRST repeatedly failed to discipline DMs for failure to follow its policy of immediately separating drivers upon receipt of a sexual harassment complaint and escalate that complaint to HR. They suggest that DMs are incentivized to keep the trucks moving because stopping them due to sexual harassment complaints will affect their compensation metrics. Plaintiffs allege sexual harassment is allowed to thrive under this purported policy, pattern or practice of failing to discipline DMs for mishandling complaints.

### 3.    *Applicable Law*

Federal Rule of Civil Procedure 23 governs class certification. Under Rule 23(a), the party seeking certification must demonstrate:

> (1)    the class is so numerous that joinder of all members is impracticable
>
> (2)    there are questions of law or fact common to the class

> (3)     the claims or defenses of the representative parties are typical
>         of the claims or defenses of the class, and
>
> (4)     the representative parties will fairly and adequately protect the
>         interests of the class.

The proposed class must also satisfy at least one of the three requirements under Rule 23(b). I found that the hostile work environment class was properly certified under Rule 23(b)(3), which requires that "the questions of law or fact common to class members predominate over any question affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). Because commonality and predominance are the two primary bases upon which CRST argues class certification is inappropriate, I will focus on those aspects of Rule 23(a) and Rule 23(b)(3).

"Commonality requires a showing that class members 'have suffered the same injury.'" *Powers v. Credit Mgmt. Servs.*, 776 F.3d 567, 571 (8th Cir. 2015) (quoting *Falcon*, 457 U.S. at 157). This requirement is satisfied when the legal question "linking the class members is substantially related to the resolution of the litigation." *DeBoer v. Mellon Mortg. Co.*, 64 F.3d 1171, 1174 (8th Cir. 1995) (quoting *Paxton*, 688 F.2d at 561). "Their claims must depend upon a common contention – for example, the assertion of discriminatory bias on the part of the same supervisor." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011). "That common contention, moreover, must be of such a nature that it is capable of classwide resolution – which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Id.* The commonality requirement cannot be satisfied by demonstrating that class members have all suffered a violation of the same provision of law." *Bennett v. Nucor Corp.*, 656 F.3d 802, 814 (8th Cir. 2011). "Plaintiffs cannot 'simply leap from the premise that they were the victims of discrimination to the position that others must also have been.'" *Gonzalez v. Brady*, 136 F.R.D. 329, 331 (D.D.C. 1991) (quoting *Morrison v. Booth*, 763 F.2d 1366, 1371 (11th Cir. 1985)).

54

Rule 23(b)(3) requires a finding "that the questions of law or fact common to class members predominate over any questions affecting only individual members and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." *Powers*, 776 F.3d at 569. Rule 23(b)(3) is composed of two requirements: predominance and superiority. Common questions must "predominate over any questions affecting only individual members" and class resolution must be "superior to other available methods for the fair and efficient adjudication of the controversy." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 615 (1997). The rule lists the following factors are pertinent to these findings:

(A)    the class members' interests in individually controlling the prosecution or defense of separate actions;

(B)    the extent and nature of any litigation concerning the controversy already begun by or against class members;

(C)    the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and

(D)    the likely difficulties in managing a class action.

Fed. R. Civ. P. 23(b)(3).

"The predominance inquiry 'tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation.'" *Elkins v. American Showa Inc.*, 219 F.R.D. 414, 419 (S.D. Ohio 2002) (quoting *Bacon v. Honda of America Mfg., Inc.*, 205 F.R.D. 466, 486 (S.D. Ohio 2001)). It is not satisfied if "individual questions . . . overwhelm the questions common to the class." *Ebert v. General Mills, Inc.*, 823 F.3d 472, 478-79 (8th Cir. 2016) (quoting *Amgen Inc. v. Conn. Ret. Plans & Trust Funds*, 133 S. Ct. 1184, 1196 (2013)). "An individual question is one where 'members of a proposed class will need to present evidence that varies from member to member,' while a common question is one where 'the same evidence will suffice for each member to make a prima facie showing [or] the issue is susceptible to generalized, class-wide proof.'" *Ebert*, 823 F.3d at 479 (quoting *Tyson Foods, Inc. v. Bouaphakeo*, 136 S. Ct. 1036, 1045 (2016)). With regard to predominance, the Eighth Circuit has stated:

When determining whether common questions predominate, a court must conduct a limited preliminary inquiry, looking behind the pleadings, but that inquiry should be limited to determining whether, if the plaintiffs' general allegations are true, common evidence could suffice to make out a prima facie case for the class. While limited in scope, this analysis should also be rigorous.

