**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF IOWA**
**CEDAR RAPIDS DIVISION**

CATHY SELLARS, on behalf of herself
and all others similarly situated, et al.,

        Plaintiffs,

vs.

CRST EXPEDITED, INC.,

        Defendant.

No. C15-117-LTS

**MEMORANDUM OPINION AND
ORDER ON MOTION FOR
SUMMARY JUDGMENT**

_____

### *TABLE OF CONTENTS*

*I.*     *INTRODUCTION*........................................................................2

*II.*    *BACKGROUND*..........................................................................2

*III.*   *SUMMARY JUDGMENT STANDARDS* .................................3

*IV.*   *RELEVANT FACTS* ..................................................................5

      *A.*     *CRST's Business Model*.......................................................5

      *B.*     *Driver Pay*...........................................................................7

      *C.*     *CRST's Policies Regarding Sexual Harassment and
            Retaliation*...........................................................................8*

      *D.*     *Plaintiffs' Commencement of Employment with CRST* ...................18

      *E.*     *Plaintiffs' Allegations Against Other Drivers* ...............................19

      *F.*     *Plaintiffs' Separation from CRST*..............................................35

*V.*     *ANALYSIS* ................................................................................35

      *A.*     *Plaintiffs' Hostile Work Environment Claims* ...............................35

      *B.*     *Plaintiffs' Retaliation Claims* .................................................54

      *C.*     *Plaintiffs' Constructive Discharge Claims*...................................55

*VI.*   *CONCLUSION* .........................................................................58

# I.     INTRODUCTION

This case is before me on a motion (Doc. No. 216) for summary judgment on plaintiffs' individual claims filed by defendant CRST Expedited, Inc. (CRST). Plaintiffs have filed a response (Doc. No. 239) and CRST has filed a reply (Doc. No. 246). I find that oral argument is unnecessary. *See* Local Rule 7(c).

# II.     BACKGROUND

On March 30, 2017, I entered an order certifying a hostile work environment class and a retaliation class in this case. *See* Doc. No. 85. Pursuant to Federal Rule of Civil Procedure 23(c)(4)(A), I also certified the following issues with respect to each class pursuant to Federal Rule of Civil Procedure 23(c)(4)(a):

a.      As to the Hostile Work Environment Class, whether CRST has any of the following policies, patterns or practices that create or contribute to a hostile work environment:

      (1)      failing to find their complaints were corroborated without an eyewitness or admission,

      (2)      failing to discipline drivers after complaints were corroborated and

      (3)      failure to discipline [driver managers] for failing to promptly respond to sexual harassment complaints and

b.      As to the Retaliation Class:

      (1)      Whether CRST has a policy, pattern or practice of retaliating against women complaining of sexual harassment by requiring them to exit the truck except when they are a lead driver or owner-operator.

*Id.* at 55. I noted that pursuant to Rule 23(c)(1)(C), the order could be altered or amended before final judgment. *Id.* at 56.

2

CRST subsequently moved for summary judgment on the retaliation claim and decertification of the hostile work environment class. *See* Doc. Nos. 171, 172. I granted both motions on January 15, 2019. *See* Doc. No. 204. I denied plaintiffs' motion to amend the decertification order; motion to stay, or alternatively amend, the trial scheduling order; and motion to certify final judgment upon the class retaliation claims for appeal. *See* Doc. No. 233. As such, only plaintiffs' individual claims of hostile work environment, retaliation and constructive discharge under Title VII remain. Those claims are now the subject of CRST's motion for summary judgment.[1] *See* Doc. No. 2.

## III.  SUMMARY JUDGMENT STANDARDS

Any party may move for summary judgment regarding all or any part of the claims asserted in a case. Fed. R. Civ. P. 56(a). Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

A material fact is one that "'might affect the outcome of the suit under the governing law.'" *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Thus, "the substantive law will identify which facts are material." *Id.* Facts that are "critical" under the substantive law are material, while facts that are "irrelevant or unnecessary" are not. *Id.*

An issue of material fact is genuine if it has a real basis in the record, *Hartnagel v. Norman*, 953 F.2d 394, 395 (8th Cir. 1992) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)), or when "'a reasonable jury could return a verdict for the nonmoving party' on the question." *Woods v. DaimlerChrysler*

---

[1] Plaintiffs have indicated they are not pursuing their individual state law claims under the California Fair Employment and Housing Act (FEHA). *See* Doc. No. 230 at 3, n.1.

*Corp.*, 409 F.3d 984, 990 (8th Cir. 2005) (quoting *Anderson*, 477 U.S. at 248). Evidence that only provides "some metaphysical doubt as to the material facts," *Matsushita*, 475 U.S. at 586, or evidence that is "merely colorable" or "not significantly probative," *Anderson*, 477 U.S. at 249-50, does not make an issue of material fact genuine.

As such, a genuine issue of material fact requires "sufficient evidence supporting the claimed factual dispute" so as to "require a jury or judge to resolve the parties' differing versions of the truth at trial." *Anderson*, 477 U.S. at 248-49. The party moving for entry of summary judgment bears "the initial responsibility of informing the court of the basis for its motion and identifying those portions of the record which show a lack of a genuine issue." *Hartnagel*, 953 F.2d at 395 (citing *Celotex*, 477 U.S. at 323). Once the moving party has met this burden, the nonmoving party must go beyond the pleadings and by depositions, affidavits, or otherwise, designate specific facts showing that there is a genuine issue for trial. *Mosley v. City of Northwoods*, 415 F.3d 908, 910 (8th Cir. 2005). The nonmovant must show an alleged issue of fact is genuine and material as it relates to the substantive law. If a party fails to make a sufficient showing of an essential element of a claim or defense with respect to which that party has the burden of proof, then the opposing party is entitled to judgment as a matter of law. *Celotex*, 477 U.S. at 322.

In determining if a genuine issue of material fact is present, I must view the evidence in the light most favorable to the nonmoving party. *Matsushita*, 475 U.S. at 587-88. Further, I must give the nonmoving party the benefit of all reasonable inferences that can be drawn from the facts. *Id.* However, "because we view the facts in the light most favorable to the nonmoving party, we do not weigh the evidence or attempt to determine the credibility of the witnesses." *Kammueller v. Loomis, Fargo & Co.*, 383 F.3d 779, 784 (8th Cir. 2004). Instead, "the court's function is to determine whether a dispute about a material fact is genuine." *Quick v. Donaldson Co., Inc.*, 90 F.3d 1372, 1376-77 (8th Cir. 1996).

4

## IV.    RELEVANT FACTS

The following facts are undisputed unless otherwise noted:

### A.    CRST's Business Model

CRST is a leading long-haul freight transportation company with more than 3,000 drivers at any one time. *See* Doc. No. 239-1 at 1. It operates by teaming two drivers per truck so that one driver may rest while the other is driving, thus allowing the truck to continue moving without violating Department of Transportation daily limitations. *Id.* at 2. Each truck contains a small sleeper berth area behind the front seats containing bunk beds. Doc. No. 247-1 at 2.

CRST has four terminals, which are located in Cedar Rapids, Iowa; Riverside, California; Oklahoma City, Oklahoma and Carlisle, Pennsylvania. *Id.* Drivers are subject to the same policies whether on the road or at the terminal. *Id.* When drivers join CRST, they are trained by "lead drivers," or "leads," for a designated period of time. Doc. No. 239-1 at 2. Lead drivers are nominated by operations personnel and reviewed by the safety department for placement into a certification class. Doc. No. 247-1 at 11. Lead drivers must pass a lead driver training class. *Id.* Plaintiffs note there are approximately 25 female lead drivers out of over 500 leads at any given time, but CRST denies this based on lack of factual support.[2]

Student drivers are not permitted to operate a truck alone without completing over-the-road training with a lead driver. Doc. No. 239-1 at 2. Leads and students are paired up by a student coordinator and a lead driver can request to work with a particular student. Doc. No. 247-1 at 13. The lead driver recommends to the driver manager whether the

---

[2] CRST admits that women comprised approximately 13 percent of all drivers for CRST Expedited as of August 2016. Doc. No. 247-1 at 1.

student should be upgraded to co-driver status. Lead drivers generally work with the same driver manager throughout the lead's training of successive students and no one other than the lead's driver manager is responsible for checking in with students during their over-the-road training. *Id.* Student drivers are road tested and separately evaluated by a safety department trainer before being upgraded to a co-driver. Doc. No. 239-1 at 3.

Once designated as a co-driver, the driver may team up with another driver of his or her choosing. *Id.* Plaintiffs note that this choice is limited to a list of currently available drivers. Thus, for example, if a female driver wishes to pair up with another female driver and one is not currently available, she will be unpaid during the time that she waits. *Id.* To find a co-driver, CRST may provide a list of potential co-drivers, whom the individual may call to see if the driver is available. Doc. No. 247-1 at 16. Available co-drivers are also posted on bulletin boards at CRST terminals and on CRST's Facebook page. *Id.* CRST also hosts "meet and greet" sessions at its terminals to encourage drivers to interact and find compatible co-drivers. *Id.* Drivers will often meet in person before deciding to drive together. Once the driver finds a co-driver, he or she informs her driver manager of the proposed pairing and, if there are no restrictions,[3] the pair can begin driving and earning pay. *Id.* at 17.

All driving teams are supervised by a driver manager located in Cedar Rapids, Iowa. Each driver manager has a fleet of trucks for which he or she is responsible at any given time. Doc. No. 247-1 at 6. Driver managers work on multiple shifts covering the 24-hour day. *Id.* at 7. The after-hours team size varies depending on the day of the week, load volume and other variables. *Id.* Drivers and driver managers communicate via phone, email, and CRST's messaging system known as "Qualcomm." Doc. No. 239-1 at 4. Driver managers are responsible for ensuring that loads are delivered on time.

---

[3] These may include a co-driver's team preference or geographic distance that is too great. *See* Doc. No. 247-1 at 18.

6

They are evaluated on metrics such as time percentage, overall mileage truck utilization, expenses (cents per mile) and the number of trucks in service. *Id.* Plaintiffs point out that if CRST buys a bus ticket for a driver who gets off a truck due to a sexual harassment complaint, that expense will be counted against the driver manager's metric. *Id.* Driver managers are also responsible for driver retention and addressing conflicts amongst team drivers. *Id.* Plaintiffs add that Human Resources (HR) also plays a role in these tasks as it is responsible for investigating harassment and discrimination complaints by drivers. *Id.* at 5. CRST admits that if a driver manager fails to meet metrics, it could jeopardize his or her continued employment, adding that it uses a progressive disciplinary system relating to driver manager performance results. Doc. No. 247-1 at 8-9. Driver managers are evaluated on their metrics during their annual performance review. The outcome of this evaluation determines whether they are eligible for a salary increase or bonus. *Id.* at 9. CRST denies that a driver manager would ever be penalized for stopping a truck due to a Title VII issue. *Id.*

**B.    *Driver Pay***

Drivers are paid on a per-mile basis using a "split mileage system." This means that each driver is paid at his or her personal rate for half of the total miles driven by the truck (regardless of how many miles that driver actually drives). Doc. No. 239-1 at 5. Personal rates vary with the driver's length of experience. The starting rate for a new driver depends on whether the driver has a license and prior experience; a license and no prior experience; or a license obtained through CRST-funded training and no experience. *Id.* Pay increases are triggered based on the length of service with CRST measured according to calendar dates. As of October 15, 2013, a student driver's pay rate increases one cent per mile following completion of three months of service and provided that he or she has been upgraded to co-driver status. *Id.* at 5-6.

7

The training for a student driver typically lasts 28 days if uninterrupted. *Id.* at 6. If interrupted, whether due to a sexual harassment complaint or otherwise, there is no economic detriment unless the training extends beyond 90 days.[4]  Doc. No. 247-1 at 86. Students sign a contract providing that they will continue working for CRST for a specified period of time after their training to pay CRST back for the value of the training. Doc. No. 239-1 at 10-11.  CRST's driver contracts also contain non-competition provisions and CRST has sued other carriers for interfering with its driver employment contracts. *Id.* at 11.

Aside from the split mileage system of pay, CRST may provide other compensation in certain circumstances. *Id.*  For instance, a driver may receive "layover pay" if a truck is available from empty time to dispatched pickup for a period of over 48 hours. *Id.* at 6-7.  Drivers may also receive compensation based on truck breakdown or impassable highway conditions. *Id.*  These rates are standard regardless of the driver's experience. *Id.* at 7.

### C.     CRST's Policies Regarding Sexual Harassment and Retaliation

CRST has a written policy prohibiting sexual harassment and retaliation in the workplace. Doc. No. 239-1 at 7.  Plaintiffs deny that this policy is enforced.  The policy is contained in the Handbook and Statement of Policy that is distributed to drivers and home office employees, including driver managers. *Id.* at 8.  The policy is also covered in a dedicated session at driver orientation when each driver is provided a stand-alone copy of the policy. *Id.*  The policy states that CRST "prohibits sexual harassment" and states that those who report it "will NOT be subject to ANY form of retaliation." *Id.*

---

[4] Plaintiffs point out that Sellars' training extended over two months due to repeated interruptions due to harassment by her trainers.  CRST states that the time was impacted by factors other than the alleged harassment.  For example, Sellars chose to take two weeks of home time in the middle of her training.  Doc. No. 247-1 at 86.

