# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF IOWA
### CEDAR RAPIDS DIVISION

| | |
|---|---|
| CATHY SELLARS, CLAUDIA LOPEZ, LESLIE FORTUNE, SCHEAVELLA CORLEY, and SIERREA FULLER, On behalf of themselves and all others similarly situated,<br><br>       Plaintiffs,<br><br>vs.<br><br>CRST EXPEDITED, INC.,<br><br>       Defendant. | No. 1:15-cv-00117-LTS-KEM<br><br><br>ANSWER TO FIRST AMENDED COMPLAINT and AFFIRMATIVE DEFENSES |

Defendant, CRST Expedited, Inc. ("CRST"), by and through its undersigned counsel, hereby answers and defends Plaintiffs' First Amended Complaint as follows:

## I. JURISDICTION AND VENUE

1.      This Court has subject matter jurisdiction over Plaintiffs' claims pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. Sec. 2000e-5(f), pursuant to 28 U.S.C. Sec. 1331 and 1343(a)(4), and pursuant to the California Fair Employment and Housing Act, Government Code Sec. 12940, *et seq*.

**ANSWER: Paragraph 1 of the First Amended Complaint ("Complaint") calls for a conclusion of law and no response is required. To the extent a response is required, CRST admits that Plaintiffs have alleged claims in this action under the Title VII of the Civil Rights Act of 1964, 42 U.S.C. Sec. 2000e-5(f), 28 U.S.C. Sec. 1331 and 1343(a)(4), and the California Fair Employment and Housing Act, Government Code Sec. 12940, *et seq.*, but CRST denies those claims.**

2.     Venue is proper pursuant to 42 U.S.C. Sec. 2000e-5(f)(3) because the unlawful practices alleged herein were committed in part within this judicial district, and because Plaintiffs would have worked in this judicial district but for the alleged unlawful employment practices.

**ANSWER: Paragraph 2 of the Complaint calls for a conclusion of law and no response is required. To the extent a response is required, CRST admits that venue is proper in this judicial district. CRST denies the remaining allegations in Paragraph 2.**

## II.  NATURE OF THIS ACTION

3.     Plaintiffs Cathy Sellars, Claudia Lopez, Leslie Fortune, Scheavella Corley, and Sierrea Fuller (hereinafter, "Class Representatives") file this Complaint as a class action against CRST Expedited, Inc. ("CRST"), a long-haul transportation company and wholly owned subsidiary of CRST International.  Female truck drivers at CRST are subjected to discrimination on the basis of their sex, including a hostile work environment on the basis of sex, and retaliation as a result of protected activity, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e et seq., and the California Fair Employment and Housing Act, Government Code Sec. 12940, *et seq.*

**ANSWER: In answer to Paragraph 3 of the Complaint, CRST admits that Plaintiffs filed its Complaint against CRST and that CRST is a long-haul transportation company and wholly owned subsidiary of CRST International Holdings, LLC. CRST denies the remaining allegations in Paragraph 3.**

4.     The Class Representatives seek to represent a class comprised of presently and formerly employed female over-the-road truck drivers for CRST who have been subjected to one or more aspects of the systemic gender discrimination described in this Complaint,

including but not limited to:

a)      Hostile work environment harassment based on sex; and

b)      Retaliation for complaining about harassment in the workplace.

The systemic gender discrimination described in this Complaint has been, and is, continuing in nature.

**ANSWER: In answer to Paragraph 4 of the Complaint, CRST admits that the named plaintiffs seek to represent a class of CRST female truck drivers who were allegedly subjected to retaliation. CRST denies the remaining allegations in Paragraph 4.**

5.      The Class Representatives seek to represent a sub-class comprised of presently and formerly employed female over-the-road truck drivers for CRST who worked in California and have been subjected to one or more aspects of the systemic gender discrimination described in this Complaint, including but not limited to:

a)      Hostile work environment harassment based on sex; and

b)      Retaliation for complaining about harassment in the workplace.

**ANSWER: In answer to Paragraph 5 of the Complaint, CRST admits that the named plaintiffs had sought to represent a sub-class of CRST female truck drivers who worked in California and were allegedly subjected to gender discrimination. CRST denies the remaining allegations in Paragraph 5.**

6.      Scheavella Corley and Sierrea Fuller (the "Post-2015 Retaliation Sub-Class Representatives") seek to represent a sub-class comprised of presently and formerly employed female over-the-road truck drivers for CRST who complained about sexual harassment and were removed from their trucks as a result at any time between CRST's

institution of HR Layover Pay in July 2015 through the end of the class period.

**ANSWER: In answer to Paragraph 6 of the Complaint, CRST admits that the named plaintiffs are seeking to represent a sub-class comprised of presently and formerly employed female over-the-road truck drivers for CRST from July 2015 forward. CRST denies the remaining allegations in Paragraph 6.**

7.     The Class Representatives are seeking, on behalf of themselves and the class they seek to represent, declaratory and injunctive relief; back pay; front pay; compensatory and punitive damages; and attorneys' fees, costs and expenses to redress CRST's pervasive, discriminatory employment policies, practices and/or procedures.

**ANSWER: In answer to Paragraph 7 of the Complaint, CRST admits that the named plaintiffs are seeking damages from CRST on behalf of themselves and the class they seek to represent. CRST denies the remaining allegations in Paragraph 7.**

### III. PARTIES

**A.     Plaintiffs**

8.     Cathy Sellars is a woman and a resident of Fort Walton Beach, Florida. She was employed by CRST from December 2013 to January 2015 as a truck driver. She attended training classes in Riverside, California.

**ANSWER: CRST admits the allegations in Paragraph 8 of the Complaint.**

9.     Claudia Lopez is a woman and a resident of Lakeland, Florida. She was employed by CRST from May 2014 to January 2015 as a truck driver. She attended training classes in Waterloo, Iowa.

**ANSWER: CRST admits the allegations in Paragraph 9 of the Complaint.**

10.     Leslie Fortune is a woman and a resident of St. Louis, Missouri. She was

employed by CRST from October 2013 to January 2015 as a truck driver. She attended training classes in Cedar Rapids, Iowa.

**ANSWER: CRST admits the allegations in Paragraph 10 of the Complaint.**

11.     Scheavella Corley is a woman and a resident of Tampa, Florida. She was employed by CRST from December 2015 to December 2016 as a truck driver.

**ANSWER: CRST admits the allegations in Paragraph 11 of the Complaint.**

12.     Sierrea Fuller is a woman and a resident of Philadelphia, Pennsylvania. She was employed by CRST from September 2017 to November 2017 as a truck driver.

**ANSWER: CRST admits the allegations in Paragraph 12 of the Complaint.**

**B.     Defendant**

13.     CRST Expedited, Inc. is a long-haul trucking company headquartered in Cedar Rapids, Iowa, with driver terminals in Riverside, California; Oklahoma City, Oklahoma; and Carlisle, Pennsylvania. It is a subsidiary of CRST International.

**ANSWER: CRST admits the allegations in Paragraph 13 of the Complaint.**

14.     Defendant is an employer for the purposes of Title VII and the California Fair Employment and Housing Act.

**ANSWER: Paragraph 14 of the Complaint calls for a conclusion of law and no response is required. To the extent a response is required, CRST admits it is an employer.**

## IV. PROCEDURAL HISTORY

15.     Class representative Cathy Sellars filed a Charge of Discrimination against CRST with the Equal Employment Opportunity Commission ("EEOC") on August 8, 2014, and filed an Amended Charge on November 28, 2014, both on behalf of herself and a class

of similarly situated persons. The charges were dual-filed with the California Department of Fair Employment and Housing ("DFEH"). Class Representative Claudia Lopez timely filed a Charge of Discrimination with the EEOC and DFEH on behalf of herself and a class of similarly situated persons. Class Representative Leslie Fortune timely filed a Charge of Discrimination with the EEOC and DFEH on behalf of herself and a class of similarly situated persons.

**ANSWER: CRST admits the allegations in Paragraph 15 of the Complaint.**

16.      Class Representatives Sellars, Fortune and Lopez received Notices of Right to Sue from the EEOC. They timely filed this lawsuit.

**ANSWER: CRST admits the allegations in Paragraph 16 of the Complaint.**

17.      Class Representatives Sellars, Fortune and Lopez received Notices of Right to Sue from the DFEH. They timely filed this lawsuit.

**ANSWER: CRST admits that Sellars, Fortune, and Lopez received Notices of Right to Sue from the DFEH and timely filed their allegations. CRST denies the balance of the allegations of Paragraph 17.**

## V.  CLASS CLAIMS

### A.    CRST's Organizational Structure and Driver Training Program

18.      CRST Expedited, Inc. ("CRST") is a long-haul transportation company that employs over-the-road truck drivers, who transport and deliver loads around the country in teams of two.

**ANSWER: CRST admits the allegations in Paragraph 18 of the Complaint.**

19.      CRST is headquartered in Cedar Rapids, Iowa, and its President is Cameron Holzer.

**ANSWER: CRST admits its headquarters are in Cedar Rapids, Iowa, and denies the balance of the allegations of Paragraph 19 of the Complaint.**

20.     One Human Resources office, located in Cedar Rapids, serves all CRST drivers. Its head is Karen Carlson, Human Resources manager.

**ANSWER: In answer to Paragraph 20, CRST admits that its Human Resources office is located in Cedar Rapids and that Karen Carlson is a CRST Employee Relations Manager. CRST denies the remaining allegations in Paragraph 20 of the Complaint.**

21.     All CRST drivers are subject to the same set of Human Resources policies.

**ANSWER: CRST admits the allegations in Paragraph 21 of the Complaint.**

22.     All CRST truck drivers receive their instructions from dispatchers, also known as fleet managers, all located in a single office in Cedar Rapids.

**ANSWER: CRST admits the allegations in Paragraph 22 of the Complaint.**

23.     CRST terminals are located in Riverside, California; Oklahoma City, Oklahoma; Carlisle, Pennsylvania; and Cedar Rapids, Iowa.  Each terminal has a manager. The Carlisle and Oklahoma City terminals are more like garages or warehouses. Unlike Riverside and Cedar Rapids, they do not have offices and living accommodations for trainers, drivers and trainees.

**ANSWER: CRST generally admits the allegations in Paragraph 23 of the Complaint.**

24.     Drivers begin and end their trips (or "runs") at the four terminals, and spend time at the terminals while they are waiting to be paired with new co-drivers.  All drivers may stop at any and all of the four terminals depending on what route they have been assigned to drive at that particular time.

**ANSWER: In answer to Paragraph 24, CRST denies that trips always begin and end at CRST's terminals and states that trips generally begin and end at a customer's place of business. CRST admits the allegations in Paragraph 24 of the Complaint generally describe a potential situation for CRST drivers, but denies that these allegations are true for each and every CRST driver on each and every trip or assignment.**

25.     Drivers may live at the terminals for limited periods from time to time.  For example, the terminal in Riverside, California has dorms, a cafeteria, and facilities for driver training classes.

**ANSWER: In answer to Paragraph 25, CRST denies drivers "live" at its terminals. CRST generally admits that drivers occasionally stay at the terminals for limited periods of time and admits the remaining allegations in Paragraph 25 of the Complaint.**

26.     New truck drivers enter CRST's training program.  Drivers first attend approximately two weeks of classes, held either at one of the driver terminals, or at an affiliated community college site.

**ANSWER: In answer to Paragraph 26, CRST admits that drivers without experience typically enter the CRST sponsored Driver Training Program, which requires driver training at an educational facility. CRST denies that these allegations are true for each and every new CRST driver and denies the remaining allegations in Paragraph 26 of the Complaint.**

27.     After completing the classes, trainees are paired with a truck driver trainer, also referred to as a "lead driver," and go out on the road, where CRST published rules

require 28 days of driving instruction.

**ANSWER: CRST generally admits the allegations in Paragraph 27 of the Complaint.**

28.     Eligibility requirements to work as a trainer, published in CRST's Employee Handbook, do not include the requirement that the trainer has not engaged in harassment in the past.

**ANSWER: CRST denies the allegations in Paragraph 28 of the Complaint.**

29.     During training, the trainer's dispatcher also serves as the dispatcher for the trainer's trainee.

**ANSWER: CRST admits the allegations in Paragraph 29 of the Complaint.**

30.     The trainer provides instruction, and documents the trainee's driving skills in such tasks as shifting, backing, parallel parking, and other maneuvers.  The trainer produces this documentation to CRST at the conclusion of the over-the-road training period.  The trainer's recommendation and documentation are the basis of CRST's decision whether the trainee passes the training.

**ANSWER: In answer to Paragraph 30, CRST admits that it expects its lead drivers to provide instruction and evaluate the student driver's driving skills. CRST denies the remaining allegations in Paragraph 30 of the Complaint.**

28.     Trainees earn significantly less pay than drivers who have completed their training.

**ANSWER: In answer to Paragraph 31, CRST admits student drivers are paid less per mile during their training period than drivers who have completed their training. CRST denies the remaining allegations in Paragraph 31 of the Complaint.**

32.     Trainees are required to enter into an eight month contract to drive upon completion of training.  The cost of training, several thousand dollars, is forgiven by CRST only if the trainee fulfills her eight month contract.  When she is sexually assaulted during training, or during her time as a co-driver prior to the completion of the eight months, her choice is to remain at CRST and endure the sexual abuse; report it, continue to endure it due to CRST's indifference to complaints, and suffer retaliation; or quit, owe CRST thousands of dollars, and potentially be sued for payment.  When women sue CRST due to sexual harassment, CRST is known to counterclaim to recover the cost of training.

**ANSWER: In answer to Paragraph 32, CRST admits that drivers in CRST's sponsored Driver Training Program may also enter into an Employment Contract agreeing to work in exchange for CRST advancing the cost of the driver's training. CRST denies the remaining allegations in Paragraph 32 of the Complaint.**

33.     Truck drivers make all runs in pairs.  Each driver has a 12 hour shift "on" followed by 12 hours "off," while their partner drives, so that the vehicle is stopped for significantly less time than it would be with only a single driver.

**ANSWER: CRST admits that its drivers typically make runs in pairs with each driver taking turns at driving, but denies that these allegations are true for each and every CRST driver on each and every run and further denies the remaining allegations in Paragraph 33 of the Complaint.**

34.     During their "off" time in transit, drivers sleep in the truck.  Each truck has a sleeper berth containing bunk beds.  For safety reasons, drivers are only permitted to sleep on the bottom bunk while the truck is in motion.  When the truck is stopped for a more extended period, such as while waiting for the truck's next load to be ready for shipment, the

drivers may sleep simultaneously and use both bunks.

**ANSWER: CRST admits the allegations in Paragraph 34 of the Complaint generally describe a typical situation for CRST drivers, but denies that these allegations are true for each and every CRST driver on each and every trip or assignment.**

35.    Drivers work for three weeks, and then are off for a fourth week.

**ANSWER: CRST admits the allegations in Paragraph 35 of the Complaint generally describe a typical situation for CRST drivers, but denies that these allegations are true for each and every CRST driver on each and every trip or assignment.**

36.    Drivers are paid per mile driven.  During times they are not driving, drivers are not paid.

**ANSWER: CRST admits the allegations in Paragraph 36 of the Complaint insofar as drivers are generally paid per mile driven, but the balance of the allegations are denied.**

37.    CRST maintains a list of available co-drivers, with names and contact information, at all times.  When a driver does not currently have a partner, he or she can access this list and contact potential co-drivers.  The two then generally meet at a terminal before agreeing to drive together.  Drivers therefore generally work with multiple partners, and can re-encounter each other within the single pool of available co- drivers.