*In re Zurn Pex Plumbing Prod. Liab. Litig.*, 644 F.3d at 618 (internal citations and quotation marks omitted). "In conducting this preliminary inquiry, however, the court must look only so far as to determine whether, given the factual setting of the case, if the plaintiffs['] general allegations are true, common evidence could suffice to make out a prima facie case for the class." *Blades*, 400 F.3d at 566. The predominance requirement is "far more demanding" that Rule 23(a)'s commonality requirement. *Amchem*, 521 U.S. at 623-24. "In contrast to Rule 23(a)(2), the issue of predominance under Rule 23(b)(3) is qualitative rather than quantitative." *Ebert*, 823 F.3d at 478.

A class action also requires plaintiffs to prove by a preponderance of the evidence that the defendant engaged in a "pattern or practice of unlawful discrimination in various company policies." *Jenson v. Eveleth Taconite Co.*, 824 F. Supp. 847, 860 (D. Minn. 1993) (citing *Craik v. Minnesota State Univ. Bd.*, 731 F.2d 465, 470 (8th Cir. 1984)). To establish a pattern or practice the discriminatory acts must not be "isolated, insignificant or sporadic" but must be "repeated, routine, or of a generalized nature." *Jenson*, 824 F. Supp. at 860 (citing *Catlett v. Missouri Highway and Transp. Comm'n*, 828 F.2d 1260, 1265 (8th Cir. 1987)). The discrimination should be "the company's standard operating procedure – the regular rather than the unusual practice." *Jenson II*, 824 F. Supp. at 860 (citing *Teamsters*, 431 U.S. at 360-62). For instance, the pattern or practice theory could be that the employer "created and maintained a sexually hostile and abusive work environment . . . because it tolerated . . . individual acts of harassment by its employees by refusing to take notice of, investigate, and/or discipline the workers who sexually harassed employees." *E.E.O.C. v. Mitsubishi Motor Mfg. of America,*

*Inc.*, 990 F. Supp. 1059, 1069 (C.D. Ill. 1998).

Sexual harassment that is "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment" constitutes unlawful sex-based discrimination under Title VII. *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 73 (1986). To prove a claim of hostile work environment, plaintiffs must prove (1) that they are members of a protected group, (2) that they were subjected to unwelcome sexual harassment, (3) that the harassment was based on sex, (4) that the harassment affected a term, condition or privilege of her employment and (5) their employer knew or should have known of the harassment and failed to take appropriate remedial action. *Nichols v. Tri-National Logistics, Inc.*, 809 F.3d 981, 985 (8th Cir. 2016). "Actionable harassment must have been both objectively and subjectively offensive affecting a term of employment." *Id.* (citing *Bainbridge v. Loffredo Gardens, Inc.*, 378 F.3d 756, 759 (8th Cir. 2004)).

### 4. *Analysis*

As noted in my previous order, plaintiffs advocated for a *Teamsters* approach to their putative class action, which would bifurcate the case into two phases: liability and damages. *See Teamsters*, 431 U.S. at 360-62; *Jenson*, 824 F. Supp. at 875-76 (applying modified *Teamsters* framework to pattern or practice hostile work environment claim). I found that Phase I would determine whether CRST created or tolerated a hostile work environment by way of the three stated policies. If liability is established, each case would then proceed to Phase II to determine damages. As discussed below, this method is not as simple as it might seem in the context of a hostile work environment pattern or practice claim in which plaintiffs seek monetary and injunctive relief.