8

The policy also sets forth the complaint procedure and reporting responsibilities. CRST's Code of Business Ethics also addresses sexual harassment by requiring immediate reporting "to the appropriate Supervisor or [HR]." *Id.* The Handbook provides that "[i]f any employee believes he or she is being subjected to verbal or physical harassment, the employee should immediately contact his or her Driver Manager or [HR] to inform them of the situation and to request a new lead driver." *Id.* at 8-9. It further provides that "[a]n employee has the right to request a new driver without fear of retaliation. Any employee who reports any act of harassment and/or discrimination will NOT be subject to ANY form of retaliation." *Id.* at 9. All drivers sign an acknowledgement that they have received and reviewed the CRST Driver's Handbook and Statement of Policy, including the policies against sexual harassment and retaliation. *Id.* Drivers must also certify their understanding that employees who complain about harassment will be removed from the harassing situation. The acknowledgment states:

> I also understand and agree that if I believe I am being subjected to harassment or discrimination, no matter how severe or pervasive, I will immediately report it to my fleet manager or to the Human Resources Department directly so that I may be removed from the harassing situation and so CRST may conduct a prompt investigation.

*Id.*

With regard to reporting harassment, plaintiffs note that if it occurs during business hours a driver can call HR with her complaint, but this line is not staffed 24 hours per day and she will be directed to voicemail if she calls during off hours. Doc. No. 247-1 at 40. CRST notes that there are other means for a driver to report harassment, such as contacting her driver manager by Qualcomm or telephone, the report hotline and after-hours driver managers. *Id.* at 40-41. With regard to the hotline, a staff member will take notes regarding a victim's complaint, which will be sent electronically to Karen Carlson, Manager of Employee Relations. *Id.* at 41. The hotline staff member has no authority to take any action on a driver's complaint. *Id.* at 42.

9

CRST contends that when it receives a complaint of sexual harassment, the safety of the complaining driver is its first priority. Plaintiffs deny this and cite affidavits from plaintiffs in which they describe specific instances of harassment and CRST's responses. *See* Doc. No. 239-1at 9-10. CRST's policy provides that when a dispatcher receives a communication from a driver alleging sexual harassment, it must take immediate steps to ensure the safety of the complainant and advance the investigation into the complaint. *Id.* at 10. Plaintiffs admit that CRST's written policy provides for this, but denies that it aligns with CRST's pattern or practice and cites documents in which dispatchers failed to immediately separate drivers or escalate the complaint to HR. *Id.*

The same goes for the dispatchers' authority to separate employees, arrange necessary accommodations and pay or reimburse for accommodations. While plaintiffs admit that dispatchers have this authority, they deny that dispatchers consistently arrange accommodations and pay or reimburse for these accommodations, alleging that employees many times have to bear these costs. *Id.* at 11. Plaintiffs also deny that CRST takes steps to separate the drivers quickly and safely. *Id.* at 11-12 (citing declarations from Fortune and others describing situations in which driver managers asked complainants to stay on the truck after they reported harassment). *See also* Doc. No. 247-1 at 42-43 (in which plaintiffs cite multiple examples (some involving plaintiffs and some involving other drivers) in which the driver manager asked the complainant to stay on the truck for various reasons (to work things out with her co-driver, to see if anything further happened, to reroute the truck, to be dropped off at the next terminal, to allow time to talk with the co-driver to see what was going on or to finish one last load)).[5]

CRST agrees that its policy is to remove a woman complaining of sexual harassment off the truck unless she is a lead driver or an owner-operator. Doc. No. 247-

---

[5] CRST denies that driver managers frequently encourage complainants to stay on the truck and denies that allegations of drivers other than plaintiffs are material. Doc. No. 247-1 at 42-43.

1 at 82. This is CRST's policy regardless of whether the woman complaining of harassment was using the truck before the allegedly harassing co-driver joined her. *Id.* at 83. The alleged harasser may continue driving depending on the situation. *Id.*

When one driver makes a complaint about another driver, CRST instructs its driver managers to remove the complainant from the situation unless the complainant is the lead driver or the owner-operator. Doc. No. 239-1 at 12. Plaintiffs deny that this policy applies regardless of the nature of the complaint, noting that all evidence cited by CRST in support involves complaints of sexual harassment. *Id.* Plaintiffs admit that all employees receive notice of CRST's policy of removing the complaining party with regard to harassment or discrimination complaints only. *Id.* at 13.

CRST has disciplined some driver managers for failing to immediately involve HR upon receiving a complaint of sexual harassment. Plaintiffs note that CRST does not have a practice or policy in place to evaluate how driver managers respond to sexual harassment complaints. *Id.* at 23. They also contend that CRST produced only three forms demonstrating disciplinary action for a driver manager's failure to timely or properly respond to a complaint of sex discrimination or sexual harassment since October 2016. *Id.* at 23-24. *See also* Doc. No. 247-1 at 38-40 (in which plaintiffs discuss three instances in which harassment by a lead driver was corroborated, but the lead driver's certification was not revoked).[6]

CRST states its primary reason for removing the complainant is based on safety. Plaintiffs deny this, stating it is a legal argument rather than a statement of fact and that their position is that CRST's primary reason for removing complainants is retaliation. *Id.* at 14. CRST contends there are numerous reasons for removing the complainant from the truck, such as allowing her to seek any necessary resources, including law enforcement, medical attention and mental health care and to remove her from the

---

[6] CRST denies these statements as containing inadmissible hearsay and being immaterial to the issues because they do not involve the named plaintiffs. Doc. No. 247-1 at 38-40.

11

inherently dangerous and stressful aspects of truck driving during a time when she may be experiencing distress. *Id.* at 14 -15. It also contends that it gives the complainant the opportunity and resources to gather and transmit any necessary information to HR as part of the investigation. *Id.* at 16. Plaintiffs deny each of these statements as either argumentative or unsupported by the evidence cited. *Id.* at 14-17. They admit that when the complainant is a student or a driver who has been harassed by an owner-operator, removing the complainant complies with licensing and truck ownership rules. However, they deny that differences in pay between the complainant who has to get off the truck with no pay and the lead driver or owner-operator who gets to continue driving and earning money complies with any licensing or truck ownership rules. *Id.* at 18-19. Plaintiffs acknowledge that in some, but not all, instances CRST takes steps to pair the complainant with a new co-driver at a later date.

On July 1, 2015, CRST promulgated a new Layover Pay Policy specific to individuals who complain of harassment or discrimination. *Id.* at 19. CRST denies that this policy was related in any way to plaintiffs' lawsuit. Doc. No. 247-1 at 82. Plaintiffs deny that this policy was actually implemented on that date. Doc. No. 239-1 at 19-20. They state that as of July 2016, the policy was still not included in the Handbook, was still in "draft[] form" and has not been produced in any format in this case. Doc. No. 247-1 at 82-83. CRST states that it is an HR practice that is not intended for inclusion in the Handbook. *Id.* In any event, the policy provides that when a complaint of harassment or discrimination is made, the complainant will be removed from the truck unless such removal would leave the truck without a qualified driver. Doc. No. 239-1 at 20. Plaintiffs deny that the complainant is provided with sufficient funds for lodging and transportation, which she does not have to pay back, stating that drivers have had to bear their own lodging and transportation costs at times, especially before July 2015 when

12

CRST did not cover any lodging or transportation costs.[7] *Id.* at 21. CRST will then pay HR layover pay starting on the date that the employee is removed from the truck and ending on the date the employee is paired with a new co-driver. Plaintiffs deny this, noting that prior to July 1, 2015, there was no layover pay and that even after July 1, 2015, the layover pay ended on the date the employee was offered a re-pairing, not the date that the employee actually paired up with a new co-driver. *Id.* at 21-22.

CRST calculates its HR layover pay based on the highest minimum wage in the country, which it then multiplies by 10 hours per day. *Id.* at 22. It initially paid $100 per day and now pays $110 per day. *Id.* Prior to July 2015, CRST states that a complainant would have been eligible to receive the standard layover pay of $40 per day if the delay between re-pairing lasted over 48 hours. Plaintiffs deny this stating that the written policy for the standard layover pay ("[t]he truck must be available from empty time to dispatched pickup time no less than 48 hours to qualify for 1 layover") excludes the situation in which a driver is removed from the truck. *Id.* at 22-23.

When HR receives a complaint of sex discrimination or sexual harassment, it enters it into its "Positive Work Environment Employee Relations" spreadsheet and commences an investigation. Plaintiffs dispute that CRST immediately commences an investigation for lack of support. The HR investigator will examine whether there are any prior complaints against the accused driver,[8] consider any relevant documents or

---

[7] Plaintiffs state that CRST instituted a new policy in July 2015 in which women complaining of sexual harassment were not required to pay back hotel and cab fares related to being pulled off the truck. Doc. No. 247-1 at 84. CRST denies this was a new policy. *Id.* Plaintiffs also state that Carlson did not know in July 2016 whether CRST had a policy of covering hotel expenses associated with a driver being pulled off a truck due to a Title VII-related complaint. CRST states that Carlson testified it was her understanding that hotel and transportation fees were paid. *Id.* at 84-85.

[8] Plaintiffs note that Carlson, CRST's Rule 30(b)(6) witness, testified that prior complaints do not impact CRST's determination as to whether the instant complaint may be deemed

communications, interview any available witnesses,[9] interview the individual accused of harassment and take into account any admissions by the accused driver. The investigator[10] will eventually determine whether the complaint can be corroborated. The parties disagree on what is necessary for CRST to find that a complaint is corroborated. CRST maintains that corroboration can be from a variety of resources and the test is whether HR is "able to identify that the action was confirmed and that it took place." *Id.* at 28. Plaintiffs cite Carlson's testimony, in which she stated that a complaint could not be corroborated without eyewitness testimony or an admission from the accused harasser. *Id.*

CRST denies that this is its policy or that it has ever had such a policy. *Id.* at 29. CRST states that it may find corroboration based on statements from the accused and accuser, witnesses, pictures or messages. *See also* Doc. No. 247-1 at 33-34. Plaintiffs cite evidence in which an accused driver admitted to touching Lopez and making an inappropriate comment, stating that it was a "joke," and Carlson conceded his conduct would be a violation of the sexual harassment policy. The investigation form for that

---

corroborated. Doc. No. 239-1 at 25-26.

[9] Plaintiffs dispute that HR interviews available witnesses as Fortune provided the name of a witness with regard to one of her complaints and the investigation indicates that HR left only a single message for this potential witness. *Id.* Plaintiffs also point out a complaint by Lopez in which the investigation form listed potential witnesses, but did not indicate any attempt to contact them. *Id.* at 26-28.

[10] From June 2013 to approximately April 2014, Carlson was responsible for investigating all complaints. In April 2014, Chelsea Stoll, an Employee Relations Representative began conducting investigations, which were supervised by Carlson. Cassie Burrill replaced Stoll in early 2015. In late 2015, an additional Employee Relations Representative, Megan Knoot, joined the team and was also under Carlson's supervision. Carlson conducts investigations and supervises Burrill's and Knoot's investigations into employee complaints. Doc. No. 247-1 at 32. Carlson reports to Angie Stastney, Director of HR. *Id.* at 33.

incident does not reflect a finding of corroboration or that the accused driver was disciplined. Doc. No. 239-1 at 29.

CRST states that even when a complaint is not deemed corroborated, it nonetheless takes remedial measures by changing the accused male driver's status to "male only" and is never reassigned to drive with the accuser. Plaintiffs disagree this is a remedial measure, stating that it is not disciplinary,[11] does not reduce the driver's pay and is not considered a disciplinary warning. Plaintiffs also cite evidence in which Carlson admitted that she changed an alleged harasser's status to "male only" to provide him "a measure of protection from a similar claim arising in the future." *Id.* at 30. The "male only" designation lasts indefinitely, can be removed only by HR and produces an error message in the driver database if anyone attempts an impermissible pairing. The accused driver will also receive a copy of CRST's policy prohibiting harassment via certified mail. *Id.* at 30-31. This action is not disciplinary in any way and the policy is also sent to the accuser. *Id.* Plaintiffs state that it is CRST's "standard response" to complaints of sexual harassment to designate the accused driver to "male only." *Id.* at 34. CRST disagrees that the cited material refers to CRST's "standard response," but affirmatively states that if there is a complaint of sexual harassment of discriminatory behavior by a female against a male, the accused male driver will be changed to a "male only" team preference and never reassigned to drive with the accuser. *Id.*

CRST states that if a complaint is corroborated, the accused driver will face disciplinary action up to and including termination. Doc. No. 239-1 at 31. Plaintiffs dispute this stating that even if this is CRST's written policy, it is not enforced. *See also* Doc. No. 247-1 at 38. They cite six examples of complaints from female drivers (none plaintiffs) that were corroborated but discipline was not imposed on the accused driver.

---

[11] CRST disagrees stating that it reduces the universe of co-drivers a male-only driver is able to pair with, which reduces his efficiency on the road and load opportunities. Doc. No. 247-1 at 35.

Doc. No. 239-1 at 32-33. HR does not impose the discipline but recommends a course of action to the respective driver manager. Doc. No. 239-1. at 33. Plaintiffs deny that it is a "recommendation" from HR, citing deposition testimony from driver managers in which they indicate they do what HR instructs them to do and have no input of their own. However, plaintiffs state in their own statement of facts that the driver manager has authority to decide what discipline should be imposed, subject to being overruled by their supervising operations manager. Doc. No. 247-1 at 35.