**ANSWER: In answer to Paragraph 37, CRST denies that the two drivers generally meet at a terminal before agreeing to drive together. The logistics and circumstances surrounding a pairing of co-drivers vary from situation to situation. CRST generally admits the remaining allegations in Paragraph 37 of the Complaint describe a potential situation for CRST drivers, but denies the situation is the same for**

**every driver.**

38.     A driver may choose to wait at the terminal for a particular co-driver to become available, however during the waiting time he or she will earn nothing.

**ANSWER: In answer to Paragraph 38, CRST admits drivers may wait for co-drivers at the terminal. CRST denies the remaining allegations in Paragraph 38 of the Complaint are true for every driver.**

39.     Each driver is assigned to a particular dispatcher.

**ANSWER: CRST admits the allegations in Paragraph 39 of the Complaint.**

40.     All trucks are equipped with the Qualcomm communication system. Qualcomm is a small computerized device, similar in appearance to a laptop, which drivers use to communicate with dispatchers.  Drivers sign in and out on the Qualcomm system when they make stops, similar to a timeclock.  They can type messages, analogous to a text message or email, and transmit them to dispatch.

**ANSWER: CRST admits the allegations in Paragraph 40 of the Complaint.**

41.     The Qualcomm system has a nightly outage, known to all drivers, from approximately 9-11pm.  If drivers send messages via Qualcomm during the down time, dispatch will not receive them until the system is back up.

**ANSWER: CRST denies the allegations in Paragraph 41 of the Complaint.**

**B.     CRST Has Maintained a Pattern or Practice of Discrimination**

43.     CRST's standard operating procedure is sex discrimination.  Sexual assaults and harassment have continued, and become more physical, because despite its knowledge of the harassment, CRST has done nothing that could be reasonably expected to stop it. As a consequence, it has gotten worse through the Named Plaintiffs' employment and up to the

present.

**ANSWER: CRST denies the allegations in Paragraph 43 of the Complaint.**

44.     For example, during driver Cinda Cianelli's employment with CRST from June 2013 to April 2014, she was subjected to sexual harassment by supervisors and co-drivers.  By way of example and not limitation, a co-driver repeatedly tried to convince her to have sex with him, and when she refused, he spread rumors throughout Riverside Terminal that she was filing a sexual harassment lawsuit against him.

**ANSWER: CRST denies the allegations in Paragraph 44 of the Complaint.**

45.     Ms. Cianelli was forced to carry knives to protect herself during her employment at CRST.

**ANSWER: CRST denies the allegations in Paragraph 45 of the Complaint for lack of information.**

46.     Driver Veronica Saur, who began working at CRST in January 2014, was subjected to repeated sexually offensive statements by her coworker, who also physically touched her with his feet.

**ANSWER: CRST denies the allegations in Paragraph 46 of the Complaint.**

47.     When Ms. Saur complained to Riverside Terminal Manager Alvin Hoggard, Hoggard told her there was no evidence her co-driver had done anything; in essence, discounting her own complaint as evidence of what had occurred.  He refused to listen to recordings she had made of her co-driver.

**ANSWER: CRST denies the allegations in Paragraph 47 of the Complaint.**

48.     Ms. Saur was also forced to carry a knife in order to protect herself while working at CRST.

**ANSWER: CRST denies the allegations in Paragraph 48 of the Complaint for lack of information.**

C. **Continuation of the Pattern or Practice of Sexual Assaults on Women**

49.    CRST's policy of creating a hostile work environment begins in its training facilities. Male CRST drivers make offensive sexual comments and/or engage in sexually offensive behavior towards class members in the Terminals on a daily basis.

**ANSWER: CRST denies the allegations in Paragraph 49 of the Complaint.**

50.    In the Terminals, male drivers regularly proposition female drivers for sex, comment on their bodies, and discuss the appearance of women in the Terminal and what they did sexually with women.

**ANSWER: CRST denies the allegations in Paragraph 50 of the Complaint.**

51.    Trainers and Dispatchers regularly witness the Terminal Managers engaging in offensive sexual conduct—which violates CRST Rules—towards women drivers.

**ANSWER: CRST denies the allegations in Paragraph 51 of the Complaint.**

52.    By way of example, and not limitation, current Riverside, California Terminal Manager Alvin Hoggard (formerly Terminal Manager when the same terminal was instead located in Fontana, California) sexually harassed trainee Kathy VonHatten. Hoggard repeatedly sent her sexual text messages; told her he would "go back on the road" for her; and sexually assaulted her when she walked into his darkened office, running his hands over her and forcibly kissing her.

**ANSWER: CRST denies the allegations in Paragraph 52 of the Complaint.**

53.    As another example, Hoggard subjected driver Cinda Cianelli to sexually offensive behavior including, but not limited to, the following: repeatedly requesting that she

have sex with him; making sexually offensive statements, such as telling her in reference to Cianelli's male friend: "my penis is as big as his;" and showing her an image of his genitals. Safety officer Brian Hairston made senior management aware of the fact that Hoggard had shown Cianelli this image. Following these events, Hoggard remained in his role as Terminal Manager.

**ANSWER: CRST denies the allegations in Paragraph 53 of the Complaint.**

54.     When CRST supervisors who work in the Terminals, including Terminal Managers, engage in sexual harassment, it gives license to subordinate supervisors, on down to Trainers, to do the same.

**ANSWER: CRST denies the allegations in Paragraph 54 of the Complaint.**

55.     When Terminal Managers, Dispatchers, the Head of Human Resources— essentially everyone at CRST with the responsibility and ability to stop sexual assault and sexual harassment—have actual knowledge of the illegal conduct, because they are present and able to hear the comments, which are openly made in common areas, or because it is repeated, reliably reported, over a period of decades, it is a reasonable inference that CRST intentionally chooses not to address the illegality, and therefore intentionally seeks the result of its indifference.

**ANSWER: CRST denies the allegations in Paragraph 55 of the Complaint.**

56.     While on the road, class members have to fend off or worry about rape by their trainer, while enduring express threats of being failed, while being objectified and told to perform sex acts.

**ANSWER: CRST denies the allegations in Paragraph 56 of the Complaint.**

57.     Driver Service Manager Ben Lafayette was aware of multiple male trainers

who tried to be paired with female students, to get the opportunity to try to have sex with the students. By way of example but not limitation, Lafayette spoke with the Terminal Manager of Cedar Rapids Terminal about a trainer who was trying to have sex with a female trainee. The Terminal Manager told Lafayette it was not the first time the trainer had done so. Lafayette told the Terminal Manager that he should stop the trainer from doing it. The Terminal Manager replied "we talked to him, but it's not serious."

**ANSWER: CRST denies the allegations in Paragraph 57 of the Complaint.**

58. Male CRST drivers and trainers regularly physically touch class members on intimate body parts, intentionally expose themselves, repeatedly attempt to get into their sleeping bunk with them, masturbate in front of them or in the same cab, show them pornography, engage in other sexually offensive conduct, including making other sexually offensive statements.

**ANSWER: CRST denies the allegations in Paragraph 58 of the Complaint.**

59. When female drivers refuse to have sex with them, male drivers retaliate, including but not limited to by kidnapping them, kicking them off shared trucks, making false reports of misconduct, threatening them with weapons, beating them or threatening beatings, spreading rumors they are prostitutes, preventing them from contacting CRST for assistance, and refusing to assist them with work-related tasks.

**ANSWER: CRST denies the allegations in Paragraph 59 of the Complaint.**

60. Plaintiffs and other class members have frequently complained to their fleet managers, Human Resources, Safety, and upper management about this sexually offensive conduct and speech, both verbally and in writing.

**ANSWER: In answer to Paragraph 60, CRST admits that it has received**

complaints from Plaintiffs and other female drivers. CRST denies the remaining allegations in Paragraph 60 of the Complaint.

61.     Safety officer Brian Hairston gave a safety class for trainees. He received complaints from Plaintiff Leslie Fortune on three occasions.  On each occasion he directed her to write a statement, and personally gave it to Alvin Hoggard, Riverside Terminal Manager. In addition, the written complaints were scanned and sent to Human Resources. In response to these complaints, Hoggard told Hairston not to speak to Ms. Fortune anymore, and told him that she was "crazy" and "does not have what it takes." Hairston responded that "She has done good in class, so she seems reasonable." Hoggard responded that "you need that log, you may have to give a deposition on her."

**ANSWER: In answer to Paragraph 61, CRST admits Brian Hairston gave a safety class for student drivers, that he received complaints from Leslie Fortune and submitted the complaints to Human Resources. CRST denies the remaining allegations in Paragraph 61 of the Complaint.**

62.     Hairston received written complaints of sexual harassment from other drivers and always scanned them, sent them to Human Resources, and made sure that the originals went to "Document Control."

**ANSWER: In answer to Paragraph 62, CRST admits Brian Hairston received complaints from drivers and submitted the complaints to Human Resources. CRST denies the remaining allegations in Paragraph 62 of the Complaint for lack of information.**

63.     By way of further example, Ben Lafayette, Driver Service Manager, received complaints from female drivers who had been harassed, and received reports by male drivers

that they had witnessed women being harassed by drivers or trainers.

**ANSWER: In answer to Paragraph 63, CRST admits Ben Lafayette received complaints from drivers. CRST denies the remaining allegations in Paragraph 63 of the Complaint for lack of information.**

64.     Lafayette observed that managers tried to avoid addressing complaints of sexual harassment, and he had to work to try to convince managers that such complaints were serious and needed to be addressed.  Driver managers would often state that the complaining female driver was the problem.

**ANSWER: CRST denies the allegations in Paragraph 64 of the Complaint.**

65.     By way of example but not limitation, a scared female driver called Lafayette from a truck that she wanted to get off of immediately.  Her male co-driver had touched her without her consent while she was sleeping.  He was sitting beside her during the call so that she could not talk freely.  Management asked the female driver to stay on the truck longer, even though Lafayette recommended against it.  When he followed up with the female driver, she was still on the truck.

**ANSWER: CRST denies the allegations in Paragraph 65 of the Complaint for lack of information.**

66.     By way of example but not limitation, Hairston received calls from Cinda Cianelli, Veronica Saur, Lindsey Raphael and McKinsey [LNU], complaining of sexual assault and/or sexual harassment. Hairston had been the safety trainer. McKinsey and Saur knew him from interaction at the Riverside terminal.

**ANSWER: In answer to Paragraph 66, CRST admits Hairston received complaints from female drivers. CRST denies the remaining allegations in Paragraph 66**

of the Complaint for lack of information.

67.     McKinsey called Hairston surreptitiously during a period when she was being assaulted. Hairston told her to call the police. He personally tried to contact the CRST 800 number but it was not answered. He had been given no other resource by CRST. He called everyone he thought could help from a staff list, but many people no longer worked there due to high turnover. He finally reached Bill Sin on his personal home phone, and told him that McKinsey was being accosted at Cedar Rapids. Human Resources did not terminate the attacker.

**ANSWER: In answer to Paragraph 67, CRST admits Hairston received a complaint from McKinsey and that he spoke to Bill Sin regarding the complaint. CRST denies the remaining allegations in Paragraph 67 of the Complaint for lack of information.**

68.     Veronica Saur called Hairston from northern California and reported that she had been assaulted. He told her to call the police. Dispatch would not authorize a car rental or hotel, initially, to move her from where she got off the truck, to safety.

**ANSWER: In answer to Paragraph 68, CRST admits Hairston received a complaint from Saur. CRST denies the remaining allegations in Paragraph 68 of the Complaint for lack of information.**

69.     Plaintiffs and other class members have been forced to carry, sleep with and use weapons such as tasers, knives, and screwdrivers for personal protection from their male co-drivers, due to CRST's intentional failure to protect them from sexual assault.

**ANSWER: CRST denies the allegations in Paragraph 69 of the Complaint.**

**D.     CRST's "No Females" Policy and Ineffective Anti-Discrimination Efforts**

70.     CRST has a pattern or practice of ignoring and/or failing to act promptly to investigate harassment complaints, conducting inadequate investigations, which are biased against finding any violation, failing to make any finding as to whether harassment has occurred and removing complaining female drivers or trainees from its trucks, but allowing male drivers against whom harassment complaints have been made to continue driving, earning money, and working with additional co-drivers, unaffected by the complaint, while any alleged investigation takes place

**ANSWER: CRST denies the allegations in Paragraph 70 of the Complaint.**

71.     CRST has a pattern or practice of returning men who have engaged in harassment to the trucks, with the foreseeable consequence that they sexually assault and/or harass additional women.

**ANSWER: CRST denies the allegations in Paragraph 71 of the Complaint.**

72.     When there is a finding of discrimination following a harassment complaint, CRST fails to implement any effective disciplinary or other deterrent or corrective measures.

**ANSWER: CRST denies the allegations in Paragraph 72 of the Complaint.**

73.     When there is a finding of discrimination following a harassment complaint, CRST has a policy of designating a male driver as "no females" for a period of six months. This means the driver cannot drive with female co-drivers for six months, after which he can again work with any co-driver in the pool.  The "no females" designation can be appealed. Female drivers are not told which male co-drivers have been designated "no females."

**ANSWER: In answer to Paragraph 73, CRST admits that, depending upon the situation, certain drivers found to have engaged in harassment or discrimination are designated as not being able to drive with females. CRST denies the remaining**

**allegations in Paragraph 73 of the Complaint.**

74. CRST's "no females" policy is not disciplinary. It does not affect male drivers' pay, their prospects for promotion, or continued employment.

**ANSWER: CRST denies the allegations in Paragraph 74 of the Complaint.**

75. It is common knowledge among CRST trainers, drivers, and the trucking industry, that CRST is often said to stand for "Constantly Raping Student Truckers."

**ANSWER: CRST denies the allegations in Paragraph 75 of the Complaint.**

76. CRST's "no females" policy encourages male drivers' widely held belief that having a female co-driver or trainee entitles them to ask for sexual favors from her, because there are no disciplinary consequences for sexual assault or harassment. It effect, all CRST does is take away the perk, when a trainer is reported, and then only temporarily. That decision can be immediately appealed, and is itself sometimes not enforced. Six months of "no females" is considered a modest price to pay by male trainers, for an opportunity to coerce sex on the job.

**ANSWER: CRST denies the allegations in Paragraph 76 of the Complaint.**

77. CRST has a policy of allowing trainers' recommendations to determine whether trainees pass their training, resulting in trainers demanding sexual favors as a condition of passing the training. CRST management is aware, and in fact it is common knowledge, that male trainers frequently demand and receive sexual favors in return for passing trainees, and that male trainers sexually assault and sexually harass female trainees.

**ANSWER: CRST denies the allegations in Paragraph 77 of the Complaint.**

78. CRST has a pattern or practice of requiring female trainees to train over-the-road for more than 28 days because of interruptions to their training from harassment,

which results in lower pay than they would have received had they been able to timely complete their training.