In my order certifying the classes, I noted that some courts applying the *Teamsters* approach for a pattern or practice hostile work environment claim find that only the objective component needs to be established during Phase I. *See Mitsubishi Motor Mfg.*,

990 F. Supp. at 1078 ("All that the EEOC will have established in Phase I by a finding of pattern or practice is that an objectively reasonable person would find that, as a whole, the environment within the company is hostile and that the company was on notice of and was negligent regarding the systemic problem.").[17] In Phase II, the individual plaintiffs must then prove the subjective component to demonstrate they are part of the affected class. *See Bremiller v. Cleveland Psychiatric Inst.*, 195 F.R.D. 1, 25, 26 (2000) (describing the two-phase approach for class action claims alleging pattern or practice of hostile work environment as a result of sexual harassment). Phase II would also involve individual determinations of damages. *See Bremiller*, 195 F.R.D. at 31 ("Whether individual class members are entitled to damages that resulted from the alleged policy of harassment is relevant only during the recovery phase of the proceedings and will be determined therein should a jury find Defendants liable for tolerating a policy of sexual harassment."). Upon closer examination, and based on the additional record now before me, I find that Phase I may involve additional considerations beyond whether CRST created or contributed to a hostile work environment through the three alleged policies, patterns or practices.

The *Teamsters* Court defined the first stage as follows:

> The plaintiff in a pattern-or-practice action is the Government, and its initial burden is to demonstrate that unlawful discrimination has been a regular procedure or policy followed by an employer or group of employers. At the initial, "liability" stage of a pattern-or-practice suit the Government is not required to offer evidence that each person for whom it will ultimately seek relief was a victim of the employer's discriminatory policy. Its burden is to establish a prima facie case that such a policy existed. The burden then shifts to the employer to defeat the prima facie

---

[17] Pattern or practice claims may be brought by the Equal Employment Opportunity Commission (EEOC) or by a class pursuant to Rule 23(a). The same liability standards apply. *See E.E.O.C. v. Dial Corp.*, 156 F. Supp.2d 926 (N.D. Ill. 2001) (referencing both EEOC and class actions in discussing liability).

showing of a pattern or practice by demonstrating that the Government's proof is either inaccurate or insignificant....

      If an employer fails to rebut the inference that arises from the Government's prima facie case, a trial court may then conclude that a violation has occurred and determine the appropriate remedy. Without any further evidence from the Government, a court's finding of a pattern or practice justifies an award of prospective relief. Such relief might take the form of an injunctive order against continuation of the discriminatory practice, an order that the employer keep records of its future employment decisions and file periodic reports with the court, or any other order "necessary to ensure the full enjoyment of the rights" protected by Title VII.

*Teamsters*, 431 U.S. at 360–61 (citation omitted).  In discussing the employer's defense, the Court noted:

      The employer's defense must, of course, be designed to meet the prima facie case of the Government. We do not mean to suggest that there are any particular limits on the type of evidence an employer may use. The point is that at the liability stage of a pattern-or-practice trial the focus often will not be on individual hiring decisions, but on a pattern of discriminatory decisionmaking. While a pattern might be demonstrated by examining the discrete decisions of which it is composed, the Government's suits have more commonly involved proof of the expected result of a regularly followed discriminatory policy. In such cases the employer's burden is to provide a nondiscriminatory explanation for the apparently discriminatory result.

*Id*. at 360-61, n. 46.  While that approach worked in *Teamsters* (a race discrimination case), it does not fit neatly into the pattern or practice claim of hostile work environment.  As one court has explained:

      [I]n a race discrimination case[,] it is clear why a pattern or practice should have an effect on an employer's liability to individual claimants.  If an employer has an established policy of making employment decisions with racial animus in violation of Title VII, it is likely that any specific employment decision also violates Title VII, and if a particular decision was not discriminatory, the employer is in the best position to show why.  However, the impact of a pattern or practice finding in a hostile work

59

environment sexual harassment case is not so clear. In contrast with a race discrimination case – where the focus is on the employer's basis for making an employment decision that adversely affected the claimant – a sexual harassment case centers on the gravity of the conduct to which a claimant was exposed. The sexual harassment suffered by the claimant must have been severe or pervasive enough (measured both objectively and subjectively) to constructively alter the terms or conditions of the claimant's employment by creating a hostile work environment. Otherwise, no Title VII violation has occurred. Therefore, a finding that an employer had a pattern or practice of tolerating sexual harassment in violation of Title VII does not necessarily establish that an individual claimant was exposed to harassment or that the harassment an individual claimant suffered violates Title VII. It is thus unclear what effect a pattern or practice finding should have on an individual claimant's suit for damages.