CRST states that discipline may involve verbal warnings, written warnings, counseling sessions with HR or other departments, removal of lead driver certification or termination. Doc. No. 239-1 at 34. Plaintiffs note there is not factual support that counseling sessions have ever taken place outside of Positive Work Environment training, which takes one to three hours and has no actual disciplinary impact (as it does not impact a driver's pay, is not a suspension or a written warning). *Id.* Carlson testified that "any corroborated harassment . . . of a Title VII nature" will result in termination. Doc. No. 247-1 at 36. However, she noted that some circumstances may not amount to true sexual harassment or discrimination under Title VII guidelines. *Id.* Plaintiffs bring up instances in which HR found the complaint was corroborated, but the driver was not terminated or his lead certification revoked. *Id.* at 36-39. CRST objects to this evidence as containing inadmissible hearsay (in the form of complaints by drivers recorded by HR investigators) and immaterial to the issues as they do not involve complaints by plaintiffs. *Id.* at 36-39.

Plaintiffs state that CRST has been aware of allegations of sexual harassment from its female drivers for years. *Id.* at 21. They cite lawsuits filed by the Equal Employment Opportunity Commission (EEOC) against CRST, including one in which 270 women were identified as having been sexually harassed while working at CRST. *Id.* at 22. CRST denies that any of these prior lawsuits are material to the issues in this case. *Id.* Plaintiffs also state that beginning in December 2013, CRST had logged over 60

16

complaints of sexual harassment in the preceding 14-month period, beginning in October 2012.[12]  *Id.* at 23.

Plaintiffs state that in late 2013 or early 2014, Carlson suggested installing cameras on CRST trucks during a meeting with CRST's President and its Director of HR.[13]  *Id.* at 28.  She received a "neutral response" to the suggestion.  *Id.*  Around August 2014, CRST created a contest in which employees could submit ideas relating to "how to make the environment great for the drivers."  *Id.* at 29.  Carlson again suggested installing cameras on team trucks.  She stated, "So many of my investigations including those such as physical altercations, inappropriate verbal comments, throwing the Qualcomm, sexual misconduct, etc. are hearsay and there are no witnesses.  I feel that a camera on each truck would mitigate the possibility of misconduct."  *Id.*  She received no substantive response to this suggestion.  *Id.*  She also suggested mandatory time on the truck for each driver manager to "see what life on a truck is like," noting that drivers would routinely say that driver managers had no idea what it was like on the road and she agreed.  *Id.*  Carlson also recommended an "undercover boss" program to monitor the performance of lead drivers because she received the most complaints about them.  *Id.* at 30.  She also felt there should be further training for lead drivers and that the criteria for promoting a driver to lead was insufficient.  *Id.* at 30-31.

In 2016, HR discussed a potential change in policy to terminate or otherwise suspend CRST managers who failed to report complaints of sexual harassment.  Plaintiffs

---

[12] To the extent this statement is based on CRST's PWE charts containing drivers' alleged complaints as recorded by CRST investigators, CRST argues such evidence is hearsay and inadmissible.  It denies that complaints of individuals other than the named plaintiffs are material to the issues in this case.  *Id.* at 23.  Plaintiffs list each complaint beginning in November 2012.  *Id.* at 23-28.  I disagree that the complaints constitute hearsay as plaintiffs are offering the entries for purposes of demonstrating CRST's notice of past complaints of sexual harassment.

[13] CRST denies that any of the statements discussed in this paragraph are material to the issues.  Doc. No. 247-1 at 29-31.  Because plaintiffs rely on some of these facts to make their arguments, I have included them in this section and will discuss their relevance in the analysis.

17

contend CRST has not produced any records of policy changes with respect to disciplining managers who fail to report complaints. CRST admits that no policy change occurred with respect to discipline of managers, noting its policy already provides that managers may be terminated for failing to report complaints. *Id.* at 31.

### D.     Plaintiffs' Commencement of Employment with CRST

Cathy Sellars attended CRST's new driver orientation in Riverside, California, in December 2013. She signed the acknowledgment of the anti-harassment policy on December 11, 2013, and acknowledged receiving the driver handbook on December 16, 2013. Doc. No. 239-1 at 34-35.

Leslie Fortune attended new driver orientation in Cedar Rapids, Iowa, in October 2013. She signed the acknowledgment of the anti-harassment policy on October 14, 2013, and acknowledged receiving the driver handbook that same day.

Claudia Lopez attended trucking school at Hawkeye Community College in Waterloo, Iowa. After graduation, she attended CRST's new driver orientation in Cedar Rapids, Iowa, in May 2014. *Id.* at 35. She signed the anti-harassment policy acknowledgment and acknowledged receiving the driver handbook on May 8, 2014. *Id.* at 35-36. CRST asked Lopez to repeat Positive Work Environment training after she was accused of sexual harassment. Lopez argues this was a false accusation by an individual who caused Lopez to feel threatened herself. *Id.* at 36. On May 13, 2014, a CRST shuttle driver made a complaint against Lopez stating that she threatened to claim he tried to rape her if he did not take her where she wanted to go. Lopez states she felt threatened by the shuttle driver and told him she would scream that he tried to rape her if he tried to do anything other than take her to the CVS store where she was permitted to go get medicine. *Id.* Lopez told HR that she was joking about the incident because "after being sexually harassed previously while undergoing CRST training, she was nervous, defensive, and still felt threatened for her safety." *Id.* at 36-37. She was

18

counseled about the incident and received retraining on CRST's policies. *Id.* at 37.

Sellars was paired with a female lead driver to complete her training but stopped due to an alleged injury that was the subject of a workers' compensation claim. *Id.* Sellars states she was injured during a sexual assault by a previous CRST trainer, Dwain Monroe, and that this injury was the cause of her receiving workers' compensation and hospital treatment, which prolonged her training. She denies that she was paired with a female lead driver to complete training but did not do so due to her injury. *Id.*

Fortune completed her training with Lydell Wilkerson. She states that she was paired with him after she complained about being sexually harassed by her previous trainer, James Woods, and upon getting off Woods' truck, had to drive from Iowa to California and then take a bus from California to Arizona to meet with Wilkerson. *Id.* at 37-38.

Lopez completed training with the first driver with whom she was paired.

### E.  *Plaintiffs' Allegations Against Other Drivers*

#### 1.  *Sellars and Lydell Wilkerson*

Sellars drove for CRST from December 2013 to March 2014. Prior to Sellars' December 2013 allegations, Fortune drove with lead driver Wilkerson and had a good driving experience. *Id.* at 38. On Sellars' first day at the Riverside Terminal in December 2013 she alleges that Wilkerson stared at her, made offensive remarks to her and forcefully grabbed her while demanding to know why she would not sleep with him. *Id.* Sellars left the room when he first made these offensive remarks, but she alleges that he approached her again and told her he wanted to "go down on [her]" and "eat [her]." *Id.* Sellars reported Wilkerson's conduct to the front desk. In a separate incident, Wilkerson allegedly began staring at Sellars while she was talking to another person. Sellars asked what he wanted and he came and stood directly behind her. She then told him she was showing another driver photos of her family and he left. *Id.* at 39. Another

time, Wilkerson grabbed Sellars' shoulder and demanded to know why she would not sleep with him.  *Id.*  Each of these incidents occurred in the CRST terminal before Sellars began training on the trucks.

Sellars complained to the CRST Riverside Terminal Manager, Alvin Hoggard, about Wilkerson.  *Id.*[14]  Sellars adds that she also reported the conduct to Carlson and never heard back regarding her report.  However, she learned that Wilkerson was sent out on the road to pick up another female student driver.  *Id.* at 40.  She did not encounter Wilkerson again.  *Id.* at 41.  *See also* Doc. No. 247-1 at 46-47 (describing Sellars' interactions with Wilkerson).  She later learned that Wilkerson was still employed by CRST as a driver.  *Id.* at 47.

### 2. *Sellars and Jesse Radford*

Sellars began driving with Radford in January 2014.  *Id.* at 48.  She states Radford made sexual remarks to her, such as telling her she had a "nice ass" and could "see where Lydell was coming from."  *Id.*  Before getting on the truck, Sellars warned Radford that she would not drive with him if he believed anything sexual would happen between them and Radford agreed to stop making sexual comments.  *Id.*  Sellars spent three days and two nights with Radford on a truck.  Doc. No. 239-1 at 40.  She states that on the first night on the truck, Radford began masturbating in her presence and asked if she would like "to join" him to which she responded "no."  Doc. No. 247-1 at 48.  On the second

---

[14] Sellars alleges generally that while she was at the Riverside Terminal, she heard men make offensive sexual remarks about other women and women in general, including but not limited to comments about the way women's bodies were built, how they were dressed and the attractiveness of women who were in the terminal.  Doc. No. 247-1 at 45-46.  For instance, men would tell her "you have a nice ass, lady" or "I'd like to tap that ass."  *Id.*  She observed Hoggard walking around the terminal and sitting in the cafeteria while such comments were openly being made at such volume that he would have heard them.  *Id.*

night, Radford attempted to remove her shirt while she was in her bunk. *Id.* at 49; Doc. No 239-1 at 41-42. She struggled with him and told him to stop, but Radford was able to lift the shirt up to her head before she could move to the passenger seat. Doc. No. 247-1 at 49. She states she spent close to six hours there before a dispatcher arranged to have her get off the truck and take a bus to the terminal. *Id.* at 41-42.[15]

On January 7, 2014, Sellars reported to her driver manager that she did not feel safe with Radford. *Id.* at 42. She did not contact her fleet manager until more than five hours after the alleged incident. *Id.* Sellars told the fleet manager she wanted to get off the truck and he arranged for her to go to the nearest town where she got off the truck. *Id.* CRST claims it paid for a hotel room and bus ticket back to the terminal. *Id.* Sellars states she had no hotel or bus expenses because dispatch arranged to have her brother-in-law take her back to the terminal immediately after she exited the truck. *Id.* at 42-43. She was reimbursed $40 for taking a cab on the day she exited the truck, but incurred no other expenses. *Id.* at 43. She did not earn any money during the time she was off the truck. Doc. No. 247-1 at 50.

Carlson interviewed Sellars that day regarding her complaints about Radford. She also interviewed Radford who denied Sellars' claims. Sellars did not see Radford again. Doc. No. 239-1 at 43. Radford's team preference was changed to "male only."

### 3.    Sellars and L.W.[16]

On January 26, 2014, Sellars left Carlson a voicemail stating she had a video of

---

[15] This conflicts with CRST's understanding of the incident, which is that she immediately got off the truck when Radford attempted to remove her shirt and then got back on in the morning. *Id.* at 42.

[16] For the reasons set forth in Judge Mahoney's order (Doc. No. 179) of June 13, 2018, I find that the identities of any accused harassers whose names have not already been disclosed in a publicly-filed document should remain confidential. I further find, however, that there is no

her lead driver, L.W., driving drunk. *Id.* Sellars later testified that L.W. made a comment (or comments, according to Sellars) about her body. *Id.* at 43-44. Sellars testified she first reported L.W.'s conduct to CRST the morning she was separated from him. Sellars states the cited testimony shows that she reported L.W.'s misconduct when she told fleet managers she wished to exit the truck. This occurred while he was off the truck and before he returned the next morning. *Id* at 44. In any event, Sellars was separated from L.W. the same day she requested. The misconduct allegedly occurred near Laredo, Texas, and CRST provided a hotel room and bus ticket back to Riverside, California. *Id.*

Carlson called Sellars back on Monday after receiving her Sunday voicemail on January 26, 2014. *Id.* Sellars denies that Carlson interviewed her regarding all of her complaints about L.W.[17] *Id.* at 44-45. Carlson also interviewed L.W., but Sellars denies that she interviewed him regarding her allegations of sexual harassment. *Id.* at 45. She did not drive with L.W. again. *Id.*

### 4.    *Sellars and Dwain Monroe*

On February 10, 2014, Sellars was talking to Monroe and another person about their families and sharing photos. *Id.* at 46. Monroe showed a photo of a family member, and while scrolling through photos, allegedly displayed a pornographic photo for a second or less. Sellars adds that Monroe purposefully stopped at the pornographic photos to look at them. *Id.* Monroe told Sellars he had accidentally downloaded the photos.

---

longer a need to maintain in confidence the names of other CRST employees who happened to be involved in the relevant events, as they are not accused of engaging in shameful conduct. Thus, for example, note 10, *supra*, refers to those employees by their names.

[17] The parties agree that CRST's records do not reflect any contemporaneous report by Sellars alleging sexual harassment by L.W. *Id.* at 45. However, Sellars denies that the lack of records does not necessarily reflect that she did not contemporaneously report such allegations. Sellars maintains that she told the dispatcher about all of her complaints when she told him or her she wanted off the truck. *Id.*

Monroe then showed Sellars and the other person a video he created wherein it appeared he was tied up with rope and held at knifepoint by two stuffed animals. Monroe then told Sellars he "was going to do that to [her]." *Id.* Later, while training on the road, Monroe told Sellars that he and his friends wished to tie her up and "do things to [her.]" *Id.* at 46-47. Sellars told him that was not going to happen. *Id.*

While they were on the road, they got into a dispute about who would drive next after stopping to get gas. *Id.* at 47. Sellars denies that the issue of "who would drive" was the cause of the dispute, stating that after Sellars rebuffed Monroe's suggestion to tie her up, he became angry with Sellars, taking photos and videos of her while driving. *Id.* The overnight dispatcher communicated to both her and Monroe simultaneously about their dispute. Sellars alleges that Monroe shoved her into the passenger seat and forced her to sit down saying she would regret calling dispatch and complaining about him. *Id.* She also alleges Monroe had a knife during this time that he kept either on the dash, in his hand or on his right leg while driving and pointed it at Sellars while threatening her that she could not leave the truck. *Id.* at 47-48. Police stopped Monroe after she was off the truck, searched the truck and found no knife. *Id.* at 48.