**ANSWER: CRST denies the allegations in Paragraph 78 of the Complaint.**

**E.      Retaliation Against Female Drivers on the Basis of their Complaints**

79.      CRST maintains a pattern or practice of retaliating against the Named Plaintiffs and members of the proposed class for opposing sexual harassment by taking action against workers who complain about sex discrimination, including but not limited to: requiring a female driver who has complained of harassment to leave the truck and allowing her male co-driver to continue onward, even if the woman had been using the truck first before the accused harasser joined her as co-driver; requiring women who have been removed from trucks following a harassment complaint to pay out of pocket to remain in a hotel, without advancing payment for the accommodations; requiring women who have been removed from trucks following a harassment complaint to wait in place to be picked up by a company truck, sometimes for as long as a week, during which time they can earn nothing; failing to take any action to pair women removed from trucks following harassment complaints with a new co-driver, forcing them to wait and earn nothing while seeking a new co-driver; where a female trainee has complained of harassment by her male trainer, prolonging her training beyond 28 days, resulting in much less pay than she would have earned during that period had she completed her training free from harassment; continuing to provide the names and contact information of women who have made harassment complaints to the entire pool of potential co- drivers, including men about whom they complained.

**ANSWER: CRST denies the allegations in Paragraph 79 of the Complaint.**

80.     For example, Driver Service Manager Ben Lafayette was aware that the "remedy" for female drivers' harassment complaints was to remove her from the truck, often far from any landmarks, causing her to stop earning money. This served as a deterrent against female drivers complaining about harassment.

**ANSWER: CRST denies the allegations in Paragraph 80 of the Complaint.**

81.     CRST has a pattern or practice of condoning known retaliatory actions taken against female drivers who complain about harassment, such as male employees kidnapping them, physically assaulting them, brandishing weapons, threatening them with physical harm, photographing and making video recordings of them, and/or spreading rumors they are prostitutes.

**ANSWER: CRST denies the allegations in Paragraph 81 of the Complaint.**

82.     CRST's retaliatory actions deterred members of the proposed class from complaining about sexual harassment.

**ANSWER: CRST denies the allegations in Paragraph 82 of the Complaint.**

## VI.  CLASS ACTION ALLEGATIONS

### A.     Class Definition

83.     Plaintiffs bring this action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of themselves and on behalf of a class of all women who are or were employed as truck drivers at any time during the class period. Each of the Class Representatives is a member of the class.

**ANSWER: In answer to Paragraph 83, CRST admits that Plaintiffs seek to maintain this action under Rule 23 of the Federal Rules of Civil Procedure. CRST denies the prerequisites for class certification are satisfied and further denies the remaining**

allegations in Paragraph 83 of the Complaint.

84.    The class consists of all women who are, or have been, employed by CRST as truck drivers and have experienced gender discrimination at any time during the applicable liability period.  Upon information and belief, there are more than 100 members of the proposed class.

**ANSWER: In answer to Paragraph 84, CRST admits that Plaintiffs seek to maintain a class of CRST truck drivers.  CRST denies the prerequisites for class certification are satisfied and further denies the remaining allegations in Paragraph 84 of the Complaint.**

85.    Plaintiffs additionally bring this action on behalf of themselves and a subclass of all women who are or were employed as truck drivers and experienced gender discrimination in California during the class period.  Each of the Class Representatives is a member of the California Subclass.

**ANSWER: CRST denies the allegations in Paragraph 85 of the Complaint.**

86.    The California Subclass consists of all women who are, or have been, employed by CRST as truck drivers and have experienced gender discrimination in California at any time during the applicable liability period.  Upon information and belief, there are more than 100 members of the proposed subclass.

**ANSWER: CRST denies the allegations in Paragraph 86 of the Complaint.**

87.    The Post-2015 Retaliation Subclass consists of all women who are, or have been, employed by CRST as truck drivers and were removed from their trucks as a result of making sexual harassment complaints at any time between CRST's institution of HR Layover Pay in 2015 and the end of the class period. There are over 60 members of this

proposed subclass.

**ANSWER: In answer to Paragraph 87, CRST admits that Plaintiffs seek to maintain a class of CRST truck drivers from July 2015 forward, but CRST denies the prerequisites for class certification are satisfied and further denies the remaining allegations in Paragraph 87 of the Complaint.**

B.     **Numerosity and Impracticability of Joinder**

88.     The members of the classes are sufficiently numerous that joinder of all members is impracticable.  Plaintiffs are informed and believe that the proposed Post- 2015 Retaliation Subclass consisted of more than 60 women during the liability period and that the other classes consisted of more than 100 women during the liability period.

**ANSWER: The allegations in Paragraph 88 call for a conclusion of law and no response is required. To the extent a response is required, the allegations are denied.**

C.     **Common Questions of Law and Fact**

89.     The prosecution of the claims of the Class Representatives will require the adjudication of numerous questions of law and fact common to both their individual claims and those of the proposed classes they seek to represent.  The overarching common question for each class member is: why was I treated differently by CRST than male drivers. Plaintiffs expect that the evidence will demonstrate that the common answer in each case is: bias against women.

**ANSWER: The allegations in Paragraph 89 call for a conclusion of law and no response is required. To the extent a response is required, the allegations are denied.**

90.     The common questions of law include, *inter alia:* (a) whether CRST has engaged in unlawful, systemic sexual harassment of its female drivers; (b) whether CRST

has unlawfully retaliated against female employees for complaining about gender discrimination; (c) whether CRST is liable for a continuing systemic violation of Title VII; and (d) a determination of the proper standards for proving a pattern and/or practice of discrimination by CRST against its female drivers.

**ANSWER: The allegations in Paragraph 90 call for a conclusion of law and no response is required. To the extent a response is required, the allegations are denied.**

91.     The common questions of fact would include, *inter alia*: whether, through its policies, practices and/or procedures: (a) CRST has maintained a hostile work environment based on gender among its female drivers; (b) CRST has subjected female drivers to sexual harassment and/or a sexually hostile work environment; (c) CRST has a policy or practice of retaliating against women for complaining about the gender discrimination described in (a) and (b) above; (d) senior CRST managers and Human Resources personnel were aware of the sexual harassment and gender discrimination; (e) CRST has engaged in a pattern or practice of failing to take prompt and effective action to remedy the pervasive sexual harassment of female drivers; and (f) whether injunctive relief and punitive damages are warranted.

**ANSWER: The allegations in Paragraph 91 call for a conclusion of law and no response is required. To the extent a response is required, the allegations are denied.**

92.     The employment policies, practices and/or procedures to which the Class Representatives and the class members are subject, are set or approved at CRST Expedited, Inc. corporate level and apply universally to all class members.    These employment policies, practices and/or procedures are not unique or limited to particular CRST terminals or specific fleet managers; rather, the policies and practices that give rise to and

perpetuate the hostile work environment based on sex apply to all female drivers and trainees. The discriminatory policies, practices, and/or procedures therefore affect the Class Representatives and proposed class members no matter which routes they drive.

**ANSWER: CRST denies the allegations in Paragraph 92 of the Complaint.**

93.     Discrimination in the form of a hostile work environment occurs as a pattern or practice in all CRST Terminals and along all drivers' routes and affects the Class Representatives and the members of the classes in the same way. Male drivers and trainers engaged or engage in in various forms of the following conduct: propositioning class members for sex, requesting sex as a condition of passing driver training, sexually assaulting class members, threatening them with rape and/or assault, physically touching them on intimate body parts, intentionally exposing themselves, repeatedly attempting to get into bed with class members, commenting sexually on their bodies, masturbating in front of them, showing them pornography, and making other sexually offensive statements; and have otherwise created a working environment hostile to female employees.

**ANSWER: CRST denies the allegations in Paragraph 93 of the Complaint.**

**D.      Typicality of Claims and Relief Sought**

94.     The claims of the Class Representatives are typical of the claims of the proposed classes. Class Representatives Sellars, Lopez, and Fortune assert claims in each of the categories of claims they assert on behalf of the proposed classes, and Class Representatives Scheavella Corley and Sierra Fuller assert the same category of claims as those they assert on behalf of the Post-2015 Retaliation Subclass. The relief sought by the Class Representatives for gender discrimination complained of herein is also typical of the relief sought on behalf of the proposed classes.

**ANSWER: The allegations in Paragraph 94 call for a conclusion of law and no response is required. To the extent a response is required, the allegations are denied.**

95. The Class Representatives are, like the members of the proposed classes, all female truck drivers who have worked for CRST during the liability period.

**ANSWER: In answer to Paragraph 95, CRST admits the Plaintiffs are female truck drivers who worked for CRST. CRST denies the remaining allegations in Paragraph 95 of the Complaint.**

96. Several of the Class Representatives and members of the classes have complained about sexual harassment, including by informal and formal complaints to supervisors and managers up to and including Cameron Holzer, President of CRST, and to the current head of Human Resources, Karen Carlson. CRST's investigations into these complaints have been inadequate, and Class Representatives and class members have been affected in the same ways by CRST's failure to take adequate remedial measures to correct this pattern or practice of gender discrimination.

**ANSWER: In answer to Paragraph 96, CRST admits that certain Plaintiffs made complaints to CRST representatives. CRST denies the remaining allegations in Paragraph 96 of the Complaint.**

97. CRST has failed to create adequate incentives for its managers to comply with equal employment opportunity laws and has failed to adequately discipline its managers and other employees when they violate the anti-discrimination laws, which has affected the Class Representatives and the class members in similar ways.

**ANSWER: CRST denies the allegations in Paragraph 97 of the Complaint.**

98. Consequently, the claims alleged by the Class Representatives are typical of

the claims of the classes. Each plaintiff has worked as a truck driver for CRST during the class period and has been subjected to the discriminatory policies or practices alleged herein. The relief sought by the Class Representatives for gender discrimination is also typical of the relief which is sought on behalf of the proposed classes.

**ANSWER: The allegations in Paragraph 98 call for a conclusion of law and no response is required. To the extent a response is required, the allegations are denied.**

99. Moreover, the claims alleged by the Post-2015 Retaliation Subclass Representatives are typical of the claims of this subclass. Each plaintiff was removed from her truck as a consequence of complaining about sexual harassment during the period between CRST's institution of HR Layover Pay in 2015 and the end of the class period, and has been subjected to CRST's policy of failing to inform employees of the existence of HR Layover Pay prior to making any complaint. The relief sought by the Post-2015 Retaliation Subclass Representatives is also typical of the relief which is sought on behalf of the proposed subclass.

**ANSWER: The allegations in Paragraph 99 call for a conclusion of law and no response is required. To the extent a response is required, the allegations are denied.**

**E. Adequacy of Representation**

100. The Class Representatives' interests are co-extensive with those of the members of the proposed classes they seek to represent, and the Class Representatives will fairly and adequately represent and protect the interests of the classes. The Class Representatives seek to remedy CRST's discriminatory employment policies, practices and/or procedures so that women at CRST will not be subjected to a hostile environment, and will not be retaliated against for complaining about discrimination. The Class

Representatives are willing and able to represent the proposed classes fairly and vigorously as they pursue their individual claims.

**ANSWER: The allegations in Paragraph 100 call for a conclusion of law and no response is required. To the extent a response is required, the allegations are denied.**

F.      **Efficiency of Class Prosecution of Common Claims**

101.    Certification of a class and subclass of female employees similarly situated to the Class Representatives is the most efficient and economical means of resolving the questions of law and fact which are common to the claims of the Class Representatives and the proposed classes.  The individual claims of the Class Representatives require resolution of the common question of whether CRST has engaged in a systemic pattern and/or practice of gender discrimination against female employees.  The Class Representatives seek remedies to eliminate the adverse effects of such discrimination in their own lives, careers and working conditions and in the lives, careers and working conditions of the proposed class members, and to prevent continued gender discrimination in the future.  The Class Representatives have standing to seek such relief because of the adverse effect that such discrimination has had on them individually and on female employees of CRST generally. To gain such relief for themselves, as well as for the proposed class members, the Class Representatives will first establish the existence of systemic gender discrimination as the premise for the relief they seek. Without class certification, the same evidence and issues would be subject to re- litigation in a multitude of individual lawsuits with an attendant risk of inconsistent adjudications and conflicting obligations.  Certification of the proposed classes of females who have been affected by these common questions of law and fact is the most efficient and judicious means of presenting the evidence and arguments necessary to

resolve such questions for the Class Representatives, the proposed classes and CRST.

**ANSWER: The allegations in Paragraph 101 call for a conclusion of law and no response is required. To the extent a response is required, the allegations are denied.**

### G. Requirements of Rule 23(b)(2)

102. Claims for injunctive relief are properly maintainable under Federal Rule of Civil Procedure Rule 23(b)(2) because defendant has acted on grounds generally applicable to the Class Representatives and the proposed classes by adopting and following systemic policies, practices and/or procedures, which are discriminatory on the basis of gender, thereby making appropriate final injunctive relief or corresponding declarative relief with respect to the classes as a whole. Gender discrimination is standard operating procedure at CRST, rather than a sporadic occurrence. CRST has refused to act on grounds generally applicable to the classes by, *inter alia:* (a) refusing to provide a working environment which is free of gender hostility and sexual harassment; and (b) refusing to take effective measures to correct and remedy sexual harassment. CRST's systemic discrimination against female employees and its refusal to act on grounds that are not discriminatory have made appropriate the requested final injunctive and declaratory relief with respect to the classes as a whole.

**ANSWER: The allegations in Paragraph 102 call for a conclusion of law and no response is required. To the extent a response is required, the allegations are denied.**

103. Injunctive and declaratory relief are the predominant relief sought in this case because they are the culmination of the proof of CRST's individual and class-wide liability at the end of Stage I of a bifurcated trial and the essential predicate for the Class Representatives' and class members' entitlement to monetary and non-monetary remedies at

Stage II of such trial. Declaratory and injunctive relief flow directly and automatically from proof of the common questions of law and fact regarding the existence of systemic gender discrimination against female CRST drivers. Declaratory and injunctive relief are the factual and legal predicates for the Class Representatives' and the class members' entitlement to monetary and non-monetary remedies for individual losses caused by, and for exemplary purposes necessitated by, such systemic discrimination.

**ANSWER: The allegations in Paragraph 103 call for a conclusion of law and no response is required. To the extent a response is required, the allegations are denied.**

**H.      Requirements of Rule 23(b)(3) and Rule 23(c)(4)**

104.    Claims for monetary relief are properly certified under Rule 23(b)(3) because questions of law and fact common to the classes predominate over any questions affecting only individual members, and a class action is superior to other available methods for the fair and efficient adjudication of this case.

**ANSWER: The allegations in Paragraph 104 call for a conclusion of law and no response is required. To the extent a response is required, the allegations are denied.**

105.    Additionally, the cost of proving CRST's pattern or practice of discrimination against female drivers makes it impracticable for the Class Representatives and members of the proposed classes to pursue their claims individually.

**ANSWER: The allegations in Paragraph 105 call for a conclusion of law and no response is required. To the extent a response is required, the allegations are denied.**

106.    Alternatively, class-wide liability on the Title VII claims and punitive damages liability under the theories advanced in this action are properly certified under Rule 23(c)(4) because such claims present only common issues, the resolution of which would advance

the interests of the parties in an efficient manner.