*E.E.O.C. v. Int'l Profit Assocs.*, No. 01 C 4427, 2007 WL 3120069, at *3 (N.D. Ill. Oct. 23, 2007).

Thus, a hostile work environment claim presents two primary questions for the trier of fact: (1) was the complainant, "because of her sex, subjected to such hostile, intimidating, or degrading behavior, verbal or nonverbal, as to affect adversely the conditions under which she worked" and (2) was "the defendant's response or lack thereof to its employees' behavior . . . negligent." *Mitsubishi Motor Mfg.*, 990 F. Supp. at 1071 (quoting *Carr v. Allison Gas Turbine Div., General Motors Corp.*, 32 F.3d 1007, 1009 (7th Cir. 1994)). CRST argues plaintiffs have only addressed the second question and their evidence as to the first question is insufficient to sustain a class.

Plaintiffs have done little to explain precisely how their hostile work environment claim should be tried and where the certified issue fits into the overall method of proving liability and damages. Aside from advocating for a bifurcated approach (which I accepted in my order certifying the classes), plaintiffs have not explained how they intend to prove their hostile work environment claim on a class basis. Indeed, in resisting CRST's motion for decertification, plaintiffs have offered no further detail regarding how they expect to prove each element of a pattern or practice hostile work environment claim prior to

60

reaching the issue of whether CRST tolerates a hostile work environment through the three alleged policies. Examining how such a case could be tried has guided my analysis as to whether any part of plaintiffs' hostile work environment claim should be certified as a class under Rule 23(a) and 23(b)(3).

*Int'l Profit Assocs.* contains a helpful analysis of how a policy, pattern or practice claim of hostile work environment would play out at trial. In that case, the court carefully considered the bifurcated approach of *Teamsters* and how it had been used in other cases. It rejected the EEOC's argument that the objective element of the hostile work environment claim could be determined at the pattern or practice phase. The EEOC had essentially argued that it intended to prove the objective component by showing that sexual harassment that occurred company-wide was sufficiently severe or pervasive such that a reasonable person would find the work environment as a whole to be hostile. The court rejected this approach with the following reasoning:

> The EEOC's belief that it can meet its burden of proof on the objective element by aggregating the acts of harassment to which *all* the claimants were subjected to derives primarily from *Mitsubishi*, which eliminated the objective component of the severe or pervasive test at the individual stage. As discussed above, the court's rationale for doing so was that "[a]lthough 'isolated' or 'sporadic' instances of harassment . . . are typically not enough to establish hostile environment sexual harassment, single instances of conduct must be taken together with the continuous pattern of harassment in the workplace, which was established at the pattern or practice phase." *Mitsibishi* [sic], 990 F. Supp. at 1081. The court therefore permitted the individual claimants to rely on the objective showing made as to the entire workplace at the pattern or practice phase rather than requiring them to make individual showings that the specific harassment they suffered was objectively severe. *Id.* at 1079-81.

> The court declines to follow *Mitsubishi*'s approach (and, concurrently, that adopted in *Dial* and *Jenson*) because the court does not see how *Mitsubishi* can be reconciled with the Supreme Court's hostile work environment jurisprudence. In *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57 (1986), the case in which the Supreme Court first articulated what has been the governing hostile work environment test for more than twenty

years, the Court stated that "[f]or sexual harassment to be actionable, it must be sufficiently severe or pervasive to alter the terms or conditions of [the victim's] employment and create an abusive working environment." *Id.* at 67 (alteration in original) (citation and internal quotation marks omitted). If the conduct at issue does not reach the *Meritor* threshold, no Title VII violation has occurred. *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 752 (1998) (citing *Meritor*, 477 U.S. at 65).

The Court elaborated on the *Meritor* test in *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1992), holding that sexual harassment is actionable only where the conduct at issue is "severe or pervasive enough to create an objectively hostile or abusive work environment – an environment that a reasonable person would find hostile or abusive." *Id.* The Court also held that the plaintiff must subjectively perceive the environment to be hostile, for otherwise the conditions of the plaintiff's employment have not *actually* been altered, regardless of whether a reasonable person would believe them to be. *Harris*, 510 U.S. at 21-22. Thus, the state of the law following *Harris* can be summarized as follows: "[I]n order to be actionable under the statute, a sexually objectionable environment must be both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that victim in fact did perceive to be so." *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998).