Sellars had asked Monroe to let her exit the truck at some point. Dispatch did not tell her to exit the truck until they reached the next town and dispatch learned Monroe had a knife. *Id.* CRST states that Sellars was told to get off the truck within approximately an hour of having contacted the dispatcher. *Id.* However, Sellars states it was longer because the Qualcomm system went down for an hour after she contacted dispatch, and when it came back online dispatch contacted her and had her exit the truck. At this point, the drivers were in the next town. She states the Qualcomm messages show that dispatch did not return her messages until at least a couple hours had passed. *Id.* at 48-49. Dispatch also told Sellars to contact 911. However, Sellars states that it did so only after Sellars indicated over the course of several messages spanning a couple hours that she would dial 911 unless something was done to alleviate the situation sooner. *Id.*

23

at 49. She did end up calling 911.

CRST provided a hotel room and bus ticket back to a terminal. *Id.* Sellars received layover pay and was reimbursed for hotel expenses. However, she contends she had to pay for these expenses as CRST later recouped them from her paycheck. *Id.* at 49-50.

Carlson contacted Sellars on February 13, 2014, to interview her about the Monroe situation. *Id.* at 50. Carlson provided Sellars with the number of CRST's Employee Assistance Program and encouraged her to use their services. Carlson also interviewed witness Dawn Mann on February 13, 2014, about the incident in the terminal when Monroe showed them the video he made. *Id.* Sellars had also been texting Mann during the events on the truck. Doc. No. 247-1 at 55. Mann confirmed Sellars' account of the video, that she saw the knife that Monroe carried and described the text messages Sellars had sent her while on the truck.[18] *Id.* Carlson did not make any attempt to obtain those text messages. *Id.* at 56.

The Qualcomm records from Sellars stated: "This is Cathy [drive] 946B where am I going [co-driver] said I had to stay on the truck till he put me off and he said and did a couple things I cant [sic] send through here but my daughter and two friends know about it if I have to I will call 911" and "I just sent a message to you this is 946B he wont [sic] tell me whats [sic] going on says I have to go with him he has a knife out on the dash in front of him do I call 911 he[']s mad at me." *Id.* at 56-57. Carlson concluded: "This appears to be a he-said/she-said situation. Corroboration of wrongdoing could not be made." *Id.* at 57. Monroe was told to have no further contact with Sellars. Sellars was paired with a female lead driver to complete her training, per her request. Doc. No. 239-1 at 50.

---

[18] CRST argues these statements are inadmissible hearsay.

On March 18, 2014, Sellars met with Carlson and CRST Expedited President Cameron Holzer. Doc. No. 247-1 at 58. She had previously spoken with Holzer regarding the sexual harassment she experienced. *Id.* at 59. None of the "Action Plan" items discussed during the meeting with Holzer addressed the issue of remediating recurring sexual harassment at CRST. *Id.* Sellars received medical treatment due to the physical assault she suffered from Monroe and was placed on workers' compensation after discussing the need for medical attention with Holzer and Carlson. *Id.*

### 5.    *Fortune and Stephen Wood*

Fortune was a CRST employee from around November 2013 to around January 2015. Doc. No. 247-1 at 70. She alleges that during her training as a student driver at the Cedar Rapids Terminal, she heard daily offensive remarks from male trainers and co-drivers about either herself or other women, including men coming on to her or propositioning her for sex, men making comments about women's bodies such as, "man she's got ass on her" or "I'll hit that" and men talking about which women they had slept with. *Id.* at 71.

Fortune was paired with Wood around November 2013. *Id.* Fortune alleges that she and Wood were driving in a rental car from Cedar Rapids, Iowa, to Riverside, California, to reach a truck. Doc. No. 239-1 at 51. Fortune proposed taking turns driving so they would not have to spend a night in a hotel, but Wood wanted to stay in a hotel. Wood made comments about Fortune's appearance, asked what she liked sexually and stated he had "never been with a colored woman before." *Id.*; Doc. No. 247-1 at 71. Fortune rejected his advances. *Id.* at 72. On the first night of the two-day trip, the drivers shared a hotel room after Wood claimed there was only one room containing only one bed and stating "that's ok, we can share." *Id.* The room had two beds and Fortune refused to share a bed with Wood even though he continued pressing her to do so. *Id.* Wood came out of the shower in his boxers (with his boxers exposing his penis), sat on

25

the bed and asked Fortune to rub his back.  Doc. No. 239-1 at 51.  He also told Fortune "I haven't had pussy in six months, if you want to pass you might want to take that into consideration."  Doc. No. 247-1 at 72.  Fortune told him "no" and proceeded to sleep in her own bed with her coat on.  *Id.* at 73.

Fortune did not contact HR or her driver manager during the drive to report Wood's conduct.  Doc. No. 239-1 at 51-52.  She testified that she wished to speak to the driver manager while at the hotel, but Wood told the driver manager they were getting into the car and could not talk further.  *Id.* at 52.  Fortune complained to a safety representative and submitted a written complaint regarding Wood's conduct, but HR did not maintain or produce this statement.[19]  Doc. No. 247-1 at 73.

At Riverside, Fortune spoke with CRST's safety personnel about Wood's conduct and they responded by getting her and her things off Wood's truck.  Doc. No. 239-1 at 52.  Fortune then submitted a written complaint about Wood, which Carlson received on November 24, 2013.  Carlson attempted to reach Fortune to conduct an interview on several occasions, but Fortune did not return her calls.  *Id.*  Carlson interviewed Wood and other witnesses.  However, Fortune points out the other witnesses were not related to her sexual harassment complaints, but complaints of Wood texting and driving.  *Id.* at 52-53.  Carlson found that Wood gave untruthful statements and Wood's employment was terminated.  Fortune denies that his employment was terminated as a result of her sexual harassment allegations, but rather for texting and driving.  *Id.* at 53.

### 6.    *Fortune and James Parker*

Fortune was paired with her first co-driver, Parker, around November 2013.  Doc. No. 247-1 at 73.  Fortune alleges Parker watched pornography and she once caught him

---

[19] CRST denies that this statement is supported by the cited material.  Doc. No. 247-1 at 73.

engaging in a sexual act.[20]  Doc. No. 239-1 at 52-53.  Fortune could not recall whether Parker ever physically touched her, but he made sexual advances toward her while he was a trainer and repeatedly asked her to have sex with him.  *Id.*  When she turned him down, he would make things difficult for her, such as refusing to help her back up the truck or blaming weight-load issues on her.  *Id.* at 53-54.  He also told her he was the type of guy that would hit a woman if he had to.  *Id.*  While waiting for a second team of drivers to pick up part of their load, Parker again propositioned Fortune to have sex. *Id.* at 54.  She states Parker forced her out of the truck and threw her belongings out after she refused to have sex with him.  Fortune spoke to her fleet manager when she was off the truck.  She states she had spoken to fleet managers prior to getting off the truck about her problems with Parker, including his sexual advances, to which one of the fleet managers laughed and stated "you guys can work this out."[21]  *Id.*  Fortune rode in a car with two other drivers back to the Riverside terminal.  *Id.* at 55.  Upon returning to the terminal, Fortune alleges Parker spread rumors that Fortune was a "lot lizard" (trucker slang for prostitute).  Doc. No. 247-1 at 75.

On December 29, 2013, Fortune provided a written statement detailing her complaints against Parker.  Doc. No. 239-1 at 55.  Carlson interviewed Fortune on January 15, 2014.  *Id.*  She also interviewed Parker and one witness.  Fortune denies that she interviewed any of the driver managers Fortune spoke with and other witnesses Fortune identified.  Carlson made one attempt to contact each witness, but did not follow

---

[20] Fortune alleges that Parker "regularly" watched pornography and masturbated while Fortune was on the truck and on at least one occasion ejaculated in her presence.  Doc. No. 247-1 at 74. CRST denies that the statement that Parker regularly watched pornography and masturbated while Fortune was on the truck is supported by the cited material.  *Id.*

[21] Neither Fortune's declaration nor her deposition indicate that she made a complaint to her fleet manager about Parker prior to getting off the truck.  *See* Doc. No. 239-5 at 21-22; Doc. No. 216-4 at 17.  Fortune's declaration states her fleet manager told her "you guys can work this out" in response to Parker forcing her off the truck and not a previous complaint.  Doc. No. 239-5 at 22.

up with any of them and reached her conclusion that there was no corroboration of Fortune's complaints that same day. *Id.* at 55-56. Carlson changed Parker's status to "male only."

### 7. *Fortune and Jamal E.*

Fortune alleges there were two male drivers by the name of "Jamal" who sexually harassed her. One threatened to rape her and the other asked her to send him a recording of herself urinating. *Id.* at 56-57. She also admits that a "Jamal" commented on her physical appearance. She denies that Jamal E. is the "Jamal" who threatened to rape her. While Jamal E.'s conduct is unclear, Fortune spoke to the night fleet manager about him. *Id.* at 57. The manager asked if there was a place nearby where she could go to and feel safe. *Id.* Fortune called friends from her motorcycle club and they met her at a gas station in St. Louis, Missouri, that night. *Id.* Her friends dropped her off at home.

Fortune continued on the truck with Jamal E. for eight more days before their trip ended in Riverside, California, on January 16, 2014. Fortune denies that Jamal E. is the individual who threatened to rape her[22] and denies that these records are accurate. Fortune denies that she was paid for her miles during the trip when the individual threatened to rape her. Her recollection of that incident took place around March 6, 2014, rather than earlier in 2014 as the records related to Jamal E. reflect. *Id.* at 58-59. Fortune's fleet manager contacted her and sent her to an HR representative. Fortune had no further contact with Jamal E. She does communicate with a different person named

---

[22] With regard to the "Jamal" who did threaten to rape Fortune, she alleges that this occurred around March 2014. Doc. No. 247-1 at 76. He stated "you're going to give me some ass, either I'm going to take it or you're going to give it to me." *Id.* Fortune complained to the off-hours driver manager about this threat and exited the truck. *Id.* Her regular driver manager was not told about the situation and called Fortune, angry that she had abandoned a load. *Id.* Fortune received no pay while off the truck as a result of her complaint. *Id.* She claims she never received a response to her complaint. *Id.* CRST states it has no record of Fortune's complaint and separation from co-driver Jamal E. *Id.*

"Jamal" who worked at CRST. *Id.* at 59.

### 8. *Fortune and J.S.*

J.S. declined a proposition from a prostitute in front of Fortune by stating, "[W]ell, I have a co-driver here, I would love to but I can't." He told Fortune, "she actually made my dick hard." *Id.* Fortune found J.S.'s response to the prostitute to be sexually offensive. She did not complain to her driver manager while she was on the truck. Fortune states that she felt compelled to leave the truck after J.S. called her a "psychotic fat black bitch" and told her that the sexual abuse that she experienced as a child was deserved. *Id.* at 59-60. Fortune complained to the terminal manager and this complaint was relayed via the Qualcomm system to her fleet manager and HR. Fortune requested to leave the truck and stop driving with J.S. after he made the above remarks. They stopped driving together.

On April 15, 2014, Fortune provided a written complaint to HR. A representative interviewed her regarding her complaints about J.S. on April 22, 2014. Another HR representative interviewed J.S. that same day. *Id.* at 60. CRST required J.S. to undergo retraining on CRST's anti-harassment policies. *Id.* at 61.

### 9. *Fortune and Hans Davis*

Fortune began driving with Davis around May 2014. Doc. No. 247-1 at 77. Fortune alleges Davis commented on her physical appearance. Doc. No. 239-1 at 61. Davis expressed a desire to sleep with Fortune, asked her to take an AIDS test and share the bunk with him and told her that he had had sex with a previous female co-driver. *Id.* Fortune rejected his advances. Doc. No. 247-1 at 78. She alleges that as she continued to reject his advances, he became angry and hostile, for instance, by refusing to help her back up the truck. *Id.* at 79. Fortune states that when she learned Davis planned to quit his employment with CRST, he threatened her to the effect that she would not want to

see what would happen if she alerted management to his intention to quit. *Id.* On May 23, 2014, Fortune reported a complaint about Davis to her driver manager. Doc. No. 239-1 at 61. The driver manager told her to notify dispatch if something happened. Doc. No. 247-1 at 78. That day, the driver manager arranged for Fortune to get off the truck in Oklahoma City and provided her with a hotel room for the evening. Doc. No. 239-1 at 61.

The next day, Fortune made a complaint about Davis through CRST's ethics hotline at a terminal in Oklahoma. *Id.* at 62. CRST contends Carlson interviewed Fortune and Davis regarding her complaints of concerning text messages. Fortune denies this for lack of factual support, stating that CRST has cited no business records documenting this interview. *Id.* Fortune drove solo to the Riverside terminal to find a new co-driver. CRST states that Davis was instructed to stop texting Fortune and HR contacted Fortune on June 2, 2014, to confirm that Davis was no longer messaging her. Fortune denies this based on lack of support in the record.