**ANSWER: The allegations in Paragraph 106 call for a conclusion of law and no response is required. To the extent a response is required, the allegations are denied.**

I.     **Nature of Notice to the Proposed Classes Required**

107.    In accordance with Fed.R.Civ.P. 23(b)(3), class and subclass members must be furnished with the best notice practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort.  Plaintiffs are informed and believe that CRST computer records contain a last known address for class and subclass members.  Plaintiffs contemplate that individual notice be given to class and subclass members at such last known address by first class mail, informing them of the following:

> A. The pendency of the class action, and the issues common to the class; B. The nature of the action;
>
> C. Their right to "opt out" of the action within a given time, in which event they will not be bound by a decision rendered in the class action;
>
> D. Their right, if they do not "opt out," to be represented by their own counsel and enter an appearance in the case; otherwise, they will be represented by the named plaintiffs and their counsel; and
>
> E. Their right, if they do not "opt out," to share in any recovery in favor of the class, and conversely to be bound by any judgment on the common issues, adverse to the class.

**ANSWER: In answer to Paragraph 107, CRST admits that it has records of the last known address of its current and former drivers. The remainder of Paragraph 107**

calls for a conclusion of law and no response is required. To the extent a response is required, it is denied.

## VII. ALLEGATIONS OF NAMED PLAINTIFFS

**A.** **Cathy Sellars**

108. Cathy Sellars was hired by CRST in or about November 2013 as a truck driver.

**ANSWER: CRST admits the allegations in Paragraph 108 of the Complaint.**

109. Ms. Sellars fulfilled her obligation to complete two weeks of training classes at the Riverside, California terminal in or about December 2013.

**ANSWER: In answer to Paragraph 109, CRST admits Ms. Sellars attended training in Riverside, California. CRST denies the remaining allegations in Paragraph 109 of the Complaint.**

110. The vast majority of Ms. Sellars' trips over the course of her employment with CRST started or terminated at Riverside.

**ANSWER: In answer to Paragraph 110, CRST admits that many of Ms. Sellars' trips originated or terminated in Riverside, California. CRST denies the remaining allegations in Paragraph 110 of the Complaint.**

111. When she was at the Riverside terminal, Ms. Sellars daily heard men make offensive sexual remarks about women, including but not limited to comments about the way women's bodies were built, how they were dressed, and the attractiveness of women who were in the terminal. For example, men would tell Ms. Sellars "you have a nice ass, lady" or "I'd like to tap that ass."

**ANSWER: CRST denies the allegations in Paragraph 111 of the Complaint for**

**lack of information.**

112.    Ms. Sellars observed Alvin Hoggard, Riverside Terminal Manager, walking around the terminal and sitting in the cafeteria while such comments were openly being made at such volume that he would have heard them.

**ANSWER: CRST denies the allegations in Paragraph 112 of the Complaint for lack of information.**

113.    On her first day at the terminal, while Ms. Sellars was sitting in the cafeteria, Lydell Wilkerson approached her. Wilkerson, a trainer, was waiting at the terminal to be assigned a trainee. He could have been assigned to train Ms. Sellars.  He began telling Ms. Sellars what he wanted to do to her and with her sexually, including but not limited to saying he wanted to "go down on her" and "eat her."  Ms. Sellars quickly left the room.

**ANSWER: CRST denies the allegations in Paragraph 113 of the Complaint.**

114.    The following day, Ms. Sellars returned from class and was talking with Jay, another driver.  Wilkerson stared at them as they spoke.  Jay noticed Wilkerson staring. She asked Wilkerson what he wanted, at which point he approached to stand behind Ms. Sellars, and then left, when she explained that she was showing Jay pictures of her family.

**ANSWER: CRST denies the allegations in Paragraph 114 of the Complaint.**

115.    On or about December 3, 2013, around 8PM, Ms. Sellars walked out to the far back lot of the Riverside Terminal, where she had arranged to meet Anthony, who was the co-driver of Ms. Sellars's brother-in-law, Adolfo Armenta.  While she was walking and speaking to Armenta on the phone, Wilkerson suddenly grabbed Ms. Sellars's shoulder, spun her around to face him, and made several requests to the effect of, "why didn't you come lie down with me?  Why didn't you come to my truck and have sex with me?"  Surprised and

afraid, Ms. Sellars told Wilkerson he was "crazy" and to get away from her.

**ANSWER: CRST denies the allegations in Paragraph 115 of the Complaint.**

116. At Armenta's request, Anthony walked Ms. Sellars back to the terminal after their meeting, for her safety. When they reached the front doors, Wilkerson was inside, and he stared intimidatingly at Ms. Sellars.

**ANSWER: CRST denies the allegations in Paragraph 116 of the Complaint.**

117. The following day, Ms. Sellars approached the front desk at the terminal. Coworkers Dawn Mann and Victor Thomas, two injured drivers, were working the front desk. Ms. Sellars reported the sexual harassment to both of them. Dawn Mann has stated under oath:

> [C]o-worker Victor Thomas and I were working behind the front desk at the terminal. Ms. Sellars approached very upset, to report a fellow driver who was sexually harassing her, even when she asked him to stop. The next day the same driver continued to follow Ms. Sellars, making her extremely uncomfortable. I saw co-worker Victor Thomas escort Ms. Sellars to the terminal manager, Alvin Hoggard, to report the incident.

*See* Declaration of Dawn Mann, dated June 6, 2014, ¶4, attached as Exhibit A.

**ANSWER: CRST admits that Paragraph 117 of the Complaint is consistent with the declaration of Dawn Mann, attached to the Complaint. CRST denies the remaining allegations in Paragraph 117 for lack of information.**

118. Victor Thomas has stated under oath:

> I first met Cathy Sellars at CRST in December 2013. I met Ms. Sellars at the CRST terminal in Riverside, CA during her first week on the job. . . .

Ms. Sellars first experienced sexual harassment at CRST her first week. She told me that Lydell, one of the other driver's (sic), solicited her, telling her he wanted her to come to his truck to have sex with him. She told him no. . .

A day or two later, Lydell began following Ms. Sellars around outside. She told me this combined with the comments about having sex in his truck made her very uncomfortable. . . .

. . . .I went with Ms. Sellars to see Alvin [Hoggard], the terminal manager, so that she could file a complaint about what had happened. I was there as Ms. Sellars told Alvin exactly what she had told me, as described above.

*See* Declaration of Victor Thomas, dated September 30, 2014, ¶2-5, attached as Exhibit B.

**ANSWER: CRST admits that Paragraph 118 of the Complaint is consistent with the declaration of Victor Thomas, attached to the Complaint. CRST denies the remaining allegations in Paragraph 118 for lack of information.**

119. Ms. Sellars complained to Terminal Manager Hoggard about Wilkerson's conduct. Hoggard gave Ms. Sellars the phone number for Karen Carlson, CRST Human Resources Manager, but did not offer to document the complaint, or otherwise insure that it was properly reported. Ms. Sellars called Carlson that same day and complained about Wilkerson's sexually harassing statements and conduct. Carlson told Ms. Sellars she would investigate the situation and would report back to Ms. Sellars.

**ANSWER: In answer to Paragraph 119 of the Complaint, CRST admits Ms. Sellars complained to Mr. Hoggard who referred her to Karen Carlson. CRST further**

admits that Ms. Sellars contacted Ms. Carlson with her complaint and Ms. Carlson assured Ms. Sellars that she would investigate her complaint and report back. CRST denies the remaining allegations in Paragraph 119 of the Complaint.

120. Carlson never called Ms. Sellars back. When Ms. Sellars contacted Carlson to ask about the status of her complaint, Carlson told her not to worry about it and said it was none of her business.

**ANSWER: CRST denies the allegations in Paragraph 120 of the Complaint.**

121. Ms. Sellars subsequently learned that Wilkerson was still employed at CRST and had gone to another state to pick up another female trainee. CRST's lack of response made it clear to Ms. Sellars and others, that complaining about harassment was ineffective.

**ANSWER: CRST denies the allegations in Paragraph 121 of the Complaint.**

122. In or about January 2014, Ms. Sellars was assigned to be trained by Jesse Radford. In their first conversation, Radford made offensive sexual remarks to Ms. Sellars, including but not limited to telling her she had a "nice ass" and that he could "see where Lydell was coming from." Ms. Sellars warned Radford that she would not get on his truck if he believed anything sexual would happen between them. Radford agreed he would stop making sexual comments.

**ANSWER: In answer to Paragraph 122, CRST admits Ms. Sellars drove with Jesse Radford in January 2014. CRST denies the remaining allegations in Paragraph 122 of the Complaint.**

123. On her first night on Radford's truck, after they had shut down for the evening, Ms. Sellars and Radford watched a movie. During the movie, Radford reached under his covers and began masturbating. He quickly asked Ms. Sellars if she "wanted to

join him." She told him no. He then said, "are you sure?" Ms. Sellars replied "yes, I'm sure." Radford then reached toward Ms. Sellars and tried to touch her back. She quickly moved away and went up to the top bunk.

**ANSWER: CRST denies the allegations in Paragraph 123 of the Complaint.**

124. The following day, Radford was visibly angry with Ms. Sellars. After she was finished driving for the day, Ms. Sellars retired to the sleeper berth. Radford finished driving and shut down at about 9:30PM. He then came into the sleeper berth and approached Ms. Sellars.

**ANSWER: CRST denies the allegations in Paragraph 124 of the Complaint.**

125. Rudford began to pull Ms. Sellars's shirt off. She immediately began struggling, telling him to stop, but he was able to remove her shirt to the point where it was up to her head before she was able to pull her shirt back on and push him away. Ms. Sellars then fled again to the top bunk.

**ANSWER: CRST denies the allegations in Paragraph 125 of the Complaint.**

126. The following day, Ms. Sellars called dispatch and was connected with Alex Hinnenan, Radford's Fleet Manager. She complained to Hinnenan about Radford's assault and sexual harassment. Radford told Ms. Sellars that he had "known Jesse a while, and didn't think Jesse would do anything like that, but he'd take her off the truck anyway."

**ANSWER: In answer to Paragraph 126 of the Complaint, CRST admits Ms. Sellars complained to Alex Hinnenan. CRST denies the remaining allegations in Paragraph 126 of the Complaint.**

127. When she hung up with Hinnenan, Ms. Sellars called Carlson, Human Resources head. Carlson said she would "look into it," and that it was "her word against

his," (even though Carlson had not yet spoken with Radford), and "they'd have to go from there."

**ANSWER: In answer to Paragraph 127 of the Complaint, CRST admits Ms. Sellars contacted Karen Carlson who assured Ms. Sellars her complaint would be investigated. CRST denies the remaining allegations in Paragraph 127 of the Complaint.**

128.    Hinnenan arranged for Armenta to pick Ms. Sellars up in Elizabethtown, Kentucky, to transport her to the terminal in Oklahoma City. Ms. Sellars's training was interrupted, and she earned no pay during this time since she was not driving. Radford remained on the truck and continued on his route, making money.

**ANSWER: In answer to Paragraph 128 of the Complaint, CRST admits Hinnenan arranged transport for Ms. Sellars to Oklahoma City. CRST denies the remaining allegations in Paragraph 128 of the Complaint.**

129.    On or about February 10, 2014, Ms. Sellars met Dwain Monroe, who had been assigned as her trainer. While at Riverside Terminal Ms. Sellars, Monroe and Mann talked about their children and families. Ms. Sellars showed Monroe a picture of her daughter. Monroe then showed Ms. Sellars pictures on his cell phone, but after displaying a picture of his own daughter, he displayed pornographic photos of a couple. Ms. Sellars told him she "did not want to see that stuff," and Monroe told her it had been an accident.

**ANSWER: In answer to Paragraph 129 of the Complaint, CRST admits Ms. Sellars was assigned to lead driver Swain Monroe in February 2010. CRST denies the remaining allegations in Paragraph 129 of the Complaint.**

130.    Monroe then showed Ms. Sellars and Mann a video on his cell phone that he said he had made. In the video, Monroe was being tied up and held for ransom with a knife

by a stuffed reindeer and bear. Monroe then told Ms. Sellars he was "going to do that to her." He laughed and acted like he was kidding, so Ms. Sellars tried to brush it off as a joke.

**ANSWER: CRST denies the allegations in Paragraph 130 of the Complaint.**

131. Ms. Sellars began her training on Monroe's truck. On her second day of training, on the route between Hesperia and Barstow, CA, Monroe again told Ms. Sellars that he and his "friends" wanted to tie her up and "do things to her." She refused and told Monroe it was not going to happen.

**ANSWER: CRST denies the allegations in Paragraph 131 of the Complaint.**

132. Monroe became angry at Ms. Sellars. He told her she was annoying him and that she had better stop it, because she was "grinding his gears" and making him mad. He began taking photos and video of her while she was driving, making her extremely nervous.

**ANSWER: CRST denies the allegations in Paragraph 132 of the Complaint.**

133. On a subsequent route heading east out of California, Ms. Sellars and Monroe stopped at highway exit 185 on Interstate 40 in Arizona. There Ms. Sellars texted Thomas and Mann, and called her daughter, to tell them what Monroe had said, because she was concerned for her safety.

**ANSWER: CRST denies the allegations in Paragraph 133 of the Complaint for lack of information.**

134. Ms. Sellars returned to the truck and requested that Monroe drive for the final couple of hours, because she was fatigued and was afraid her driving would be impaired. Monroe refused to drive. He climbed out of the truck and began speaking to someone on the phone.

**ANSWER: CRST denies the allegations in Paragraph 134 of the Complaint.**

135.     Ms. Sellars used the Qualcomm system to send a message to dispatch, advising them that she was too fatigued to drive safely.  Rick [last name unknown], the third shift dispatcher, told her to talk to Monroe and find out what was going on.  Monroe was talking to Rick simultaneously, and Rick had told him what Ms. Sellars was saying.

**ANSWER: In answer to Paragraph 135 of the Complaint, CRST admits Ms. Sellars sent a Qualcomm message to dispatch stating that she felt fatigued. CRST denies the remaining allegations in Paragraph 135 of the Complaint.**

136.     Ms. Sellars was standing between the two front seats inside the truck cab, by the shift, when Monroe reentered the truck.  Enraged and yelling at Ms. Sellars that she was "going to regret telling on him," he shoved her into the passenger seat, smashing her left shoulder and head into the passenger side door and window.

**ANSWER: CRST denies the allegations in Paragraph 136 of the Complaint.**

137.     Ms. Sellars grabbed her purse and told Monroe she was getting off the truck. He replied "not until I tell you you're getting off," and began driving.  She repeatedly asked to be let off the truck, and asked where she was going, which he refused to answer.

**ANSWER: CRST denies the allegations in Paragraph 137 of the Complaint.**

138.     When Monroe began driving he pulled a knife out of his pocket and rested it on his right leg.  He told Ms. Sellars to "shut up and sit down."  As he drove, he alternately set the knife on the dash within reach, or held it and toyed with it in his lap.

**ANSWER: CRST denies the allegations in Paragraph 138 of the Complaint.**

139.     Ms. Sellars sent multiple Qualcomm messages to dispatch to report the emergency.

**ANSWER: In answer to Paragraph 139, CRST admits Ms. Sellars sent**

**Qualcomm messages to dispatch reporting Monroe had a knife. CRST denies the remaining allegations in Paragraph 139 of the Complaint.**

140.    Ms. Sellars frantically texted her daughter, Thomas, and Mann to tell them what was happening.  Mann stated under oath:

> In February, 2014, Ms. Sellars texted me repeatedly she was being held at knife point by a trainer/driver who, more than once, pressured Ms. Sellars to have sex with him while on the road. When she refused he became angry, continuing to physically and verbally threaten her. Ms. Sellars texted me she tried unsuccessfully to inform dispatch, their computer system was down every night between 9-11PM.