. . . .

The Court's hostile work environment cases demonstrate that it intended to construct a test that would prevent eggshell plaintiffs – those who are offended by comments or actions that would not offend a reasonable person – from recovering under Title VII. The objective inquiry functions as a limitation on suits attacking the 'genuine but innocuous differences in the ways men and women routinely interact with members of the same sex and of the opposite sex.'" *Id.* (quoting *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81 (1998)). But the EEOC's proposed method of proof – and, in the court's opinion, that endorsed by *Mitsubishi*, et al. – would strip the limitation of its significance in a pattern or practice case. Under the EEOC's theory, if IPA is found to have a policy of tolerating severe or pervasive sexual harassment, then every woman who was exposed to any form of sexual harassment at IPA, however trivial, would be entitled to damages so long as she was subjectively offended by the conduct she was exposed to. In other words, a woman who experienced only an untoward glance or an isolated remark could nonetheless recover compensatory and punitive damages so long as she was subjectively

offended. This scenario is inconsistent with the principles announced in *Meritor* and *Harris*, and the court does not believe that the Supreme Court would sanction such a result, even in the context of a pattern or practice case.

This is not to say, however, that the terms or conditions of employment are not altered when an employer has a policy of allowing severe or pervasive harassment to occur in its workplace. A policy of tolerating such behavior is itself a Title VII violation, but proof of such a policy establishes only that the employer behaved improperly with respect to a protected group *in general*, and therefore justifies only injunctive relief under *Teamsters*. That an employer has such a general policy does not mean that every employee who was harassed has been exposed to harassment meeting the *Meritor* threshold, and thus does not mean that the terms and conditions of employment have been altered for each employee who experienced harassment. It is entirely possible for an employee to work at a business with a policy of tolerating actionable sexual harassment, yet be exposed to harassment in only the most superficial of ways.

Of course, the extent to which a particular employee was *exposed* to the conduct relied on by the EEOC to prove the company's hostile work environment (at the pattern or practice phase) is relevant to that employee's individual hostile environment claim. But this is only to say, as *Harris* instructed, that the totality of each employee's circumstances, not isolated instances, determine whether sexual harassment is actionable. The court therefore agrees with *Mitsubishi* that the work environment as a whole *may* be relevant to an individual claimant's experience, *see* 990 F. Supp. at 1081, but disagrees that an individual claimant can satisfy her burden on the objective element by aggregating all claimants' experiences. Instead, the court will focus on the conduct to which *each individual claimant* was exposed. This approach is more consistent with the Court's admonition in *Meritor* and *Harris* that a Title VII violation occurs only when the harassment to which a particular claimant is exposed is so severe or pervasive that a reasonable person would be offended.

The court therefore agrees with IPA that the claimants cannot be relieved of their burden to make an objective showing at the individual phase of this lawsuit if the EEOC prevails on the pattern or practice aspect of this case in Phase I. An objective showing will be required at both Phase I and Phase II. At Phase I, the EEOC will be required to prove that a

reasonable person would find the sexual harassment occurring globally at IPA so severe or pervasive that the work environment as a whole was hostile or abusive toward women. At Phase II, the EEOC must also show that the harassment to which each individual claimant was exposed is severe or pervasive enough to be actionable.

*Int'l Profit Assocs., Inc.*, 2007 WL 3120069, at \*12-14.

I agree with this approach as it applies to this case, particularly given the manner in which the sexual harassment is alleged to have occurred here – in trucks and by one individual against another. It would be unfair to conclude that a work environment as a whole is hostile by tallying up all instances of sexual misconduct when each person in the class may have been subject to only one of those instances and unaware of the others. For that reason, Phase II must involve the question of whether the conduct particular to each individual is objectively and subjectively offensive.