### 10. *Fortune and Charles Pickens*

Fortune began driving with Pickens around August 2014. Doc. No. 247-1 at 80. Fortune alleges Pickens started touching her inappropriately, including but not limited to grabbing her buttocks and waist. *Id.* Fortune told him to stop and she did not like it. *Id.* On one occasion, while standing over her bed, Pickens told her he wanted to get in bed with her and she told him no. *Id.*; Doc. No. 239-1 at 63. Pickens continued expressing an interest in having sex with her. *Id.* Fortune alleges Pickens would not leave until she told him about knives she kept under her pillow to protect herself. Doc. No. 247-1 at 81.

Fortune complained to her fleet manager who responded they needed to get her off the truck and could route her to Riverside. CRST does not have records of any complaints Fortune made about Pickens. To the extent this implies that Fortune did not

report a complaint regarding Pickens, Fortune states she did report Pickens' conduct to her fleet manager. Doc. No. 239-1 at 63-64. She has not seen Pickens since she quit driving with him.

### 11. *Lopez and J.M.*

On Lopez's first day of training at a Red Roof Inn in Iowa around April 2014, J.M. (a fellow student driver) approached Lopez and another female student and asked them personal questions about their marital status. Doc. No. 247-1 at 61. He commented to the female student that Lopez's shirt was "too long," implying that he could not see her buttocks. *Id.* The next day, J.M. approached Lopez and began touching her back, scratching it numerous times over her objections while she was on the phone with her mother. *Id.* Eventually, Lopez was able to get out of her chair and exit into an elevator. *Id.* J.M. continued to accost Lopez, making her nervous. *Id.* at 62. He would tell her she was "very pretty" and, while laughing, asked if she had spoken to her mother again. *Id.* J.M. told Lopez's friend, in front of Lopez, that after his road training, he was "coming back for [Lopez] to rape [her] and marry [her] and take [her] with him." *Id.* J.M. also tried to force Lopez to hug him. *See* Doc. No. 239-1 at 64.

Lopez reported J.M.'s comments and conduct over the phone and via email. Doc. No. 247-1 at 62. Lopez told HR that she had been in contact with J.M. for about a week and a half and made the complaint against him on the fourth day. Doc. No. 239-1 at 64. CRST states that Stoll contacted Lopez on April 17, 2014, and conducted an interview. *Id.* at 65. Lopez denies ever speaking to Stoll. CRST states that Stoll also interviewed J.M. and told him to have no further contact with Lopez. *Id.* Lopez denies this based on lack of factual support. J.M. admitted to HR that he scratched Lopez's back, that she broke down crying in front of him and that he told her that she was "very pretty."[23] Doc.

---

[23] CRST argues these statements from J.M. constitute inadmissible hearsay.

31

No. 247-1 at 63. HR never interviewed the witnesses that Lopez identified during the investigation. *Id.* J.M.'s team preference was changed to male only. Doc. No. 239-1 at 64. Lopez has not spoken with nor seen J.M. since he left training and since she spoke to HR. *Id.*

### 12. *Lopez and Charles Smith*

In general, Lopez alleges that when she spent time at Riverside Terminal and Cedar Rapids Terminal, male drivers frequently came on to her sexually, making comments such as "is it true what they say about Puerto Rican women, that they're hot?" Doc. No. 247-1 at 64. Lopez began driving with Smith around July 2014. *Id.* She alleges that Smith made sexual advances towards her, would purchase things for her, tell her "I like big women" and would attempt to kiss her. *Id.* Lopez alleges that Smith commented on her physical appearance, woke her for a driving shift change by touching her hair, asked her to shower with him and told her that she should appreciate him. Doc. No. 239-1 at 66.

Lopez adds that Smith touched her back and hair on more than one occasion even after she previously told him not to touch her when waking her up. *Id.* Smith also laid in bed with her against her will and repeatedly attempted to pressure her into reciprocating his advances, including attempts to kiss her. *Id.* He would become angry with her and subject her to verbal abuse when she did not reciprocate. *Id.* This conduct took place during a trip from Riverside to Florida. *Id.* After getting off the truck at some point to get directions, Lopez saw Smith drive away with the truck, whereupon a driver manager contacted Lopez and Lopez complained about Smith's conduct and harassment. Doc. No. 247-1 at 66. The driver manager directed the truck back to Lopez so that she could gather her belongings, but insisted that Lopez exit and leave the truck to Smith, despite her pleas to make Smith exit given that she had procured the truck herself at the prior terminal. *Id.* Her driver manager arranged a hotel room for her that evening. Doc. No.

239-1 at 67. She was reimbursed for the hotel and the dispatcher offered to buy a bus ticket to meet the next truck, but Lopez declined and opted to rent a car. *Id.* at 67. Lopez was not paid for the time she was off the truck, which lasted several days. Doc. No. 247-1 at 66.

Around July 7, 2014, Lopez complained to Carlson about Smith's conduct and identified a truck stop cashier as a witness. *Id.* at 67. Lopez declined to provide a written statement after being interviewed by Carlson. Doc. No. 239-1 at 67. Carlson made one attempt to reach the witness identified by Lopez, but did not reach him or her. *Id.* Carlson also interviewed Smith who denied any wrongdoing. *Id.* She concluded the complaint could not be corroborated. Doc. No. 247-1 at 67. Lopez has not spoken with Smith since they drove together and Smith's driver preference was changed to male only. Doc. No. 239-1 at 68.

### 13. *Lopez and Craig Jones*

During an October 2014 trip, Lopez alleges that Jones laid on top of her naked while she was sleeping and pressed his erect penis against her[24] until she woke up and showed him a screwdriver she kept under her pillow for safety. *Id.*; Doc. No. 247-1 at 67-68. Lopez exited the truck and went into the truck shop where they were stationed. Doc. No. 247-1 at 68.

Lopez contacted a shuttle driver about her allegations and when she hung up a different person from CRST contacted her. Doc. No. 239-1 at 68. Lopez spoke to a driver manager. Lopez asked the driver manager to let them continue to Oklahoma City so Lopez could pick up a different truck there. She did not address the harassment from Jones until after she requested they continue to Oklahoma City. *Id.* The next day, she spoke with driver manager Teresa Strong, who routed Lopez to Oklahoma City only after

---

[24] CRST denies this statement is supported by the cited material. *See* Doc. No. 247-1 at 67.

Lopez and Jones relayed the load in West Memphis, Arkansas. Strong had Lopez get off the truck in West Memphis, stay in a motel and take a rental car to Oklahoma City to pick up a truck. *Id.* at 69. Lopez received layover pay for the time she was unable to drive due to being removed from the truck.

HR attempted to reach Lopez by phone on October 24, 2014, and left a voicemail, which was the day after Lopez's October 23, 2014, complaint to Strong. While finishing the trip with Jones, Lopez had recorded Jones admitting that he had touched her inappropriately and she sent the recording to HR. Doc. No. 247-1 at 69. Lopez alleges that after the one voicemail, HR did not attempt to reach her again and did not complete an investigation into her complaint.[25] Jones' team preference was changed to male only according to CRST, but Lopez denies this based on lack of factual support. Doc. No. 239-1 at 69.

### 14.    *Lopez and M.B.*

Lopez alleges she and M.B. had the following exchange:

> Well, I was grinding the gears a lot, and he had a situation with that, and he would say that I was grinding the gears a lot. I called it in and the problem was the truck. It had to have the clutch fixed. That's why the gears were grinding so much. He made a comment one day when we were going through mountains, and he tells me, oh, Claudia, one of these days I could just do anything to you, kill you, throw you through the mountains there and no one – nobody ever going to find you.

*Id.* at 70. Lopez did not make any complaints to CRST regarding M.B. while on the truck with him. Lopez states she quit working at CRST after driving with M.B. because she was "nervous" as a result of her experiences on the road with various harassers. Doc. No. 247-1 at 70. CRST denies that this is supported by the cited material and admits that while Lopez testified she stopped driving with M.B. because she was

---

[25] CRST denies this as unsupported by the cited material. Doc. No. 247-1 at 69.

"nervous" she also testified she quit CRST because her doctor told her she needed an operation for her bladder. *Id.*

**F.  Plaintiffs' Separation from CRST**

Sellars stopped driving while she had a workers' compensation claim open for several months. She adds that this was from an injury during a sexual assault by Monroe and that the injury and hospital treatment effectively stopped her driving with CRST. Doc. No. 239-1 at 70. She denies that she voluntarily stopped driving for CRST. CRST states Sellars' workers' compensation claim was closed on November 23, 2015, due to Sellars abandoning treatment. Sellars states that CRST sent her a notice in January 2015 that it would stop her payments, falsely claiming that she did not provide certain medical forms, which were to have been provided to CRST directly from the treating providers.

Fortune left CRST to take care of her mother, who was very ill, and because she could not bear to undergo any more of the experiences she had complained about. *Id.* at 71. She bought a bus ticket and went home and after failing to report to work, CRST entered her termination on February 27, 2015. *Id.*

Lopez felt "nervous" after leaving M.B.'s truck. This, along with medical issues she experienced, caused her to leave CRST. *Id.* at 72. During Lopez's "home time," she was told she would need an operation. She contends her decision not to go back was related to feeling nervous after leaving M.B.'s truck and she denies that she voluntarily separated from CRST. *Id.* Lopez last worked on December 21, 2014, and CRST terminated her employment on February 20, 2015. CRST states this was after she failed to report to work and Lopez denies this for lack of factual support.

**V.  ANALYSIS**

**A.  Plaintiffs' Hostile Work Environment Claims**

CRST argues that plaintiffs cannot establish a hostile work environment because

35

their allegations are not actionably severe or pervasive and CRST's prompt response was reasonably calculated to stop the alleged misconduct. Doc. No. 219 at 22. Plaintiffs argue that CRST had constructive and actual notice of the multiple incidents of harassment, including those involving plaintiffs, and that CRST's purported remedy did nothing to stop the routine and repeated harassment each plaintiff experienced. Doc. No. 239 at 15.

"Discrimination based on sex which creates a hostile or abusive working environment violates Title VII." *McCown v. St. John's Health System, Inc.*, 349 F.3d 540, 542 (8th Cir. 2003). To establish a claim of hostile work environment, a plaintiff must prove:

> (1) that she is a member of a protected group; (2) that she was the subject of unwelcome sexual harassment; (3) that a causal nexus existed between the harassment and protected group status; (4) that harassment affected a term, condition or privilege of employment; and (5) that her employer knew or should have known of the harassment and failed to take prompt and effective remedial action.

*Hales v. Casey's Marketing Co.*, 886 F.3d 730, 735 (8th Cir. 2018) (citing *Klein v. McGowan*, 198 F.3d 705, 709 (8th Cir. 1999)). "In order to show that the harassment affected a term or condition of employment, 'the conduct must be sufficiently severe or pervasive to create an environment that a reasonable person would find hostile or abusive and that actually altered the conditions of the victim's employment.'" *Id.* (quoting *Crist v. Focus Homes, Inc.*, 122 F.3d 1107, 1111 (8th Cir. 1997)). As noted above, CRST challenges plaintiffs' claims of hostile work environment based on the fourth and fifth elements only.

### 1. Severe and Pervasive Requirement

"To survive summary judgment, a plaintiff must present evidence from which a reasonable jury could conclude that the harassment was sufficiently 'severe or pervasive'

36

to affect a term, condition, or privilege of the plaintiff's employment." *Powell v. Yellow Book USA, Inc.*, 445 F.3d 1074, 1077 (8th Cir. 2006) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)). The offensive conduct must be "severe or pervasive enough to create an objectively hostile or abusive work environment – an environment that a reasonable person would find hostile or abusive." *Woodland v. Joseph T. Ryerson & Son, Inc.*, 302 F.3d 839, 843 (8th Cir. 2002). The plaintiff must have also found the work environment subjectively hostile based on the harassment. *Sallis v. Univ. of Minn.*, 408 F.3d 470, 476 (8th Cir. 2005). Relevant factors include the frequency of the discriminatory conduct, its severity, whether it is physically threatening or humiliating or a mere offensive utterance, and whether it unreasonably interfered with an employee's work performance. *Pye v. Nu Aire, Inc.*, 641 F.3d 1011, 1018 (8th Cir. 2011). The conduct "must be extreme and not merely rude or unpleasant to affect the terms and conditions of employment." *Alagna v. Smithville R-II Sch. Dist.*, 324 F.3d 975, 980 (8th Cir. 2003). "More than a few isolated incidents are required and the alleged harassment must be so intimidating, offensive, or hostile that it poisoned the work environment." *Tuggle v. Mangan*, 348 F.3d 714, 720 (8th Cir. 2003) (internal quotations omitted). A single incident can be sufficiently severe to amount to a hostile work environment. *See Moring v. Ark. Dept. of Corr.*, 243 F.3d 452, 456 (8th Cir. 2001) ("we are unaware of any rule of law holding that a single incident can never be sufficiently severe to be hostile-work-environment sexual harassment).

Here, the parties disagree about how to view the alleged, offensive conduct. CRST argues that it should be viewed on a complaint-by-complaint basis as to each alleged harasser. Plaintiffs argue that I must consider the totality of the offensive conduct that each of them experienced. Under the fourth element, I must consider whether the harassment is objectively and subjectively offensive to rise to the level of severe and pervasive that affected a term, condition or privilege of the plaintiff's employment. Under the fifth element, I must consider whether the employer knew or should have

37

known of the harassment and failed to take prompt and effective remedial action. The fourth element focuses on the perspective of the reasonable person and the plaintiff herself while the fifth element focuses on the perspective of the employer. For purposes of the fourth element, I will consider the totality of the allegedly offensive conduct that each plaintiff experienced to determine whether she has demonstrated a genuine issue of material fact as to whether the conduct was sufficiently severe or pervasive to affect a term, condition or privilege of her employment.