> Earlier that day, I had eaten dinner with Ms. Sellars and the trainer, we used his fold-up knife to cut our meat.

*See* Ex. A ¶6-7.

**ANSWER: CRST admits that Paragraph 140 of the Complaint is consistent with the declaration of Dawn Mann, attached to the Complaint. CRST denies the remaining allegations in Paragraph 140 for lack of information.**

141.    Thomas stated under oath:  "The worst incident was in February 2014 when Ms. Sellars was texting me from the truck because the driver had a knife in his lap and he was not going to let her go.  I told her to call the police and get off that truck."  *See* Ex. B ¶7.

**ANSWER: CRST admits that Paragraph 141 of the Complaint is consistent with the declaration of Victor Thomas, attached to the Complaint. CRST denies the remaining allegations in Paragraph 141 for lack of information.**

142.    Monroe finally pulled into a truck stop in or near Gallup, New Mexico.  As

the truck slowed to a stop Ms. Sellars grabbed her purse, opened the passenger door and stepped out onto the step. Just as she did so Rick, a dispatcher, called her cell phone, saying he had received her Qualcomm messages, and asking "what's with the knife?" Ms. Sellars said that she could not answer. Rick then asked if she had been held against her will, and she said yes. He told her to get her valuables and get off the truck. Ms. Sellars jumped down from the step. She ran inside and called the police. Monroe drove away.

**ANSWER: CRST denies the allegations in Paragraph 142 of the Complaint.**

143. Officers responded to the scene and took Ms. Sellars's statement. CRST required her to stay in a hotel room at the gas station overnight.

**ANSWER: CRST generally admits the allegations in Paragraph 143 of the Complaint, but denies that it "required" Ms. Sellars to stay in the hotel room.**

144. The next morning Ms. Sellars called Carlson and told her of the kidnapping, and her report to the police. Carlson said she would look into it.

**ANSWER: CRST denies Ms. Sellars was "kidnapped." CRST generally admits the remaining allegations in Paragraph 144 of the Complaint.**

145. Ms. Sellars was transported to Riverside Terminal. There she sought medical attention for neck and back injuries from Monroe's assault, and reported the injury to CRST.

**ANSWER: CRST generally admits the allegations in Paragraph 145 of the Complaint.**

146. CRST required Ms. Sellars to go to Oklahoma City to retrieve her belongings, because that was where Monroe had unloaded them.

**ANSWER: CRST generally admits the allegations in Paragraph 146 of the Complaint, but denies that it "required" Ms. Sellars to go to Oklahoma City.**

147.    Within several days Ms. Sellars learned that Monroe was still on the road driving for CRST.  She called Carlson and told her Monroe was still driving.  Carlson replied, "yeah?"  Ms. Sellars asked whether Monroe was being disciplined for the sexual assault and kidnapping.  Carlson replied it was "none of her business."

**ANSWER: CRST denies the allegations in Paragraph 147 of the Complaint.**

148.    On or about March 10, 2014, Ms. Sellars called and complained to Mike Gannon, Group President for Strategic Growth for CRST International, and Jenny Bower, who reports to Gannon, about the sexual assaults and harassment committed by her trainers. Gannon stated he would need to speak with Carlson and find out what was going on. Ms. Sellars told Gannon she would need to talk with an attorney if nothing was done about the harassment.

**ANSWER: In answer to Paragraph 148, CRST admits Ms. Sellars complained to Mike Gannon and Jenny Bower on or about March 10, 2014 and that Ms. Sellars threatened to retain an attorney. CRST denies the remaining allegations in Paragraph 148 of the Complaint.**

149.    Ms. Sellars asked Gannon, "what are you going to do when they [harassing male drivers] kill one of these women?"  Gannon replied, "well we'll deal with that when it happens."

**ANSWER: CRST denies the allegations in Paragraph 149 of the Complaint.**

150.    Shortly thereafter, CRST Expedited President Holzer ordered Ms. Sellars' current trainer to bring her directly to Iowa.  There she met with Holzer and Carlson. Holzer attempted to pressure Ms. Sellars not to speak with an attorney about the harassment.  They did not tell Ms. Sellars the outcome of their investigation of her

45

complaints.

**ANSWER: In answer to Paragraph 150, CRST admits that Ms. Sellars met with Cameron Holzer and Karen Carlson in Iowa. CRST denies the remaining allegations in Paragraph 150 of the Complaint.**

151.    CRST put Ms. Sellars on worker's compensation due to the spinal injuries resulting from Monroe's assault.  Holzer directed that Ms. Sellars be confined to a hotel in Iowa with no contact with any other CRST employee for the duration of her physical therapy.  She was not permitted to ride the company shuttle, speak to any company employees at her physical therapy sessions, or have any guests in her room.  After two weeks in isolation, Ms. Sellars convinced her worker's compensation representative to allow her to return home to complete her physical therapy.

**ANSWER: CRST denies the allegations in Paragraph 151 of the Complaint.**

152.    On or about January 1, 2015 Ms. Sellars's new worker's compensation representative informed her that CRST was stopping her worker's compensation payments on the pretext that she had failed to provide certain medical forms which, in reality, should have been provided directly to CRST by physicians.  Ms. Sellars was left without any wages or any worker's compensation payments from CRST.

**ANSWER: CRST denies the allegations in Paragraph 152 of the Complaint.**

153.    Despite Ms. Sellars's complaints, all of the drivers who harassed her continued to be employed by CRST.  Mann has stated under oath:

I continue to see all of the drivers/trainers Ms. Sellars complained about at the terminal, still employed and driving.  I do not know the total number of driver/trainers who harassed her, there were four about whom she reported ongoing

harassment and/or assaults.

*See* Ex. A ¶5.

**ANSWER: CRST admits that Paragraph 153 of the Complaint is consistent with the declaration of Dawn Mann, attached to the Complaint. CRST denies the remaining allegations in Paragraph 153.**

154.    Thomas has stated under oath:

[] Ms. Sellars told me about four different drivers who harassed her at CRST between December 2013 and February 2014. When she called me after an incident of harassment, she would tell me that she had complained yet again to management and/or Human Resources about what had happened.

[] As far as I know, CRST has not done anything about the sexual harassment. I still see the drivers Ms. Sellars complained about coming into the terminal.

[] I hear about incidents of both male and female CRST employees being sexually harassed, three to five times a week. It is part of the culture.

[] From August 2013 to March 2014, I worked at the front desk at the Riverside Terminal. Sometimes I was the only person available at the Terminal to answer the phone. I received calls from female trainees on the road who were being sexually harassed. I would inform the terminal manager about the call and tell the woman who was being harassed to tell the dispatcher and call Corporate about what had occurred.

[] One woman driver told me that the driver who had been assigned to train her told her she had to sleep with him if she wanted to pass the training. She filed a detailed report, but he is still a trainer.

[] CRST says they have a zero tolerance policy for harassment, but it is someone else's definition of zero. Harassment is swept under the rug.

*See* Ex. B ¶¶8-13.

**ANSWER: CRST admits that Paragraph 154 of the Complaint is consistent with the declaration of Victor Thomas, attached to the Complaint. CRST denies the remaining allegations in Paragraph 154 for lack of information.**

155.    Ms. Sellars spent time at Riverside Terminal at the start and/or end of the majority of her runs for CRST.

**ANSWER: CRST admits Ms. Sellars spent time at the Riverside Terminal at the start and/or end of some of her runs. CRST denies the remaining allegations in Paragraph 155 of the Complaint.**

156.    Ms. Sellars would have continued to work in California but for the harassment and retaliation she experienced.

**ANSWER: CRST denies the allegations in Paragraph 156 of the Complaint for lack of information.**

157.    As a result of CRST's conduct, Ms. Sellars experienced severe emotional distress and lost wages.

**ANSWER: CRST denies the allegations in Paragraph 157 of the Complaint.**

158.    Ms. Sellars's injuries were proximately caused by CRST.

**ANSWER: CRST denies the allegations in Paragraph 158 of the Complaint.**

**B.    Claudia Lopez**

159.    Claudia Lopez is a woman and a resident of Passaic, New Jersey. She was hired by CRST in May 2014 as a truck driver.

**ANSWER: CRST admits the allegations in Paragraph 159 of the Complaint.**

160.   Ms. Lopez completed her training classes at Hawkeye Community College in Waterloo, Iowa.  For the duration of the classes CRST trainees were housed at an area Red Roof Inn.

**ANSWER: In answer to Paragraph 160, CRST admits Ms. Lopez attended driving school at Hawkeye Community College in Waterloo, Iowa and that she stayed at an area Red Roof Inn during the time she was in Waterloo. CRST denies the remaining allegations in Paragraph 160 of the Complaint.**

161.   On the first day of Ms. Lopez's training, at the Red Roof Inn, she was sitting at a computer with Gloria [last name unknown], her roommate and a fellow trainee.  They were approached by Junior [last name unknown], another trainee.  Junior began asking them personal questions, including whether they were each married.  Ms. Lopez replied that she was.  Junior stated that she was a "liar" because she didn't have a ring.

**ANSWER: CRST denies the allegations in Paragraph 161 of the Complaint for lack of information.**

162.   Junior told Ms. Lopez and Gloria that he wanted to give them some paperwork that would help them in their training classes, and requested that they meet him late that night.  Ms. Lopez and Gloria, concerned by his actions, decided to return to their room. As they walked to the elevator, Junior told Gloria her "shirt was too long," indicating his desire to look at her rear end.  The women did not come back down that night.

**ANSWER: CRST denies the allegations in Paragraph 162 of the Complaint for lack of information.**

163.   The following day, Junior approached Ms. Lopez while she was working on a

general knowledge practice test on the computer. He offered to help, and she told him no, because she needed to learn the information herself. He then sat down in a chair close to Ms. Lopez.

**ANSWER: CRST denies the allegations in Paragraph 163 of the Complaint.**

164. Ms. Lopez received a call from her mother. When she sat up to answer the call, Junior reached over and began scratching her back. Ms. Lopez pushed his hand away, telling him "don't you dare touch me." He began laughing. As Ms. Lopez spoke on the phone, he started to scratch her back again. Ms. Lopez told him, "you better stop," and quickly left.

**ANSWER: CRST denies the allegations in Paragraph 164 of the Complaint.**

165. The following day, Cynthia Russo and Nancy [last name unknown], two trainees, noticed that Ms. Lopez appeared nervous when Junior was nearby. Lopez told them what Junior had done. Nancy told Junior to "bug off." Junior responded by asking Ms. Lopez, "has your mom called you again?" She replied "no, and please leave me alone." Junior again just laughed.

**ANSWER: CRST denies the allegations in Paragraph 165 of the Complaint for lack of information.**

166. Several days into her training, Ms. Lopez was in the CRST employee shuttle which ran between the hotel and the training classes. Junior approached and told her she was "very pretty." Ms. Lopez was fearful and started shaking. Junior asked what was wrong, and she told him "I don't like you, you're a bad person that doesn't understand when I say 'stop,' and that's not nice."

**ANSWER: CRST denies the allegations in Paragraph 166 of the Complaint.**

167. At the training center, Junior sat down next to Ms. Lopez. Russo and Nancy were present. In Ms. Lopez's presence, Junior told Russo he was leaving for his 28 day road training, and that he was "coming back for Claudia to rape her and marry her and take her with me." Ms. Lopez felt panicked.

**ANSWER: CRST denies the allegations in Paragraph 167 of the Complaint for lack of information.**

168. A few hours later, when Junior was about to leave, he approached Ms. Lopez and tried to force her to hug him. She pushed him away, telling him to stop.

**ANSWER: CRST denies the allegations in Paragraph 168 of the Complaint.**

169. Fearing for Ms. Lopez's safety, Russo and Nancy reported Junior's conduct to Bob [last name unknown], a CRST manager. They subsequently accompanied Ms. Lopez to speak with Bob. She complained to him about Junior's conduct. Bob told Ms. Lopez he would relay her complaint to HR, and that she did the right thing.

**ANSWER: In answer to Paragraph 169, CRST admits that a complaint was reported on behalf of Ms. Lopez and the complaint was referred to Human Resources. CRST denies the remaining allegations in Paragraph 169 of the Complaint for lack of information.**

170. Approximately a week later, Carlson from Human Resources contacted Ms. Lopez. Ms. Lopez again complained about Junior's harassment. Carlson told Ms. Lopez to send her a written account of what Junior had done via email.

**ANSWER: In answer to Paragraph 170, CRST admits that Ms. Carlson contacted Ms. Lopez about her complaints and requested that she send a written account by email. CRST denies the remaining allegations in Paragraph 170 of the Complaint.**

171.    Ms. Lopez sent Carlson the requested email.  Carlson never followed up to get additional details, or test contradictions between her version and her harasser's (if in fact Carlson spoke to her harasser, or any witness).

**ANSWER: In answer to Paragraph 171, CRST admits that Ms. Lopez sent Ms. Carlson the requested email. CRST denies the remaining allegations in Paragraph 171 of the Complaint.**

172.    Ms. Lopez passed her training and became a driver for CRST.

**ANSWER: CRST generally admits the allegations in Paragraph 172 of the Complaint.**

173.    When she spent time at Riverside Terminal and Cedar Rapids Terminal, male drivers frequently came on to her sexually, making comments to the effect of "is it true what they say about Puerto Rican women, that they're hot?"

**ANSWER: CRST denies the allegations in Paragraph 173 of the Complaint.**

174.    On or about July 3, 2014, Ms. Lopez met Charles Smith, a potential co-driver, at Riverside Terminal.  Smith was the only available co-driver at the time.

**ANSWER: In answer to Paragraph 174, CRST admits that Ms. Lopez began driving with Charles Smith on or around July 2014. CRST denies the remaining allegations in Paragraph 174 of the Complaint for lack of information.**

175.    Ms. Lopez told Smith she wanted his respect, and that she was married.  Smith told her he was married too and everything would be fine.  She agreed to drive with him.

**ANSWER: CRST denies the allegations in Paragraph 175 of the Complaint for lack of information.**

176.    When they started driving together, departing from Riverside Terminal, Smith began buying things for Ms. Lopez during stops.  Ms. Lopez told him to stop doing so.

**ANSWER: CRST denies the allegations in Paragraph 176 of the Complaint for lack of information.**

177.    Smith made offensive sexual remarks to Ms. Lopez, including but not limited to telling her that he "liked big women."

**ANSWER: CRST denies the allegations in Paragraph 177 of the Complaint.**

178.    Smith pulled into a filling station on an occasion when it was Ms. Lopez's turn to drive.  He went into the berth where she was sleeping, and began touching her hair. She woke up and immediately told him to stop.  Smith said, "it's hard to wake you up."  Ms. Lopez told him not to touch her.

**ANSWER: CRST denies the allegations in Paragraph 178 of the Complaint.**

179.    On another day late in the week, Ms. Lopez was asleep in the sleeper berth when she began to wake up, feeling that there was someone near her.  It was Smith.  He asked her if he could stay there with her, and she told him no.  He began to touch her hair and hold her hand, and lay down next to her.  Frightened and angry, Ms. Lopez pushed him away and told him to stop.  Smith told her "that's the way he likes women to be, angry, because he'll put them straight."  Ms. Lopez insisted, "I told you to respect me."

**ANSWER: CRST denies the allegations in Paragraph 179 of the Complaint.**

180.    Because of Smith's prior behavior, Ms. Lopez had already arranged to drive with a new partner beginning on the following Monday.  She informed Smith that she would be taking him back to the terminal on Monday because she could not work with him anymore.