The district court in *Int'l Profit Assocs.* explained this as follows:

> As discussed above, proof that the employer had a policy of tolerating unlawful sexual harassment does not necessarily make it more likely that any particular claimant was subject to actionable sexual harassment. Rather, a particular claimant could have experienced only mundane comments, even though the employer had a practice of tolerating far more objectionable actions. Thus, to remain consistent with the goals of Title VII, as articulated by the Supreme Court, each claimant must demonstrate that the harassment she experienced meets the objective threshold of *Meritor* and *Harris*. Nor would the employer be in a better position than the employee to demonstrate that the harassment experienced by a given plaintiff was not sufficiently severe or pervasive. To the contrary, each individual claimant should have knowledge of the specific harassment she experienced, and the relevant inquiry is whether this conduct, taken as a whole, would render the work environment hostile to a reasonable person. Thus, shifting the burden on the objective element to the employer at the individual phase does not make sense under *Teamsters*.

*Id.* at \*15. I agree with the general framework discussed by the District of Northern Illinois regarding how a pattern or practice claim of hostile work environment should proceed. *See id.* at \*17 (summarizing the legal framework for trial). Because plaintiffs

are seeking more than injunctive relief, and this is a class action – rather than an action brought by the EEOC – I must consider whether this approach is compatible with the requirements of Rule 23(a) and Rule 23(b)(3).

CRST argues that plaintiffs are unable to meet the commonality requirement under Rule 23(a) and the predominance and superiority requirements under Rule 23(b)(3). When applying the above framework in the context of a class action, it becomes obvious that individual issues will predominate common ones under Rule 23(b)(3). Even at Phase I, proof of the alleged sexual harassment will consist of individual and separate instances of conduct rather than conduct to which multiple women were exposed. *Compare E.E.O.C. v. Pitre, Inc.*, 908 F. Supp. 2d 1165, 1177-78 (D.N.M. 2012) ("because the EEOC's claims fall within the same course of conduct and do not present great individual differences, bifurcation of this matter would increase the efficiency of the trial and is appropriate.").

*Jenson v. Eveleth Taconite Co.*, 130 F.3d 1287 (8th Cir. 1997), involved a class action pattern or practice hostile work environment claim and utilized a modified *Teamsters* model, which the Eight Circuit adopted. *Jenson* is distinguishable from this case, however, in one important way. In *Jenson*, the alleged conduct involved sexually explicit graffiti and posters found in common areas such as the lunchroom, lockers, desks, offices, vehicles, elevators, women's restrooms, inter-office mail and company bulletin boards. *See Jenson v. Eveleth Taconite Co.*, 824 F. Supp. 847, 880 (D. Minn. 1993). While women individually experienced unwelcome touching, including kissing, pinching and grabbing and offensive language, generic comments were also made to groups of women. *Id.* Here, the alleged conduct almost exclusively involves actions perpetuated by one individual against another individual in an isolated environment, not conduct in a common environment directed against several women at once. This is relevant to the proof plaintiffs intend to use to at Phase I to establish the offensive conduct, which is an element that plaintiffs have failed to address and that does not appear to be amenable to

common evidence.

CRST argues that plaintiffs' approach of examining each individual complaint in order to extrapolate some common policy, pattern or practice in the aggregate, and without any expert analysis, is insufficient to certify a class. *See* Doc. No. 172-1 at 27. Plaintiffs' evidence primarily consists of CRST records during the relevant time period as to how CRST handled sexual harassment complaints and summary exhibits prepared by plaintiffs' counsel based on those records. Plaintiffs argue the three alleged policies, patterns and practices are borne out by these records.

Even if plaintiffs are correct on this point, CRST argues that the policies, patterns and practices that plaintiffs identify would address only the second aspect of a hostile work environment claim as identified above – the employer's response. *See* Doc. No. 197 at 20. CRST argues that plaintiffs have failed to describe how they intend to prove the other elements of a hostile work environment at Phase I and contends that proof of these elements cannot involve common evidence because each alleged incident of sexual harassment took place in isolation from any other. This raises the question of whether an employer's common response to individualized hostile conditions can form the entire basis of a hostile work environment claim.