Sellars has put forth evidence demonstrating that she was subject to the following instances of alleged harassing conduct:

- At the Riverside Terminal, Sellars heard men make offensive sexual remarks about other women and women in general, including but not limited to comments about the way women's bodies were built, how they were dressed and the attractiveness of women who were in the terminal. Doc. No. 247-1 at 45-46. For instance, men would tell her "you have a nice ass, lady" or "I'd like to tap that ass." *Id.*

- Wilkerson stared at her, made offensive remarks to her and forcefully grabbed her while demanding to know why she would not sleep with him. *Id.*

- He approached her again and told her he wanted to "go down on [her]" and "eat [her]" after she left the room the first time he made the offensive remarks. *Id.*

- Wilkerson grabbed Sellars' shoulder and demanded to know why she would not sleep with him. *Id.*

- Radford made sexual remarks to her, such as telling her she had a "nice ass" and could "see where Lydell was coming from." *Id.*

- Radford began masturbating in her presence and asked if she would like "to join" him to which she responded "no." Doc. No. 247-1 at 48.

- Radford attempted to remove her shirt while she was in her bunk. *Id.* at 49; Doc. No 239-1 at 41-42. She struggled with him telling him to stop, but

38

Radford was able to lift the shirt up to her head before she could move to the passenger seat. Doc. No. 247-1 at 49.

- L.W. made a comment (or comments, according to Sellars) about her body. *Id.* at 43-44.

- Sellars was talking to Monroe and another person about their families and sharing photos. *Id.* at 46. Monroe showed a photo of a family member, and while scrolling through photos, allegedly displayed a pornographic photo for a second or less. Sellars adds that Monroe purposefully stopped at the pornographic photos to look at them. *Id.* Monroe told Sellars he had accidentally downloaded the photos. Monroe then showed Sellars and the other person a video he created wherein it appeared he was tied up with rope and held at knifepoint by two stuffed animals. Monroe then told Sellars he "was going to do that to [her]." *Id.* Later, while training on the road, Monroe told Sellars that he and his friends wished to tie her up and "do things to [her.]" *Id.* at 46-47. Sellars told him that was not going to happen. *Id.* While they were on the road, they got into a dispute about who would drive next after stopping to get gas. *Id.* at 47. Sellars denies that the issue of "who would drive" was the cause of the dispute stating that after Sellars rebuffed Monroe's suggestion to tie her up, he became angry with Sellars, taking photos and videos of her while driving. *Id.*

- Monroe shoved her into the passenger seat and forced her to sit down saying she would regret calling dispatch and complaining about him. *Id.* Monroe had a knife during this time that he kept either on the dash, in his hand or on his right leg while driving and pointed it at Sellars while threatening her that she could not leave the truck. *Id.* at 47-48.

- Sellars received medical treatment due to the physical assault she suffered from Monroe and was placed on workers' compensation after discussing the need for medical attention with Holzer and Carlson. *Id.*

This evidence, viewed in the light most favorable to Sellars, is sufficient for a jury to conclude that a reasonable person would find the alleged conduct severe and pervasive enough to constitute a hostile work environment. The evidence also reflects that Sellars herself found the conduct severe and pervasive as she rejected these drivers' sexual advances and made complaints to HR regarding their conduct. CRST is not entitled to

39

summary judgment based on this element of Sellars' hostile work environment claim.

Fortune has put forth evidence demonstrating that she was subject to the following instances of alleged harassing conduct:

- During her training as a student driver at the Cedar Rapids Terminal, she heard daily offensive remarks from male trainers and co-drivers about either herself or other women, including men coming on to her or propositioning her for sex, men making comments about women's bodies such as, "man she's got ass on her" or "I'll hit that" and men talking about which women they had slept with. *Id.* at 71.

- Wood made comments about Fortune's appearance, asked what she liked sexually and stated he had "never been with a colored woman before." *Id.*; Doc. No. 247-1 at 71. Fortune rejected his advances. *Id.* at 72.

- On the first night of the two-day trip, Wood claimed there was only one room containing only one bed and stated "that's ok, we can share." *Id.* The room had two beds and Fortune refused to share a bed with Wood even though he continued pressing her to do so. *Id.*

- Wood came out of the shower in his boxers (with his boxers exposing his penis) and sat on the bed and asked Fortune to rub his back. Doc. No. 239-1 at 51.

- Wood told Fortune "I haven't had pussy in six months, if you want to pass you might want to take that into consideration." Doc. No. 247-1 at 72. Fortune told him "no" and proceeded to sleep in her own bed with her coat on. *Id.* at 73.

- Parker watched pornography and Fortune once caught him engaging in a sexual act.[26] Doc. No. 239-1 at 52-53. Fortune could not recall whether Parker ever physically touched her, but he made sexual advances toward her while he was a trainer and repeatedly asked her to have sex with him. *Id.* When she turned him down, he would make things difficult for her, such as by refusing to help her back the truck or blaming weight-load issues on her. *Id.* at 53-54. He also told her he was the type of guy that would hit a woman if he had to. *Id.*

---

[26] As noted above, Fortune alleges that Parker "regularly" watched pornography and masturbated while Fortune was on the truck and on at least one occasion ejaculated in her presence. Doc. No. 247-1 at 74. CRST denies that the statement that Parker regularly watched pornography and masturbated while Fortune was on the truck is supported by the appendix citation. *Id.*

- While waiting for a second team of drivers to pick up part of their load, Parker again propositioned Fortune to have sex. *Id.* at 54. She states Parker forced her out of the truck and threw her belongings out after she refused to have sex with him.

- Upon returning to the terminal, Fortune alleges Parker spread rumors that Fortune was a "lot lizard" (trucker slang for prostitute). Doc. No. 247-1 at 75.

- Fortune alleges there were two male drivers by the name of "Jamal" who sexually harassed her. One threatened to rape her and the other asked her to send him a recording of herself urinating. *Id.* at 56-57. "Jamal" also commented on her physical appearance.

- J.S. declined a proposition from a prostitute in front of Fortune by stating, "[W]ell, I have a co-driver here, I would love to but I can't." He told Fortune, "she actually made my dick hard." *Id.* Fortune found J.S.'s response to the prostitute to be sexually offensive.

- Fortune felt compelled to leave the truck after J.S. called her a "psychotic fat black bitch" and told her that the sexual abuse that she experienced as a child was deserved. *Id.* at 59-60.

- Davis commented on Fortune's physical appearance. Doc. No. 239-1 at 61. Davis expressed a desire to sleep with Fortune, asked her to take an AIDS test, asked her to share the bunk with him and told her that he had had sex with a previous female co-driver. *Id.* Fortune rejected his advances. Doc. No. 247-1 at 78. She alleges that as she continued to reject his advances, he became angry and hostile, for instance, by refusing to help her back the truck. *Id.* at 79.

- Fortune states that when she learned that Davis planned to quit his employment with CRST, he threatened her to the effect that she would not want to see what would happen if she alerted management to his intention to quit. *Id.*

- Pickens started touching Fortune inappropriately, including but not limited to, grabbing her buttocks and waist. *Id.* Fortune told him to stop and she did not like it. *Id.*

- On one occasion, while standing over her bed, Pickens told her he wanted to get in bed with her and she told him no. *Id.*; Doc. No. 239-1 at 63. Pickens continued expressing an interest in having sex with her. *Id.* Pickens would not leave until

41

she told him about knives she kept under her pillow to protect herself.  Doc. No. 247-1 at 81.

This evidence, viewed in the light most favorable to Fortune, is sufficient for a jury to conclude that a reasonable person would find the alleged conduct severe and pervasive enough to constitute a hostile work environment.  The evidence also reflects that Fortune herself found the conduct severe and pervasive as she rejected this conduct and made complaints to HR regarding this conduct.  CRST is not entitled to summary judgment based on this element of Fortune's hostile work environment claim.

Lopez has put forth evidence demonstrating that she was subject to the following instances of alleged harassing conduct:

- When Lopez spent time at Riverside Terminal and Cedar Rapids Terminal, male drivers frequently came on to her sexually, making comments such as "is it true what they say about Puerto Rican women, that they're hot?"  Doc. No. 247-1 at 64.

- On Lopez's first day of training at the Red Roof Inn in Iowa around April 2014, J.M. (a fellow student driver) approached Lopez and another female student and asked them personal questions about their marital status.  Doc. No. 247-1 at 61. He commented to the female student that Lopez's shirt was "too long," implying that he could not see her buttocks.  *Id.*

- The next day, J.M. approached Lopez and began touching her back, scratching it numerous times over her objections while she was on the phone with her mother. *Id.*  Eventually, Lopez was able to get out of her chair and exit into an elevator. *Id.*

- J.M. continued to accost Lopez, making her nervous.  *Id.* at 62.  He would tell her she was "very pretty" and, while laughing, asked if she had spoken to her mother again.  *Id.*  J.M. told Lopez's friend, in front of Lopez, that after his road training, he was "coming back for [Lopez] to rape [her] and marry [her] and take [her] with him."  *Id.*

- J.M. also tried to force Lopez to hug him.  *See* Doc. No. 239-1 at 64.

- Smith made sexual advances towards her, would purchase things for her, tell her

42

"I like big women" and would attempt to kiss her. *Id.*

- Smith commented on her physical appearance, woke her for a driving shift change by touching her hair, asked her to shower with him and told her that she should appreciate him. Doc. No. 239-1 at 66.

- Smith touched her back and hair on more than one occasion even after she previously told him not to touch her when waking her up. *Id.*

- Smith also laid in bed with her against her will and repeatedly attempted to pressure her into reciprocating his advances, including attempts to kiss her. *Id.* He would become angry with her and subject her to verbal abuse when she did not reciprocate. *Id.*

- Jones laid on top of Lopez naked while she was sleeping and pressed his erect penis against her[27] until she woke up and showed him a screwdriver she kept under her pillow for safety. *Id.*; Doc. No. 247-1 at 67-68.

- M.B. told her, "oh, Claudia, one of these days I could just do anything to you, kill you, throw you through the mountains there and no one – nobody ever going to find you."

This evidence, viewed in the light most favorable to Lopez, is sufficient for a jury to conclude that a reasonable person would find the alleged conduct severe and pervasive enough to constitute a hostile work environment. The evidence also reflects that Lopez herself found the conduct severe and pervasive as she rejected this conduct and made complaints to HR regarding this conduct. CRST is not entitled to summary judgment based on this element of Lopez's hostile work environment claim.

### 2.     *CRST's Response to Alleged Harassment*

CRST argues that no plaintiff has provided evidence demonstrating that CRST had received a complaint of harassment with respect to any of the accused drivers prior to a

---

[27] CRST denies this statement is supported by the cited material. *See* Doc. No. 247-1 at 67.

43

plaintiff's complaint. Doc. No. 219 at 17. It further argues that nothing in the record supports a probability of harassment by an accused driver at the time he was put into the same work environment as a plaintiff because no plaintiff was placed back in a truck with any of the accused drivers following a complaint. CRST contends it could not have been aware of any alleged risk absent reporting because the alleged misconduct occurred in isolated environments (often in a two-person truck cab). *Id.* at 17-18. Moreover, it contends that its prompt remedial action in response to each complaint was reasonably calculated to stop the alleged harassment such that CRST cannot be held liable. *Id.* at 20.

Plaintiffs rely on prior sexual harassment lawsuits filed against CRST and Carlson's suggestion to install cameras on each truck to demonstrate a genuine issue of material fact as to whether CRST was aware that plaintiffs would be subjected to sexual harassment. Doc. No. 239 at 32-33. They argue that even after CRST had actual notice of harassment, plaintiffs continued to experience multiple instances of harassment despite CRST's response. As such, they argue a reasonable jury could conclude that CRST failed to take prompt and effective remedial action.

"An employer's liability turns on whether the employer was aware of the conduct and whether it took appropriate action to remedy the circumstances in a timely and appropriate manner." *Hales*, 886 F.3d at 735 (citing *Crist*, 122 F.3d at 1111). "Prompt remedial action shields an employer from liability when the harassing conduct is committed by a co-worker rather than by a supervisor." *Meriwether v. Caraustar Packaging Co.*, 326 F.3d 990, 994 (8th Cir. 2003) (citing *Moisant v. Air Midwest, Inc.*, 291 F.3d 1028, 1031 (8th Cir. 2002)). When an employer has a published policy providing a procedure for reporting harassment, a plaintiff must invoke this procedure to establish actual notice. *See Weger v. City of Ladue*, 500 F.3d 710, 721 (8th Cir. 2007). Otherwise, an employee "can show an employer's constructive knowledge of sexual harassment by demonstrating that 'the harassment was so severe and pervasive that

44

management reasonably should have known of it.'" *Id.* (quoting *Watson v. Blue Circle, Inc.*, 324 F.3d 1252, 1259 (11th Cir. 2003)). The harassment must be so widespread as to be "obvious to everyone." *Smith v. St. Louis Univ.*, 109 F.3d 1261, 1265 n.3 (8th Cir. 1997).