**ANSWER: CRST denies the allegations in Paragraph 180 of the Complaint for lack of information.**

181.     On the weekend they stopped at a Pilot Truck Stop in Florida to shower. A cashier escorted Ms. Lopez and Smith to the showers. As they walked, Smith suggested to Lopez that she should join the shower with him. The cashier, unaware of Smith's harassment, asked Ms. Lopez "do you want to join your husband in the shower?" Humiliated, Ms. Lopez said that he was not her husband, he was her co-driver, and she did not.

**ANSWER: CRST denies the allegations in Paragraph 181 of the Complaint.**

182.     On or about July 7, 2014, Ms. Lopez and Smith were nearing their delivery location in or near Miami, Florida. Ms. Lopez was driving, but could not find the building. She stopped the truck in a safe location and disembarked to ask for directions.

**ANSWER: CRST denies the allegations in Paragraph 182 of the Complaint for lack of information.**

183.     While she was seeking assistance, Smith started driving the truck, called Austin [last name unknown], Fleet Manager, and told him that Ms. Lopez had abandoned the truck.

**ANSWER: CRST denies the allegations in Paragraph 183 of the Complaint.**

184.     Dispatcher Matt Pachota called Ms. Lopez on her cell phone, with Austin also on the line, and asked if she had abandoned the truck. She told him she was only 100 feet away from the truck and that she was seeking directions. She then complained to Pachota and Austin about Smith's harassment.

**ANSWER: In answer to Paragraph 184, CRST admits that Matt Pachota and**

Austin called Ms. Lopez and that Ms. Lopez complained about Mr. Smith. CRST denies the remaining allegations in Paragraph 184 of the Complaint.

185.    Ms. Lopez returned to the truck, put her cell phone onto speakerphone mode, and forced Smith to admit that he had touched her and sexually harassed her.  Pachota and Austin instructed Ms. Lopez to get off the truck, and she removed her belongings and did so.

**ANSWER: In answer to Paragraph 185, CRST admits that Matt Pachota instructed Ms. Lopez to get off the truck and she did so. CRST denies the remaining allegations in Paragraph 185 of the Complaint.**

186.    She then called Pachota back and begged him to remove Smith from the truck and allow her to go onward instead, because it had been her truck before he joined her. Both Smith and Ms. Lopez were company drivers.  Pachota told Ms. Lopez to remain where she was and get a hotel room.  Even though Smith had no more entitlement to remain on the truck than Ms. Lopez did, they told her he could not be removed.

**ANSWER: CRST denies the allegations in Paragraph 186 of the Complaint.**

187.    Ms. Lopez had to remain in Miami for several days, with no ability to drive and earn pay, until she was permitted to go to Virginia to join another truck.

**ANSWER: CRST generally admits the allegations in Paragraph 187 of the Complaint, but denies Ms. Lopez was forced to remain in Miami.**

188.    Several days after she had been removed from the truck, Human Resources manager Carlson called Ms. Lopez.  Ms. Lopez complained about all of Smith's harassment. As was the case with her complaint about Junior, Carlson's conduct had none of the hallmarks of a bona fide investigation. She did not request additional details, she did not ask

Ms. Lopez to rebut Smith's claims and she did not ask Ms. Lopez whom she could interview to corroborate any of the details of her ordeal, such as the cashier at the Pilot Truck Stop. After her single contact with Carlson there was literally no further contact about Smith.

**ANSWER: In answer to Paragraph 188, CRST admits that Ms. Lopez was contacted by Ms. Carlson and that Ms. Lopez made complaints about Mr. Smith. CRST denies the remaining allegations in Paragraph 188 of the Complaint.**

189.    Later in 2014, Ms. Lopez met potential co-driver Craig Jones in Iowa.

**ANSWER: CRST denies the allegations in Paragraph 189 of the Complaint for lack of information.**

190.    Venell Brown, who had been Ms. Lopez's trainer, was present. He had suggested that he present himself to Jones as Ms. Lopez's husband to deter him from later coming on to her sexually. Brown introduced himself as Ms. Lopez's husband, and Ms. Lopez told Jones he had to respect her. They agreed to drive together.

**ANSWER: CRST denies the allegations in Paragraph 190 of the Complaint for lack of information.**

191.    After beginning to drive with Jones, Ms. Lopez parked the truck when it was time for a shift change and entered the back to tell Jones it was his turn to drive. Although company policy requires that employees always remain fully clothed while on the truck, she encountered Jones only in his underwear. She hurriedly told Jones it was his turn to drive and ran out.

**ANSWER: CRST denies the allegations in Paragraph 191 of the Complaint.**

192.    Afterward, she told Jones she did not like seeing him unclothed.

**ANSWER: CRST denies the allegations in Paragraph 192 of the Complaint.**

193.    On the way to California, Jones later stopped the truck near West Memphis, Arkansas. Ms. Lopez was asleep in the sleeper berth. She began to awaken and felt someone massaging and touching her. She was lying on her stomach and felt something hard on her rear end. She sat up and turned around to find Jones naked and on top of her, with his penis erect. His clothes were on the floor. Ms. Lopez grabbed the screwdriver she kept under her pillow, and left the truck.

**ANSWER: CRST denies the allegations in Paragraph 193 of the Complaint.**

194.    Ms. Lopez called Al [last name unknown], a CRST shuttle driver, and asked whether she was currently closer to the terminal in Oklahoma City or in Iowa. She cried and told him what Jones had done. Al told Ms. Lopez she should report Jones to CRST, but she said she feared doing so because she knew they would again remove her from the truck and leave her alone in a totally unknown part of Arkansas.

**ANSWER: CRST denies the allegations in Paragraph 194 of the Complaint for lack of information.**

195.    Al notified Dan [last name unknown], a management-level CRST employee, who then called Ms. Lopez. She requested that he tell her where to drop off the load, and then get her to a safe location, and then she would talk about what had happened. Dan told Ms. Lopez to drop the load about 45 minutes away in West Memphis. She drove the remainder of the way there displaying the screwdriver, for her own protection.

**ANSWER: CRST denies the allegations in Paragraph 195 of the Complaint for lack of information.**

196.    During this drive, Ms. Lopez recorded Jones admitting he had touched her:

Lopez: I'm scared of you. Jones: Scared of me? Lopez: Yeah.

Jones: Why?

Lopez: Because. I never know you was going to touch me [inaudible].

Jones: Oh my god.

Lopez: I want you to be honest. Why did you touch me? Or made me touch [inaudible]. Do what you did?

...I want to know. What happened?

Jones: I don't know, I guess playing around too much.

Lopez: Huh?

Jones: Playing around too much.

Lopez: I don't play around like that. I can't work with you like that [inaudible].

**ANSWER: CRST denies the allegations in Paragraph 196 of the Complaint for lack of information.**

197.    After she dropped off the trailer CRST directed Ms. Lopez to remove her belongings from the truck, and sent her to a hotel. She had to advance her own funds for the hotel and seek reimbursement later, and earned nothing while she waited. Jones continued onward in the truck, driving and earning pay.

**ANSWER: CRST generally admits the allegations in Paragraph 197 of the Complaint.**

198.    Ms. Lopez complained to Fleet Manager Theresa Strong about Jones's conduct.

**ANSWER: CRST generally admits the allegations in Paragraph 198 of the Complaint.**

199.     Ms. Lopez was required to rent a car to drive from West Memphis to the terminal in Oklahoma, during which time she earned nothing.  Carlson called her while she was in route.  Ms. Lopez complained about everything Jones had done.  Carlson said she would investigate.  Ms. Lopez later followed up by sending Carlson the recording she had made of Jones admitting he touched her.  Carlson never responded to this complaint, or the evidence Ms. Lopez had provided.

**ANSWER: In answer to Paragraph 199, CRST admits that Ms. Carlson contacted Ms. Lopez regarding her complaint and assured her the complaint would be investigated. CRST denies the remaining allegations in Paragraph 199 of the Complaint.**

200.     In Oklahoma Ms. Lopez had to wait a week to pick up with another truck, during which time she had no opportunity to earn anything.

**ANSWER: CRST denies the allegations in Paragraph 200 of the Complaint.**

201.     In or about November, Ms. Lopez began to drive in the Refrigeration unit. When CRST sent her the list of available co-drivers, she saw Craig Jones on the list.

**ANSWER: In answer to Paragraph 201, CRST admits that Ms. Lopez began to drive in the refrigeration unit in or about November 2014. CRST denies the remaining allegations in Paragraph 201 of the Complaint for lack of information.**

202.     Ms. Lopez approached the Safety representative at Riverside Terminal, and said she was afraid that Jones would find her.  He directed her to speak with a driver coordinator at the terminal.  When she told the driver coordinator her concerns, the coordinator told Ms. Lopez it was a "big world" and she wouldn't see Jones.  Ms. Lopez protested that there were only a few CRST terminals and she could easily see him at any of them, and that it was even more likely since they were both driving in the Refrigeration unit,

and those trips were between a more limited set of locations.

**ANSWER: CRST denies the allegations in Paragraph 202 of the Complaint.**

203.    In or about December 2014, Ms. Lopez began driving with Mark [last name unknown].

**ANSWER: CRST admits the allegations in Paragraph 203 of the Complaint.**

204.    Mark told Ms. Lopez he was becoming irritated with her.  Ms. Lopez saw text messages he was exchanging about her with Butch [last name unknown]:

Butch: Lol...slap her with da dick

Mark:  LMAO! [Laughing My Ass Off]

Butch: Tell her to shower first...lol

*See* Text Message Exchange with Butch, attached as Exhibit C.

**ANSWER: CRST admits that Paragraph 204 of the Complaint is consistent with the text message attached to the Complaint. CRST denies the remaining allegations in Paragraph 204 for lack of information.**

205.    Ms. Lopez asked Mark why he kept saying she was "grinding his gears." Mark replied, "you know, one of these days I could come kill you and leave you in the mountains, and just bury you, and nobody's gonna find you." He then laughed.  Ms. Lopez was terrified and said she wanted to get off the truck, but Mark refused, saying he was just kidding.

**ANSWER: CRST denies the allegations in Paragraph 205 of the Complaint.**

206.    Ms. Lopez was too afraid to continue driving due to the threats, assaults and sexual harassment she continued to experience, with no consequences for the harassers despite her repeated complaints. She was constructively discharged on or about January 10,

2015.

**ANSWER: CRST denies the allegations in Paragraph 206 of the Complaint.**

207. Over the course of her work at CRST Ms. Lopez spent time at Riverside Terminal on more than ten occasions, spending on average several days at the terminal each time.

**ANSWER: In answer to Paragraph 207, CRST admits Ms. Lopez spent time at the Riverside terminal during her employment at CRST. CRST denies the remaining allegations in Paragraph 207 of the Complaint.**

208. Ms. Lopez would have continued working in California but for the harassment and discrimination she experienced.

**ANSWER: CRST denies the allegations in Paragraph 208 of the Complaint for lack of information.**

209. Ms. Lopez would be interested in re-employment with CRST if she could be guaranteed that she would not experience any further harassment, discrimination or retaliation.

**ANSWER: CRST denies the allegations in Paragraph 209 of the Complaint for lack of information.**

210. As a result of CRST's conduct, Ms. Lopez experienced severe emotional distress and lost wages.

**ANSWER: CRST denies the allegations in Paragraph 210 of the Complaint.**

211. Ms. Lopez's injuries were proximately caused by CRST.

**ANSWER: CRST denies the allegations in Paragraph 211 of the Complaint.**

C.    **Leslie Fortune**

212.	Leslie Fortune is a woman and a resident of St. Louis, Missouri.  She was hired by CRST in October 2013 as a truck driver.

**ANSWER: CRST admits the allegations in Paragraph 212 of the Complaint.**

213.	Ms. Fortune completed her training classes at the CRST Terminal in Cedar Rapids, Iowa.

**ANSWER: CRST admits the allegations in Paragraph 213 of the Complaint.**

214.	During her training at the Cedar Rapids Terminal, Ms. Fortune heard daily offensive sexual remarks from male trainers and co-drivers, including but not limited to men coming onto Ms. Fortune or propositioning her for sex (including while she was in the middle of studying), men making comments about women's bodies such as "man she's got ass on her" or "I'll hit that," and men talking about which women they had slept with.

**ANSWER: CRST denies the allegations in Paragraph 214 of the Complaint.**

215.	In or about early November 2013, Ms. Fortune was paired with trainer Stephen Woods to do her over-the-road time.

**ANSWER: CRST denies the allegations in Paragraph 215 of the Complaint.**

216.	Woods was in the process of becoming an owner-operator, so Ms. Fortune was required to drive with him in a rental car from Cedar Rapids to Riverside, CA to pick up the truck he would be using.

**ANSWER: CRST generally admits the allegations in Paragraph 216 of the Complaint, but denies Ms. Fortune was "required" to drive in the rental car with Mr. Woods.**

217.	On their first day on the road, Woods asked Ms. Fortune what she liked

sexually, and commented that she was pretty. He then said he had "never been with a colored woman before." She rejected his advances.

**ANSWER: CRST denies the allegations in Paragraph 217 of the Complaint.**

218.    When they arrived at their first hotel, Woods told Ms. Fortune to stay in the car while he went in. When he reemerged he claimed the motel only had one room left, with one bed. He said, "that's ok, we can share." Ms. Fortune refused.

**ANSWER: CRST denies the allegations in Paragraph 218 of the Complaint.**

219.    Ms. Fortune and Woods went to the room. It contained two beds. Woods told Ms. Fortune they should share only one of the beds. She again told him no. He asked Ms. Fortune if he could take his clothes off, and told her to "dress down." She continued to reject his advances.

**ANSWER: CRST denies the allegations in Paragraph 219 of the Complaint.**

220.    Ms. Fortune left to do laundry. When she returned, he was in only his boxer shorts.

**ANSWER: CRST denies the allegations in Paragraph 220 of the Complaint.**

221.    Woods told Ms. Fortune, "I haven't had pussy in six months, if you want to pass you might want to take that into consideration." She told him no.

**ANSWER: CRST denies the allegations in Paragraph 221 of the Complaint.**

222.    She locked herself into the bathroom to shower, emerged fully dressed, and got into her own bed to sleep in her clothes. Woods told her his shoulders hurt and asked for a massage. Ms. Fortune refused. He then suggested that he give her a massage. He again told him no, and went to sleep.

**ANSWER: CRST denies the allegations in Paragraph 222 of the Complaint.**

223.   The following morning, Woods told Ms. Fortune she was a "hard sleeper." He said he had tried to wake her up, and that "you sleep so hard, anything can happen to you while you're asleep."

**ANSWER: CRST denies the allegations in Paragraph 223 of the Complaint.**

224.   Woods stayed close to Ms. Fortune, listening to any calls she made on her phone, and standing right by the bathroom door while she was inside to see if she was calling anyone.   She had no phone numbers to contact anyone at CRST.   Woods, her trainer, had the numbers but would not give them to her.

**ANSWER: CRST denies the allegations in Paragraph 224 of the Complaint.**

225.   Woods called their fleet manager, told him that Ms. Fortune was fine, and would not allow her to speak to him.

**ANSWER: CRST denies the allegations in Paragraph 225 of the Complaint.**

226.   When she arrived at Riverside Terminal, Ms. Fortune complained about Woods to the Safety representative.   He directed her to write a report about Woods's conduct, which she did.