I find that it cannot. Plaintiffs are not alleging that CRST's policies, patterns or practices themselves are the harassing conduct, but the means by which CRST tolerates, encourages and allows sexual harassment in the workplace. As CRST notes, this addresses the second part of a hostile work environment claim (the employer's response), but the first part (the unwelcome sexual harassment and the severity of such harassment), is equally important to establish liability. Aside from the employer's alleged negligence, plaintiffs must prove: (1) that they are members of a protected group, (2) that they were subjected to unwelcome sexual harassment, (3) that the harassment was based on sex, (4) that the harassment affected a term, condition or privilege of their employment. *See Hall v. Gus Const. Co.*, 842 F.2d 1010, 1013 (8th Cir. 1998). The harassment must be more

than isolated or sporadic. A hostile work environment occurs when "the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to later the conditions of the victim's employment and create an abusive working environment." *Harris v. Forklift Sys. Inc.*, 510 U.S. 17, 21 (1993) (citations omitted). A hostile work environment claim does not involve isolated incidents, but ongoing and repeated conduct. *See Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 115 (2002).

This is where the class structure falls apart, as there is no common evidence regarding the alleged harassment female drivers experienced. This is not a situation such as that in *Jenson* in which the plaintiffs were working in the same environment and the alleged harassing conduct repeatedly affected more than one individual. *See Jenson*, 824 F. Supp. at 880 (describing that many of the alleged instances of unwelcome sexual harassment applied to all women including visual references posted around the workplace and comments by male co-workers to groups of women). Here, the harassment primarily took place one-on-one in a truck by a codriver against another codriver or by a lead driver against a student driver. While some women experienced multiple offensive encounters, most women reported only one instance of sexual harassment, as evidenced by plaintiffs' summary exhibits. Of course, these women could have been subjected to other offensive conduct that was not reported or that is outside of the class time period. Nonetheless, the nature of the offensive conduct at issue is isolated and sporadic when viewed from each plaintiff's perspective, even if appears severe and pervasive when all of the complaints are viewed together. Any commonality concerning CRST's alleged response (or lack of response) to each reported incident of harassment has no bearing on the isolated nature of the harassing conduct.

Considering that at Phase II, the conduct will have to be evaluated again (regarding whether it is objectively and subjectively offensive), the class structure, even with regard to one issue (the employer's negligence), loses its efficiency. *See Int'l Profit Assocs.*,

2007 WL 3120069 at *3 ("Therefore, a finding that employer had a pattern or practice of tolerating sexual harassment in violation of Title VII does not necessarily establish that an individual claimant was exposed to harassment or that the harassment an individual suffered violates Title VII. It is thus unclear what effect a pattern or practice finding should have on an individual claimant's suit for damages."). The allegedly offensive actions, not the employer's alleged policies, are what create difficulties in trying hostile work environment claims as a class. *See Elkins*, 219 F.R.D. at 424 ("Given the variations in the frequency and the severity of the behavior to which different female workers were subjected, the Court must conclude that commonality is lacking.").[18]

In sum, I find that the hostile work environment class and certified issue do not meet the predominance and superiority requirements under Rule 23(b)(3), nor the commonality requirement under Rule 23(a). The hostile work environment class must be decertified.

## IV. CONCLUSION

For the reasons stated herein:

1. Defendant's motion (Doc. No. 171) for partial summary judgment regarding the class retaliation claim is **granted**. The class claim of unlawful retaliation is hereby **dismissed**.

2. Defendant's motion (Doc. No. 172) for decertification of the Hostile Work Environment class is **granted** and the Hostile Work Environment Class is hereby **decertified**.

---

[18] In discussing *Elkins* in my previous order, I focused on the *policies* that plaintiffs were subjected to rather than the *conduct* in concluding that plaintiffs' claims were typical to the class. *See* Doc. No. 85 at 39-40. When viewing plaintiffs' claims in this new light, it appears that plaintiffs would also have difficulties meeting the typicality requirement under Rule 23(a) because the offensive conduct differed from plaintiff to plaintiff – even if CRST's response allegedly remained the same.

3.     The plaintiffs may pursue their hostile work environment claims against defendant on an individual basis.  In addition, while I have granted summary judgment as to the class claim of retaliation, this does not preclude the possibility that an individual plaintiff might have a viable retaliation claim based on the specific facts and circumstances of that plaintiff's case.

**IT IS SO ORDERED.**

**DATED** this 15th day of January, 2019.

_____
Leonard T. Strand, Chief Judge