"The factors to consider when assessing the reasonableness of an employer's action 'include the amount of time that elapsed between the notice and remedial action, the options available to the employer, . . . and whether or not the measures ended the harassment.'" *Nichols v. Tri-Nat'l Logistics, Inc.*, 809 F.3d 981, 987 (8th Cir. 2016) (quoting *E.E.O.C. v. CRST Van Expedited, Inc.*, 679 F.3d 657, 692-93 (8th Cir. 2012)). "Proper remedial action need be only 'reasonably calculated to stop the harassment,' and remedial action that does not end the harassment can still be adequate if it is reasonably calculated to do so." *Engel v. Rapid City Sch. Dist.*, 506 F.3d 1118, 1125 (8th Cir. 2007) (quoting *Carter v. Chrysler Corp.*, 173 F.3d 693, 702 (8th Cir. 1999)).

As acknowledged by the parties, the fifth element involves two questions: (1) the employer's notice of harassment and (2) the employer's response. Plaintiffs argue that there is a genuine issue of material fact regarding whether CRST had constructive notice[28] of the alleged harassment, while CRST contends that only actual notice is at issue. It is undisputed that each of the three plaintiffs attended CRST's new driver orientation and acknowledged receiving CRST's anti-harassment policy and a copy of CRST's driver Handbook. *See* Doc. No. 239-1 at 34-37. Because it is undisputed that CRST had a

---

[28] Plaintiffs argue that "an employer may be negligent although it did not have actual notice if *it reasonably should have anticipated the harassment*, i.e., if it had constructive notice." Doc. No. 239 at 35 (quoting *Sandoval v. Am. Bldg. Maint. Indust. Inc.*, 578 F.3d 787, 802 (8th Cir. 2009) (emphasis added)). In *Sandoval*, the Eighth Circuit remanded the case to the district court instructing it to consider plaintiffs' evidence of widespread sexual harassment in determining whether the employer had constructive notice of plaintiffs' harassment. *Sandoval*, 578 F.3d at 803. On remand, the district court concluded that the employer could not be charged with constructive notice based on complaints from 80 of plaintiffs' coworkers as these complaints did not involve the same workplace and many did not identify the accused harasser. *Sandoval v. Am. Bldg. Maint. Indust., Inc.*, 765 F. Supp. 2d 1138, 1169-71 (D. Minn. 2010).

45

reporting procedure in place and that plaintiffs used it to report harassment, CRST had actual notice of the harassment at issue when it was reported. Plaintiffs attempt to show that CRST had constructive knowledge of the harassment much earlier based on past sexual harassment lawsuits against CRST and Carlson's testimony regarding the need for a different approach (such as installing cameras on trucks) to prevent sexual harassment. *See* Doc. No. 239 at 32-33.

In addition to admissibility issues with this type of evidence, CRST contends that plaintiffs advocate for a duty of being "aware of the danger that Plaintiffs *would be* sexually assaulted or harassed." Doc. No. 246 at 11 (citing Doc. No. 239 at 32-33 (emphasis added)). CRST asserts that the law requires knowledge of a specific risk of harassment and plaintiffs' approach would require it to assume that every one of its male drivers would harass every one of its female drivers at some point. *Id.* at 16. I agree with CRST that plaintiffs' attempt to show constructive notice through general evidence regarding previous complaints in separate lawsuits goes beyond the applicable standard. Plaintiffs have not shown that any of the past complaints of sexual harassment in those cases involved the same drivers accused of harassment in this case. *See Kramer v. Wasatch Cnty. Sheriff's Office*, 743 F.3d 726, 756 (10th Cir. 2014) ("An employer's knowledge that the harasser had harassed people other than the plaintiff could be relevant to whether the employer had constructive notice of the dangerousness of the employee, but the extent and seriousness of the earlier harassment and the similarity and nearness in time to the later harassment should be factors in deciding whether to allow the evidence of harassment of others to prove notice.") (internal quotations omitted)).

I find that the law does not require an employer to anticipate the misconduct of its employees when those employees have given no indication that they would engage in misconduct. To conclude otherwise would raise the standard to strict liability rather than negligence. The same conclusion applies to Carlson's suggestion to install cameras in each truck. Such evidence provides no indication that a particular individual poses a

threat to other employees. *See CRST Van Expedited, Inc.*, 679 F.3d at 390 (noting that constructive notice is established "where an employee provides management level personnel with enough information to raise a probability of sexual harassment in the mind of a reasonable employer" or "where the harassment is so pervasive and open that a reasonable employer would have had to be aware of it.").

I agree with CRST that because it had a reporting procedure in place and plaintiffs undisputedly acknowledged and used the procedure, CRST's remedial efforts must be measured based on its actual notice of allegations. As CRST points out, the record evidence does not demonstrate any history of complaints against any of the drivers who plaintiffs accused of harassment. Thus, CRST's knowledge and remedial response depends on actual knowledge based on each plaintiff's complaint. Doc. No. 219 at 22.

CRST argues that its remedial response to sexual harassment has already been acknowledged by the Eighth Circuit as prompt and appropriate. In *Nichols*, the court stated:

> In *CRST*, we determined that the employer took appropriate remedial action by: "(1) removing the [harassed] woman from the truck as soon as practicable, arranging overnight lodging at a motel and subsequent transportation to a CRST terminal at the company's expense; (2) requesting a written statement from the [victim]; (3) relieving the [victim] from future assignments with the alleged harasser; and (4) reprimanding the alleged harasser and barring him from team-driving with women indefinitely." We further noted that these "actions, not necessarily in combination, constitute the type of prompt and effective remedial action that our precedents prescribe."

*Nichols*, 809 F.3d at 987 (quoting *CRST Van Expedited, Inc.*, 679 F.3d at 693) (internal citations omitted). CRST argues that the undisputed evidence in this case demonstrates that when a plaintiff reported a complaint, CRST endeavored to respond within less than 24 hours to separate that plaintiff from the accused driver, arrange overnight lodging and transportation (where appropriate), investigate the complaint, relieve plaintiff from future assignments with the alleged harasser to ensure she would not be placed in a truck cab

47

with him again and put measures in place to ensure the misconduct stopped (by designating the alleged harasser's team preference to "male only" and imposing discipline where appropriate). Doc. No. 219 at 22. CRST breaks down each of plaintiff's complaints with respect to each driver, including plaintiff's allegations, the employment conditions (whether the alleged misconduct was severe and pervasive enough to affect a term, condition or privilege of employment), CRST's response time, plaintiff's statement and interview (the investigation) and what measures were taken. *See id.* at 23-40. While CRST's response did not always follow the formula described above, it is undisputed that in response to plaintiffs' complaints, they were separated from the harassing driver and were never paired with him again.

Plaintiffs contend that the continued harassment they experienced after reporting a previous complaint (albeit against a different harasser) generates a fact issue as to whether CRST failed to take preventive measures. Doc. No. 239 at 36-37 (citing *Vance v. Ball State Univ.*, 570 U.S. 421, 448-49 (2013) ("Assuming that a harasser is not a supervisor, a plaintiff could still prevail by showing that his or her employer was negligent in failing to prevent harassment from taking place.")).[29] None of the plaintiffs allege that they continued to be harassed by the same individual after reporting a complaint. Rather, they allege that they continued experiencing harassment from different individuals demonstrating that CRST did not do enough systemically to prevent harassment.

"When coworkers, rather than supervisors, are responsible for the creating and perpetuation of a hostile work environment . . . an employer can only be liable if the harassment is causally connected to some negligence on the employer's part." *Wilson v.*

---

[29] The Court went on to state that relevant conduct would include "that an employer did not monitor the workplace, failed to respond to complaints, failed to provide a system for registering complaints, or effectively discouraged complaints from being filed." *Vance*, 570 U.S. at 449. The preventive measures plaintiffs argue should have been imposed include surveillance cameras on all trucks.

*Moulison North Cop.*, 639 F.3d 1, 7 (1st Cir. 2011) (quoting *Noviello v. City of Boston*, 398 F.3d 76, 84 (1st Cir. 2005)). "Liability only attaches if the employer, after receiving notice, fails to take prompt and appropriate ameliorative action." *Id.* at 8 (citing *Forrest v. Brinker Int'l Payroll Co.*, 511 F.3d 225, 231 (1st Cir. 2007)). Proper remedial action need be only "reasonably calculated to stop the harassment." *Carter v. Chrysler Corp.*, 173 F.3d 693, 702 (8th Cir. 1999). "[R]emedial action that does not end the harassment can still be adequate if it is reasonably calculated to do so." *Engel*, 506 F.3d at 1125.

The cases in which courts have found an employer's response to be negligent or the remedial response inadequate (or to raise a fact issue as to this question) involve continued harassment by the same harasser. *See Nichols*, 809 F.3d at 987 (concluding there was a genuine issue of material fact as to whether company took appropriate remedial action when there was evidence that plaintiff (a truck driver) made multiple complaints about her codriver's recurring harassment over a multi-day trip); *Engel*, 506 F.3d at 1127 ("In sum, Engel has presented evidence that could support a reasonable finding that some elements of RCSD's second remedial action were insufficient to address [the harasser's] ongoing harassment, that the remedial action did not stop the harassment, and that the second remedial action may actually have encouraged [the harasser] to feel that he could safely continue certain activities."); *Carter*, 173 F.3d at 703 (remanding for court to consider whether response was reasonably calculated to end the harassment where there was evidence that harassment continued for a year and a half after initial complaint despite ongoing complaints of continued harassment); *Hanna v. Boys and Girls Home and Family Servs., Inc.*, 212 F. Supp. 2d 1049, 1063-64 (N.D. Iowa 2002) (concluding there were genuine issues of material fact as to whether employer's response was reasonably calculated to end the harassment where there was evidence that the plaintiff reported the alleged harassing conduct by the same individual repeatedly during her employment and employer denied her requests to be assigned to a different shift).

49

The only case plaintiffs cite in which an employer's response to continued harassment by different individuals was considered inadequate is easily distinguishable. In *Tademy v. Union Pacific Corp.*, 614 F.3d 1132 (10th Cir. 2008), the alleged misconduct involved racist graffiti. The court found that the employer was on notice that there was a serious problem with bigoted messages appearing in public spaces around the time Tademy raised his complaints. *Id*. at 1148. The court noted that the employer did nothing in response to plaintiff's initial complaints, the graffiti continued and became worse and the employer then required training and a warning for those who were caught. Sometimes the graffiti was anonymous and other times it was not. The employer argued that the plaintiff could survive summary judgment only if he was able to demonstrate that the same perpetrator committed any two of the incidents. *Id*. at 1143. The court disagreed stating, "if only repeat offenders could render the company liable for a hostile work environment, the company's failure to investigate the incidents and identify the perpetrator might devolve to its benefit." It required plaintiff to demonstrate "a nexus between a[n employer's] prior response and later harassment by others." *Id*. at 1148.

Unlike the employer in *Tademy*, CRST took action in response to plaintiffs' complaints. Moreover, the alleged misconduct in this case does not involve a common work environment such that many drivers would become aware of misconduct by others and how they were being disciplined. There is no suggestion in the record of the nexus described in *Tademy* – that each new driver a plaintiff was paired with was motivated to harass her based on CRST's response to other harassment complaints involving other drivers.

Plaintiffs argue that *Tademy* stands for the proposition that the prevention of harassing conduct is required. I agree to the extent that the court must evaluate whether the employer's response was reasonably calculated to end the harassment. There was evidence in *Tademy* that employees were undeterred by the employer's response, even remarking that they could get "paid vacation" by means of training in another city for

50

engaging in racist conduct. *Tademy*, 614 F.3d at 1137. Therefore, the court found there were genuine issues of fact as to whether the employer's response or failure to respond to Tademy's complaints contributed to subsequent acts of harassment. *Id.* at 1148. *See also Scarberry v. Exxonmobil Oil Corp.*, 328 F.3d 1255, 1261 (10th Cir. 2003) (affirming summary judgment in favor of employer when employer identified culprit of inappropriate graffiti and terminated his employment);[30] *Engel*, 506 F.3d at 1126 (addressing continued harassment by same individual after employer's remedial efforts).

The Ninth Circuit has held that the employer's remedial response must go beyond the instant report of harassment and deter future harassers. *See Nichols v. Azteca Rest. Enterprises, Inc.*, 256 F.3d 864, 875 (9th Cir. 2001) ("When the employer undertakes no remedy, or where the remedy does not end the current harassment and deter future harassment, liability attaches for both the past harassment and any future harassment."); *Yamaguchi v. U.S. Dept. of the Air Force*, 109 F.3d 1475, 1483 (9th Cir. 1997) ("An employer is liable for a co-worker's sexual harassment only if, after the employer learns of the alleged conduct, he fails to take adequate remedial measures. These measures must include immediate and corrective action reasonably calculated 1) to end the current harassment, and 2) to deter future harassment from the same offender or others."). The Fourth Circuit has also discussed the need to prevent future harassment but, like other circuits, this duty appears to be limited to harassment from a known harasser. *Alexander v. Alcatel NA Cable Sys., Inc.*, 50 F. App'x 594, 602 (4th Cir. 2002) ("if an employer reasonably should have anticipated that the plaintiff would become a victim, but failed to

---

[30] Plaintiffs cite *Scarberry* as a "prevention" case because prior to identifying the culprit, the employer increased security, fixed and upgraded lights, surveillance cameras and fences. *Scarberry*, 328 F.3d at 1258. However, it was catching the culprit (based on his handwriting) that stopped the graffiti, not the extra security measures. Anonymous harassment is not at issue in this case.