**ANSWER: CRST admits the allegations in Paragraph 226 of the Complaint.**

227.   Ms. Fortune completed her training with a different trainer.   The trainer suggested that she work with James Parker as her first co-driver, and she agreed.

**ANSWER: In answer to Paragraph 227, CRST admits Ms. Fortune completed her training with a different lead driver.  CRST denies the remaining allegations in Paragraph 227 of the Complaint for lack of information.**

228.   In or about December 2013, Ms. Fortune departed Riverside Terminal with Parker. He propositioned Ms. Fortune for sex, and she refused.

**ANSWER: In answer to Paragraph 228, CRST admits Ms. Fortune began driving with Mr. Parker in or about December 2013. CRST denies the remaining allegations in Paragraph 228 of the Complaint.**

229.     Parker told Ms. Fortune he had been in jail immediately before he began driving at CRST.  He drank alcohol and smoked marijuana while on the job.

**ANSWER: CRST denies the allegations in Paragraph 229 of the Complaint.**

230.     Parker asked Ms. Fortune to sleep with him a second time while they were stopped at a weigh station waiting for two other CRST drivers, one of whom was Kairee [last name unknown], to come assist them in resolving a problem with the truck's weight. He then began acting angry at her, which the other two drivers observed.

**ANSWER: CRST denies the allegations in Paragraph 230 of the Complaint.**

231.     En route to Salt Lake City after their stop, Parker became angry with Ms. Fortune because she would not sleep with him, and kicked her off the truck.  She called her fleet manager Ben, who laughed and told her to get back on the truck, even after she told him Parker had been drinking, smoking marijuana, and propositioning her for sex.  He said "you guys can work this out."

**ANSWER: CRST denies the allegations in Paragraph 231 of the Complaint.**

232.     Ms. Fortune refused to get back on the truck, and had to be picked up by the two other CRST drivers, who returned her to Riverside Terminal.

**ANSWER: In answer to Paragraph 232, CRST admits Ms. Fortune was picked up by another team of CRST drivers who brought her to the Riverside Terminal. CRST denies the remaining allegations in Paragraph 232 of the Complaint for lack of information.**

233. Once Parker returned to the terminal, he spread rumors that Ms. Fortune was a "lot lizard," trucker slang for a prostitute, and had been doing "extra jobs," i.e. sleeping with male truckers for pay.

**ANSWER: CRST denies the allegations in Paragraph 233 of the Complaint.**

234. Ms. Fortune filed a written complaint with Alvin Hoggard about Parker's conduct. A week or two later, Human Resources representative Karen Carlson called her. Ms. Fortune complained to Carlson about everything Parker had done. Carlson did not tell Ms. Fortune what action would be taken, if any. She never afterward told Ms. Fortune what was the outcome of her complaint, if any.

**ANSWER: In answer to Paragraph 234, CRST admits Ms. Fortune complained to Mr. Hoggard and that Karen Carlson contacted her regarding her complaint. CRST denies the remaining allegations in Paragraph 234 of the Complaint.**

235. When Parker learned Ms. Fortune had filed a written complaint, he accosted her in the lobby at Riverside Terminal, yelled at her, and put up his fists to intimidate her.

**ANSWER: CRST denies the allegations in Paragraph 235 of the Complaint.**

236. In or about early 2014, Ms. Fortune worked with a co-driver named Jamal. He requested that she record herself urinating, because he "liked hearing women pee." Ms. Fortune got off his truck at Riverside Terminal.

**ANSWER: CRST denies the allegations in Paragraph 236 of the Complaint.**

237. Also in or about early 2014, Ms. Fortune met a different potential co-driver also named Jamal. The two met at Riverside Terminal and agreed to drive together.

**ANSWER: In answer to Paragraph 237, CRST admits Ms. Fortune began driving with Jamal in early 2014. CRST denies the remaining allegations in Paragraph 237 of the**

Complaint for lack of information.

238.    After they began driving Jamal repeatedly commented on how "pretty" Ms. Fortune is, and came on to her.  She told him she was not interested.

**ANSWER: CRST denies the allegations in Paragraph 238 of the Complaint.**

239.    On a route heading east from Riverside Terminal, Jamal insisted on buying Ms. Fortune a meal at Denny's for her birthday.  While they were eating, he told Ms. Fortune "it's not working."  She asked what he meant, and he replied "nothing."

**ANSWER: CRST denies the allegations in Paragraph 239 of the Complaint.**

240.    When they got back into the truck, Jamal told Ms. Fortune "you're going to give me some ass, either I'm going to take it or you're going to give it to me."  He started laughing.

**ANSWER: CRST denies the allegations in Paragraph 240 of the Complaint.**

241.    Ms. Fortune was afraid.  At night, she contacted a fleet manager and complained about Jamal's threat to rape her.  The fleet manager asked if she could see any hotels nearby, but Ms. Fortune explained that the truck was in an empty part of Kansas and there was nowhere to go if she got off the truck.  She agreed to stay on the truck until they reached Missouri.

**ANSWER: In answer to Paragraph 241, CRST admits Ms. Fortune complained to her fleet manager about Jamal who instructed her to find a hotel and that she agreed to stay on the truck until they reached Missouri. CRST denies the remaining allegations in Paragraph 241 of the Complaint.**

242.    Once they reached St. Louis, Ms. Fortune waited until Jamal had entered a service station, then took her possessions and left the truck.  She lost the pay she would have

earned had she been able to continue driving free of harassment.

**ANSWER: In answer to Paragraph 242, CRST admits Ms. Fortune left the truck in St. Louis. CRST denies the remaining allegations in Paragraph 242 of the Complaint.**

243.    Ms. Fortune complained to an employee in Human Resources about Jamal's conduct.  She was not told what would happen following her complaint.

**ANSWER: In answer to Paragraph 243, CRST admits Ms. Fortune complained to Human Resources about Jamal. CRST denies the remaining allegations in Paragraph 243 of the Complaint.**

244.    Later, when she stopped in to visit her CRST classroom instructors in Cedar Rapids, Ms. Fortune encountered Jamal.  He had been promoted to become a CRST classroom trainer.

**ANSWER: In answer to Paragraph 244, CRST admits Jamal began working as a classroom trainer after he drove with Ms. Fortune. CRST denies the remaining allegations in Paragraph 244 of the Complaint for lack of information.**

245.    Ms. Fortune began carrying knives and a Taser for personal protection because of the harassment and threats she was experiencing from her codrivers.

**ANSWER: CRST denies the allegations in Paragraph 245 of the Complaint.**

246.    In or about spring 2014, Ms. Fortune was waiting at Riverside Terminal to find a new co-driver, and was not earning any pay while she waited.  She met a potential co-driver from Florida, Hans Davis, and they began to work together.

**ANSWER: In answer to Paragraph 246, CRST admits Ms. Fortune began driving with Hans Davis in the spring of 2014. CRST denies the remaining allegations in Paragraph 246 of the Complaint for lack of information.**

247.    Ms. Fortune was having difficulty improving her skills at backing trucks, and Davis agreed to help teach her how.

**ANSWER: CRST denies the allegations in Paragraph 247 of the Complaint for lack of information.**

248.    Not long after they left Riverside Terminal to begin driving together, Davis repeatedly commented on Ms. Fortune's appearance, telling her that she was "gorgeous" and "fine." He told her he had previously driven with a Puerto Rican woman and that they had sex "all the time" in the truck, in an effort to convince Ms. Fortune to sleep with him and that he would not tell anyone. Ms. Fortune rejected his advances.

**ANSWER: CRST denies the allegations in Paragraph 248 of the Complaint.**

249.    Davis later told Ms. Fortune that he was "going to need [her] to take an AIDS test." Ms. Fortune was shocked, said they were not sleeping together, and asked why she would take such a test. He replied "well I need to know if you're clean."

**ANSWER: CRST denies the allegations in Paragraph 249 of the Complaint.**

250.    Davis asked to lie in bed with Ms. Fortune, and propositioned her for sex. She told him no.

**ANSWER: CRST denies the allegations in Paragraph 250 of the Complaint.**

251.    Because she would not sleep with him, Davis became hostile, and stopped teaching Ms. Fortune how to back the truck, telling her "well just figure it out."

**ANSWER: CRST denies the allegations in Paragraph 251 of the Complaint.**

252.    Davis decided to take a different job without informing CRST that he was quitting. He began threatening Ms. Fortune that she would not want to see what happened if she told CRST about it.

**ANSWER: CRST denies the allegations in Paragraph 252 of the Complaint.**

253.     When they arrived at Oklahoma City Terminal, Ms. Fortune called a hotline that she saw posted on the wall in the terminal, which was intended for reporting threats. She complained about Davis's conduct.

**ANSWER: CRST generally admits the allegations in Paragraph 253 of the Complaint.**

254.     In or about summer 2014, Ms. Fortune was at Cedar Rapids Terminal in need of a co-driver.  Her fleet manager suggested she work with potential co-driver Charles Pickens, and she agreed.

**ANSWER: CRST generally admits the allegations in Paragraph 254 of the Complaint.**

255.     Ms. Fortune had to drive in a rental car with Pickens and two other drivers to pick up a truck at the terminal in Carlisle, Pennsylvania.

**ANSWER: CRST generally admits the allegations in Paragraph 255 of the Complaint.**

256.     During the drive, Pickens started touching Ms. Fortune inappropriately, including but not limited to grabbing her behind and waist.  She told him to stop and that she did not like it.

**ANSWER: CRST denies the allegations in Paragraph 256 of the Complaint.**

257.     After they began driving the truck together, Pickens stopped the truck at night while Ms. Fortune was asleep.  She awoke to find him standing over her.  He asked to get into bed with her, and she said no.  He would not leave until Ms. Fortune referred to the knives she kept under her pillow.

**ANSWER: CRST denies the allegations in Paragraph 257 of the Complaint.**

258.    Ms. Fortune complained about Pickens's conduct to her fleet manager Whitney Bell, and got off the truck at Riverside Terminal.

**ANSWER: CRST generally admits the allegations in Paragraph 258 of the Complaint.**

259.    Ms. Fortune was constructively discharged in January 2015.

**ANSWER: CRST denies the allegations in Paragraph 259 of the Complaint.**

260.    Ms. Fortune was present at Riverside Terminal approximately three times per month over the course of her employment with CRST.  She would have continued working in California but for the harassment and discrimination she experienced.

**ANSWER: In answer to Paragraph 260, CRST admits Ms. Fortune was present at the Riverside Terminal during her employment with CRST. CRST denies the remaining allegations in Paragraph 260 of the Complaint for lack of information.**

261.    As a result of CRST's conduct, Ms. Fortune experienced severe emotional distress and lost wages.

**ANSWER: CRST denies the allegations in Paragraph 261 of the Complaint.**

262.    Ms. Fortune's injuries were proximately caused by CRST.

**ANSWER: CRST denies the allegations in Paragraph 262 of the Complaint.**

D.    <u>Scheavella Corley</u>

263.    Scheavellea Corley is a woman and a resident of Tampa, Florida. She was hired by CRST in December 2015 as a truck driver.

**ANSWER: CRST admits the allegations in Paragraph 263 of the Complaint.**

264.    CRST did not publicize to its employees, including Ms. Corley, the existence

of HR Layover Pay prior to Ms. Corley being removed from her truck.

**ANSWER: CRST denies the allegations of Paragraph 264 insofar as CRST publicizes to employees that any employee who reports any act of harassment and/or discrimination will not be subject to any form of retaliation and admits that CRST did not publish each possible implementation of that policy, including the text of the HR Layover Pay practice.**

265.    Ms. Corley believed she would lose pay if she was removed from her truck due to making a sexual harassment complaint.

**ANSWER: CRST denies the allegations in Paragraph 265 of the Complaint for lack of information.**

266.    Ms. Corley complained of sexual harassment by her co-driver on or about April 15, 2016.

**ANSWER: CRST admits that Ms. Corley got off of a truck on April 15, 2016, and thereafter complained of harassment, but the balance of the allegations of Paragraph 266 are denied.**

267.    Ms. Corley was removed from her truck as a result on or about April 15, 2016.

**ANSWER: CRST admits that Ms. Corley got off of a truck on April 15, 2016 and the balance of the allegations of Paragraph 267 are denied.**

268.    As a consequence of CRST's conduct, Ms. Corley experienced emotional distress and lost wages.

**ANSWER: CRST denies the allegations in Paragraph 268 of the Complaint.**

269.    Ms. Corley's injuries were proximately caused by CRST.

**ANSWER: CRST denies the allegations in Paragraph 269 of the Complaint.**

E.  <u>Sierrea Fuller</u>

270.    Sierrea Fuller is a woman and a resident of Philadelphia, Pennsylvania. She was hired by CRST in September 2017 as a truck driver.

**ANSWER: CRST admits the allegations in Paragraph 270 of the Complaint.**

271.    CRST did not publicize to its employees, including Ms. Fuller, the existence of HR Layover Pay prior to Ms. Fuller being removed from her truck.

**ANSWER: CRST denies the allegations of Paragraph 271 insofar as CRST publicizes to employees that any employee who reports any act of harassment and/or discrimination will not be subject to any form of retaliation and admits that CRST did not publish each possible implementation of that policy, including the text of the HR Layover Pay practice.**

272.    Ms. Fuller believed she would lose pay if she was removed from her truck due to making a sexual harassment complaint.

**ANSWER: CRST denies the allegations in Paragraph 272 of the Complaint for lack of information.**

273.    Ms. Fuller complained of sexual harassment by her lead driver on or about September 25, 2017.

**ANSWER: CRST admits that Ms. Fuller got off of a truck on September 25, 2017, and thereafter complained of harassment, but the balance of the allegations of Paragraph 273 are denied.**

274.    Ms. Fuller was removed from her truck as a result on or about September 25, 2017.

**ANSWER: CRST admits that Ms. Fuller got off of a truck on September 25, 2017, and the balance of the allegations of Paragraph 274 are denied.**

275.   As a consequence of CRST's conduct, Ms. Fuller experienced emotional distress and lost wages.

**ANSWER: CRST denies the allegations in Paragraph 275 of the Complaint.**

276.   Ms. Fuller's injuries were proximately caused by CRST.

**ANSWER: CRST denies the allegations in Paragraph 276 of the Complaint.**

## VIII.  CLAIMS FOR RELIEF

### First Claim for Relief
### Discrimination in Violation of Title VII
### On Behalf of the Named Plaintiffs and the Title VII Class

277.   Plaintiffs incorporate Paragraphs 1 through 276.

**ANSWER: CRST incorporates its answers to Paragraphs 1 through 276.**

278.   The foregoing conduct violates Title VII of the Civil Rights Act of 1964.

**ANSWER: CRST denies the allegations in Paragraph 278 of the Complaint.**

279.   Defendant CRST has engaged in illegal, intentional discrimination on the basis of sex, by creating a hostile work environment based on sex with respect to all women employed as truck drivers.