51

take action reasonably calculated to prevent the harassment, it may be liable.").[31]

Plaintiffs have cited no Eighth Circuit case imposing a standard similar to the Ninth Circuit's position that an employer may be liable for failing to prevent future harassment by any other individual. Even if the case law could be read that broadly, it requires only a response that is "reasonably calculated" to end the harassment. While plaintiffs contend that CRST's response of designating drivers accused of harassment as "male only" is not sufficiently disciplinary, this action assures that individuals accused of harassment are not paired with another female driver. Plaintiffs argue CRST is required to do more and intends to demonstrate CRST's response is insufficient by citing recurring harassment that takes place, along with evidence that Carlson believed more could be done to stop harassment (such as installing cameras in all trucks). The Tenth Circuit has explained why this position is problematic:

> For the dissent, the mere occurrence of the future harassment is enough circumstantial evidence to draw an inference of the inadequacy of prior employer responses. Whether even the immediate firing of each harasser would have actually deterred future wrongdoers is purely speculative, and factually impossible if the future harassers did not know about those actions. Unless we hold employers strictly liable for failing to broadcast sensitive disciplinary matters to their entire workforces, we cannot predicate liability

---

[31] Regarding whether an employer should have anticipated that a plaintiff would become a victim, the Fourth Circuit acknowledged that an "employer's knowledge that a male worker has previously harassed female employees other than the plaintiff will often prove highly relevant in deciding whether the employer should have anticipated that the plaintiff too would become a victim of the male employee's harassing conduct." *Alexander*, 50 Fed. App'x at 602 (quoting *Paroline v. Unisys Corp.*, 879 F.2d 100, 107 (4th Cir. 1989) *vacated and remanded on other grounds*, 900 F.2d 27 (4th Cir. 1990)). This falls in line with how other circuits interpret an employer's obligation to prevent future harassment. *See Ferris v. Delta Air Lines, Inc.* 277 F.3d 128, 136 (2d Cir. 2001) ("If an employer is on notice of a likelihood that a particular employee's proclivities place other employees at unreasonable risk of rape, the employer does not escape responsibility to warn or protect likely future victims merely because the abusive employee has not previously abused those particular employees."); *Hawkins v. Anheuser-Busch, Inc.*, 517 F.3d 321, 341 (6th Cir. 2008) ("An employer's responsibility to prevent future harassment is heightened where it is dealing with a known serial harasser and is therefore on clear notice that the same employee has engaged in inappropriate behavior in the past.").

52

on this theory. In addition, if the dissent's inference is properly drawn on this record, it would be so in every case involving multiple incidents of harassment, and employers would be hard pressed to prove the negative – that future harassers were not motivated by prior employer responses.

We recognize the sensibility of taking measures to prevent harassment in the first instance, although such measures are not mandatory. The dissent's test, however, would make employers insurers against future sexual harassment by coworkers after an initial employer response, regardless of the nature of the responses taken. This is liability without end.

*Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 679 (10th Cir. 1998) (internal citations omitted). I agree with this reasoning. Plaintiff's theory puts too great a burden on the employer to foresee misconduct by employees who have no history of misconduct. CRST cannot be held liable for failing to respond to an action by an employee that has not yet happened and that CRST has no reason to suspect will happen. Its remedial response must be measured only by what it knew at the time. On that point, plaintiffs have failed to demonstrate a genuine issue of material fact that CRST's response to their complaints of harassment was negligent.

Plaintiffs have not put forth any evidence that after they made a complaint of harassment by a co-driver and CRST responded to their complaint, they continued to be harassed by that same co-driver. Indeed, the undisputed evidence shows that the plaintiff was never re-paired with that driver and, in most cases, never even saw him again. Thus, CRST's response was adequate in stopping the harassment as to that particular co-driver and it was not reasonably foreseeable that plaintiffs would continue to be harassed by the next co-driver. There is also no evidence that any of the alleged harassers in this case had previously harassed another female driver, which would be relevant as to CRST's knowledge and the reasonableness of its previous response.

Finally, and as CRST points out, this case presents the unique situation in which the Eighth Circuit has already evaluated CRST's responses to complaints of sexual harassment by a coworker and determined that, "as a matter of law, CRST promptly and

53

effectively remedied any alleged harassment that the women reported." *CRST Van Expedited, Inc.*, 679 F.3d at 693. At minimum, the Eighth Circuit's conclusion is instructive in this case and provides further support for CRST's position. For all of these reasons, I find that CRST is entitled to summary judgment on plaintiff's claims of hostile work environment.

## B.    *Plaintiffs' Retaliation Claims*

I previously granted CRST's motion for summary judgment on plaintiffs' class-wide retaliation claim. I found that the claim failed based on an absence of a "genuine issue of material fact as to whether CRST maintained a policy, pattern or practice after July 1, 2015, of not paying female drivers who were removed from their truck following a complaint of sexual harassment or paying them substantially less than they would have made had they stayed on the truck." Doc. No. 204 at 32. Specifically, I found that plaintiffs had not put forth sufficient evidence for a jury to infer that CRST's articulated reasons were false and that the real reason was retaliation. *Id.* at 41. Plaintiffs' evidence consisted of other alternatives to CRST's current policy (such as requiring the alleged harasser to leave the truck), temporal proximity to when the complaint was reported and evidence that CRST later instituted its HR layover pay. *Id.* at 35-41. I found that none of this evidence would allow a jury to conclude that CRST's stated reasons for removing sexual harassment complainants from the truck without pay during the time they waited to get assigned to another truck was pretext for retaliation. *Id.* at 41. I noted that while I granted summary judgment as to the class claim of retaliation, this did not preclude the possibility that an individual plaintiff might have a viable retaliation claim based on the specific facts and circumstances of that plaintiff's case. *Id.* at 69.

CRST argues that none of the plaintiffs have provided evidence that CRST acted with retaliatory intent or that removing her from the truck was pretext for retaliation. Doc. No. 219 at 44. Plaintiffs state the individual plaintiffs' retaliation claims have the

54

same basis as the class claim. Doc. No. 239 at 48-49. Therefore, I find that summary judgment is appropriate on plaintiffs' individual retaliation claims for the reasons articulated in my order granting summary judgment on the class retaliation claim. *See* Doc. No. 204 at 35-41.

### C.    Plaintiffs' Constructive Discharge Claims

CRST argues plaintiffs' constructive discharge claims fail because they did not face the prospect of intolerable working conditions, nor did CRST desire or intend for any of them to quit. Doc. No. 219 at 45. It states that it promptly addressed each complaint and put plaintiffs in trucks with individuals who had no prior allegations or harassment and paired them with only female drivers when requested. *Id.* It also argues that plaintiffs quit without giving CRST a reasonable chance to address their concerns and for reasons unrelated to the working environment. *Id.* at 46.

Plaintiffs argue that a jury could conclude that a reasonable employee would have found the working conditions at CRST to be intolerable. Doc. No. 239 at 49. They also argue that their resignations were a reasonably foreseeable consequence of CRST's actions or inactions. *Id.* at 50. Finally, they argue that a jury could conclude that plaintiffs gave CRST a reasonable opportunity to correct the intolerable conditions and CRST's response was insufficient because it merely shifted the harassment rather than stopped it. *Id.* at 51, 61.

"To prove a constructive discharge, an employee must show that the employer deliberately created intolerable working conditions with the intention of forcing her to quit." *Alvarez v. Des Moines Bolt Supply, Inc.*, 626 F.3d 410, 418 (8th Cir. 2010) (citing *Coffman v. Tracker Marine, L.P.*, 141 F.3d 1241, 1247 (8th Cir. 1998)). "An employee must, however, grant her employer a reasonable opportunity to correct the intolerable condition before she terminates her employment." *Anda v. Wickes Furniture Co.*, 517 F.3d 526, 534 (8th Cir. 2008). "Evidence of the employer's intent can be proven

55

'through direct evidence or through evidence that the employer could have reasonably foreseen that the employee would quit as a result of its actions.'" *Sanders v. Lee Cty. Sch. Dist. No. 1*, 669 F.3d 888, 893 (8th Cir. 2012) (quoting *Fercello v. Cty. of Ramsey*, 612 F.3d 1069, 1083 (8th Cir. 2010)).

Prior to addressing the merits of plaintiffs' constructive discharge claims, I will consider CRST's argument that plaintiffs quit for unrelated reasons. They allege that Lopez quit due to a doctor's suggestion she get an operation, Fortune quit because her mother was ill and Sellars quit because she had an alleged workers' compensation injury that caused her to stop driving. Plaintiffs argue the law does not require an employee to resign immediately after the work conditions become intolerable and the fact that plaintiffs had other life events arise around the same time as their resignation is immaterial. *See* Doc. No. 239 at 51-60 (citing *Henderson v. Simmons Foods, Inc.*, 217 F.3d 612, 617 (8th Cir. 2000) ("The fact that Henderson resigned from Simmons after a three-week vacation is irrelevant.")). I do not find that plaintiffs' other life events that coincided with their resignations entitle CRST to summary judgment on plaintiffs' constructive discharge claims. Whether plaintiffs resigned for those reasons or based on the alleged intolerable conditions would be a fact issue for a jury to decide.

With regard to whether plaintiffs have demonstrated a genuine issue of material fact as to the elements of a constructive discharge claim, I first note that the parties disagree on what is necessary to prove CRST "deliberately" created intolerable working conditions with the "intent" for plaintiffs to quit. Plaintiffs argue that they may show intent if their resignations were a reasonably foreseeable consequence of CRST's actions or inactions, but they do not need to prove that CRST deliberately created intolerable work conditions or that CRST consciously meant to force plaintiffs to quit. *See* Doc. No. 239 at 50. They argue that evidence that an employer did not take sufficient remedial action, did not investigate or ignored a plaintiff's complaint of harassment speaks to the intolerability of the work conditions and is sufficient to demonstrate the employer's intent.

56

*Id.* They also argue that an employer's reasonable opportunity to correct the intolerable conditions must "strike at the heart" of the intolerable conditions. *Id.* at 51. CRST argues that it addressed each plaintiff's report of sexual harassment by separating each plaintiff from the accused co-driver and assuring she would never share a truck with that individual again. Doc. No. 246 at 19. It also argues that it was willing to eliminate any possible chance of future harassment by agreeing to a plaintiff's request to be paired with female drivers only. *Id.* at 20.

Whether CRST acted deliberately and with intent are related. "[T]he employer's actions leading to the decision to quit must have been deliberate, that is, they 'must have been taken with the intention of forcing the employee to quit.'" *Delph v. Dr. Pepper Bottling Co. of Paragould, Inc.*, 130 F.3d 349, 354 (8th Cir. 1997) (quoting *Johnson v. Bunny Bread Co.*, 646 F.2d 1250, 1256 (8th Cir. 1981)). *See also Jackson v. Ark. Dept. of Educ.*, 272 F.3d 1020, 1026 (8th Cir. 2001) ("To be liable, the employer must have intended to force the employee to quit, or at least have reasonably foreseen the employee's resignation as a consequence of the unlawful working conditions it created."); *Whidbee v. Garzarelli Food Specialties, Inc.*, 223 F.3d 62, 74 (2d Cir. 2000) (concluding that case law indicates that "deliberate" action on part of employer requires "something beyond mere negligence or ineffectiveness.").

Plaintiff's claims of constructive discharge are based on the same evidence as their hostile work environment claims. As to those claims, I found there was a genuine issue of material fact regarding whether the conduct plaintiffs experienced was severe and pervasive enough to affect a term or condition of their employment. However, I concluded the claims ultimately failed because there was no fact issue with regard to CRST's remedial response or negligence. In doing so, I noted that CRST's response need only be measured by what it knew at the time. With regard to plaintiffs' constructive discharge claims, I find that whether the employer deliberately created intolerable working conditions with the intent to get plaintiffs to resign must also include a

57

consideration of the employer's knowledge. Specifically, it must be "reasonably foreseeable" that the employee would resign as a consequence of the employer's actions. *Phillips v. Taco Bell Corp.*, 156 F.3d 884, 890 (8th Cir. 1998).

When viewing the facts in the light most favorable to plaintiffs, I find that a reasonable jury could conclude that the conditions were intolerable. However, plaintiffs must also prove that CRST deliberately intended for them to be intolerable such that it was reasonably foreseeable that plaintiffs would resign. Plaintiffs have not put forth sufficient evidence that CRST deliberately created intolerable working conditions with the intent that any plaintiff would resign her employment. In each instance of a complaint of harassment, CRST removed the plaintiff from the harassing situation and re-paired her with another driver. While plaintiffs often faced harassment by the next driver, the record lacks evidence that CRST knew or had reason to know that these particular drivers would engage in such conduct.

Because there is no evidence that CRST removed plaintiffs from harassing environments and deliberately put them in new environments which they knew or had reason to know that plaintiffs would continue to be subject to harassment, I find that plaintiffs' constructive discharge claims must fail. *See Vajdl v. Mesabi Academy of KidsPeace, Inc.*, 484 F.3d 546, 553 (8th Cir. 2007) ("Vajdl fails to produce evidence suggesting her employer intentionally created an intolerable work condition in an effort to cause her to resign."). CRST is entitled to summary judgment on plaintiffs' constructive discharge claim.

## VI. CONCLUSION

For the reasons stated herein, defendant's motion (Doc. No. 216) for summary judgment is **granted** as to all claims. Because this order disposes of all pending claims, judgment shall enter in favor of the defendant and against the plaintiffs. The Clerk shall **close this case**.

58

**IT IS SO ORDERED.**

**DATED** this 15th day of July, 2019.

_____
Leonard T. Strand, Chief Judge

59