**ANSWER: CRST denies the allegations in Paragraph 279 of the Complaint.**

280.   Plaintiffs have regularly complained to CRST regarding discrimination and harassment.

**ANSWER: CRST denies the allegations in Paragraph 280 of the Complaint.**

281.   CRST has allowed the discrimination and harassment to continue.

**ANSWER: CRST denies the allegations in Paragraph 281 of the Complaint.**

282.    As a consequence of Defendant's conduct, the Named Plaintiffs have suffered emotional distress.

**ANSWER: CRST denies the allegations in Paragraph 282 of the Complaint.**

283.    Defendant's actions proximately caused the Named Plaintiffs' and Class's injuries.

**ANSWER: CRST denies the allegations in Paragraph 283 of the Complaint.**

284.    Plaintiffs request relief as provided in the Prayer for Relief below.

**ANSWER: CRST denies Plaintiffs are entitled to the relief requested in Paragraph 284 of the Complaint.**

<u>**Second Claim for Relief**</u>
<u>**Harassment in Violation of**</u>
<u>**the California Fair Employment and Housing Act**</u>
<u>**On Behalf of the California Subclass**</u>

285.    Plaintiffs incorporate Paragraphs 1 through 284.

**ANSWER: CRST incorporates its answers to Paragraphs 1 through 284.**

286.    The foregoing conduct violates the California Fair Employment and Housing Act, Government Code Sec. 12940, *et seq.*

**ANSWER: CRST denies the allegations in Paragraph 286 of the Complaint.**

287.    Defendant CRST has engaged in illegal, intentional discrimination on the basis of sex, by creating a hostile work environment based on sex with respect to all women employed as truck drivers.

**ANSWER: CRST denies the allegations in Paragraph 287 of the Complaint.**

288.    Plaintiffs have regularly complained to CRST regarding discrimination and

harassment.

**ANSWER: CRST denies the allegations in Paragraph 288 of the Complaint.**

289.    CRST has allowed the discrimination and harassment to continue.

**ANSWER: CRST denies the allegations in Paragraph 289 of the Complaint.**

290.    As a consequence of Defendant's conduct, the Named Plaintiffs have suffered emotional distress.

**ANSWER: CRST denies the allegations in Paragraph 290 of the Complaint.**

291.    Defendant's actions proximately caused the Named Plaintiffs' and Class's injuries.

**ANSWER: CRST denies the allegations in Paragraph 291 of the Complaint.**

292.    Plaintiffs request relief as provided in the Prayer for Relief below.

**ANSWER: CRST denies Plaintiffs are entitled to the relief requested in Paragraph 292 of the Complaint.**

<u>**Third Claim for Relief**</u>
<u>**Retaliation in Violation of Title VII**</u>
<u>**On Behalf of the Named Plaintiffs, the Title VII Class and the Post-2015 Retaliation Sub-Class**</u>

293.    Plaintiffs incorporate Paragraphs 1 through 292.

**ANSWER: CRST incorporates its answers to Paragraphs 1 through 292.**

294.    CRST retaliated against the Class Representatives and the members of the proposed class because they insisted upon a work environment free of sex discrimination and also because they complained about sex discrimination.

**ANSWER: CRST denies the allegations in Paragraph 294 of the Complaint.**

295.    CRST retaliated against the Class Representatives and the members of the

proposed class by subjecting them to adverse employment actions, including but not limited to, subjecting them to sexual harassment, a hostile work environment and/or other forms of discrimination in violation of Title VII; requiring a female driver who has complained of harassment to leave the truck and allowing her male co-driver to continue onward; requiring women who have been removed from trucks following a harassment complaint to pay out of pocket for accommodations; requiring women who have been removed from trucks following a harassment complaint to wait in place to be picked up by a company truck while earning nothing; failing to take any action to pair women removed from trucks following harassment complaints with a new co-driver, forcing them to wait and earn nothing while seeking a new co-driver; where a female trainee has complained of harassment by her male trainer, prolonging her training beyond 28 days, resulting in much less pay than she would have earned during that period had she completed her training free from harassment; continuing to provide the names and contact information of women who have made harassment complaints to the entire pool of potential co-drivers, including men about whom they complained; in the case of the Named Plaintiffs, being constructively discharged; and otherwise penalizing women for complaining.

**ANSWER: CRST denies the allegations in Paragraph 295 of the Complaint.**

296.    CRST retaliated against Named Plaintiffs Scheavella Corley and Sierrea Fuller, and the Post-2015 Retaliation Sub-Class, from its institution of HR Layover Pay in 2015 onward, by refusing to inform employees about the existence of HR Layover Pay prior to female employees lodging complaints of sexual harassment, leaving them in the belief that they would lose pay as a consequence of making any sexual harassment complaint and being removed from their trucks as a result, which deterred female employees from lodging

such complaints.

**ANSWER: CRST denies the allegations in Paragraph 296 of the Complaint.**

297.   As a consequence of Defendant's conduct, the Named Plaintiffs lost past and future wages and other job benefits, and suffered severe emotional distress.

**ANSWER: CRST denies the allegations in Paragraph 297 of the Complaint.**

298.   CRST's actions proximately caused the injuries of the Class Representatives and the members of the proposed class.

**ANSWER: CRST denies the allegations in Paragraph 298 of the Complaint.**

299.   The Class Representatives and the proposed class request relief as provided in the Prayer for Relief below.

**ANSWER: CRST denies Plaintiffs are entitled to the relief requested in Paragraph 299 of the Complaint.**

**Fourth Claim for Relief**
**Retaliation in Violation of the California Fair Employment and Housing Act On Behalf of the Named Plaintiffs and the California Subclass**

300.   Plaintiffs incorporate Paragraphs 1 through 299.

**ANSWER: CRST incorporates its answers to Paragraphs 1 through 299.**

301.   CRST retaliated against the Class Representatives and the members of the proposed class because they insisted upon a work environment free of sex discrimination and also because they complained about sex discrimination.

**ANSWER: CRST denies the allegations in Paragraph 301 of the Complaint.**

302.   CRST retaliated against the Class Representatives and the members of the proposed class by subjecting them to adverse employment actions, including but not limited

to, subjecting them to sexual harassment, a hostile work environment and/or other forms of discrimination in violation of the Fair Employment and Housing Act; requiring a female driver who has complained of harassment to leave the truck and allowing her male co-driver to continue onward; requiring women who have been removed from trucks following a harassment complaint to pay out of pocket for accommodations; requiring women who have been removed from trucks following a harassment complaint to wait in place to be picked up by a company truck while earning nothing; failing to take any action to pair women removed from trucks following harassment complaints with a new co-driver, forcing them to wait and earn nothing while seeking a new co-driver; where a female trainee has complained of harassment by her male trainer, prolonging her training beyond 28 days, resulting in much less pay than she would have earned during that period had she completed her training free from harassment; continuing to provide the names and contact information of women who have made harassment complaints to the entire pool of potential co-drivers, including men about whom they complained; and otherwise penalizing women for complaining.

**ANSWER: CRST denies the allegations in Paragraph 302 of the Complaint.**

303.　　As a consequence of Defendant's conduct, the Named Plaintiffs lost past and future wages and other job benefits, and suffered severe emotional distress.

**ANSWER: CRST denies the allegations in Paragraph 303 of the Complaint.**

304.　　CRST's actions proximately caused the injuries of the Class Representatives and the members of the proposed class.

**ANSWER: CRST denies the allegations in Paragraph 304 of the Complaint.**

305.　　The Class Representatives and the proposed class request relief as provided in

the Prayer for Relief below.

**ANSWER: CRST denies Plaintiffs are entitled to the relief requested in Paragraph 305 of the Complaint.**

<u>Fifth Claim for Relief</u>
<u>Constructive Discharge in Violation of Title VII</u>
<u>On Behalf of the Named Plaintiffs and the Title VII Class</u>

306.    Plaintiffs incorporate Paragraphs 1 through 305.

**ANSWER: CRST incorporates its answers to Paragraphs 1 through 305.**

307.    As a consequence of Defendant's conduct, the Class Representatives and members of the proposed class were subjected to discriminatory working conditions that were so intolerable that any reasonable person would resign.

**ANSWER: CRST denies the allegations in Paragraph 307 of the Complaint.**

308.    As a consequence of Defendant's conduct, the Class Representatives suffered severe emotional distress.

**ANSWER: CRST denies the allegations in Paragraph 308 of the Complaint.**

309.    CRS's actions proximately caused the injuries of the Class Representatives and the members of the proposed class.

**ANSWER: CRST denies the allegations in Paragraph 309 of the Complaint.**

310.    The Class Representatives and the proposed class request relief as provided in the Prayer for Relief below.

**ANSWER: CRST denies Plaintiffs are entitled to the relief requested in Paragraph 310 of the Complaint.**

Sixth Claim for Relief
Constructive Discharge in Violation of the
California Fair Employment and Housing Act
On Behalf of the Named Plaintiffs and the California Subclass

311.    Plaintiffs incorporate Paragraphs 1 through 310.

**ANSWER: CRST incorporates its answers to Paragraphs 1 through 310.**

312.    As a consequence of Defendant's conduct, the Class Representatives and members of the proposed class were subjected to discriminatory working conditions that were so intolerable that any reasonable person would resign.

**ANSWER: CRST denies the allegations in Paragraph 312 of the Complaint.**

313.    As a consequence of Defendant's conduct, the Class Representatives suffered severe emotional distress.

**ANSWER: CRST denies the allegations in Paragraph 313 of the Complaint.**

314.    CRST's actions proximately caused the injuries of the Class Representatives and the members of the proposed class.

**ANSWER: CRST denies the allegations in Paragraph 314 of the Complaint.**

315.    The Class Representatives and the proposed class request relief as provided in the Prayer for Relief below.

**ANSWER: CRST denies Plaintiffs are entitled to the relief requested in Paragraph 315 of the Complaint.**

## IX.  RELIEF ALLEGATIONS

316.    Plaintiffs and the Classes they represent have no plain, adequate or complete remedy at law to redress the wrongs alleged herein, and the injunctive relief sought in this action is the only means of securing complete and adequate relief. Plaintiffs and the Classes

they represent are now suffering and will continue to suffer irreparable injury from Defendant's discriminatory acts and omissions.

**ANSWER: CRST denies the allegations in Paragraph 316 of the Complaint.**

317. The actions on the part of Defendant have caused and continue to cause Plaintiffs and all Class and Subclass members substantial losses in earnings, promotional opportunities another employment benefits, in an amount to be determined according to proof.

**ANSWER: CRST denies the allegations in Paragraph 317 of the Complaint.**

318. Defendant acted or failed to act as herein alleged with malice or reckless indifference to the protected rights of Plaintiffs and Class and Subclass members. Plaintiffs and class members are thus entitled to recover punitive damages in an amount to be determined according to proof.

**ANSWER: CRST denies the allegations in Paragraph 318 of the Complaint.**

319. Plaintiffs hereby demand trial of their claims by jury to the extent authorized by law.

**ANSWER: No response is required to Paragraph 319 of the Complaint**

**The remainder of Plaintiffs' Complaint constitutes their prayer for relief and no response is required. To the extent a response is required, it is denied. Any allegation not specifically admitted herein is denied.**

## AFFIRMATIVE DEFENSES

1. Plaintiffs' Complaint fails to state a claim upon which relief can be granted against Defendant.

2.     Plaintiffs lack standing to bring all or a portion of the claims alleged in the Complaint.

3.     Plaintiffs' claims are barred to the extent that they have failed to timely exhaust the administrative remedies or otherwise timely satisfy the statutory conditions precedent to the claims asserted in the Complaint.

4.     Plaintiffs' claims are barred in whole or in party by the applicable statute of limitations.

5.     All actions taken with respect to Plaintiffs and their employment were made and done in good faith and were based upon legitimate, non-discriminatory and non-retaliatory business reasons.

6.     All actions taken with regard to Plaintiffs were not impermissibly based upon any unlawful consideration or otherwise the result of any unlawful motive.

7.     All actions taken and/or decisions made with regard to Plaintiffs' employment would have been the same regardless of Plaintiffs' complaints of discrimination or harassment; i.e., the same decision defense.

8.     Defendant acted reasonably to prevent any harassing or discriminatory conduct and Plaintiffs failed to act reasonably to take advantage of Defendant's policies and procedures designed to prevent and remedy harassment and discrimination.  Defendant initiated a timely and appropriate investigation into all reported conduct and took prompt action reasonably calculated to end any harassment or discrimination.

9.     To the extent that it is later determined that an employee of Defendant committed any intentional, negligent, or otherwise unlawful act, which has been and is again expressly denied, such acts were committed without the knowledge of Defendant,

were not authorized by Defendant, and were outside the course and scope of the employee's duties. Therefore, Defendant is not liable under the doctrine of respondeat superior or otherwise for the alleged intentional, negligent, or other unlawful acts and conducts of such employee.

10. Even if an employee of Defendant committed any wrongful acts, which has been and is again expressly denied, reasonable care was exercised to prevent such acts and Plaintiffs unreasonably failed to take advantage of the preventive and/or corrective opportunities provided by Defendant or to otherwise avoid harm.

11. The conduct, acts, and/or omissions of the Plaintiffs caused all or part of the damages they purport and now seek.

12. If Plaintiffs have been damaged, other causes have contributed to the same.

13. Plaintiffs' claims for liquidated damages are barred by Defendant's good faith efforts to comply with applicable law.

14. To the extent Plaintiffs have failed to mitigate the damages they now seeks, they are barred, in whole or in part, from recovery in this action.

15. To the extent that Plaintiffs' damages are speculative, such damages are unrecoverable as a matter of law.

16. Plaintiffs are not entitled to equitable relief insofar as they have adequate remedies at law.

17. This lawsuit may not be properly maintained as a class action because Plaintiffs have failed to plead and cannot establish the necessary prerequisites for class treatment.

18. Defendant opposes class certification in this matter and disputes the propriety of class treatment. Defendant asserts each and every affirmative defense set forth above against each and every member of the certified class.

19. Plaintiffs' claims are barred in whole, or in part, by the law of the case doctrine.

20. Plaintiffs' claims are barred in whole, or in part, by the doctrines of claim preclusion and/or issue preclusion.

21. Defendant reserves the right to assert additional affirmative defenses as necessary.

WHEREFORE, having answered the Complaint and asserted its affirmative defenses, Defendant respectfully prays that this Court dismiss Plaintiffs' Complaint in its entirety, and grant any such other relief this Court deems to be fair and equitable.

## DEMAND FOR JURY TRIAL

Defendant hereby demands a trial by jury in the above-entitled matter.

Dated: June 27, 2022

John H. Mathias Jr.
James T. Malysiak
JENNER & BLOCK LLP
353 N. Clark Street
Chicago, IL 60654
jmathias@jenner.com
jmalysiak@jenner.com
Telephone: (312) 222-9350
Facsimile: (312) 527-0484

Jessica Ring Amunson
JENNER & BLOCK LLP
1099 New York Avenue, NW, Suite 900
Washington, DC 20001-4412
jamunson@jenner.com
Telephone: (202) 639-6000
Facsimile: (202) 639-6066

Respectfully submitted:

SIMMONS PERRINE MOYER
BERGMAN PLC

/s/ Kevin J. Visser
Kevin J. Visser AT0008101
Nicholas Petersen AT0012570
115 Third Street SE, Suite 1200
Cedar Rapids, IA 52401-1266
Telephone: (319) 366-7641
Facsimile: (319) 366-1917
kvisser@simmonsperrine.com
npetersen@simmonsperrine.com

*Counsel for Defendant*

## CERTIFICATE OF SERVICE

I hereby certify that on June 27, 2022, I filed the foregoing with the Clerk of Court

using the ECF system, which will send notification to counsel of record.

/s/ Kevin J. Visser